Gerard P. Fox (SBN 151649)
gfox@gerardfoxlaw.com
Timothy Lamoureux (294048)
tlamoureux@gerardfoxlaw.com
Gerard Fox Law P.C.
1880 Century Park East, Suite 1410
Los Angeles, California 90067
Telephone:   (310) 441-0500
Facsimile:   (310) 441-4447

*Attorneys for Plaintiff*
McCandless Group, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| McCandless Group, LLC, a Florida Limited Liability Company<br><br>Plaintiff,<br><br>v.<br><br>The Coy Collective, Inc., a Delaware Corporation;  Jessica  Bartlett,  an individual;  Cristina  Dospassos,  an individual; Corey Lewis, an individual; Robert Hankins, an individual; Thomas Drew,  an  individual;  and  DOES  1 through 50, inclusive,<br><br>Defendants. | Case No.: _____<br><br>**COMPLAINT FOR:**<br>**(1) Misappropriation of Trade Secrets;**<br>**(2) Breach of Contract – Non-Disclosure Agreement;**<br>**(3) Breach of the Implied Covenant of Good Faith and Fair Dealing;**<br>**(4) Breach of Contract against Jessica Bartlett;**<br>**(5) Breach of the Implied Covenant of Good Faith and Fair Dealing;**<br>**(6) Breach of Contract against Cristina Dospassos;**<br>**(7) Breach of the Implied Covenant of Good Faith and Fair Dealing;**<br>**(8) Breach of Contract against The Coy Collective, Inc.;**<br>**(9) Breach of the Implied Covenant of Good Faith and Fair Dealing;**<br>**(10) Fraud against Jessica Bartlett;** |

-1-

COMPLAINT

**(11) Fraud against Corey Lewis, Robert Hankins, and Thomas Drew**
**(12) Fraud against Cristina Dospassos**
**(13) Fraud against The Coy Collective, Inc.**
**(14) Unfair Competition**


**JURY TRIAL DEMANDED**

Plaintiff McCandless Group, LLC ("MG") brings this action against The Coy Collective, Inc. ("Coy"), Jessica Bartlett ("Bartlett"), Cristina Dospassos ("Dospassos"), Corey Lewis ("Lewis"), Robert Hankins ("Hankins"), Thomas Drew ("Drew"), and DOES 1-50 (all together, the "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1.     MG is a victim of former clients turned collaborators who gained Plaintiff's trust before stabbing it in the back. Defendants entered into a business relationship with MG, signing nondisclosure agreements and/or confidentiality clauses, ostensibly to cooperate and grow their businesses together. However, this was never Defendants' plan, as they always had the intent of learning about MG's technology, business model, processes, techniques, and strategies in order to steal them and use them for themselves. They took MG's methods and information obtained through their false pretense of cooperation and started their own competing business, Coy, to subsume MG. Now, MG's very survival as a business is threatened by Defendants' breaches, fraud, misappropriation, and unfair competition.

## PARTIES

2.     Plaintiff McCandless Group, LLC is a limited liability company organized under the laws of Florida with its principal place of business in Miami, Florida. McCandless Group, LLC creates individual websites for models and influencers seeking to monetize their social media following. McCandless Group, LLC creates the websites for its clients and assists them with the technical operations of their website. In exchange, McCandless Group, LLC receives a portion of the revenue that their clients' sites collect each month.

3.     Defendant The Coy Collective, Inc. is a corporation organized under the laws of Delaware. Plaintiff is informed and believes that The Coy Collective, Inc. has its principal place of business in Texas. The Coy Collective, Inc. originally started as a purported partner with McCandless Group, LLC and utilizes the same

website design, technologies, and structure pioneered by McCandless Group, LLC. The Coy Collective, Inc. now operates as a direct competitor to McCandless Group, LLC, hosting websites for models and social media influencers and in exchange receives a portion of each client's monthly revenue. The Coy Collective, Inc. targets major U.S. cities where many models and influencers reside, such as Los Angeles, CA, New York, NY, and Miami, FL.

4.     Defendant Jessica Bartlett is an individual. Plaintiff is informed and believes that Jessica Bartlett is a resident of the County of Los Angeles in the state of California and is the CEO and/or President of The Coy Collective, Inc.

5.     Defendant Cristina Dospassos is an individual. Plaintiff is informed and believes that Cristina Dospassos is a resident of the state of Florida and is acting as an agent for The Coy Collective, Inc.

6.     Defendant Corey Lewis is an individual. Plaintiff is informed and believes that Corey Lewis is a resident of the state of Texas and is acting as an agent for The Coy Collective, Inc.

7.     Defendant Robert Hankins is an individual. Plaintiff is informed and believes that Robert Hankins is a resident of the state of California and is acting as an agent for The Coy Collective, Inc.

8.     Defendant Thomas Drew is an individual. Plaintiff is informed and believes that Thomas Drew is a resident of the state of New York and is acting as an agent for The Coy Collective, Inc.

9.     The true names and capacities of all defendants sued herein as Does 1 through 50 (the "Doe Defendants") are unknown to Plaintiff, who therefore sues such defendants by fictitious names. If necessary, Plaintiff will seek leave of Court to amend this Complaint to state their true names and capacities when the same have been ascertained. Plaintiff is informed and believes, and on that basis alleges, that the Doe Defendants direct, control, ratify, participate in, materially contribute to, profit from, induce, encourage, facilitate, and/or are the moving force behind the

violations of Plaintiff's copyrights or are otherwise liable to Plaintiff as a result of their participation in all or some of the acts set forth hereinafter. Plaintiff is further informed and believes and therefore alleges that each of the Doe Defendants was the agent of at least one of the named defendants, and in doing the things alleged in this Complaint was acting within the course and scope of such agency, and/or acted in concert with at least one of the named defendants and is jointly and severally liable to Plaintiff with said named defendants.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action as a federal question under 28 U.S.C. § 1331, this Court also has jurisdiction over the state law claims pursuant to ancillary, pendant, and supplemental jurisdiction, including under 28 U.S.C. § 1367.

11. This Court has personal jurisdiction over Jessica Bartlett because she is domiciled in California. Jessica Bartlett also entered into at least two contracts with Plaintiff when both Plaintiff and Jessica Bartlett were domiciled in California. These two contracts contain California choice of law provisions. She is also an executive at Coy, and she is operating multiple websites targeting residents of California. These websites involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features.

12. This Court has personal jurisdiction over The Coy Collective, Inc. because it operates multiple websites targeting residents of California. These websites involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features.

13. This Court has personal jurisdiction over Cristina Dospassos because she operates at least one website targeting residents of California. This website involves paid monthly subscriptions, and many of the subscribers are believed to be California

COMPLAINT

residents. This website also contains interactive elements, such as chat features. Cristina Dospassos also entered into at least one contract with Plaintiff when Plaintiff was domiciled in California. This contract contains a California choice of law provision.

14.     This Court has personal jurisdiction over Corey Lewis because he has contacts with California and has purposefully availed himself of California law. Corey Lewis entered into at least one contract with Plaintiff when Plaintiff was domiciled in California. This contract contains a California choice of law provision. In addition, Corey Lewis is, or was at all relevant times, either an executive, part owner, employee, or agent of Coy, and is involved in its business running websites, and his tortious activities complained about were, in part, directly in relation to the creation of these websites. These websites target residents of California and involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features.

