Gerard P. Fox (SBN 151649)
gfox@gerardfoxlaw.com
Marina V. Bogorad (SBN 217524)
mbogorad@gerardfoxlaw.com
Gerard Fox Law P.C.
1880 Century Park East, Suite 1410
Los Angeles, California 90067
Telephone: (310) 441-0500
Facsimile: (310) 441-4447

*Attorneys for Plaintiff*
McCandless Group, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

McCandless Group, LLC,

Plaintiff,

v.

The Coy Collective, Inc., *et al.*,

Defendants.

Case No.: 2:21-cv-02069

Hon. David O. Carter
Courtroom 9D

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff McCandless Group, LLC ("MG") brings this action against The Coy Collective, Inc. ("Coy"), Jessica Bartlett ("Bartlett"), Corey Lewis ("Lewis"), Robert Hankins ("Hankins"), Thomas Drew ("Drew"), and DOES 1-10 (all together, the "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1. MG is a victim of business partners who gained Plaintiff's trust before stabbing it in the back. Defendants entered into a business relationship with MG, signing nondisclosure agreements and/or confidentiality clauses, ostensibly to cooperate and grow their businesses together. However, this was never Defendants' plan, as they always had the intent of learning about MG's technology, business model, processes, techniques, and strategies in order to steal them and use them for themselves. Defendants took MG's methods and information obtained through their false pretense of cooperation and instead started their own competing business, Coy, to subsume MG. Now, MG's very survival as a business is threatened by Defendants' contractual and fiduciary breaches, fraud, misappropriation, and unfair competition.

## PARTIES

2. Plaintiff McCandless Group, LLC is a limited liability company organized under the laws of Florida with its principal place of business in Miami, Florida. McCandless Group, LLC creates individual websites for models and influencers seeking to monetize their social media following. McCandless Group, LLC creates the websites for its clients and assists them with the technical operations of their website. In exchange, McCandless Group, LLC receives a portion of the revenue that their clients' sites collect each month.

3. Defendant The Coy Collective, Inc. is a corporation organized under the laws of Delaware. Plaintiff is informed and believes that The Coy Collective, Inc. has its principal place of business in Texas. The Coy Collective, Inc. originally started as a purported partner with McCandless Group, LLC and utilizes the same website design, technologies, and structure pioneered by McCandless Group, LLC. The Coy

Collective, Inc. now operates as a direct competitor to McCandless Group, LLC, hosting websites for models and social media influencers and in exchange receives a portion of each client's monthly revenue. The Coy Collective, Inc. targets major U.S. cities where many models and influencers reside, such as Los Angeles, CA, New York, NY, and Miami, FL.

4. Defendant Jessica Bartlett is an individual. Plaintiff is informed and believes that Jessica Bartlett is a resident of the County of Los Angeles in the state of California and is the CEO and/or President of The Coy Collective, Inc.

5. Defendant Corey Lewis is an individual. Plaintiff is informed and believes that Corey Lewis is a resident of the state of Texas and is acting as an agent for The Coy Collective, Inc.

6. Defendant Robert Hankins is an individual. Plaintiff is informed and believes that Robert Hankins is a resident of the state of California and is acting as an agent for The Coy Collective, Inc.

7. Defendant Thomas Drew is an individual. Plaintiff is informed and believes that Thomas Drew is a resident of the state of New York and is acting as an agent for The Coy Collective, Inc.

8. The true names and capacities of all defendants sued herein as Does 1 through 10 (the "Doe Defendants") are unknown to Plaintiff, who therefore sues such defendants by fictitious names. If necessary, Plaintiff will seek leave of Court to amend this Complaint to state their true names and capacities when the same have been ascertained. Plaintiff is informed and believes, and on that basis alleges, that the Doe Defendants direct, control, ratify, participate in, materially contribute to, profit from, induce, encourage, facilitate, and/or are the moving force behind the violations of Plaintiff's copyrights or are otherwise liable to Plaintiff as a result of their participation in all or some of the acts set forth hereinafter. Plaintiff is further informed and believes and therefore alleges that each of the Doe Defendants was the agent of at least one of the named defendants, and in doing the things alleged in this

Complaint was acting within the course and scope of such agency, and/or acted in concert with at least one of the named defendants and is jointly and severally liable to Plaintiff with said named defendants.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action as a federal question under 28 U.S.C. § 1331. This Court also has jurisdiction over the state law claims pursuant to ancillary, pendant, and supplemental jurisdiction, including under 28 U.S.C. § 1367. This Court also has complete jurisdiction over all state claims given diversity jurisdiction pursuant to 28 U.S.C. § 1332 because each defendant is domiciled in a different state from the plaintiff and the amount in controversy exceeds $75,000.

10. This Court has personal jurisdiction over Jessica Bartlett because she is domiciled in California. Jessica Bartlett also entered into at least two contracts with Plaintiff when both Plaintiff and Jessica Bartlett were domiciled in California. These two contracts contain California choice of law provisions. She is also an executive at Coy, and she is operating multiple websites targeting residents of California. These websites involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features.

11. This Court has personal jurisdiction over The Coy Collective, Inc. because it operates multiple websites targeting residents of California. These websites involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features.

12. This Court has personal jurisdiction over Corey Lewis because he has contacts with California and has purposefully availed himself of California law. Corey Lewis entered into at least one contract with Plaintiff when Plaintiff was domiciled in California. This contract contains a California choice of law provision.

In addition, Corey Lewis is, or was at all relevant times, either an executive, part owner, employee, or agent of Coy, and is involved in its business running websites, and his tortious activities complained about were, in part, directly in relation to the creation of these websites. These websites target residents of California and involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features.

13. This Court has personal jurisdiction over Robert Hankins because he is domiciled in Los Angeles, California. Robert Hankins also entered into at least one contract with Plaintiff when both Plaintiff and Robert Hankins were domiciled in California. The contract contains a California choice of law provision. In addition, Robert Hankins is, or was at all relevant times, either an executive, part owner, employee, or agent of Coy, and is involved in its business running websites, and his tortious activities complained about below were, in part, directly in relation to the creation of these websites. These websites target residents of California and involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features.

14. This Court has personal jurisdiction over Thomas Drew because he has contacts with California and has purposefully availed himself of California law. Thomas Drew entered into at least one contract with Plaintiff when Plaintiff was domiciled in California. This contract contains a California choice of law provision. In addition, Thomas Drew is, or was at all relevant times, either an executive, part owner, employee, or agent of Coy, and is involved in its business running websites, and his tortious activities complained about below were, in part, directly in relation to the creation of these websites. These websites target residents of California and involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features.

15. Venue in this judicial district is proper under 28 U.S.C. § 1391 because

a substantial part of the events giving rise to the underlying claims occurred in the Central District of California, and the codefendants do not all reside in the same state. Many of the contracts underlying this action were formed in this district while Plaintiff was domiciled in this district. A substantial part of the underlying tortious activity occurred in this district and its effects were felt in this district. Additionally, at least one defendant is domiciled in the Central District of California.

## COMMON FACTUAL ALLEGATIONS

### I. MG's Business

16. MG was started by Nick McCandless ("Nick") on June 23, 2014.[1] MG is an innovative technology company that creates individually owned and operated websites for models and social media influencers who wish to monetize their online following. MG builds and hosts websites for its clients, who in turn create and provide exclusive content to subscribers who pay for a monthly subscription to the individual client's website. These subscribers can then also purchase specific premium content, such as photos and videos. In exchange for creating and running their clients' websites, MG receives a percentage of each client's monthly website revenue.

17. MG's clients run their own businesses, and set their own prices, including the monthly subscription fee for their websites. MG developed and structured the technological infrastructure to handle the billing and subscription aspects of the Clients' websites, and it created an easy interface for its clients to be able to upload the content they create to their websites.

18. MG's market differentiator is its ability to create individual custom websites for social media influencers and models, thereby allowing them to run their own business and promote their own brand. Competing companies, such as OnlyFans, operate under a particular company's brand and merely have a sub-page under the main overarching website and company brand. By contrast, MG's clients

[1] MG initially began as a California LLC and converted to a Florida LLC on May 18, 2020.

get to have their own URL of their choosing, set their own pricing and run their own business as they see fit.[2]

19. MG consists of a group of skilled and experienced technology experts who have spent years honing their craft. The team spent over a year developing the technology, the infrastructure, the business model and the processes involved that make MG's current service successful. Like many startups sailing in uncharted waters, MG experienced challenges and threats to its survival. Unlike many startups, MG learned and adapted.

20. MG's valuable confidential business information and trade secrets include know-how and negative know-how regarding the design and structure of individual websites and the technology behind those websites (the "technology stack"), MG's cost and accounting structure, MG's revenue model, as well as compilations, methods, techniques and processes with regard to the information described above.

21. MG takes reasonable precautions to maintain the secrecy and confidentiality of its proprietary business information and trade secrets. For example, MG has all its employees and contractors sign agreements for non-disclosure, non-use, and non-competition. MG also ensures that external software developers have internal confidentiality policies[3] and utilizes data security measures, such as hosting all of its websites using secure socket layer ("SSL"), employing the latest security

---

[2] In addition to the unique URLs provided by MG, unlike OnlyFans, MG uses its own technology, customizes its websites based directly upon feedback and requests by its clients, monitors and protects client content, avoids any particular brand association or stigma and coaches and consults with its clients in an effort to help them maximize their revenue. OnlyFans, on the other hand, does nothing to assist its clients.

[3] For example, one developer MG frequently uses has an explicit policy whereby individuals may not disclose even the identity of its client, let alone confidential information, and the importance of confidentiality is discussed at least once per month.

standards on all of its websites using Amazon Web Services ("AWS"), encrypting all source code, restricting network access using two-factor authentication, allowing only approved internet protocol ("IP") addresses access to database information and restricting data to only those who need access to that data for their particular job. Furthermore, websites created by MG disable the right click ("view source" feature) so as to protect as much code as possible. Beyond that, the HTML code itself is created dynamically by servers based on things such as the visitor's unique ID. This means that even if someone were able to view the HTML code, that would not provide the information necessary to recreate a website like MG's or develop a technology platform similar to MG's. Thus, even though MG creates and operates public-facing websites, MG has intentionally taken more steps than most companies in order to protect its websites, source code and other confidential information and trade secrets.