15.     This Court has personal jurisdiction over Robert Hankins because he is domiciled in Los Angeles, California. Robert Hankins also entered into at least one contract with Plaintiff when both Plaintiff and Robert Hankins were domiciled in California. The contract contains a California choice of law provision. In addition, Robert Hankins is, or was at all relevant times, either an executive, part owner, employee, or agent of Coy, and is involved in its business running websites, and his tortious activities complained about below were, in part, directly in relation to the creation of these websites. These websites target residents of California and involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features.

16.     This Court has personal jurisdiction over Thomas Drew because he has contacts with California and has purposefully availed himself of California law. Thomas Drew entered into at least one contract with Plaintiff when Plaintiff was domiciled in California. This contract contains a California choice of law provision.

In addition, Thomas Drew is, or was at all relevant times, either an executive, part owner, employee, or agent of Coy, and is involved in its business running websites, and his tortious activities complained about below were, in part, directly in relation to the creation of these websites. These websites target residents of California and involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features.

17.    Venue in this judicial district is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the underlying claims occurred in the Central District of California, and the codefendants do not all reside in the same state. Many of the contracts underlying this action were formed in this district while Plaintiff was domiciled in this district. A substantial part of the underlying tortious activity occurred in this district and its effects were felt in this district. Additionally, at least one defendant is domiciled in the Central District of California.

## COMMON FACTUAL ALLEGATIONS

18.    MG was started by Nick McCandless ("Nick") on June 23, 2014.[1] MG is an innovative technology company that creates individually owned and operated websites for models and social media influencers who wish to monetize their online following. MG builds and hosts websites for its clients, who in turn create and provide exclusive content to subscribers who pay for a monthly subscription to the individual client's website. These subscribers can then also purchase specific premium content, such as photos and videos. In exchange for creating and running their clients' websites, MG receives a percentage of each client's monthly website revenue.

19.    MG consists of a group of skilled and experienced technology experts who have spent years honing their craft. The team spent over a year developing the technology infrastructure and business model underlying MG. Like many startups

---

[1] MG initially began as a California LLC and converted to a Florida LLC on May 18, 2020.

sailing in uncharted waters, MG experienced challenges and threats to its survival. Unlike many startups, MG learned and adapted.

20.    Each of MG's clients enters into a contract with MG called a Website Development Agreement. The agreement spells out the responsibilities of both parties and includes robust confidentiality provisions.

21.    In late 2019, MG approached Jessica Bartlett as a potential client. Bartlett already had a large social media following, and MG offered her the chance to create her own website and monetize her social media brand.

22.    Bartlett entered into a Website Development Agreement with MG on October 27, 2019 ("Bartlett WDA"). Bartlett provided a signed copy to Nick on the same day. The Bartlett WDA is attached and incorporated herein as **Exhibit A**.

23.    A couple of months later, Cristina Dospassos approached MG also as a seemingly typical client. On information and belief, Dospassos is a personal friend of Bartlett and claimed to be referred by her.

24.    Dospassos signed the Website Development Agreement with MG on December 25, 2019 and Nick signed the agreement on December 26, 2019 ("Dospassos WDA"). Dospassos provided a signed copy to Nick the same day. 7The Dospassos WDA is attached and incorporated herein as **Exhibit B**.

25.    On May 6, 2020, Bartlett sent a text message to Nick with a business proposal for MG. She had an idea to create a new company that would provide management and other services to models, such as arranging for professional photo shoots and video shoots, provide assistance with social media marketing, and brand management.[2] Meanwhile, MG would provide the same services it already offered, such as supplying the websites, technology, payment processing, technical support, and protecting the exclusivity of subscribed content.

---

[2] This business eventually was formed as The Coy Collective, Inc.

26.     According to Bartlett, she already had investors lined up and business partners who were excited about the prospect of working with MG.

27.     MG perceived Bartlett's offer as an opportunity to expand the business and its revenue base, and it appeared by all accounts to be a mutually beneficial business arrangement.

28.     On May 9, 2020, Bartlett arranged for a phone call with Nick, Bartlett, and Corey Lewis. Bartlett described Lewis as one of her main business partners. During the call, Nick marketed his business by telling them what services he would be able to provide them if they worked together.

29.     On May 16, 2020, Nick had another call with Lewis and Bartlett in which they all agreed to a basic set of terms for working together. These were clarified over text messages exchanged between Nick and Lewis over the next few days.

30.     Given that Bartlett and Lewis had a clear and concrete plan for a future business but had not yet formed a company, MG began doing business with Bartlett and her business partners and investors directly in anticipation of her business being created.

31.     In order for the cooperative effort to work, Nick and MG would need to share MG's technologies, designs, business practices, strategies, techniques, processes, and financial information with Bartlett and Lewis, as well as Bartlett's other business partners, Robert Hankins and Thomas Drew. To protect the confidentiality of this information, Bartlett and her business partners were required to sign non-disclosure agreements ("NDAs") with MG, guaranteeing that they would keep this sensitive information in confidence and never use it to compete directly with MG.

COMPLAINT

32.     Bartlett signed an NDA with MG on May 21, 2020 and provided a copy to Nick on the same day.[3] This NDA is attached and incorporated herein as **Exhibit C**.

33.     Several of Bartlett's business partners also signed NDAs on May 21, 2020 that they provided to Nick on the same day, including Lewis, Hankins, and Drew. Their NDAs are attached and incorporated herein as **Exhibits D**, **E**, and **F**, respectively.

34.     After the NDAs were signed, MG shared its confidential information with Bartlett and her partners, Lewis, Hankins, and Drew. This occurred over the next several months in various emails, text message exchanges, and phone calls.

35.     MG had spent over a year developing its technology and refining its overall structure and processes. MG had also made mistakes along the way, necessitating expensive and time-consuming changes in the way MG conducted its business. In an instant, all of that immediately went to Bartlett and the others with an expectation and understanding that the parties would be working together and mutually benefit from MG's collective blood, sweat, and tears.

36.     On June 9, 2020, Bartlett formed The Coy Collective, Inc. as a Delaware corporation. As far as MG and Nick were aware, Coy was only going to operate in the manner originally described by Bartlett—offering additional services to models beyond what MG already provided, while MG continued to operate the underlying technology.

37.     MG would create and host the web platform that Coy would use. MG had Coy sign a separate Website Development Agreement for this new site. As CEO of Coy, Bartlett signed the agreement on behalf of Coy on August 6, 2020 ("Coy WDA"). Bartlett on behalf of Coy provided the signed agreement to Nick, representing MG, the same day. This agreement is attached and incorporated herein as **Exhibit G**. As

---

[3] Several other people associated with Coy signed NDAs with MG, including Corey Lewis, Joshua Chery, Robert Hankins, and Thomas Drew.

with the other Website Development Agreements, the agreement with Coy contained confidentiality provisions and limited Coy's use of MG's information and technology to the uses within the agreement.

38.    With all of the agreements in place, MG shared additional confidential information with Coy, both directly and through Jessica, Lewis, Hankins, and Drew, each of whom had already signed NDAs with MG.

39.    MG then assisted Coy with setting up its website, operating its subscription and payment processing system, and implementing the same processes and technology underlying MG itself. MG also assisted with ensuring that Coy was performing the necessary legal compliance work for its models, assisted with setting up Coy's revenue structure, and continued to answer day-to-day questions on how to successfully run the business. This saved Coy at least twelve months of development and growing pains that could have led to Coy's demise before it ever began operating in earnest.