22. Each of MG's clients enters into a contract with MG called a Website Development Agreement. The agreement spells out the responsibilities of both parties and includes robust confidentiality provisions.

23. MG's technology and business model has made it popular with established social media influencers and models who already have a large online presence and wide name recognition and who want to continue to grow their own brand.

## II. The Bartlett WDA

24. In late 2019, MG approached Jessica Bartlett as a potential client. Bartlett already had a large social media following, and MG offered her the chance to create her own website and monetize her social media brand.

25. Bartlett entered into a Website Development Agreement with MG on October 27, 2019 ("Bartlett WDA"). Bartlett provided a signed copy to Nick on the same day. The Bartlett WDA is attached and incorporated herein as **Exhibit A**.

## III. Bartlett's Partnership Proposal

26. On May 6, 2020, Bartlett sent a text message to Nick with a business proposal for MG. She had an idea to create a new company that would provide management and other services to models, such as arranging for professional photo shoots and video shoots, providing assistance with social media marketing, and brand management.[4] She wanted to partner with MG. Through that partnership, MG was to: (1) help Bartlett learn the ropes of running website businesses, and (2) provide its core services to the partnership, such as supplying the websites, technology, payment processing, technical support, and protecting the exclusivity of subscribed content. According to Bartlett, she already had investors lined up and business partners who were excited about the prospect of working with MG and having MG serve as the technology developer.

27. Keenly aware of the benefits and commercial value of MG's business, Bartlett pretended to be interested in a partnership with MG, including a license to MG's technology, to gain access to highly valuable information and technical assistance from Nick and MG that otherwise would not have been available to her. Yet her representations that she intended to partner up with MG were intentionally false, and so were the conversations to the same effect with her and her associates that followed. Bartlett and her cronies were there to pump MG for information, learn everything they could and then turn around and stub MG in the back by using its own information against it. And just how quickly the truth came out later shows that Defendants never intended to do anything they represented they intended to do at the time the representations were made to MG.

28. When Bartlett first approached Nick about her business idea for what would eventually become Coy, she did not present Coy as a technology company or ultimately a competitor to MG; rather, she indicated that it would be a "subscription-

---

4 This business eventually was formed as The Coy Collective, Inc.

based project," that she wanted MG to develop a website based upon her idea and that she did not want to share a percentage of the revenue and, instead, wanted to pay a flat fee each month.

29. Due to the nature of websites and web traffic, costs are highly variable for hosting and operating websites. This means that flat fees are not well suited for the services Bartlett wanted MG to provide for their partnership. Bartlett specifically stated that she wanted the same features as her own website, but that she expected much higher web traffic than her own website. As web traffic increases, the costs involved also increase. This would mean that the more successful the website became, the less MG would profit. Nick explained that a flat fee would therefore not make sense for MG but reiterated that he was open to reaching a mutually beneficial arrangement.

30. MG perceived Bartlett's offer as an opportunity to expand the business and its revenue base, and it appeared by all accounts to be a mutually beneficial partnership.

31. On May 9, 2020, Bartlett arranged for a phone call with Corey Lewis so that she could introduce Lewis to Nick. Bartlett described Lewis as one of her main business partners. During the call, Nick marketed his business by telling them what services he would be able to provide them if they worked together.

32. On May 16, 2020, Nick had another call with Lewis and Bartlett, in which they all agreed to a basic set of terms for the proposed partnership. These terms were further clarified over text messages exchanged between Nick and Lewis over the next few days. During these exchanges, Bartlett and Lewis repeatedly explained that they wanted to provide model management services for aspiring models and social influencers and sought to partner with MG because MG was established and had the industry "figured out." Lewis and Bartlett wanted to have MG create websites for these aspiring models and influencers, similar to what MG already did for its own clients. However, the joint business, as proposed by Bartlett and Lewis, was mostly

focused on providing additional services aside from the technology.

33. Shortly after the May 16 phone call, Bartlett and Lewis told Nick that they wanted to use MG as their technology partner. Indeed, and from the outset, MG, Bartlett and Lewis intended their relationship to be that of partners, they referred to each other as partners in their communications, and Lewis introduced Nick as his "technology partner" to third parties. This held true when other partners who had prior business relations with Bartlett and Lewis joined the company; they intentionally entered into the same partnership for the same business venture designed by MG, Bartlett, and Lewis. And while Bartlett had at first tried to get MG on board with only a flat monthly fee, as set forth above, MG made it clear that such an arrangement would not be acceptable. Ultimately, MG accepted a share of revenue that scaled with the success of the new venture.

34. Based on their descriptions and repeated representations, MG and Nick understood that their company (Coy) would be more of a management agency than anything else and would target different clients than MG. The proposed joint business would be centered on the idea of helping to develop aspiring social media influencers and aspiring models by providing opportunities to improve content creation and individual recognition. In other words, the new company would help its clients with the content creation side of things, whereas MG would develop and operate the technology, just like it already did with MG's own clients.

35. Given that Bartlett and Lewis had a clear and concrete plan for a future joint business but had not yet formed a company, MG began doing business with Bartlett and her other business partners and investors directly in anticipation of their future creation of a business entity to fulfill their plan.

**IV. Defendants' NDAs with MG**

36. From the inception of the parties' collaboration, it became clear that, in order for the partnership to work, Nick and MG would need to share MG's extremely

valuable trade secrets and other protected information with Bartlett and Lewis, as well as Bartlett's other business partners, Robert Hankins and Thomas Drew.

37. As a result, to protect MG's confidential and trade secret information, Bartlett and her business partners were required to sign non-disclosure agreements ("NDAs") with MG, guaranteeing that they would keep this sensitive information in confidence and would not use it for any other purpose but the proposed partnership, thus promising never to use it to compete directly with MG.

38. Bartlett signed an NDA with MG on May 21, 2020 and provided a copy to Nick on the same day. This NDA is attached and incorporated herein as **Exhibit B**.

39. Several of Bartlett's business partners also signed MG's NDAs on May 21, 2020 and provided them to Nick on the same day. This included Lewis, Hankins, and Drew. Their NDAs are attached and incorporated herein as **Exhibits C**, **D**, and **E**, respectively.

40. After the NDAs were signed, MG provided Bartlett, Lewis, Hankins and Drew its confidential and trade secret information, consisting of:

a. The design and structure of individual websites and the technology behind those websites, including the technologies, software, servers, vendors, and overall infrastructure of MG's technology platform (hereinafter sometimes referred to as MG's "technology stack");
b. Details regarding MG's cost and accounting structure;
c. Details regarding MG's revenue model;
d. Compilations, methods, techniques and processes with regard to the information described above; and
e. Know-how and negative know-how regarding the categories set forth above, as well as such know-how and negative know-how as to setting up, running and succeeding as a company such as MG.

Said information is herein referred to collectively as "confidential and trade secret

information."

**V. MG Shares Confidential and Trade Secret Information Under the NDAs**

41. After the NDAs were signed, MG began sharing its confidential and trade secret information with Bartlett and her associates, Lewis, Hankins, and Drew. MG's understanding was that they were all engaging in a mutually beneficial partnership, which, in addition to the NDAs, gave MG and Nick comfort to disclose the necessary information and allow the partnership to quickly build its business from scratch so that it would soon become a productive venture. This occurred over the next several months in various emails, text message exchanges, and phone calls.

42. MG participated in all the aspects of getting the business going, including recommending target clients, providing the technology and structuring, as well as conducting interviews and making hiring decisions on behalf of the venture. Under the parties' agreement, MG would share in the profits by earning a portion of each subscriber's monthly fee for each website, as well as a portion of each individual sale of premium content. Because MG had a share of the profits involved, it had every incentive to cooperate fully and ensure its success.

***A. Key Components of MG's Confidential Technology Disclosures***

43. MG has developed proprietary software and created a unique overall technological infrastructure. Products and services from outside vendors integrate seamlessly with MG's own software in order to provide a single service to MG's clients. MG operates behind the scenes, making technological and procedural adjustments as necessary without interfering with each client's business operations and thus their ability to generate content and revenue. When certain vendors, products, processes, and systems are determined by MG to improve MG's own product and service offering, MG incorporates those, making the whole greater than the sum of its parts.

44. MG handles many of the technical and business operations for its clients, including the initial website development, monthly billing, accounting, and

technology support. MG also ensures that content is accessible only to paying subscribers and issues takedown notices to any website found improperly reposting a client's copyrighted content.

45. [redacted]

46. MG also invented and utilizes a dynamic watermarking feature. All content posted on MG's websites is displayed with a dynamic watermark, which overlays the unique user ID number for each subscriber on photos displayed on that subscriber's device. If content is leaked and wrongfully posted on other websites, that ID number can be used to identify the individual subscriber responsible. That subscriber is then banned from the website. Nick first told Bartlett about this technology while it was still in development. While Bartlett was excited about the idea, she did not do anything to contribute to its creation or development. Attached hereto as **Exhibit F** are true and correct copies of text messages between Nick and Bartlett discussing the watermarking feature while it was still being developed. Also attached hereto as **Exhibit G** are true and correct copies of text messages between Nick and Bartlett, in which Bartlett asked Nick how leaked content is handled. Upon information and belief, prior to Coy, MG was the only company to utilize this watermarking technology. Coy now openly boasts about its ability to handle "legalities associated with leaked content" and includes "copyright protection and

leaked content removal" on its website (thecoy.com/about) as one of the services Coy provides.

47. Lewis, in particular, wanted to know all about MG's technology stack. There was no indicator that Coy was going to copy or recreate MG's platform and infrastructure. Therefore, after the NDAs were signed, Nick emailed a PDF containing MG's technology stack to Lewis. With that information, Coy obtained a list of components necessary to recreate MG's technology platform. A true and correct copy of the email to Lewis containing the attachment is attached as **Exhibit H.** A true and correct copy of the technology PDF is attached hereto as **Exhibit I**.[5]

48. Defendants also solicited and received information from MG regarding automating some parts of its clients' websites. Nick explained to Lewis some of the features that could be automated and what the various costs would be. He also explained how much time it would take to have someone manually do some of the tasks that Lewis and his clients may not want to perform.

49. MG spent over a year developing its technology and refining its overall structure and processes. MG had also made mistakes along the way, necessitating expensive and time-consuming changes in the way MG conducted its business. In an instant, all of that immediately went to Bartlett and the other individual Defendants with an expectation and understanding that the parties would be working together and mutually benefit from MG's collective blood, sweat, and tears.