40.    Between August 2020 and early September 2020, Bartlett approached MG about having Coy host websites for Bartlett and Dospassos and then have Coy handle some of the revenue for both of them as well. Without rescinding any existing agreements with MG, MG worked in good faith to try to accommodate Bartlett's requests as part of the ongoing cooperative effort between MG and Coy.

41.    MG operated in good faith under the belief that all parties would benefit in a cooperative relationship. However, by the autumn of 2020, it was becoming clear to MG that Coy, Bartlett, and the others never had any intention of including MG in their plans.

42.    MG had been in discussions with potential clients who were considering signing agreements with MG. Coy intercepted them and convinced them to join Coy instead. In response, MG sent a letter to Coy in early November 2020 reminding Coy, Bartlett, and the others of their responsibilities under the agreements they had signed.

43.     Instead of cooperating and following the agreements and overall understanding they made with MG, Bartlett and Coy, collectively, ratcheted up their efforts to use MG's innovations and secrets against it. This included a marketing push where Bartlett used MG's systems and techniques, obtained through confidentiality agreements, to gain traction and notoriety for Coy. For instance, Bartlett was featured in magazine articles promoting Coy in October 2020 and November 2020 in which she bragged about coming up with original business ideas for Coy that MG had already created and implemented more than a year earlier. Attached hereto as **Exhibit H** is a copy of a November 2, 2020 Maxim Magazine article accessible online in which Bartlett discusses Coy.

44.     On or about November 3, 2020, Bartlett sent a text message to MG stating her intention to break the partnership arrangement. MG responded with a letter reminding Bartlett that the Bartlett WDA had already renewed for 12 months, and the Dospassos WDA was already within the 90-day renewal period.

45.     On November 19, 2020, Coy's legal counsel sent a letter to MG announcing Coy's intention to claim website URLs, subscriber data, and payment processing systems, and completely cut itself off from MG. Coy also suggested it wanted to select a neutral mediator to sort help with the dispute. Attached hereto as **Exhibit I** is a copy of the letter from Coy's counsel. On December 2, 2020, Plaintiff's counsel responded to Coy's letter by requesting to use JAMS mediators in either California, New York, or Florida. Coy never responded to this letter. Attached hereto as **Exhibit J** is a copy of the letter to Coy from Plaintiff's counsel.

46.     On January 5, 2021, Plaintiff's counsel sent a letter to Bartlett requesting mediation. Attached hereto as **Exhibit K** is a copy of the letter to Bartlett from Plaintiff's counsel. On January 7, 2021 Plaintiff's counsel sent a similar letter to Dospassos also requesting mediation. Attached hereto as **Exhibit L** is a copy of the letter to Dospassos from Plaintiff's counsel. Nevertheless, counsel for Bartlett and Dospassos did not mention mediation and did not respond until February 2, 2021 after

prodding by Plaintiff's counsel. Attached hereto as **Exhibit M** is a copy of the response from counsel for Bartlett and Dospassos.

47.    In the letters sent by Plaintiff's counsel, there were three requests for selection of a mediator, all of which were ignored. Plaintiff warned in its January letters that a failure to comply would be seen as a refusal to select a mediator. Thus, Plaintiff attempted in good faith to select a mediator with Defendants, and all such attempts have failed. The Web Development Agreements on their face do not require mediation be completed before bringing any claims, but even if they did, Plaintiff's attempt to select a mediator proved unsuccessful thereby releasing Plaintiff from any further obligation to pursue this mechanism under the agreement.

48.    With MG's technology and processes in place for Coy's own website, Coy had no further use for MG. Defendants took MG's know-how and negative know-how regarding the design and structure of individual websites for social media influencers and models, the actual underlying technology behind those websites, the cost and accounting structure, the revenue model, successful and unsuccessful marketing and monetization approaches, successful and unsuccessful payment processing approaches, and the technical implementation of the above.

49.    Coy now operates as a direct competitor to MG, using MG's own technologies, techniques, and strategies that had been developed and honed for over a year and were shared only on the basis of an understanding of cooperation. As recently as March 4, 2021, Bartlett wrote an update on her Instagram profile where she stated, "From [Coy's] inception, our main focus was that of a technology company, however we quickly realized that we excelled in model management as well." Attached hereto as **Exhibit N** is a copy of this Instagram post. This is the exact opposite of what Bartlett, Coy, and its other founders represented to MG. They clearly indicated that MG would handle the technology business, and Coy would handle the modeling side. Bartlett, in this post, is admitting that her intention was the exact opposite of what she originally represented. Coy's real raison d'être is further clarified by Bartlett's

exposition in the same post that she would be founding a new business called Verge for model management, which is the *exact* business she told MG she intended Coy to be. From inception, Coy was always going to be a competing technology company.

50.    Thus, Coy is transparently not, nor was it ever planned to be, what Bartlett, Coy, and its executives/investors represented when they were obtaining MG's valuable information, including trade secrets, and now they are taking credit for MG's work and innovations to further drum up business at MG's expense in the marketplace. Bartlett and Coy have also reached out to existing MG clients requesting that they terminate their existing contract or relationship with MG and instead use Coy exclusively. With this new development, MG has no choice but to initiate this litigation.

51.    Coy, Bartlett, Dospassos, Lewis, Hankins, and Drew all continue to use MG's technology and confidential information in direct violation of their agreements. They each profit themselves at MG's expense. MG's business is its software and processes. That business has been stolen and its assets hijacked, and now, after this perfidious scheme, MG faces an existential threat from Coy using its own innovations against it.

## **FIRST CAUSE OF ACTION**

### **Misappropriation and Threatened Misappropriation of Trade Secrets – Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1836 *et eq.* (Against All Defendants)**

52.    Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 51 set forth above.

53.    MG possesses and owns trade secrets, including know-how and negative know-how regarding creating and operating a successful technology company in the area of individualized websites for social media influencers and models. This includes MG's design and structure of the websites, the actual underlying technology behind

those websites, the cost and accounting structure, the revenue model, successful and unsuccessful marketing and monetization approaches, successful and unsuccessful payment processing approaches, and the technical implementation of the above.

54.     MG's trade secrets also include "existing or contemplated business, processes and services, techniques, components, sales, markets, costs, profits, research, development, inventions, purchasing, staff, employees, compensation, contractors, suppliers, customers, prospects, marketing, pricing policies, financial information, engineering and all other data." **Exhibit C**, ¶ 1.

55.     These trade secrets are the result of over a year of business experience, research, and trial and error, in addition to specialized knowledge and skills developed over the course of several years prior.

56.     MG relies on these trade secrets in order to conduct business and directly gains economic value from this information. MG relies on keeping this information secret because their business quite literally *is* their software and expertise. MG created a system of technology and business processes in which the whole is greater than the sum of its parts.

57.     MG operates primarily on the internet and therefore its trade secrets are used in interstate commerce.

58.     MG's confidential trade secrets are subject to extensive efforts to maintain its secrecy and confidentiality. These efforts include the following:

      a.  Requiring customers, clients, and business partners to sign NDAs and/or other contracts containing confidentiality provisions that prevent using the confidential information or disclosing it to third parties.

      b.  Restricting information to a "need to know" basis for those who require the information to perform their jobs.

      c.  Securing the information with technical safeguards, such as passwords and user accounts with access based on the user's role.

    d.  MG's clients only see information related to their own websites and revenue.

    e.  Source code and proprietary technology is stored on encrypted disk drives.