50. MG provided information about its technology to Defendants because Defendants claimed their investors required details of the technology that would be implemented in order to follow through with their investments in the proposed partnership with MG.

---

[5] While the design of websites developed by MG is viewable by the public subject to restrictions placed by MG, MG provided Defendants with its confidential technology stack, which breaks down all of the technologies MG uses that are not accessible by the public and thus not generally known to the public or the industry.

51. Upon information and belief, Defendants utilized MG's technology stack in building their own websites for Coy's clients and continue to use it to this day to operate Coy. The websites (and technology behind those websites) could not have been replicated in the time it took Coy to build their sites following the termination of Coy's partnership with MG absent misappropriation of MG's confidential and trade secret information, especially given that: (1) Defendants had no prior experience in researching and developing the technology at issue before partnering with MG; (2) it took MG over a year and countless man hours to do the same; and (3) it was Defendants that sought out MG to explore potential collaborative working relationship associated with Coy due to Defendants' lack of knowledge and experience in this area.

### *B. Key Components of MG's Confidential Accounting Structure Disclosures*

52. Through years of trial and error, MG figured out how to implement a robust and efficient accounting structure consisting of MG's financial information, cost information including how MG calculates its costs and how those costs affect other processes of the business, how to monetize the chargeback ratio, how to calculate payments to its clients, and key components of MG's payment processing approach.

53. Defendants repeatedly solicited information on MG's accounting structure, including information related to calculating potential earnings and costs as factors in determining how to quote prices for potential clients. For example, on May 25, 2020, Bartlett sent Nick a text message requesting a call to discuss "minimum percentage tiers" that MG uses to charge its clients. Bartlett specifically requested MG's pricing information, which varies from the industry standard as well as that used by other MG competitors, such as OnlyFans,[6] and Nick provided that

[6] As Nick explained to Bartlett, MG developed its own pricing model and did not use the 80/20 pricing model, which is considered to be the industry standard and

information to Bartlett over a phone call and several text messages. During the call with Bartlett, Nick explained the importance of a client's following and user engagement on a social media platform to potential earnings as well as how costs factor into determining the percentage to provide a price quote for a client. True and correct copies of text messages between Nick and Bartlett discussing the pricing percentages as "tiers" as well as scheduling a phone call to further discuss the same are attached hereto as **Exhibit J**.

54. It was clear that Bartlett and Lewis did not understand most, if not all, of the costs and pricing factors involved in running the business. Nick had detailed conversations with Bartlett and Lewis, in which he explained the various costs involved and went over the process as to how MG priced its services in order to factor in all of those costs. For example, there are various costs related to emails and processing fees that Lewis was unaware of until Nick explained them to him. On May 27, 2020, Lewis asked Nick for details regarding various email costs, payment processing fees, and how MG handles its revenue share and payment processing terms. True and correct copies of the text messages between Nick and Lewis are attached hereto as **Exhibit K.**

55. Defendants were also interested other aspects of MG's accounting system. Lewis, in particular, asked to connect with MG's accountant and wanted to hire MG's accountant to handle all of Coy's accounting. Lewis specifically wanted an accountant familiar with MG's business model. MG's accountant was unavailable but, on behalf of the proposed partnership, Nick interviewed several candidates and selected an accountant whom he believed would be well suited for Coy. Nick walked Coy's new accountant through MG's accounting system in order to save Coy time and money. True and correct copies of text messages, in which Lewis and Nick discuss an accountant for Coy, are attached hereto as **Exhibit L**.

---

utilized by MG's competitors including OnlyFans.

56. Defendants also solicited information on MG's chargeback percentages, which were unique to MG and differed from standard industry practice, as well as information on how MG monetizes the chargeback ratio. The chargeback ratio is crucial for any merchant that relies on credit card payments. Chargebacks occur when a consumer has a bank or credit card issuer roll back a charge that is claimed to be fraudulent or otherwise improper. The chargeback ratio is the percentage of the chargebacks when compared to the total number of transactions. It is critical to stay below a 1 percent ratio, or a business may be fined or even blocked by Visa or MasterCard. MG proactively monitors its chargeback ratio and takes steps to reduce fraudulent charges. Charges from certain geographical regions are subject to more scrutiny than others. Nick responded to Defendants' requests and provided this information, which was subject to the confidentiality provisions of the NDAs and (eventually) the Coy WDA. True and correct copies of Lewis' text messages with Nick whereby Nick explained various aspects of the chargeback percentage, industry averages, and how MG monetizes the chargeback ratio are attached hereto as **Exhibit M**.

57. In response to the inquiries from Bartlett, Nick also provided information related to MG's subscriber retention rates and how MG's monthly billing system was structured. Nick explained MG's billing structure, which was based on know-how and negative know-how developed by MG through trial and error over the years.

58. As with any startup company pioneering a new business model, MG ran into pitfalls and bumps along the road and developed negative know-how along the way. Thus, if Nick noticed that Bartlett and her business associates were heading toward a potential technology or business problem MG had previously faced and overcome, he would warn them. For example, MG initially used a particular payment processor as part of its billing and accounting system. Widely used by many online companies, MG assumed the payment processor would meet its needs as well.

However, MG learned by experience that the processor in question was particularly unfit for use for a company operating like MG. There were not only technical problems but also regulatory problems due to the nature of MG's operations and its structure. These problems were not readily foreseeable for a novice, and MG did not discover them until the problems actually occurred. Therefore, Nick shared MG's negative know-how with Defendants by warning them about these problems and recommending the same payment processor that MG had come to use. In fact, Nick allowed Defendants to utilize MG's payment processing account so that they could benefit from the lower prices MG had already negotiated. Notable, fixing the problems caused by the payment processor had cost MG time and money that could have been spent in other ways, such as marketing to potential clients or improving its product, and MG's negative know-how saved Coy from wasting time and effort in the same way.

### *C. Key Components of MG's Confidential Revenue Model Disclosures*

59. MG spent years through trial and error developing its robust and unique revenue model, such as its formulas for determining the percentages MG charges its clients and the percentages MG keeps for itself. To develop its confidential and unique revenue model, MG, among other things, looked at competitors' revenue models and used those as a baseline to be adjusted on a client-by-client basis.

60. In September 2020, Bartlett solicited information related to how MG handled certain aspects of its business and how it handled certain clients. For example, she wanted to know how long the payments took and when they arrived; in addition, she sought information on how MG handled its payments to its own clients in circumstances where MG had not yet received a particular month's revenue payments. Relying, once again, on their proposed partnership, MG shared this information with the Defendants.

61. Nick also described the mechanics of MG's revenue sharing and the percentages involved to Bartlett and Lewis. MG's revenue model is complicated, and

costs can change dramatically depending on the amount of web traffic. Accordingly, Nick explained how much of that works for MG so that Defendants would be aware of the costs and understand the necessary cash flow.

62. MG also taught Defendants about pricing subscriptions to maximize profit, how to create successful flash sales, how to create and market pay-per-view content and other information of similar nature that Defendants did not have and/or were not aware of prior to MG and Nick's involvement.

63. Bartlett, in particular, also wanted to know more about generating financial reports, when financial reports would arrive, how revenue was split, what revenue processes had to be handled manually, and how weekends and holidays impacted business processes. When Bartlett received the requested financial spreadsheets and reports, she asked Nick to explain them to her. Importantly, Bartlett asked Nick to identify the sources of certain revenue and how to understand various accounts. Upon information and belief, Bartlett obtained confidential and trade secret information related to MG's revenue splits, information related to financial reports, tracing revenue to particular sources and conducing data analysis in order to use that information to later compete with MG.

64. Bartlett and Lewis also did not understand some of the regulatory requirements and recommendations. For example, Nick had to explain to Lewis the importance of having some of his clients sign particular waivers in order to protect himself and the company from later liability concerns.

65. Lewis also asked about the language and structure of various MG contracts. With client contracts, he wanted to know about particular clauses and what language to include in his own contracts so that he could get out of a contract with a client at his convenience. He also asked from a sample independent contractor contract and asked particular questions about some of the language in the sample Nick shared with him.

## VI. COY is Formed

66. Eventually, Bartlett formed The Coy Collective, Inc. as a Delaware corporation. As far as MG and Nick were aware, Coy was only going to operate in the manner originally described by Bartlett—offering additional management-focused services to models beyond what MG already provided, while MG continued to operate the underlying technology.

67. Under its agreement with Coy, MG would create and host the web platform that Coy would use. MG had Coy sign a separate Website Development Agreement for this new site. As CEO of Coy, Bartlett signed the agreement on behalf of Coy on August 6, 2020 ("Coy WDA"). Bartlett, on behalf of Coy, provided the signed agreement to Nick (representing MG) the same day. The Coy WDA is attached and incorporated herein as **Exhibit N**. As with the other Website Development Agreements, the Coy WDA contained confidentiality provisions and limited Coy's use of MG's information and technology to the uses specified within the Coy WDA.

68. MG then assisted Coy with setting up its website, operating its subscription and payment processing system and implementing the same processes and technology underlying MG itself. MG also assisted with ensuring that Coy was performing the necessary legal compliance work for its models, assisted with setting up Coy's revenue structure and continued to answer day-to-day questions on how to successfully run the business. This saved Coy at least twelve months of development and growing pains that could have led to Coy's demise before it ever began operating in earnest.

69. Between August 2020 and early September 2020, Bartlett approached MG about having Coy handle some of the financial aspects of MG's website for Bartlett and for her friend and fellow MG Client, Cristina Dospassos. Without rescinding any existing agreements with MG, MG worked in good faith to try to accommodate Bartlett's requests as part of the ongoing cooperative effort between MG and Coy.

70. During this time, Lewis and Bartlett still referred to their relationship with MG as a "partnership." MG operated under the assumption that MG and Coy were partners and/or joint ventures. Indeed, in July 2020, Lewis reiterated via email Coy's vision of MG being "positioned as the Technology Partner powering Coy's technology…."

**VII. Unlawful Conduct by Defendants**

71. At all the relevant times, MG operated in good faith under the belief that all the parties would benefit from the proposed partnership. However, by the autumn of 2020, it was becoming clear to MG that Coy, Bartlett, and the other Defendants had never had any intention of operating a partnership, or even including MG in their future plans at all. The entire partnership was merely a ploy designed to earn the trust of Nick and MG. Indeed, Defendants used the confidential and trade secret information they had learned from Nick and MG to set up and operate their own competing business, and this became clear once Defendants abruptly ceased any further ongoing collaborative discussions and proceeded to undersell MG in order to sign clients who were already negotiating with MG.