59.    Bartlett, Lewis, Hankins, and Drew wrongfully obtained trade secrets from MG by misrepresenting their true aims and signing NDAs to which none of them ever had intention of adhering. Though Bartlett and her business partners had originally claimed to be working with MG in a cooperative, mutually beneficial arrangement, Bartlett and her business partners Lewis, Hankins, and Drew always intended to steal MG's information in order to benefit from MG's experience and expertise, and ultimately, in order to compete against MG directly.

60.    Dospassos also obtained confidential trade secrets of MG's and entered into a contract with robust confidentiality provisions. Dospassos contracted with MG in order to obtain MG's proprietary technology and confidential information, which she then provided to Bartlett, Coy, and others. Dospassos' use of the trade secrets she obtained pursuant to her confidential agreements, as well as other confidential information from those who signed the NDAs, constitutes a wrongful use of the trade secrets.

61.    Coy misappropriated the information by acquiring MG's trade secrets from Bartlett, Dospassos, Lewis, Hankins, and Drew, which all Defendants knew was information protected by NDAs and the confidentiality provisions in the Website Development Agreements entered into by Bartlett, Dospassos, and Coy. Coy also obtained confidential trade secrets from MG despite entering into a contract with MG with robust confidentiality provisions. Coy is improperly using MG's trade secrets to directly compete against MG.

62.    By utilizing MG's confidential information, including its technological and business structure, and its know-how and negative know-how, Defendants were able to become a competitor overnight. Essentially, Defendants were able to operate

and compete without the need to spend time, effort, and money developing and implementing the technology, technical structure, business models, payment processing structure, and more. Unlike MG, Coy was not exposed to the risk and expense of developing these trade secrets on its own, and it did not experience growing pains. In other words, by taking valuable information from MG, Coy and the Defendants were able to take a sure thing—a tried-and-true business—and claim it for themselves.

63.     Defendants also obtained valuable confidential information such as MG's costs and pricing structure that is used and shared in order to compete unfairly against MG. On information and belief, Coy, Bartlett, Lewis, Hankins, and Drew have also been improperly disclosing MG's trade secrets to others, such as, but not limited to, Dospassos, in order to better run their websites and compete.

64.     Defendants use, and threaten to continue to use, MG's trade secrets in interstate commerce in order to interfere with MG's relationships with its current clients, attempt to recruit MG's existing clients, disrupt MG's business, and compete unfairly against MG until MG eventually can no longer continue to conduct business.

65.      Defendants have each improperly used the trade secrets misappropriated from MG to harm MG's existing business relationships and compete directly against MG, resulting in financial and reputational harm to MG.

66.     Defendants have each been unjustly enriched by using MG's confidential trade secrets to run a competing business using MG's own information, processes, and technology.

67.     MG has been harmed by this misappropriation. Each and every wrongful acquisition, use, and disclosure of MG's confidential information was and continues to be a substantial factor in causing MG's harm. Defendants' use of MG's trade secrets threatens its MG's very survival as a business and monetary damages alone are an inadequate remedy.

68.    Defendants' misappropriation was willful and malicious, and MG is entitled to an award of exemplary damages and reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(C) and (D).

## SECOND CAUSE OF ACTION

### Breach of Contract – Non-Disclosure Agreements (California Law)
### (Against Jessica Bartlett, Corey Lewis, Robert Hankins, and Thomas Drew)

69.    Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 51 set forth above.

70.    Bartlett, Lewis, Hankins, and Drew signed NDAs with MG on May 21, 2020 in order to protect MG's confidential information. Thus, Bartlett, Lewis, Hankins, and Drew each entered into binding and valid contracts with MG. MG could share its confidential business information with Bartlett and the others who had signed NDAs in anticipation of a joint collaboration. In exchange, Bartlett, Lewis, Hankins, and Drew would each keep all information they received in the highest confidence by not disclosing it to third parties, and they all agreed not to use the information themselves.

71.    MG performed all, or substantially all, of the elements of its end of the NDAs, including sharing MG's technology, business model, strategies, processes, and techniques with Bartlett, Lewis, Hankins, and Drew in anticipation of a collaborative relationship.

72.    All conditions required by the contract for Bartlett, Lewis, Hankins, and Drew performance on their respective NDAs were met.

73.    MG's confidential information is defined as including "existing or contemplated business, processes and services, techniques, components, sales, markets, costs, profits, research, development, inventions, purchasing, staff, employees, compensation, contractors, suppliers, customers, prospects, marketing,

pricing policies, financial information, engineering and all other data." **Exhibit C**, ¶ 1. It also includes all proposals and information and data furnished by MG. *Id.*

74.     Among other things, each NDA prohibits Bartlett, Lewis, Hankins, and Drew from using MG's confidential information for any purpose other than evaluating and negotiating a proposed transaction, or in other words outside of the cooperative relationship between Coy and MG. *Id.* at ¶ 4.

75.     Bartlett, Lewis, Hankins, and Drew each violated this provision by using MG's confidential information, including, but not limited to, financial information, inventions, technology, processes, services, and techniques to form a competing business utilizing MG's confidential information, acts specifically prohibited by the NDAs that they signed.

76.     Each NDA also requires Bartlett, Lewis, Hankins, and Drew to return all original confidential information provided by MG and destroy all "copies, reproductions, summaries, compilations, analyses, and extracts thereof or based thereon" upon MG's request. *Id.* at ¶ 10.

77.     MG has reminded Bartlett of this requirement in multiple written communications, but Bartlett's only response has been to feign ignorance. She has refused and continues to refuse to return or destroy MG's confidential information she has in her possession and refuses to acknowledge she possesses any such confidential information.

78.     MG has been damaged by Bartlett, Lewis, Hankins, and Drew's past and continuing breaches of the NDAs. MG shared confident information in order to cooperate with Coy to the benefit of both companies. Instead, Coy is using MG's own confidential information to undermine MG.

79.     Bartlett, Lewis, Hankins, and Drew's breaches of their NDAs with MG have caused, and continue to cause, immense damage to MG. Bartlett, Lewis, Hankins, and Drew's breaches were and continue to be significant causes of this damage to Plaintiff.

### THIRD CAUSE OF ACTION

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

**(California Law)**

**(Against Jessica Bartlett, Corey Lewis, Robert Hankins, and Thomas Drew)**

80.    Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 51 set forth above.

81.    Bartlett, Lewis, Hankins, and Drew signed NDAs with MG on May 21, 2020 in order to protect MG's confidential information. Thus, Bartlett, Lewis, Hankins, and Drew each entered into binding and valid contracts with MG. MG could share its confidential business information with Bartlett and the others who had signed NDAs in anticipation of a joint collaboration. In exchange, Bartlett, Lewis, Hankins, and Drew would each keep all information they received in the highest confidence by not disclosing it to third parties, and they all agreed not to use the information themselves.

82.    MG performed all, or substantially all, of the elements of its end of the NDAs, including sharing MG's technology, business model, strategies, processes, techniques, know-how and negative know-how with Bartlett, Lewis, Hankins, and Drew in anticipation of a collaborative relationship.

83.    All conditions required by the respective contracts for Bartlett, Lewis, Hankins, and Drew's performance on their respective NDAs were met.

84.    Every contract contains a covenant of good faith and fair dealing.

85.    One main purpose of the NDAs is to prevent MG's confidential information from ending up in the hands of competitors.

86.    Bartlett, Lewis, Hankins, and Drew have unfairly interfered with MG's right to receive the benefits of the NDAs by creating a direct competitor and using the confidential information against MG in defiance of the obvious, core purpose of the NDA.