72. For example, by October 2020, MG had been in discussions with potential clients who were considering signing agreements with MG, clients that ostensibly would not have fit Coy's proposed business model. It was around that time that Coy, headed by Bartlett, intercepted those discussions and convinced those clients to hire Coy instead by, *inter alia*, criticizing MG and attempting to undersell MG. Yet, when Nick confronted Bartlett in mid-October 2020, Bartlett still reiterated that she saw Coy's relationship with MG as "a mutually beneficial relationship without competition." According to Bartlett, "keeping a healthy partnership" with MG was her "main concern." Lewis, for his part, assured Nick that Coy would focus on training its clients how to develop content, and specifically that Coy would not overlap as far as targeting the same potential clients.

73. However, all of that was mere cover-up, as MG came to discover shortly

thereafter. Instead of cooperating with MG, abiding by the agreements the parties had reached or fulfilling the promises Defendants had made, Defendants ratcheted up their efforts to use MG's confidential information and trade secrets against it. This included a marketing push where Bartlett used MG's systems and techniques, obtained under the NDAs, to gain traction and notoriety for Coy. For instance, Bartlett was featured in magazine articles promoting Coy in October 2020 and November 2020, in which she bragged about coming up with original business ideas for Coy that MG had already created and implemented more than a year earlier. Attached hereto as **Exhibit O** is a copy of a November 2, 2020 Maxim Magazine article accessible online, in which Bartlett discusses Coy.

74. Furthermore, upon information and belief, after obtaining MG's confidential and trade secret information, Bartlett reached out to at least one MG client, whereby she showed off her knowledge of MG's whole business in her attempt to get the client to switch to Coy by, among other things, using the percentages that MG uses as a way to convince the client to switch to Coy.

75. When it became clear that Coy was establishing itself as a direct competitor to MG and discouraging potential clients from working with MG, Nick attempted to slow down this runaway train by seeking to formalize the partnership arrangements that had been proposed to him by Bartlett and her associates, including those terms that had MG handling the technology for the partnership. Specifically, MG sought to require Coy clients on MG's technology platform to sign agreements directly with MG because, although MG was willing to continue to work with Coy as a partner, the websites would need to go directly through MG.

76. However, on or about November 5, 2020, Bartlett responded on behalf of Coy and expressed that Coy would be terminating its partnership with MG and transitioning its technology operations to being handled in-house after December 31, 2020. Upon information and belief, Coy decided to terminate its agreement with MG so that it could compete with MG without any further pretense.

77. Shortly thereafter, MG responded with a letter establishing the proposed initial terms for ending the partnership and explaining MG's intentions, which, *inter alia*, included holding Bartlett to her own WDA, as, by that time, it had already automatically renewed for another year and had not been validly terminated. Attached hereto as **Exhibit U** is a copy of a November 16, 2020 e-mail communication, attaching the letter in question. It also warned Coy not to use MG's confidential information and trade secrets to set itself up as a direct competitor to MG and reminded Coy about the signed NDAs and other contracts in force between MG and Defendants.

78. On November 19, 2020, Coy's legal counsel sent a letter to MG threatening legal action and demanding the return of certain internet URLs, subscriber data and payment processing systems. The letter also included a request for mediation to help with the dispute. Attached hereto as **Exhibit P** is a copy of the letter from Coy's counsel. In a good-faith effort to resolve any dispute, MG released the URLs to Coy.

79. On the same day, November 19, 2021, MG's payment processor forwarded MG an email from Bartlett, in which she requested a refund from the payment processor for multiple charges to a website that was created and operated by MG for a Coy client. In the email, Bartlett mentions that a Coy software developer was testing something. Upon information and belief, Coy's developers were attempting to duplicate MG's technology and design.

80. On December 2, 2020, Plaintiff's counsel responded to Coy's letter by requesting to use JAMS mediators in either California, New York, or Florida. Coy never responded to this letter. Attached hereto as **Exhibit Q** is a copy of the letter to Coy from Plaintiff's counsel.

81. On January 5, 2021, Plaintiff's counsel sent a letter to Bartlett requesting mediation. Attached hereto as **Exhibit R** is a copy of the letter to Bartlett from Plaintiff's counsel. Attached hereto as **Exhibit S** is a copy of the response from

counsel for Bartlett.

82. In the letters sent by Plaintiff's counsel, there were three requests for selection of a mediator, all of which were ignored. Plaintiff warned in its January letters that a failure to comply would be seen as a refusal to select a mediator. Thus, Plaintiff attempted in good faith to select a mediator with Defendants, and all such attempts have failed. The Web Development Agreements on their face do not require mediation be completed before bringing any claims, but even if they did, Plaintiff's attempt to select a mediator proved unsuccessful thereby releasing Plaintiff from any further obligation to pursue this mechanism under the agreement.

83. With MG's confidential and trade secret information in hand, Coy had no further use for MG. Defendants took MG's confidential and trade secret information in order to set up a business that now directly competes with MG.

84. Coy forsook the partnership and now operates as a direct competitor to MG, using MG's confidential and trade secret information that had been developed and honed for over a year and was shared only in reliance on Defendants' representations that they sought to partner up with MG for a mutually beneficial collaborative business venture.

85. Since at least October 2020, Coy has positioned itself as a direct competitor to MG. Coy now targets the same clients as MG, and Nick has been told by current MG clients that people from Coy, and Bartlett in particular, have reached out to them in an effort to convince them to leave MG and become Coy's clients instead. Essentially, Coy took all of the confidential and trade secret information MG had provided and replicated MG's intended contribution to the partnership. As such, Coy now uses its own employees and resources to implement MG's technology, structure and business model.

86. Coy has stolen more than just information from MG. Coy has stolen MG's entire business model. At every step of the way, Defendants asked for information and assistance. Thinking that Coy was going to be a long-term partner to

MG, Nick provided that information to Defendants and helped them avoid mistakes that would have wasted months of time, cost many thousands of dollars to repair and permanently damaged Coy's goodwill and reputation—assuming Coy would have ever figured out the solutions to begin with. The value of the information MG provided to Defendants cannot be overstated. MG spent over a year creating and refining its platform. Everything from accounting and marketing, web technologies and pricing were carefully refined and honed based on experience and research. All of this information is what gives MG its competitive advantage. Coy obtained all of that valuable information in a few weeks without ever having to pay the costs that MG did. Upon information and belief, Coy would not be operating now if not for all of the information it obtained from MG under false, misleading and fraudulent pretenses.

87. As recently as March 4, 2021, Bartlett wrote an update on her Instagram profile where she stated, "From [Coy's] inception, our main focus was that of a technology company, however we quickly realized that we excelled in model management as well." Attached hereto as **Exhibit T** is a copy of this Instagram post. This is the exact opposite of what Bartlett, Coy and the other Defendants represented to MG. They clearly indicated that MG would handle the technology side of the proposed joint business, and Coy would handle the model-management. Defendants' real raison d'être is further clarified by Bartlett's exposition in the same post that she would be establishing a new business called Verge for model management, which is the *exact* business she told MG she intended Coy to be as part of their proposed partnership and which, in part, informed why and how the partnership would be a logical split of their respective expertise. From the very inception, Defendants thus always intended to operate a competing technology company and misled MG to gain the benefits of its knowledge and cooperation.

88. Thus, Coy is transparently not, nor was it ever planned to be, what Defendants represented when they were obtaining MG's valuable information,

including trade secrets. Now Defendants are taking credit for MG's work and innovations to further drum up business at MG's expense in the marketplace. Bartlett and Coy have also reached out to existing MG clients requesting that they terminate their existing contract or relationship with MG and instead use Coy exclusively. With this new development, MG had no choice but to initiate this litigation.

89. Since at least October 2020, Coy has been signing contracts with clients who were already in contract negotiations with MG. Coy knows MG's confidential cost and profit information, and Coy deliberately attempted to undersell MG when speaking to current MG clients. Defendants have unlawfully solicited Plaintiff's clients utilizing MG's trade secrets and other confidential information to assist in growing and developing Coy's business in breach of the NDAs and the Coy WDA, as well as various U.S. and state law. Indeed, it was MG's stolen confidential information and trade secrets that enabled Defendants to build their competing business, Coy, as quickly as they did.

90. Defendants all continue to use MG's confidential and trade secret information in direct violation of their agreements. They each individually profit at MG's expense. MG's business is its software and processes. That business has been stolen and its assets hijacked. Now, after this perfidious scheme, MG faces an existential threat from Coy using MG's own innovations against it.

## FIRST CAUSE OF ACTION

**Misappropriation and Threatened Misappropriation of Trade Secrets – Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1836 *et eq.***

**(Against All Defendants)**

91. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

92. MG possesses and owns confidential trade secrets, consisting of:

a. The design and structure of individual websites and the technology behind those websites, including the technologies, software, servers, vendors, and

overall infrastructure of MG's technology platform;

b. Details regarding MG's cost and accounting structure;

c. Details regarding MG's revenue model;

d. Compilations, methods, techniques and processes with regard to the information described above; and

e. Know-how and negative know-how regarding the categories set forth above, as well as such know-how and negative know-how as to setting up, running and succeeding as a company such as MG.

93. MG's confidential information also includes "existing or contemplated business, processes and services, techniques, components, sales, markets, costs, profits, research, development, inventions, purchasing, staff, employees, compensation, contractors, suppliers, customers, prospects, marketing, pricing policies, financial information, engineering and all other data." **Exhibits B, C, D, E**, ¶ 1.

94. MG's confidential and trade secret information is the result of over a year of business experience, research, and trial and error, in addition to specialized knowledge and skills developed over the course of several years prior.

95. MG's confidential and trade secret information is not public. MG's trade secrets derive independent economic value, actual and/or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from the disclosure or use of the information.

96. MG relies on its confidential and trade secret information in order to conduct business and directly gains economic value from this information. MG relies on keeping this information secret because its business quite literally *is* its software and expertise. MG created a system of technology and business processes, in which the whole is greater than the sum of its parts.

97. MG operates primarily on the internet, and, therefore, MG's confidential

and trade secret information is used in interstate commerce.