87.     Such actions frustrate the purpose of the NDAs and unfairly interfere with MG's rights to receive the benefits of the contract—namely to prevent MG's information from ending up in the hands of competitors. In other words, *becoming* a competitor with all of MG's confidential information clearly defies the purpose of the agreement. The good faith performance of the NDAs would be to not use the confidential information against MG.

88.     MG was harmed, and continues to be harmed, by Bartlett, Lewis, Hankins, and Drew's conduct. MG would never have shared information that could be used to harm MG if it had known that Bartlett, Lewis, Hankins, and Drew actually entered into the contract in bad faith and for the purpose of competing directly with MG.

89.     Bartlett, Lewis, Hankins, and Drew's breaches of the implied covenant of good faith and fair dealing was willful, malicious, oppressive, fraudulent, and reckless and justifies an award of punitive damages.

## FOURTH CAUSE OF ACTION

### Breach of Contract – Website Development Agreement (California Law)
### (Against Jessica Bartlett)

90.     Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 51 set forth above.

91.     Bartlett entered into the Bartlett WDA with MG on October 27, 2019, which is a valid and binding contract. **Exhibit A**.

92.     The Bartlett WDA provides that MG will create a website for Bartlett's use but will retain ownership of all intellectual property rights. MG would also handle copyright infringement issues that arise. In exchange, Bartlett would be able to use her own independent website and earn revenue from that website. MG also was also entitled to a certain percentage of the revenue earned by Bartlett's website. Finally, the agreement ensured a certain level of exclusivity.

-21-
COMPLAINT

93.    The Bartlett WDA also contains a California choice of law clause. **Exhibit A**, ¶ 12.

94.    MG performed all, or substantially all, of the elements of its end of the Bartlett WDA, including sharing creating a website, providing use of MG's technology, ensuring infringed images of Bartlett protected by copyright were taken down, and providing a platform for Bartlett to monetize her online following.

95.    All conditions required by the contract for Bartlett's performance were met.

96.    The Bartlett WDA automatically renews each year unless one party provides written notice of intent not to renew at least 90 days before its renewal period begins. **Exhibit A**, ¶ 3.1.

97.    The Bartlett WDA also has an integration clause that limits modifications to the agreement only by a written instrument executed by the parties. (Exhibit A, ¶ 13(a.)

98.    Bartlett's contract renewed for another twelve-month period on October 27, 2020 because she had never provided a contractually adequate notice within the possible cancellation period of the Bartlett WDA.

99.    Nonetheless, Bartlett refuses to pay for any of the services she agreed MG would provide under the agreement, and to the extent she claims to have terminated the agreement, it is through improper means. As such, Bartlett has breached the contract by refusing to accept services for which she agreed to pay and then by improperly attempting to terminate the contract despite its clear terms.

100.   The Bartlett WDA also has robust confidentiality provisions designed to protect confidential information to which Bartlett may have access or otherwise come across. **Exhibit A**, § 5.

101.   In breach of section 5 of the Bartlett WDA, Bartlett shared confidential information belonging to MG and covered by the Website Development Agreement.

She also used, and continues to use, this confidential information to compete against MG using, among other things, MG's own technologies, processes, and strategies.

102. Bartlett's breaches of the Bartlett WDA have caused, and continue to cause, immense damage to MG. Bartlett's breaches are significant causes of this damage to Plaintiff.

103. Bartlett's breaches of contract were and continue to be a substantial factor in causing MG's harm.

## FIFTH CAUSE OF ACTION

**Breach of the Implied Covenant of Good Faith and Fair Dealing – Website Development Agreement (California Law)**

**(Against Jessica Bartlett)**

104. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 51 set forth above.

105. Bartlett entered into Bartlett WDA on October 27, 2019, which is a valid and binding contract. **Exhibit A**.

106. The Bartlett WDA provides that MG will create a website for Bartlett's use but will retain ownership of all intellectual property rights. MG would also handle copyright infringement issues that arise. In exchange, Bartlett would be able to use her own independent website and earn revenue from that website. MG also was also entitled to a certain percentage of the revenue earned by Bartlett's website. Finally, the agreement ensured a certain level of exclusivity.

107. The Bartlett WDA contains a California choice of law clause. **Exhibit A**, ¶ 12.

108. MG performed all, or substantially all, of the elements of its end of the Bartlett WDA, including sharing creating a website, providing use of MG's technology, ensuring infringed images of Bartlett protected by copyright were taken down, and providing a platform for Bartlett to monetize her online following.

109.   All conditions required by the contract for Bartlett's performance were met.

110.   Every contract contains a covenant of good faith and fair dealing.

111.   Bartlett has taken confidential information and technology owned by MG in order to create a competing business that harms MG instead of working in a mutually beneficial collaboration.

112.   Such actions frustrate the purpose of the Bartlett WDA and unfairly interfere with MG's rights to receive the benefits of the contract—namely to prevent MG's information from ending up in the hands of competitors. In other words, the good faith performance of the Bartlett WDA would be to not use the confidential information against MG.

113.   Bartlett has unfairly interfered with MG's right to receive the benefits of the Bartlett WDA by creating a direct competitor and using the confidential information obtained in the course of the agreement with MG.

114.   MG was harmed, and continues to be harmed, by Bartlett's conduct. MG would never have shared information that could be used to harm MG if it had known that Bartlett actually entered into the contract in bad faith and for the purpose of competing directly with MG.

115.   Bartlett's breach of the implied covenant of good faith and fair dealing was willful, malicious, oppressive, fraudulent, and reckless and justifies an award of punitive damages.

## SIXTH CAUSE OF ACTION

**Breach of Contract – Website Development Agreement (California Law)**
**(Against Cristina Dospassos)**

116.   Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 51 set forth above.

117.  Dospassos entered into the Dospassos WDA with MG on December 26, 2019, which is a valid and binding contract. **Exhibit B**.

118.  The Dospassos WDA provides that MG will create a website for Dospassos' use but will retain ownership of all intellectual property rights. MG would also handle copyright infringement issues that arise. In exchange, Dospassos would be able to use her own independent website and earn revenue from that website. MG also was also entitled to a certain percentage of the revenue earned by Dospassos' website. Finally, the agreement ensured a certain level of exclusivity.

119.  The Dospassos WDA contains a California choice of law clause. **Exhibit B**, ¶ 12.

120.  MG performed all, or substantially all, of the elements of its end of the Dospassos WDA, including sharing creating a website, providing use of MG's technology, ensuring infringed images of Dospassos protected by copyright were taken down, and providing a platform for Dospassos to monetize her online following.

121.  All conditions for Dospassos' performance had been met.

122.  The agreement automatically renews each year unless one party provides written notice of intent not to renew at least 90 days before it renews. **Exhibit B**, ¶ 3.1.

123.  The agreement also has an integration clause that limits modifications to the agreement only by a written instrument executed by the parties. **Exhibit B**, ¶ 13(a).

124.  The Dospassos WDA renewed on December 25, 2020 because Dospassos had never provided a contractually adequate termination notice within the possible cancellation period of the Dospassos WDA.

125.  Nonetheless, Dospassos refuses to pay for any of the services she agreed MG would provide under the agreement, and to the extent she claims to have terminated the agreement, it is through improper means. As such, Dospassos has breached the contract by refusing to accept services for which she agreed to pay and then by improperly attempting to terminate the contract despite its clear terms.

126.  The Dospassos WDA also has robust confidentiality provisions designed to protect confidential information to which Dospassos may have access or otherwise come across. **Exhibit B**, § 5.