98. MG's confidential and trade secret information is subject to extensive efforts to maintain its secrecy and confidentiality. These efforts include the following:

a. Requiring customers, clients, and business partners to sign NDAs and/or other contracts containing confidentiality provisions that prevent using the confidential information or disclosing it to third parties.

b. Restricting information to a "need to know" basis for those who require the information to perform their jobs.

c. Securing the information with technical safeguards, such as passwords and user accounts with access based on the user's role.

d. MG's clients only see information related to their own websites and revenue.[7]

e. Source code and proprietary technology is stored on encrypted disk drives.

f. For its public-facing websites, MG disables the "right click" feature for end users, preventing them from viewing the source code of a given website.

g. Even if an end user were to view the website code, much of it would have been generated dynamically by MG's servers using input such as that user's unique visitor identification code, meaning an end user could not recreate a website like MG's by simply copying the public-facing HTML code.

---

[7] While Bartlett was initially an MG client, she and the other Defendants gained access to all of MG's confidential information and trade secrets vis-à-vis their partnership with MG in pursuit of creating Coy. MG does not regularly share with its clients the full extent of the information shared with Defendants in reliance on the proposed partnership.

h. MG's technology and server infrastructure (or "technology stack") is kept secret to the degree possible for websites that are accessible by the public. This includes the server structure, the software on each server, third-party vendors, and security features.

99. As such, the foregoing are protectable trade secrets under the Defend Trade Secrets Act, 18 U.S.C § 1836, et seq. ("DTSA").

100. At all relevant times, Defendants knew or had reason to know that their knowledge of MG's confidential and trade secret information was acquired under circumstances giving rise to a duty to maintain the secrecy of MG's trade secrets or limit the use of MG's trade secrets by virtue of the NDAs and the Coy WDA.

101. Bartlett, Lewis, Hankins, and Drew wrongfully obtained MG's confidential and trade secret information from MG by misrepresenting their true aims and signing the NDAs, to which none of them ever had intention of adhering. Defendants acquired MG's confidential and trade secret information under the fraudulent and false pretense of technology integration in a preferred partnership and then improperly used these trade secrets in their own technical systems and business models. Though Bartlett and her business partners had originally claimed to be working with MG in a cooperative, mutually beneficial partnership, Bartlett and her business partners Lewis, Hankins, and Drew always intended to steal MG's trade secrets in order to benefit from MG's experience and expertise—and, ultimately, in order to compete against MG directly.

102. Coy misappropriated the information by acquiring MG's confidential and trade secret information from Bartlett, Lewis, Hankins, and Drew, which all Defendants knew was information protected by NDAs and the Coy WDA. Coy also obtained MG's trade secrets despite entering into the Coy WDA, which contained robust confidentiality provisions. Coy is improperly using MG's trade secrets to directly compete with MG. The foregoing constitutes misappropriation of trade secrets prohibited under the DTSA.

103. By so misappropriating MG's confidential and trade secret information, Coy gained an unfair competitive advantage and huge head start commercializing its competing business. Indeed, by utilizing MG's confidential and trade secret information, as described herein, Defendants were able to become a competitor overnight. Essentially, Defendants were able to operate and compete without the need to spend time, effort and money developing and implementing MG's confidential and trade secret information. Unlike MG, Coy was not exposed to the risk and expense of developing these trade secrets on its own, and it did not experience growing pains. In other words, by taking valuable information from MG, Coy and the Defendants were able to take a sure thing—a tried-and-true business—and claim it for themselves.

104. On information and belief, Coy, Bartlett, Lewis, Hankins, and Drew have also misappropriated MG's confidential and trade secret information by improperly disclosing it to others, such as (but not limited to) a client and friend of Bartlett, Cristina Dospassos.

105. MG never authorized or consented to Defendants' acquisition by improper means or use of its confidential and trade secret information.

106. Defendants use, and threaten to continue to use, MG's confidential and trade secret information in interstate commerce in order to interfere with MG's relationships with its current clients, attempt to recruit MG's existing clients, disrupt MG's business and compete unfairly against MG until MG eventually can no longer continue to conduct business.

107. Defendants have each improperly used MG's confidential and trade secret information misappropriated from MG to harm MG's existing business relationships and compete directly against MG, resulting in financial and reputational harm to MG.

108. Defendants have each been unjustly enriched by using MG's confidential and trade secret information to run a competing business using MG's

own information, processes and technology.

109. MG has been harmed as a proximate result of the foregoing misappropriation of its confidential and trade secret information by Defendants, in a manner and amounts to be proven at trial. Each and every wrongful acquisition, use, and disclosure of MG's trade secrets was and continues to be a substantial factor in causing MG's harm. Defendants' use of MG's confidential and trade secret information threatens MG's very survival as a business, and monetary damages alone are an inadequate remedy. The exact extent of the harm, given Defendants' secrecy, can be determined only through discovery, but is no less than $1.5 million.

110. Defendants' misappropriation was willful and malicious, and MG is entitled to an award of exemplary damages and reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(C) and (D).

## SECOND CAUSE OF ACTION

**Breach of Contract – Non-Disclosure Agreements (California Law)**

**(Against Jessica Bartlett, Corey Lewis, Robert Hankins, and Thomas Drew)**

111. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

112. As set forth herein, on May 21, 2020, Bartlett, Lewis, Hankins, and Drew signed NDAs with MG in order to protect MG's confidential information. Thus, Bartlett, Lewis, Hankins, and Drew each entered into binding and valid contracts with MG. MG could share its confidential business information with Bartlett and the others who had signed NDAs in anticipation of a joint collaboration. In exchange, Bartlett, Lewis, Hankins, and Drew would each keep all information they received in the highest confidence by not disclosing it to third parties, and they all agreed not to use the information themselves for any purpose beyond those stated in the NDAs.

113. MG's confidential information is defined as including "existing or contemplated business, processes and services, techniques, components, sales,

markets, costs, profits, research, development, inventions, purchasing, staff, employees, compensation, contractors, suppliers, customers, prospects, marketing, pricing policies, financial information, engineering and all other data." **Exhibit B, C, D, E,** ¶ 1. It also includes all proposals and information and data furnished by MG. *Id.*

114. Among other things, each NDA prohibits Bartlett, Lewis, Hankins, and Drew from using MG's confidential information for any purpose other than evaluating and negotiating a proposed transaction, or, in other words, outside of the cooperative relationship between Coy and MG. *Id.* at ¶ 4.

115. MG has performed all conditions, covenants and promises required on its part to be performed in accordance with the terms and conditions of the NDAs.

116. Bartlett, Lewis, Hankins, and Drew each breached the NDAs by utilizing confidential information disclosed to them under the NDAs, which Defendants did not know previously and which was confidential information not generally known to the public, to form a competing business utilizing MG's confidential information.

117. Each NDA also requires Bartlett, Lewis, Hankins, and Drew to return all original confidential information provided by MG and destroy all "copies, reproductions, summaries, compilations, analyses, and extracts thereof or based thereon" upon MG's request. *Id.* at ¶ 10.

118. MG has reminded Bartlett of this requirement in multiple written communications, but Bartlett's only response has been to feign ignorance. She has refused and continues to refuse to return or destroy MG's confidential information she has in her possession and refuses to acknowledge she possesses any such confidential information.

119. The foregoing conduct of Bartlett, Lewis, Hankins and Drew constitutes breaches of the NDAs.

120. MG has been damaged as a direct and proximate result of the foregoing

conduct in a manner and amounts to be proven at trial, but no less than $1.5 million based on calculating the loss of business and the spreading and improper use of economically valuable secrets in the marketplace, plus interest on the foregoing sums.

121. Bartlett, Lewis, Hankins, and Drew's breaches of their NDAs with MG have caused, and continue to cause, immense damage to MG. Bartlett, Lewis, Hankins, and Drew's breaches were and continue to be significant causes of this damage to Plaintiff.

**<u>THIRD CAUSE OF ACTION</u>**

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

**(California Law)**

**(Against Jessica Bartlett, Corey Lewis, Robert Hankins, and Thomas Drew)**

122. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

123. Bartlett, Lewis, Hankins, and Drew signed NDAs with MG on May 21, 2020, in order to protect MG's confidential information. Thus, Bartlett, Lewis, Hankins, and Drew each entered into binding and valid contracts with MG. MG could share its confidential business information with Bartlett and the others who had signed NDAs in anticipation of a joint collaboration. In exchange, Bartlett, Lewis, Hankins, and Drew would each keep all information they received in the highest confidence by not disclosing it to third parties, and they all agreed not to use the information themselves.

124. Implicit in every contract, including the NDAs, is a covenant between the parties thereto that no party will interfere with the other party's enjoyment of its contractual rights and benefits, and that each contracting party will do everything that the contract presupposes it will do to accomplish the contract's purpose.

125. Bartlett, Lewis, Hankins, and Drew breached the covenant of good faith and fair dealing implied in the NDAs by engaging in conduct that has precluded MG from enjoying the benefits of the NDAs and otherwise interfering with and/or failing

to cooperate with MG with respect to those agreements. Among other things, Bartlett, Lewis, Hankins and Drew's use of MG's confidential and trade secret information in setting up a competing business was unlawful and in bad faith.

126. Such actions frustrate the purpose of the NDAs and unfairly interfere with MG's rights to receive the benefits of the contract—namely, to prevent MG's information from ending up in the hands of competitors. In other words, *becoming* a competitor with all of MG's confidential information clearly defies the purpose of the agreement. The good faith performance of the NDAs would be to not use the confidential information against MG.

127. MG performed all, or substantially all, of the elements of its end of the NDAs.

128. All conditions required by the respective contracts for Bartlett, Lewis, Hankins and Drew's performance on their respective NDAs were met.

129. MG was harmed, and continues to be harmed, by Bartlett, Lewis, Hankins, and Drew's conduct. MG would never have shared information that could be used to harm MG if it had known that Bartlett, Lewis, Hankins, and Drew actually entered into the contract in bad faith and for the purpose of competing directly with MG.

130. The full amount of harm, given the Defendants' secretiveness and the type of harm suffered by Plaintiff, can be determined only in discovery. However, MG has been harmed by at least $1.5 million, based on calculating the loss of business and the spreading and improper use of economically valuable secrets in the marketplace.