127.  In breach of § 5 of the Dospassos WDA, Dospassos shared confidential information belonging to MG and covered by the Dospassos WDA. She also used, and continues to use, this confidential information to compete against MG using, among other things, MG's own technologies, processes, and strategies.

128.  Dospassos' breaches of the Dospassos WDA have caused, and continue to cause, immense damage to MG. Dospassos' breaches are significant causes of this damage to Plaintiff.

129.  Dospassos' breaches of contract have been and continue to be a substantial factor in the harm suffered by MG.

## SEVENTH CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (California Law)

### (Against Cristina Dospassos)

130.  Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 51 set forth above.

131.  Dospassos entered into the Dospassos WDA with MG on December 26, 2019, which is a valid and binding contract. **Exhibit B**.

132.  The Dospassos WDA provides that MG will create a website for Dospassos' use but will retain ownership of all intellectual property rights. MG would also handle copyright infringement issues that arise. In exchange, Dospassos would be able to use her own independent website and earn revenue from that website. MG also was also entitled to a certain percentage of the revenue earned by Dospassos' website. Finally, the agreement ensured a certain level of exclusivity.

133.  The Dospassos WDA contains a California choice of law clause. **Exhibit B**, ¶ 12.

134.  MG performed all, or substantially all, of the elements of its end of the Dospassos WDA, including sharing creating a website, providing use of MG's technology, ensuring infringed images of Dospassos protected by copyright were taken down, and providing a platform for Dospassos to monetize her online following.

135.  All conditions required by the contract for Dospassos' performance were met.

136.  Every contract contains a covenant of good faith and fair dealing.

137.  Dospassos has taken confidential information and technology owned by MG in order to create a competing business that harms MG instead of working in a mutually-beneficial collaboration.

138.  Such actions frustrate the purpose of the Dospassos WDA and unfairly interfere with MG's rights to receive the benefits of the contract—namely to prevent MG's information from ending up in the hands of competitors. In other words, the good faith performance of the Dospassos WDA would be to not use the confidential information against MG.

139.  Dospassos has unfairly interfered with MG's right to receive the benefits of the Dospassos WDA by working with Bartlett to create a direct competitor and using the confidential information learned through the course of the agreement against MG.

140.  MG was harmed, and continues to be harmed, by Dospassos' conduct. MG would never have shared information that could be used to harm MG if it had known that Dospassos actually entered into the contract in bad faith and for the purpose of competing directly with MG.

141.  Dospassos' breach of the implied covenant of good faith and fair dealing was willful, malicious, oppressive, fraudulent, and reckless and justifies an award of punitive damages.

# EIGHTH CAUSE OF ACTION

## Breach of Contract – Website Development Agreement (Florida Law)

## (Against Coy)

142.  Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 51 set forth above.

143.  Coy entered into the Coy WDA with MG on August 6, 2020, which is a binding and valid written contract. **Exhibit G**. This agreement was similar to the agreements MG entered into with Bartlett and Dospassos. The major difference is that it was anticipated that Coy would have multiple sub-users, each with their own websites operating in connection with the main Coy website. Another difference is that the agreement could be terminated by either party upon 30 days written notice. **Exhibit G**, ¶ 3.1.

144. As with the other agreements, MG maintained ownership of all intellectual property. MG would also handle copyright infringement issues that arise. In exchange, Coy would be able to offer its clients use of their own independent websites from which they could earn revenue. MG would be entitled to a certain amount of the revenue earned by the Coy website family that scaled up with its usage and popularity. Finally, the agreement ensured a certain level of exclusivity.

145. Unlike the other Website Development Agreements, the Coy WDA contains a Florida choice of law clause. **Exhibit G**, ¶ 12.

146. MG performed all, or substantially all, of the elements of its end of the Coy WDA, including sharing creating a website, providing use of MG's technology, ensuring images infringing on Coy's copyrights were taken down, and providing a platform for Coy to allow its clients to create their own websites under the Coy and MG banners.

147.  All conditions for Coy's performance had been met.

148.  Coy committed a material breach of the contract when it utilized its website to directly compete against MG, and Coy continues to compete against MG using MG's own technology, processes, and strategies.

149.  In violation of the Coy WDA, Coy has continued to use MG's software and services even though the agreement specifically states that MG will retain all ownership.

150.  The Coy WDA also has robust confidentiality provisions designed to protect confidential information to which Coy may have access or otherwise come across. **Exhibit G**, § 5.

151.  In breach of § 5 of the Coy WDA, Coy shared confidential information belonging to MG and covered by the Coy WDA. Coy also used, and continues to use, this confidential information to compete against MG using, among other things, MG's own technologies, processes, and strategies.

152.  MG suffered, and continues to suffer, damages caused by Coy's breach of its agreement with MG.

## NINTH CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing (Florida Law)
### (Against Coy)

153.  Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 51 set forth above.

154.  Coy entered into the Coy WDA with MG on August 6, 2020, which is a binding and valid written contract. **Exhibit G**. This agreement was similar to the agreements MG entered into with Bartlett and Dospassos. The major difference is that it was anticipated that Coy would have multiple sub-users with their own websites operating in connection with the main Coy website. Another difference is that the Coy WDA could be terminated by either party upon 30 days written notice. **Exhibit G**, ¶ 3.1.

155. As with the other agreements, MG maintained ownership of all intellectual property. MG would also handle copyright infringement issues that arise. In exchange, Coy would be able to offer its clients use of their own independent websites from which they could earn revenue. MG would be entitled to a certain percentage of the revenue earned by the Coy website family. Finally, the agreement ensured a certain level of exclusivity.

156. The Coy WDA contains a Florida choice of law clause. **Exhibit G**, ¶ 12.

157. Every contract contains a covenant of good faith and fair dealing.

158. The Coy WDA is ambiguous about the permissibility or scope of the conduct engaged in by Coy. It was not anticipated that Coy was a wolf in sheep's clothing.

159. Coy consciously and deliberately failed and refused to adhere to the Coy WDA it entered into with MG and refuses to discharge its contractual responsibilities that unfairly frustrates the contract's purpose. The purpose had been to operate in a cooperative, mutually beneficial manner with Coy and MG each taking different roles.

160. Coy's actions result in disappointing MG's expectations, as it had expected a cooperative relationship in which MG's innovations, contributions, intellectual property, know-how, and negative know-how would be recognized and for which MG would be compensated in the form of a long-running cooperative effort.

161. Coy's unfair and bad faith actions have breached the implied covenant of good faith and fair dealing. The epitome of bad faith is to take technology, know-how, and information obtained only by feigning collaboration and then turning around to use it against the party with whom one is in privity, as happened here.

162. MG was harmed, and continues to be harmed, by Coy's conduct. MG would never have shared information that could be used to harm MG if it had known that Coy actually entered into the contract in bad faith and for the purpose of competing directly with MG.

163.  Coy's breach of the implied covenant of good faith and fair dealing was willful, malicious, oppressive, fraudulent, and reckless and justifies an award of punitive damages.

### TENTH CAUSE OF ACTION

**Fraud (California Law)**

**(Against Jessica Bartlett)**

164.  Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 51 set forth above.

165. Bartlett knowingly made false statements regarding her true motives behind soliciting MG's help with starting Coy and operating Coy. Beginning May 6, 2020 and continuing on through the end of October 2020, Bartlett negotiated with MG and sought information from MG through multiple emails, text messages, phone calls, and even actual contracts. In these communications, Bartlett claimed that she wanted to partner with MG for their mutual gain. In actuality she simply sought information and technology from MG in order to create a competing business. She thus deceived MG in order to make her own company using technology and information gained from MG.