## FOURTH CAUSE OF ACTION

**Breach of Contract – Website Development Agreement (California Law)**

**(Against Jessica Bartlett)**

131. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

132. Bartlett entered into the Bartlett WDA with MG on October 27, 2019, which is a valid and binding contract. **Exhibit A**.

133. The Bartlett WDA provides that MG will create a website for Bartlett's use but will retain ownership of all intellectual property rights. MG would also handle copyright infringement issues that arise. In exchange, Bartlett would be able to use her own independent website and earn revenue from that website. MG was also entitled to a certain percentage of the revenue earned by Bartlett's website. Finally, the agreement ensured a certain level of exclusivity.

134. The Bartlett WDA also contains a California choice of law clause. **Exhibit A**, ¶ 12.

135. MG performed all, or substantially all, of the elements of its end of the Bartlett WDA, including sharing creating a website, providing use of MG's technology, ensuring infringed images of Bartlett protected by copyright were taken down and providing a platform for Bartlett to monetize her online following.

136. All conditions required by the contract for Bartlett's performance were met.

137. The Bartlett WDA automatically renews each year unless one party provides written notice of intent not to renew at least 90 days before its renewal period begins. **Exhibit A**, ¶ 3.1.

138. The Bartlett WDA also has an integration clause that limits modifications to the agreement only by a written instrument executed by the parties. **Exhibit A**, ¶ 13(a.)

139. Bartlett's contract renewed for another twelve-month period on October 27, 2020 because she never provided contractually adequate notice within the possible cancellation period of the Bartlett WDA.

140. Nonetheless, Bartlett refuses to pay for any of the services she agreed MG would provide under the agreement, and to the extent she claims to have terminated the agreement, it is through improper means. As such, Bartlett has

breached the contract by refusing to accept services for which she agreed to pay and then by improperly attempting to terminate the contract despite its clear terms.

141. The Bartlett WDA also has robust confidentiality provisions designed to protect confidential information, to which Bartlett may have access or otherwise come across. **Exhibit A**, § 5.

142. In breach of section 5 of the Bartlett WDA, Bartlett shared confidential information belonging to MG and covered by the Website Development Agreement. She also used and continues to use this confidential information to compete against MG using, among other things, MG's own technologies, processes and strategies.

143. Bartlett's breaches of the Bartlett WDA have caused and continue to cause immense damage to MG. Bartlett's breaches are significant causes of this damage to Plaintiff.

144. The full amount of harm, given the Bartlett's secretiveness and the type of harm suffered by Plaintiff, can be determined only in discovery, but certainly exceeds $75,000 given the value of Bartlett's website to MG.

145. Bartlett's breaches of contract were and continue to be a substantial factor in causing MG's harm.

## <u>FIFTH CAUSE OF ACTION</u>

### Breach of the Implied Covenant of Good Faith and Fair Dealing – Website Development Agreement (California Law)

### (Against Jessica Bartlett)

146. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

147. Bartlett entered into Bartlett WDA on October 27, 2019, which is a valid and binding contract. **Exhibit A**.

148. The Bartlett WDA provides that MG will create a website for Bartlett's use but will retain ownership of all intellectual property rights. MG would also handle copyright infringement issues that arise. In exchange, Bartlett would be able to use

her own independent website and earn revenue from that website. MG was also entitled to a certain percentage of the revenue earned by Bartlett's website. Finally, the agreement ensured a certain level of exclusivity.

149. The Bartlett WDA contains a California choice of law clause. **Exhibit A,** ¶ 12.

150. Implicit in every contract, including the Bartlett WDA, is a covenant between the parties thereto that no party will interfere with the other party's enjoyment of its contractual rights and benefits, and that each contracting party will do everything that the contract presupposes it will do to accomplish the contract's purpose.

151. Bartlett breached the covenant of good faith and fair dealing implied in the Bartlett WDA by engaging in conduct that has precluded MG from enjoying the benefits of the Bartlett WDA and otherwise interfering with and/or failing to cooperate with MG with respect to that agreement. Among other things, Bartlett solicitation and use of MG's confidential and trade secret information in setting up a competing business was unlawful and in bad faith.

152. Such actions frustrate the purpose of the Bartlett WDA and unfairly interfere with MG's rights to receive the benefits of the contract—namely to prevent MG's information from ending up in the hands of competitors. In other words, *becoming* a competitor with all of MG's confidential information clearly defies the purpose of the agreement. The good faith performance of the Bartlett WDA would be to not use the confidential information against MG.

153. MG performed all or substantially all of the elements of its end of the Bartlett WDA.

154. All conditions required by the contract for Bartlett's performance were met.

155. MG was harmed and continues to be harmed by Bartlett's conduct. MG would never have shared information that could be used to harm MG if it had known

that Bartlett actually entered into the contract in bad faith and for the purpose of competing directly with MG.

156. The full amount of harm, given the Bartlett's secretiveness and the type of harm suffered by Plaintiff, can be determined only in discovery, but certainly exceeds $75,000 given the value of Bartlett's website to MG.

## SIXTH CAUSE OF ACTION

### Breach of Contract – Website Development Agreement (Florida Law)

### (Against Coy)

157. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

158. Coy entered into the Coy WDA with MG on August 6, 2020, which is a binding and valid written contract. **Exhibit N**. This agreement was similar to the agreements MG had entered into with Bartlett. The major difference is that it was anticipated that Coy would have multiple sub-users, each with their own websites operating in connection with the main Coy website. Another difference is that the agreement could be terminated by either party upon 30 days written notice. **Exhibit N**, ¶ 3.1.

159. As with the other agreements, MG maintained ownership of all intellectual property. MG would also handle copyright infringement issues that may arise. In exchange, Coy would be able to offer its clients use of their own independent websites, from which they could earn revenue. MG would be entitled to a certain amount of the revenue earned by the Coy website family that scaled up with its usage and popularity. Finally, the agreement ensured a certain level of exclusivity.

160. Unlike the other Website Development Agreements, the Coy WDA contains a Florida choice of law clause. **Exhibit N**, ¶ 12.

161. MG performed all or substantially all of the elements of its end of the Coy WDA, including sharing creating a website, providing use of MG's technology, ensuring images infringing on Coy's copyrights were taken down and providing a

platform for Coy to allow its clients to create their own websites under the Coy and MG banners.

162. All conditions for Coy's performance had been met.

163. Coy committed a material breach of the contract when it utilized its website to directly compete against MG, and Coy continues to compete against MG using MG's own technology, processes and strategies.

164. In violation of the Coy WDA, Coy has continued to use MG's software and services, even though the agreement specifically states that MG will retain all ownership.

165. The Coy WDA also has robust confidentiality provisions designed to protect confidential information, to which Coy may have access or otherwise come across. **Exhibit N**, § 5.

166. In breach of § 5 of the Coy WDA, Coy shared confidential information belonging to MG and covered by the Coy WDA. Coy also used and continues to use this confidential information to compete against MG using, among other things, MG's own technologies, processes and strategies.

167. Due to the nature of the breach and the sensitive information at issue, Coy is situated to have the information necessary to determine the full damage it has caused by its breach. However, MG has been harmed by at least $2.5 million, based on calculating the loss of business and the spreading and improper use of economically valuable information in the marketplace.

168. MG suffered and continues to suffer damages caused by Coy's breach of its agreement with MG.

## SEVENTH CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing (Florida Law)

### (Against Coy)

169. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

170. Coy entered into the Coy WDA with MG on August 6, 2020, which is a binding and valid written contract. **Exhibit N**. This agreement was similar to the agreements MG entered into with Bartlett. The major difference is that it was anticipated that Coy would have multiple sub-users with their own websites operating in connection with the main Coy website. Another difference is that the Coy WDA could be terminated by either party upon 30 days written notice. **Exhibit N**, ¶ 3.1.

171. As with the other agreements, MG maintained ownership of all intellectual property. MG would also handle copyright infringement issues that may arise. In exchange, Coy would be able to offer its clients use of their own independent websites, from which they could earn revenue. MG would be entitled to a certain percentage of the revenue earned by the Coy website family. Finally, the agreement ensured a certain level of exclusivity.

172. The Coy WDA contains a Florida choice of law clause. **Exhibit N**, ¶ 12.

173. Implicit in every contract, including the NDAs, is a covenant between the parties thereto that no party will interfere with the other party's enjoyment of its contractual rights and benefits, and that each contracting party will do everything that the contract presupposes it will do to accomplish the contract's purpose.

174. Based on the language contained in the Coy WDA, as well as repeated representations made by the Defendants, it shows that it was not anticipated that Coy was a wolf in sheep's clothing.

175. Coy consciously and deliberately failed and refused to adhere to the Coy WDA it had entered into with MG and refuses to discharge its contractual responsibilities that unfairly frustrates the contract's purpose. The purpose had been to operate in a cooperative, mutually beneficial manner, with Coy and MG each taking different roles.

176. Coy's actions result in destroying MG's expectations, as it had expected a cooperative relationship, in which MG's innovations, contributions, intellectual property, know-how and negative know-how would be recognized and for which MG

would be compensated in the form of a long-running cooperative effort.

177. Coy's unfair and bad faith actions have breached the implied covenant of good faith and fair dealing. The epitome of bad faith is to take technology, know-how and information obtained only by feigning collaboration and then turning around to use it against the party with whom one is in privity, as happened here.

178. MG was harmed and continues to be harmed by Coy's conduct. MG would never have shared information that could be used to harm MG if it had known that Coy actually entered into the contract in bad faith and for the purpose of competing directly with MG.

179. Due to the nature of the breach and the sensitive information at issue, Coy is situated to have the information necessary to determine the full damage it has caused by its breach. However, MG has been harmed by at least $2.5 million, based on calculating the loss of business and the spreading and improper use of economically valuable information in the marketplace.

## <u>EIGHTH CAUSE OF ACTION</u>

**Fraud (California Law)**

**(Against Jessica Bartlett)**

180. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

181. Bartlett knowingly made false statements regarding her true motives behind soliciting MG's help with starting Coy and operating Coy. For example, on May 6, 2020, Bartlett sent Nick a business proposal via text message seeking to partner up for what she represented would be a new management agency. During this initial May 6th exchange, Bartlett told Nick that she wanted to partner with MG to help her learn the ropes of running website businesses and to have MG provide its core services to this new business. When Bartlett first approached Nick about her business idea for what would eventually become Coy, she never said anything about Coy being a technology company or ultimately a competitor to MG. She merely

stated that it was a "subscription-based project." Indeed, Bartlett always represented to MG that Coy would be focused on offering management services to their clients and MG would be the technology company that supported Coy as its partner, with Coy focused on assisting with the actual creation of content. At no point did Bartlett, or anyone else, state to MG or Nick that Coy was supposed to be a competing technology company. However, Bartlett's subsequent statements that she always intended Coy to be a technology company prove that she lied when she stated otherwise to Plaintiff on May 6, 2020 and in subsequent statements thereafter.