166. On October 27, 2019, Bartlett made promises to MG in the form of signing the Bartlett WDA with MG. When entering into the agreement, Bartlett never had any intention of performing her end of the bargain.

167.  On May 21, 2020 Bartlett made promises to MG in the form of signing an NDA. When entering into the agreement, Bartlett never had any intention of performing her end of the bargain.

168.  Bartlett later concealed the fact that she was actually setting Coy up to compete against MG using MG's own information and technology structure against it.

169.  Bartlett intended MG to rely on her misrepresentations, including her promise to keep MG's confidential information secret, so that MG would share its

-31-

COMPLAINT

confidential information with her and provide her the necessary information to run her own competing business. Bartlett made her original intention and her knowing falsity very clear when on March 4, 2021 she posted an Instagram update where she stated she always viewed Coy as a technology company first. *See*, *supra*, ¶ 49. Her intention, as described in her post, is the *opposite* of what she represented to MG. Had MG known the truth, it never would have associated with or done any business with Bartlett.

170.  MG actually relied on the statements and promises made by Bartlett, including the NDA and the earlier Website Development Agreement between Bartlett and MG. On the basis of the NDA, phone calls, and text messages from Bartlett, MG shared confidential information and provided assistance with creating and operating Coy.

171.  MG's reliance on Bartlett's statements and promises was justifiable in light of MG's knowledge and experience. Others associated with MG had adhered to their agreements and kept information confidential. Moreover, MG believed that all parties involved stood to gain from the cooperative effort.

172.  MG has been harmed in that it was deceived into sharing its technology and expertise that was ultimately used to compete directly with MG using its own business model and own technology.

173.  The extent of the harm remains to be seen absent discovery showing the extent of Coy's reach after stealing Plaintiff's information and business. Bartlett may have also damaged many of MG's existing client relationships. However, MG has been harmed by at least $1.5 million, based on calculating MG's costs over the last year to develop and refine the technology, know-how, and confidential information that was fraudulently obtained as well as the opportunity costs associated with time spent collaborating that could have been spent either on client relations or collaborating with good-faith individuals and businesses.

174.  Bartlett's conduct was intentional, malicious, and fraudulent, justifying the award of punitive and exemplary damages.

175.  MG's reliance on Bartlett's false statements and false promises was, and continues to be, a substantial factor in causing its harm.

## ELEVENTH CAUSE OF ACTION

### Fraud (California Law)

### (Against Corey Lewis, Robert Hankins, and Thomas Drew)

176.  Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 51 set forth above.

177.  On May 21, 2020 Lewis, Hankins, and Drew each made promises to MG in the form of signing NDAs. When entering into these agreements, Lewis, Hankins, and Drew never had any intention of performing these promises. They were already in league with Bartlett to take MG's technology, information, and business model for themselves.

178.  Lewis knowingly made false statements regarding his true motives, including in multiple phone calls and text messages. Lewis also concealed the fact that he, Bartlett, and the others were setting Coy up to compete directly against MG.

179.  Lewis, Hankins, and Drew intended MG to rely on their misrepresentations, and particularly their false promises in the NDAs they signed, so that MG would share its confidential information and assist with creating Coy. Bartlett made Coy's founders' original intention and their knowing falsity very clear when on March 4, 2021 she posted an Instagram update where she stated she always viewed Coy as a technology company first. *See*, *supra*, ¶ 49. Coy's founders' intention, as described in Bartlett's post, is the exact *opposite* of what they represented to MG. Had MG known the truth, it never would have associated with or done any business with Lewis, Hankins, or Drew.

180.  MG actually relied on the NDAs to keep its confidential information out of the hands of competitors. On that basis, MG shared confidential information and provided assistance with creating and operating Coy.

181.  MG's reliance on the NDAs was justifiable in light of MG's knowledge and experience. Others associated with MG had adhered to their agreements and kept information confidential. Moreover, MG believed that all parties involved stood to gain from the cooperative effort.

182.  MG has been harmed in that it was deceived into sharing its technology and expertise that was ultimately used to compete directly with MG using its own business model and own technology.

183.  The extent of the harm remains to be seen absent discovery, showing the extent of Coy's reach after stealing Plaintiff's information and business. However, MG has been harmed by at least $1.5 million, based on calculating MG's costs over the last year to develop and refine the technology, know-how, and confidential information that was fraudulently obtained as well as the opportunity costs associated with time spent collaborating that could have been spent either on client relations or collaborating with good-faith individuals and businesses.

184.  Lewis, Hankins, and Drew's conduct was intentional, malicious, and fraudulent, justifying the award of punitive and exemplary damages.

185.  MG's reliance on Lewis, Hankins, and Drew's false promises was, and continues to be, a substantial factor in causing its harm.

## TWELFTH CAUSE OF ACTION
### Fraud (California Law)
### (Against Cristina Dospassos)

186.  Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 51 set forth above.

187.  On December 25, 2019, Dospassos made promises to MG in the form of signing the Dospassos WDA. When entering into the agreement, Dospassos never had any intention of performing her end of the bargain.

-34-

188. Dospassos later concealed the fact that she was conveying MG's confidential information to Coy so that Coy could compete against MG using MG's own information and technology structure against it.

189. Dospassos intended MG to rely on her misrepresentations, including her promise to keep MG's confidential information secret, so that MG would share its confidential information with her.

190. MG actually relied on the statements and promises made by Dospassos, including the promises contained within the Website Development Agreement between Dospassos and MG. On the basis of the agreement, MG shared confidential information with Dospassos.

191. MG's reliance on Dospassos' statements and promises was justifiable in light of MG's knowledge and experience. Others associated with MG had adhered to their agreements and kept information confidential. Moreover, MG believed that all parties involved stood to gain from the cooperative effort.

192. MG has been harmed in that it was deceived into sharing its technology and expertise that was ultimately used to compete directly with MG using its own business model and own technology.

193. The extent of the harm remains to be seen absent discovery, showing the extent of Coy's reach after stealing Plaintiff's information and business. Dospassos may have also damaged many of MG's existing client relationships. However, MG has been harmed by at least $1.5 million, based on calculating MG's costs over the last year to develop and refine the technology, know-how, and confidential information that was fraudulently obtained as well as the opportunity costs associated with time spent collaborating that could have been spent either on client relations or collaborating with good-faith individuals and businesses.

194. Dospassos' conduct was intentional, malicious, and fraudulent, justifying the award of punitive and exemplary damages.

195.  MG's reliance on Dospassos false promises was, and continues to be, a substantial factor in causing its harm.

## THIRTEENTH CAUSE OF ACTION

### Fraud (California Law)

### (Against Coy)

196.  Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 51 set forth above.

197.  On August 6, 2019, Coy made promises to MG in the form of a Website Development Agreement with MG signed by Bartlett as CEO of Coy. When entering into the agreement, Coy never had any intention of performing its end of the bargain.

198.  Coy intended MG to rely on its misrepresentations and those made by its founders prior to being incorporated, including emails, text messages, phone calls, and earlier NDAs signed by its founders. These promises centered largely on keeping MG's information confidential and out of the hands of competitors.  promise to keep MG's confidential information secret, so that MG would share its confidential information with her. Bartlett made Coy's original intention and its knowing falsity very clear when on March 4, 2021, she posted an Instagram update where she stated she always viewed Coy as a technology company first. *See*, *supra*, ¶ 49. Coy's intention, as described in her post, is the exact *opposite* of what she represented to MG. Had MG known the truth, it never would have associated with or done any business with Bartlett.