182. Bartlett also falsely represented that she was procuring MG's confidential information solely for the purpose of entering into a partnership with MG. Beginning May 6, 2020, and continuing on through the end of October 2020, Bartlett negotiated with MG and solicited confidential information from MG through multiple emails, text messages, phone calls and even actual contracts. In these communications, Bartlett claimed that she wanted to partner with MG to run together a joint business with MG supplying its expertise on the technology side. For example, during a phone call between Bartlett, Lewis and Nick on May 16, 2020, Bartlett stated that she and Lewis wanted MG to be their technology partner because MG was already established and had the industry "figured out." In mid-October 2020, Bartlett reiterated to Nick that she saw Coy's relationship with MG as a "mutually beneficial relationship without competition" and that "keeping a healthy partnership" with MG was her "main concern." In actuality, she simply sought confidential information and technology from MG in order to create a competing business. She thus deceived MG in order to make her own company using technology and information gained from MG.

183. On October 27, 2019, Bartlett made promises to MG in the form of signing the Bartlett WDA with MG, in which she promised, *inter alia*, to keep Plaintiff's sensitive information in confidence and not to use it beyond the stated purposes in the contract. When entering into the agreement, Bartlett never had any

intention of performing her end of the bargain.

184. On May 21, 2020, Bartlett made promises to MG in the form of signing an NDA, in which she promised, *inter alia*, to keep Plaintiff's sensitive information in confidence and not to use it to beyond the stated purposes in the contract. When entering into the agreement, Bartlett never had any intention of performing her end of the bargain.

185. Bartlett later concealed the fact that she was actually setting Coy up to compete against MG using MG's own information and technology structure against it.

186. Bartlett intended MG to rely on her misrepresentations, including her promise to keep MG's confidential information secret and her intention for Coy and MG to maintain a "mutually beneficial relationship without competition" so that MG would share its confidential information with her and provide her the necessary information to run her own competing business. Bartlett made her true intention and her knowing of the falsity of her representations at the time they were made very clear when on March 4, 2021, she posted an Instagram update where she stated she always viewed Coy as a technology company first. *See supra* ¶ 87. Her intention, as described in her post, is the *opposite* of what she represented to MG, which was, as alleged herein, for MG to create a partnership with her new *management company* with its own website where it would MG's role to supply Coy's future clients with their websites, among other services.

187. Bartlett's false representations and omissions were material for several reasons, including that Plaintiff would not have turned over confidential information to Bartlett if it had known about Bartlett's false representations and omissions. Had MG known the truth, it never would have associated with or done any business with Bartlett, it would have never partnered with Coy, it would never have helped set up the business and it would have never disclosed its confidential information and trade secrets with any of the Defendants.

188. At the time of Bartlett's false representations and omissions, Bartlett knew her representations were false when made and that her omissions created false impressions because she knew that she was always intending to create and operate a business that directly competes with MG using MG's confidential information.

189. Bartlett had a duty to disclose the omitted information for several reasons, including that Bartlett had made disclosures regarding her intended use of MG's confidential information, which gave rise to a duty to make a full disclosure.

190. Bartlett knew that MG was unaware of Defendants' development of a competing business or Defendants' use of MG's confidential information.

191. Bartlett intended for MG to act on her representations and omissions and turn over confidential information, and MG did, in fact, turn over confidential information to Bartlett due to its reliance on Bartlett's representations and omissions.

192. MG actually and reasonably relied on the statements and promises made by Bartlett, including those contained in Bartlett's NDA with MG and the Bartlett WDA. On the basis of the NDA and the Bartlett WDA, as well as numerous phone calls and text messages from Bartlett, as described herein, MG shared confidential information and trade secrets and provided assistance with creating and operating Coy.

193. MG's reliance on Bartlett's statements and promises was justifiable in light of MG's knowledge and experience. Others associated with MG had adhered to their agreements and kept information confidential. Moreover, MG believed that all parties involved stood to gain from the cooperative effort.

194. MG has been harmed in that it was deceived into sharing its technology and expertise that was ultimately used to compete directly with MG using its own business model and own technology.

195. Given the nature of Bartlett's fraud, and the secretive nature of Bartlett's business, Bartlett necessarily and naturally has the complete information related to the damage she has caused from stealing Plaintiff's information and business.

However, MG has been harmed by at least $2.5 million, based on calculating MG's costs to develop and refine its trade secrets and confidential information that was fraudulently obtained, MG's expected share of profit from the partnership, as well as the opportunity costs associated with time spent collaborating that could have been spent either on client relations or collaborating with good-faith individuals and businesses.

196. Bartlett's conduct was intentional, malicious and fraudulent, justifying the award of punitive and exemplary damages.

197. MG's reliance on Bartlett's false statements and false promises was and continues to be a substantial factor in causing its harm.

198. MG is entitled to any and all compensatory and punitive damages flowing from Bartlett's fraud in procuring MG's confidential information.

**NINTH CAUSE OF ACTION**

**Fraud (California Law)**

**(Against Corey Lewis, Robert Hankins, and Thomas Drew)**

199. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

200. On May 21, 2020, Lewis, Hankins and Drew each made promises to MG in the form of signing NDAs, including, *inter alia*, promises to keep Plaintiff's sensitive information in confidence and not to use it to beyond the stated purposes in the contract. When entering into these agreements, Lewis, Hankins and Drew never had any intention of performing the promises contained in the agreements. They were already in league with Bartlett to take MG's technology, information and business model for themselves.

201. Lewis knowingly made false statements regarding his true motives, including in multiple phone calls and text messages. For example, during his May 16, 2020 phone call with Bartlett and Nick, Lewis told Nick that he and Bartlett wanted to provide model management services to aspiring models and social influencers and

wanted MG to serve as Coy's technology partner because MG was already established and had the industry "figured out." Lewis concealed the fact that he, Bartlett and the other Defendants were setting Coy up to compete directly against MG.

202. Lewis, Hankins and Drew intended MG to rely on their misrepresentations, and particularly their false promises in the NDAs they signed, so that MG would share its confidential information and assist with creating Coy. Bartlett made Coy's founders' true intentions and their knowing of the falsity of their representations at the time they were made very clear when on March 4, 2021 she posted an Instagram update where she stated she always viewed Coy as a technology company first. *See supra* ¶ 87. Coy's founders' intentions, as described in Bartlett's post, are the exact *opposite* of what they represented to MG. Had MG known the truth, it never would have associated with or done any business with Lewis, Hankins or Drew.

203. MG actually relied on the NDAs to keep its confidential information out of the hands of competitors. On that basis, MG shared confidential information and provided assistance with creating and operating Coy.

204. MG's reliance on the NDAs was justifiable in light of MG's knowledge and experience. Others associated with MG had adhered to their agreements and kept information confidential. Moreover, MG believed that all parties involved stood to gain from the cooperative effort.

205. MG has been harmed in that it was deceived into sharing its technology and expertise that was ultimately used to compete directly with MG using its own business model and own technology.

206. Given the nature of Lewis, Hankins and Drew's fraud, as well as the secretive nature of Lewis, Hankins and Drew's business, Lewis, Hankins and Drew necessarily and naturally have the complete information related to the damages they have caused by stealing Plaintiff's information and business. However, MG has been harmed by at least $2.5 million, based on calculating MG's costs over the last year to

develop and refine the technology, know-how and confidential information that was fraudulently obtained, MG's expected share of profit from the partnership, as well as the opportunity costs associated with time spent collaborating that could have been spent either on client relations or collaborating with good-faith individuals and businesses.

207. Lewis, Hankins and Drew's conduct was intentional, malicious, and fraudulent, justifying the award of punitive and exemplary damages.

208. MG's reliance on Lewis, Hankins, and Drew's false promises was and continues to be a substantial factor in causing its harm.

## TENTH CAUSE OF ACTION

### Fraud (California Law)

### (Against Coy)

209. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

210. On August 6, 2019, Coy made promises to MG in the form of a Website Development Agreement with MG signed by Bartlett as CEO of Coy (the "Coy WDA"). When entering into the Coy WDA, Coy never had any intention of performing its end of the bargain.

211. Coy intended MG to rely on its misrepresentations and those made by its founders prior to being incorporated, including emails, text messages, phone calls and earlier NDAs signed by its founders. These promises centered largely on keeping MG's information confidential and out of the hands of competitors. Bartlett made Coy's true intention and its knowing of the falsity at the time the misrepresentations were made very clear when on March 4, 2021, she posted an Instagram update where she stated she always viewed Coy as a technology company first. *See supra* ¶ 87. Coy's intention, as described in her post, is the exact *opposite* of what she represented to MG. Had MG known the truth, it never would have associated with or done any business with Bartlett.

212. MG actually relied on the statements and promises made by Coy's officers and founders, including the promises contained within the Coy WDA and the earlier NDAs. On the basis of the NDAs, the Coy WDA, as well as the various statements, texts, emails and phone calls outlined above, MG shared confidential information with Coy.

213. MG's reliance on Coy's false statements and promises was justifiable in light of MG's knowledge and experience. Others associated with MG had adhered to their agreements and kept information confidential. Moreover, MG believed that all parties involved stood to gain from the cooperative effort.

214. MG has been harmed in that it was deceived into sharing its technology and expertise that was ultimately used to compete directly with MG using its own business model and own technology.

215. Given the nature of Coy's fraud and the secretive nature of Coy's business, Coy necessarily and naturally has the complete information of damage it has caused from stealing Plaintiff's information and business. However, MG has been harmed by at least $2.5 million, based on calculating MG's costs over the last year to develop and refine the technology, know-how and confidential information that was fraudulently obtained, MG's expected share of profit from the partnership, as well as the opportunity costs associated with time spent collaborating that could have been spent either on client relations or collaborating with good-faith individuals and businesses.