199.  MG actually relied on the statements and promises made by Coy's officers and founders, including the promises contained within the Website Development Agreement between Coy and MG and the earlier NDAs. On the basis of the NDAs, the Coy Website Development Agreement, and various statements, texts, emails, and phone calls outlined above, MG shared confidential information with Coy.

200.  MG's reliance on Coy's false statements and promises was justifiable in light of MG's knowledge and experience. Others associated with MG had adhered to

their agreements and kept information confidential. Moreover, MG believed that all parties involved stood to gain from the cooperative effort.

201.  MG has been harmed in that it was deceived into sharing its technology and expertise that was ultimately used to compete directly with MG using its own business model and own technology.

202.  The extent of the harm remains to be seen absent discovery, showing the extent of Coy's reach after stealing Plaintiff's information and business. Coy may have also damaged many of MG's existing client relationships. However, MG has been harmed by at least $1.5 million, based on calculating MG's costs over the last year to develop and refine the technology, know-how, and confidential information that was fraudulently obtained as well as the opportunity costs associated with time spent collaborating that could have been spent either on client relations or collaborating with good-faith individuals and businesses.

203.  Coy's conduct was intentional, malicious, and fraudulent, justifying the award of punitive and exemplary damages.

204.  MG's reliance on Coy's false statements and promises was, and continues to be, a substantial factor in causing its harm.

## **FOURTEENTH CAUSE OF ACTION**

### **Unfair Competition – California Bus. Prof. Code § 17200 *et seq*.**

### **(Against Coy)**

205.  Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 204 set forth above.

206.  California Business and Professions Code § 17200 *et seq*. prohibits any unlawful, unfair, or fraudulent business act or practice, any unfair, deceptive, untrue, or misleading advertising, and any violation of Business and Professions Code § 17500 *et seq*.

207.  Coy has engaged in unfair competition.

208.  Coy has misappropriated MG's trade secrets and used those trade secrets to compete directly against MG. Coy continues to use MG's trade secrets. This constitutes an unlawful and fraudulent practice under the law of the state of California.

209.  Breach of the Implied Covenant of Good Faith and Fair Dealing, as alleged, also constitutes an unlawful and fraudulent business act.

210.  Fraud, as alleged, constitutes an unlawful and fraudulent business act as well.

211.  MG has suffered injury in fact as a result of each of the forms of Coy's unfair competition.

212.  Coy has been unjustly enriched by resorting to fraud and unfair competition.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

ON THE FIRST CAUSE OF ACTION

1.  Compensatory damages according to proof;

2.  Disgorgement of profits due to unjust enrichment;

3.  Punitive and exemplary damages as awarded at trial pursuant to 18 U.S.C. § 1836(b)(3)(C);

4.  A temporary and final injunction to prevent or restrain further infringement and misappropriation of Plaintiff's trade secrets;

5.  A reasonable royalty;

6.  Plaintiffs' costs, including reasonable attorneys' fees, pursuant to U.S.C. § 1836(b)(3)(D);

ON THE SECOND CAUSE OF ACTION

7.  Expectation damages according to proof;

8.  A temporary and final injunction to prevent or restrain further use and disclosure of Plaintiff's intellectual property and confidential information;

9.    Plaintiff's costs, including reasonable attorneys' fees, as provided by the contract;

## ON THE THIRD CAUSE OF ACTION

10.   Expectation damages according to proof;

11.   Punitive and exemplary damages as awarded at trial;

12.   A temporary and final injunction to prevent or restrain further use and disclosure of Plaintiff's intellectual property and confidential information;

13.   Plaintiff's costs, including reasonable attorneys' fees, as provided by the contract;

## ON THE FOURTH CAUSE OF ACTION

14.   Expectation damages according to proof;

15.   A temporary and final injunction to prevent or restrain further use and disclosure of Plaintiff's intellectual property and confidential information;

16.   Plaintiff's costs, including reasonable attorneys' fees, as provided by the contract;

## ON THE FIFTH CAUSE OF ACTION

17.   Expectation damages according to proof;

18.   Punitive and exemplary damages as awarded at trial;

19.   A temporary and final injunction to prevent or restrain further use and disclosure of Plaintiff's intellectual property and confidential information;

20.   Plaintiff's costs, including reasonable attorneys' fees, as provided by the contract;

## ON THE SIXTH CAUSE OF ACTION

21.   Expectation damages according to proof;

22.   A temporary and final injunction to prevent or restrain further use and disclosure of Plaintiff's intellectual property and confidential information;

23.   Plaintiff's costs, including reasonable attorneys' fees, as provided by the contract;

COMPLAINT

ON THE SEVENTH CAUSE OF ACTION

24.    Expectation damages according to proof;

25.    Punitive and exemplary damages as awarded at trial;

26.    A temporary and final injunction to prevent or restrain further use and disclosure of Plaintiff's intellectual property and confidential information;

27.    Plaintiff's costs, including reasonable attorneys' fees, as provided by the contract;

ON THE EIGHTH CAUSE OF ACTION

28.    Expectation damages according to proof;

29.    A temporary and final injunction to prevent or restrain further use and disclosure of Plaintiff's intellectual property and confidential information;

30.    Plaintiff's costs, including reasonable attorneys' fees, as provided by the contract;

ON THE NINTH CAUSE OF ACTION

31.    Expectation damages according to proof;

32.    Punitive and exemplary damages as awarded at trial;

33.    A temporary and final injunction to prevent or restrain further use and disclosure of Plaintiff's intellectual property and confidential information;

34.    Plaintiff's costs, including reasonable attorneys' fees, as provided by the contract;

ON THE TENTH CAUSE OF ACTION

35.    Damages according to proof but of no less than $1.5 million;

36.    Punitive and exemplary damages as awarded at trial;

ON THE ELEVENTH CAUSE OF ACTION

37.    Damages according to proof but of no less than $1.5 million;

38.    Punitive and exemplary damages as awarded at trial;

ON THE TWELFTH CAUSE OF ACTION

COMPLAINT

39.    Damages according to proof but of no less than $1.5 million;

40.    Punitive and exemplary damages as awarded at trial;

ON THE THIRTEENTH CAUSE OF ACTION

41.    Damages according to proof but of no less than $1.5 million;

42.    Punitive and exemplary damages as awarded at trial;

ON THE FOURTEENTH CAUSE OF ACTION

43.    Compensatory damages according to proof;

44.    Disgorgement and restitution of illegally gained profits due to Defendant's unfair competition;

45.    A temporary and final injunction to prevent or restrain further unfair competition against Plaintiff;

46.    Plaintiff's costs incurred by this suit, including reasonable attorneys' fees, under Cal. Civ. Proc. Code § 1021.5;

ON THE ALL CAUSES OF ACTION

47.    Pre- and post-judgment interest; and

48.    Such other and further relief as the Court may deem just and proper.

### ***DEMAND FOR JURY TRIAL***

Plaintiff hereby demands a jury trial on all issues so triable pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the U.S. Constitution.

Respectfully submitted,

DATED: March 6, 2021          BY:   GERARD FOX LAW, P.C.


*/s/ Gerard P. Fox*
Gerard P. Fox
Timothy Lamoureux
*Attorneys for Plaintiff McCandless Group, LLC*

COMPLAINT