216. Coy's conduct was intentional, malicious and fraudulent, justifying the award of punitive and exemplary damages.

217. MG's reliance on Coy's false statements and promises was and continues to be a substantial factor in causing its harm.

## ELEVENTH CAUSE OF ACTION

**Breach of Fiduciary Duty**

**(Against Jessica Bartlett, Corey Lewis, Robert Hankins, and Thomas Drew)**

218. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

219. Bartlett, Lewis, Hankins and Drew each, knowingly or unknowingly, entered into a partnership and/or joint venture with MG in May 2020 by entering into an agreement whereby: (1) MG shared in the management and control of the partnership and/or venture, including by making hiring decisions and exercising control over the technology and creative design used; (2) MG contributed valuable services, such as providing technology and creating the websites. MG also offered technical expertise, industry expertise, and business expertise; and (3) MG shared in the profits by receiving a portion of each website subscriber's monthly subscription fee and a portion of each individual sale of premium content.[8]

220. The parties' intent was clear, as Bartlett and Lewis frequently referred to MG as their partner and described their relationship as a partnership. They also introduced Nick to third parties as their "technology partner."

221. Even after the contract between MG and Coy was signed in August 2020, Bartlett, Lewis and Nick all referred to their relationship as a "partnership."

222. As partners and/or joint venturers with MG, Bartlett, Lewis, Hankins and Drew each owed MG fiduciary duties of care, loyalty and good faith.

223. Bartlett, Lewis, Hankins and Drew each breached their fiduciary duties, including care, loyalty, and good faith owed to MG by concealing their true motives and goals, leveraging the trust engendered by the partnership and/or joint venture with MG in order to obtain knowledge and skills and by ultimately creating a business expressly designed to compete directly against their partner/joint venturer, MG.

---

[8] Additionally, the existence of a partnership has been judicially admitted by Defendants and/or is subject to judicial estoppel.

224. By entering into a partnership and/or joint venture with MG under false pretenses, Bartlett, Lewis, Hankins and Drew breached their fiduciary duties of care and loyalty owed to MG the instant those duties came into being.

225. The breaches of fiduciary duties by Bartlett, Lewis, Hankins and Drew have actually and proximately caused harm to MG.

226. Since the above-described breaches are breaches of fiduciary duties, including care, loyalty and good faith (which includes candor), the breach is inherently secretive, which makes the full extent of the damage known only to Bartlett, Lewis, Hankins and Drew absent discovery. However, MG has been harmed by at least $2.5 million, based on calculating MG's costs and opportunity costs cooperating in good faith with partners who have breached their fiduciary duties to harm MG for their own benefit.

## TWELFTH CAUSE OF ACTION

**Breach of Fiduciary Duty**

**(Against Coy)**

227. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

228. Coy and MG entered into a partnership or joint venture by entering into an agreement whereby: (1) MG shared in the management and control of the partnership and/or venture, including by making hiring decisions and exercising control over the technology and creative design used; (2) MG contributed valuable services, such as providing technology and creating the websites. MG also offered technical expertise, industry expertise, and business expertise; and (3) MG shared in the profits by receiving a portion of each website subscriber's monthly subscription fee and a portion of each individual sale of premium content.[9]

229. The parties' intent was clear, as Bartlett and Lewis frequently referred

[9] Additionally, the existence of a partnership has been judicially admitted by Defendants and/or is subject to judicial estoppel.

to MG as their partner and described Coy's relationship with MG as a partnership. They also introduced MG to third parties as Coy's "technology partner."

230. The partnership was originally formed in May 2020, and the fiduciary breaches at issue took place both before and after the contract between Coy and MG was signed in August 2020. The language in the contract between MG and Coy could not eliminate the reality of the partnership that existed when all parties involved behaved and continued as though there were in fact a partnership. For example, even after the contract between MG and Coy was signed in August 2020, Defendants and MG still referred to their relationship as a "partnership."

231. As partners and/or joint venturers with MG, Coy owed MG fiduciary duties of care and loyalty.

232. Coy breached its fiduciary duties, including care, loyalty and good faith owed to MG by concealing its true motives and goals, leveraging the trust engendered by the partnership and/or joint venture with MG in order to obtain knowledge and skills and by ultimately becoming a direct competitor against its partner/joint venturer, MG.

233. By entering into a partnership and/or joint venture with MG under false pretenses, Coy breached its fiduciary duties of care, loyalty and good faith owed to MG the instant those duties came into being.

234. The breaches of fiduciary duties by Coy have actually and proximately caused harm to MG.

235. Since the above-described breaches are breaches of fiduciary duties, including care, loyalty, and good faith (which includes candor), the breach is inherently secretive, which makes the full extent of the damage known only to Coy absent discovery. However, MG has been harmed by at least $2.5 million, based on calculating MG's costs and opportunity costs cooperating in good faith with partners who have breached their fiduciary duties to harm MG for their own benefit.

**THIRTEENTH CAUSE OF ACTION**

**Unfair Competition – California Bus. Prof. Code § 17200 *et seq*.**

**(Against All Defendants)**

236. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1-90, 122-130, 146-156 and 169-235 set forth above.

237. California Business and Professions Code § 17200 *et seq*. prohibits any unlawful, unfair or fraudulent business act or practice, as well as any unfair, deceptive, untrue or misleading advertising in violation of Business and Professions Code § 17500 *et seq*.

238. Defendants have engaged in unlawful, unfair and fraudulent business acts. Defendants knowingly engaged in unfair competition within the meaning of California Business and Professions Code § 17200 by, among other things, developing and furthering plans to build a competitive business using MG's confidential information and trade secrets and soliciting and/or inducing MG's clients to terminate their business relationship with MG and moving their business to Coy.

239. Defendants' defrauding of Plaintiff, as alleged above, constitutes an unlawful business act.

240. Defendants' breaches of the implied covenant of good faith and fair dealing, as alleged above, also constitutes an unlawful business act.

241. Defendants' breaches of their fiduciary duties owed to MG, as alleged above, constitutes an unlawful business act.

242. MG has suffered injury in fact as a result of each of the forms of Defendants' unfair competition.

243. Defendants have been unjustly enriched by resorting to unfair competition with the full amount to be determined at trial following discovery of records necessarily and logically under Defendants' control.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

ON THE FIRST CAUSE OF ACTION

1. Compensatory damages according to proof at trial;

2. Disgorgement of profits due to unjust enrichment;

3. Punitive and exemplary damages as awarded at trial pursuant to 18 U.S.C. § 1836(b)(3)(C);

4. A temporary and final injunction to prevent or restrain further infringement and misappropriation of Plaintiff's trade secrets;

5. A reasonable royalty;

6. Plaintiff's costs, including reasonable attorneys' fees, pursuant to U.S.C. § 1836(b)(3)(D);

ON THE SECOND CAUSE OF ACTION

7. Expectation damages exceeding $1.5 million;

8. A temporary and final injunction to prevent or restrain further use and disclosure of Plaintiff's intellectual property and confidential information;

9. Plaintiff's costs, including reasonable attorneys' fees, as provided by the contract;

ON THE THIRD CAUSE OF ACTION

10. Expectation damages exceeding $1.5 million;

11. A temporary and final injunction to prevent or restrain further use and disclosure of Plaintiff's intellectual property and confidential information;

12. Plaintiff's costs, including reasonable attorneys' fees, as provided by the contract;

ON THE FOURTH CAUSE OF ACTION

13. Expectation damages exceeding $75,000;

14. A temporary and final injunction to prevent or restrain further use and disclosure of Plaintiff's intellectual property and confidential information;

15. Plaintiff's costs, including reasonable attorneys' fees, as provided by the contract;

ON THE FIFTH CAUSE OF ACTION

16. Expectation damages exceeding $75,000;

17. A temporary and final injunction to prevent or restrain further use and disclosure of Plaintiff's intellectual property and confidential information;

18. Plaintiff's costs, including reasonable attorneys' fees, as provided by the contract;

ON THE SIXTH CAUSE OF ACTION

19. Expectation damages exceeding $2.5 million;

20. A temporary and final injunction to prevent or restrain further use and disclosure of Plaintiff's intellectual property and confidential information;

21. Plaintiff's costs, including reasonable attorneys' fees, as provided by the contract;

ON THE SEVENTH CAUSE OF ACTION

22. Expectation damages exceeding $2.5 million;

23. A temporary and final injunction to prevent or restrain further use of Plaintiff's intellectual property and confidential information;

24. Plaintiff's costs, including reasonable attorneys' fees, as provided by the contract;

ON THE EIGHTH CAUSE OF ACTION

25. Damages according to proof but of no less than $2.5 million;

26. Punitive and exemplary damages as awarded at trial;

ON THE NINTH CAUSE OF ACTION

27. Damages according to proof but of no less than $2.5 million;

28. Punitive and exemplary damages as awarded at trial;

ON THE TENTH CAUSE OF ACTION

29. Damages according to proof but of no less than $2.5 million;

30. Punitive and exemplary damages as awarded at trial;

ON THE ELEVENTH CAUSE OF ACTION

31. Compensatory damages according to proof but of no less than $2.5 million;

32. Punitive and exemplary damages as awarded at trial;

33. Disgorgement of profits;

ON THE TWELFTH CAUSE OF ACTION

34. Compensatory damages according to proof but of no less than $2.5 million;

35. Punitive and exemplary damages as awarded at trial;

36. Disgorgement of profits;

ON THE THIRTEENTH CAUSE OF ACTION

37. Compensatory damages exceeding $75,000;

38. Disgorgement and restitution of illegally gained profits due to Defendants' unfair competition;

39. A temporary and final injunction to prevent or restrain further unfair competition against Plaintiff;

40. Plaintiff's costs incurred by this suit, including reasonable attorneys' fees, under Cal. Civ. Proc. Code § 1021.5;

ON THE ALL CAUSES OF ACTION

41. Costs of suit incurred herein;

42. Pre- and post-judgment interest; and

43. Such other and further relief as the Court may deem just and proper.

## ***DEMAND FOR JURY TRIAL***

Plaintiff hereby demands a jury trial on all issues so triable pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the U.S. Constitution.

Respectfully submitted,

DATED: November 4, 2021 BY: GERARD FOX LAW, P.C.

*/s/ Gerard P. Fox*
Gerard P. Fox
Marina V. Bogorad
*Attorneys for Plaintiff McCandless Group, LLC*