Gerard P. Fox (SBN 151649)
gfox@gerardfoxlaw.com
Cirstan S. Fitch (SBN 268646)
cfitch@gerardfoxlaw.com
Gerard Fox Law P.C.
1880 Century Park East, Suite 1410
Los Angeles, California 90067
Telephone: (310) 441-0500
Facsimile: (310) 441-4447

Attorneys for Plaintiff/Counter-Defendants
McCandless Group LLC and Nicholas McCandless

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MCCANDLESS GROUP LLC,<br><br>Plaintiff,<br>v.<br><br>THE COY COLLECTIVE, et al.,<br><br>Defendants. | Case No.: 2:21-cv-02069<br><br>Hon. David O. Carter<br><br>**PROPOSED FOURTH AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| THE COY COLLECTIVE, et al.,<br><br>Counterclaimants,<br><br>v.<br><br>MCCANDLESS GROUP LLC and NICHOLAS MCCANDLESS,<br><br>Counter-Defendants. | |

Plaintiff McCandless Group, LLC ("MG") brings this action against The Coy Collective, Inc. ("Coy"), Jessica Bartlett ("Bartlett"), Corey Lewis ("Lewis"), Robert Hankins ("Hankins"), Thomas Drew ("Drew"), TMW Labs Inc. ("TMW Labs") a Texas corporation, Matthew Silk ("Silk"), The Sheth Sangreal Foundation ("Sangreal") a Texas 501(c)3 corporation, Andrew Geller ("Geller"), Juan Pablo Lopez ("Lopez") in his individual capacity as Director of TMW Labs Inc., and DOES 1-10 (all together, the "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1. MG is a victim of business partners who gained Plaintiff's trust before stabbing it in the back. Certain Defendants (Coy, Bartlett, Lewis and Drew) entered into a business relationship with MG, signing nondisclosure agreements and/or confidentiality clauses, ostensibly to cooperate and grow their businesses together. However, this was never Defendants' plan, as they always had the intent of learning about MG's technology, business model, processes, techniques, and strategies in order to steal them and use them for themselves. Defendants took MG's methods and information obtained through their false pretense of cooperation and instead started their own competing business, Coy, to subsume MG. Later, Defendants Coy, Bartlett, Lewis and Drew, acting in concert, transferred Plaintiff's technology trade secrets to Defendants TMW Labs, which is owned, operated and/or controlled by Defendants Silk, Geller, Sangreal and Lopez all of whom were acting in concert to deprive Plaintiff of the benefit of his trade secrets causing millions of dollars in economic damage.

## PARTIES

2. Plaintiff McCandless Group, LLC is a limited liability company organized under the laws of Florida with its principal place of business in Miami, Florida. McCandless Group, LLC creates individual websites for models and influencers seeking to monetize their social media following. McCandless Group, LLC creates the websites for its clients and assists them with the technical operations

of their website. In exchange, McCandless Group, LLC receives a portion of the revenue that their clients' sites collect each month.

3. Defendant The Coy Collective, Inc. is a corporation organized under the laws of Delaware. Plaintiff is informed and believes that The Coy Collective, Inc. has its principal place of business in Texas. The Coy Collective, Inc. originally started as a purported partner with McCandless Group, LLC and utilizes the same website design, technologies, and structure pioneered by McCandless Group, LLC. The Coy Collective, Inc. began operating as a direct competitor to McCandless Group, LLC, hosting websites for models and social media influencers and in exchange receives a portion of each client's monthly revenue. It was recently determined that The Coy Collective Inc. transferred its sole asset, the technological design and development which is or is nearly a mirror-image of Plaintiff's trade secret, to Defendant TMW Labs which intends to conduct the same operation and/or business that would compete directly with Plaintiff.

4. Defendant Jessica Bartlett is an individual. Plaintiff is informed and believes that Jessica Bartlett is a resident of the County of Los Angeles in the state of California and is the CEO and/or President of The Coy Collective, Inc.

5. Defendant Corey Lewis is an individual. Plaintiff is informed and believes that Corey Lewis is a resident of the state of Texas and is acting as an agent for The Coy Collective, Inc.

6. Defendant Robert Hankins is an individual. Plaintiff is informed and believes that Robert Hankins is a resident of the state of California and is acting as an agent for The Coy Collective, Inc.

7. Defendant Thomas Drew is an individual. Plaintiff is informed and believes that Thomas Drew is a resident of the state of New York and is acting as an agent for The Coy Collective, Inc.

8. Defendant Juan Pablo Lopez is an individual. Plaintiff is informed and believes that Juan Lopez is a resident of the state of Texas and is acting as the Director

for TMW Labs Inc.

9. Defendant TMW Labs Inc., is a Texas for-profit corporation and was organized on information and belief on January 10, 2023 by Defendant Matthew Silk, who is also the current Chief Financial Officer of The Coy Collective Inc.

10. Defendant Sheth Sangreal Foundation is a Texas 501(c)3 domestic nonprofit corporation, that identifies Defendant Andrew Geller as one of its Directors. On information and belief, it was organized on October 27, 2011.

11. Defendant Andrew Geller and individual. Plaintiff is informed and believes that Andrew Geller is a resident of the state of Texas and is a Director of The Sheth Sangreal Foundation is an investor in The Coy Collective.

12. Defendant Matthew Silk is an independent investor and was installed as the Chief Executive Officer of The Coy Collective, on information and belief, sometime in or around January 2022. Silk is also believed to own 30-40% interest in Defendant TMW Labs Inc., organized in Texas on or about January 10, 2023.

13. On information and belief, at all times mentioned herein, each defendant was the agent, employee, representative, partner, subsidiary, affiliate, joint venturer, or alter-ego of each of the other defendants, and in doing the things herein alleged, was acting, at least in part, within the course and scope of such relationship and with the knowledge, authorization, consent, and ratification of each of the other defendant. Each and every defendant was acting as a single enterprise, with a single purpose, such that any corporate veil is non-existent.

14. Defendants and each of them worked in concert to conspire against Plaintiff in order to deprive it of the value and benefit of its trade secrets at all times mentioned herein.

15. The true names and capacities of all defendants sued herein as Does 1 through 10 (the “Doe Defendants”) are unknown to Plaintiff, who therefore sues such defendants by fictitious names. If necessary, Plaintiff will seek leave of Court to amend this Complaint to state their true names and capacities when the same have

been ascertained. Plaintiff is informed and believes, and on that basis alleges, that the Doe Defendants direct, control, ratify, participate in, materially contribute to, profit from, induce, encourage, facilitate, and/or are the moving force behind the violations of Plaintiff's copyrights or are otherwise liable to Plaintiff as a result of their participation in all or some of the acts set forth hereinafter. Plaintiff is further informed and believes and therefore alleges that each of the Doe Defendants was the agent of at least one of the named defendants, and in doing the things alleged in this Complaint was acting within the course and scope of such agency, and/or acted in concert with at least one of the named defendants and is jointly and severally liable to Plaintiff with said named defendants.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action as a federal question under 28 U.S.C. § 1331. This Court also has jurisdiction over the state law claims pursuant to ancillary, pendant, and supplemental jurisdiction, including under 28 U.S.C. § 1367. This Court also has complete jurisdiction over all state claims given diversity jurisdiction pursuant to 28 U.S.C. § 1332 because each defendant is domiciled in a different state from the plaintiff and the amount in controversy exceeds $75,000.

17. This Court has personal jurisdiction over Jessica Bartlett because she is domiciled in California. Jessica Bartlett also entered into at least two contracts with Plaintiff when both Plaintiff and Jessica Bartlett were domiciled in California. These two contracts contain California choice of law provisions. She is also an executive at Coy, and she is operating multiple websites targeting residents of California. These websites involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features.

18. This Court has personal jurisdiction over The Coy Collective, Inc. because it operates multiple websites targeting residents of California. These

websites involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features.

19. This Court has personal jurisdiction over Corey Lewis because he has contacts with California and has purposefully availed himself of California law. Corey Lewis entered into at least one contract with Plaintiff when Plaintiff was domiciled in California. This contract contains a California choice of law provision. In addition, Corey Lewis is, or was at all relevant times, either an executive, part owner, employee, or agent of Coy, and is involved in its business running websites, and his tortious activities complained about were, in part, directly in relation to the creation of these websites. These websites target residents of California and involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features.

20. This Court has personal jurisdiction over Robert Hankins because he is domiciled in Los Angeles, California. Robert Hankins also entered into at least one contract with Plaintiff when both Plaintiff and Robert Hankins were domiciled in California. The contract contains a California choice of law provision. In addition, Robert Hankins is, or was at all relevant times, either an executive, part owner, employee, or agent of Coy, and is involved in its business running websites, and his tortious activities complained about below were, in part, directly in relation to the creation of these websites. These websites target residents of California and involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features.

21. This Court has personal jurisdiction over Thomas Drew because he has contacts with California and has purposefully availed himself of California law. Thomas Drew entered into at least one contract with Plaintiff when Plaintiff was domiciled in California. This contract contains a California choice of law provision. In addition, Thomas Drew is, or was at all relevant times, either an executive, part

owner, employee, or agent of Coy, and is involved in its business running websites, and his tortious activities complained about below were, in part, directly in relation to the creation of these websites. These websites target residents of California and involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features.

22. This Court has personal jurisdiction over Juan Pablo Lopez because he has contacts with California and has purposefully availed himself of California law. Juan Pablo Lopez, as Director of TMW Labs, Inc., entered into at least one contract with The Coy Collective when The Coy Collective was operating its business and availing itself to the jurisdiction of California. In addition, Juan Pablo Lopez is, or was at all relevant times, either an executive, officer, director or part owner, employee, or agent of Coy, and is involved in its business including but not limited to the receipt of Coy's misappropriated assets, and his tortious activities complained about throughout were, in part, directly in relation to the creation of these websites and the conspiracy to deprive Plaintiff of the benefit of its trade secrets. The Coy Collective's websites target residents of California and involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features and the technology used for those website targeted towards California residents.

23. This Court has personal jurisdiction over TMW Labs, Inc. because it received the transfer of misappropriated assets from The Coy Collective which operates multiple websites targeting residents of California. These websites involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features. Furthermore, TMW Labs, Inc. is a shell corporation owned, operated and/or controlled by Defendant Matthew Silk who is the current Chief Executive Officer of The Coy Collective and who owes certain fiduciary duties governed under the laws

of the state of California.

24. This Court has personal jurisdiction over The Sheth Sangreal Foundation because it is an investor in, and the agent of, The Coy Collective which operates multiple websites targeting residents of California. These websites involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features. Furthermore, The Sheth Sangreal Foundation is a shell corporation owned, operated and/or controlled by Defendants Matthew Silk who is the current Chief Executive Officer of The Coy Collective and/or Andrew Geller and who owes certain fiduciary duties governed under the laws of the state of California and who was the direct recipient of Plaintiff's trade secrets.

25. This Court has personal jurisdiction over Andrew Geller because he has contacts with California and has purposefully availed himself of California law. Andrew Geller, as Director of The Sheth Sangreal Foundation, was at all relevant times, either an owner, part owner, or agent of Coy, and is involved in its business including but not limited to the transfer and receipt of Coy's misappropriated assets, and his tortious activities complained about throughout were, in part, directly in relation to the creation of these websites and the conspiracy to deprive Plaintiff of the benefit of its trade secrets. The Coy Collective's websites target residents of California and involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features and the technology used for those websites targeted towards California residents.

26. This Court has personal jurisdiction over Matthew Silk because he has contacts with California and has purposefully availed himself of California law. Matthew Silk, as Chief Executive Officer of The Coy Collective and owner/operator of TMW Labs Inc., was at all relevant times, either an executive, officer, director, owner, part owner, or agent of Coy and TMW Labs Inc., and is involved in its

business including but not limited to the transfer and receipt of Coy's misappropriated assets, and his tortious activities complained about throughout were, in part, directly in relation to the creation of these websites and the conspiracy to deprive Plaintiff of the benefit of its trade secrets. The Coy Collective's websites target residents of California and involve paid monthly subscriptions, and many of the subscribers are believed to be California residents. These websites also contain interactive elements, such as chat features and the technology used for those websites targeted towards California residents.

27. Venue in this judicial district is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the underlying claims occurred in the Central District of California, and the codefendants do not all reside in the same state. Many of the contracts underlying this action were formed in this district while Plaintiff was domiciled in this district. A substantial part of the underlying tortious activity occurred in this district and its effects were felt in this district. Additionally, at least one defendant is domiciled in the Central District of California.

## COMMON FACTUAL ALLEGATIONS

### I. MG's Business

28. MG was started by Nick McCandless ("Nick") on June 23, 2014.[1] MG is an innovative technology company that creates individually owned and operated websites for models and social media influencers who wish to monetize their online following. MG builds and hosts websites for its clients, who in turn create and provide exclusive content to subscribers who pay for a monthly subscription to the individual client's website. These subscribers can then also purchase specific premium content, such as photos and videos. In exchange for creating and running their clients' websites, MG receives a percentage of each client's monthly website revenue.

---

[1] MG initially began as a California LLC and converted to a Florida LLC on May 18, 2020.

29. MG's clients run their own businesses, and set their own prices, including the monthly subscription fee for their websites. MG developed and structured the technological infrastructure to handle the billing and subscription aspects of the Clients' websites, and it created an easy interface for its clients to be able to upload the content they create to their websites.

30. MG's market differentiator is its ability to create individual custom websites for social media influencers and models, thereby allowing them to run their own business and promote their own brand. Competing companies, such as OnlyFans, operate under a particular company's brand and merely have a sub-page under the main overarching website and company brand. By contrast, MG's clients get to have their own URL of their choosing, set their own pricing and run their own business as they see fit.[2]

31. MG consists of a group of skilled and experienced technology experts who have spent years honing their craft. The team spent over a year developing the technology, the infrastructure, the business model and the processes involved that make MG's current service successful. Like many startups sailing in uncharted waters, MG experienced challenges and threats to its survival. Unlike many startups, MG learned and adapted.

32. MG's valuable confidential business information and trade secrets include know-how and negative know-how regarding the design and structure of individual websites and the technology behind those websites (the "technology stack"), MG's cost and accounting structure, MG's revenue model, as well as compilations, methods, techniques and processes with regard to the information

---

[2] In addition to the unique URLs provided by MG, unlike OnlyFans, MG uses its own technology, customizes its websites based directly upon feedback and requests by its clients, monitors and protects client content, avoids any particular brand association or stigma and coaches and consults with its clients in an effort to help them maximize their revenue. OnlyFans, on the other hand, does nothing to assist its clients.

described above.

33. MG takes reasonable precautions to maintain the secrecy and confidentiality of its proprietary business information and trade secrets. For example, MG has all its employees and contractors sign agreements for non-disclosure, non-use, and non-competition. MG also ensures that external software developers have internal confidentiality policies[3] and utilizes data security measures, such as hosting all of its websites using secure socket layer ("SSL"), employing the latest security standards on all of its websites using Amazon Web Services ("AWS"), encrypting all source code, restricting network access using two-factor authentication, allowing only approved internet protocol ("IP") addresses access to database information and restricting data to only those who need access to that data for their particular job. Furthermore, websites created by MG disable the right click ("view source" feature) so as to protect as much code as possible. Beyond that, the HTML code itself is created dynamically by servers based on things such as the visitor's unique ID. This means that even if someone were able to view the HTML code, that would not provide the information necessary to recreate a website like MG's or develop a technology platform similar to MG's. Thus, even though MG creates and operates public-facing websites, MG has intentionally taken more steps than most companies in order to protect its websites, source code and other confidential information and trade secrets.

34. Each of MG's clients enters into a contract with MG called a Website Development Agreement. The agreement spells out the responsibilities of both parties and includes robust confidentiality provisions.

35. MG's technology and business model has made it popular with

[3] For example, one developer MG frequently uses has an explicit policy whereby individuals may not disclose even the identity of its client, let alone confidential information, and the importance of confidentiality is discussed at least once per month.

established social media influencers and models who already have a large online presence and wide name recognition and who want to continue to grow their own brand.

## II. The Bartlett WDA

36. In late 2019, MG approached Jessica Bartlett as a potential client. Bartlett already had a large social media following, and MG offered her the chance to create her own website and monetize her social media brand.

37. Bartlett entered into a Website Development Agreement with MG on October 27, 2019 ("Bartlett WDA"). Bartlett provided a signed copy to Nick on the same day. The Bartlett WDA is attached and incorporated herein as **Exhibit A**.

## III. Bartlett's Partnership Proposal

38. On May 6, 2020, Bartlett sent a text message to Nick with a business proposal for MG. She had an idea to create a new company that would provide management and other services to models, such as arranging for professional photo shoots and video shoots, providing assistance with social media marketing, and brand management.[4] She wanted to partner with MG. Through that partnership, MG was to: (1) help Bartlett learn the ropes of running website businesses, and (2) provide its core services to the partnership, such as supplying the websites, technology, payment processing, technical support, and protecting the exclusivity of subscribed content. According to Bartlett, she already had investors lined up and business partners who were excited about the prospect of working with MG and having MG serve as the technology developer.

39. Keenly aware of the benefits and commercial value of MG's business, Bartlett pretended to be interested in a partnership with MG, including a license to MG's technology, to gain access to highly valuable information and technical assistance from Nick and MG that otherwise would not have been available to her.

---

4 This business eventually was formed as The Coy Collective, Inc.

Yet her representations that she intended to partner up with MG were intentionally false, and so were the conversations to the same effect with her and her associates that followed. Bartlett and her cronies were there to pump MG for information, learn everything they could and then turn around and stub MG in the back by using its own information against it. And just how quickly the truth came out later shows that Defendants never intended to do anything they represented they intended to do at the time the representations were made to MG.

40. When Bartlett first approached Nick about her business idea for what would eventually become Coy, she did not present Coy as a technology company or ultimately a competitor to MG; rather, she indicated that it would be a "subscription-based project," that she wanted MG to develop a website based upon her idea and that she did not want to share a percentage of the revenue and, instead, wanted to pay a flat fee each month.

41. Due to the nature of websites and web traffic, costs are highly variable for hosting and operating websites. This means that flat fees are not well suited for the services Bartlett wanted MG to provide for their partnership. Bartlett specifically stated that she wanted the same features as her own website, but that she expected much higher web traffic than her own website. As web traffic increases, the costs involved also increase. This would mean that the more successful the website became, the less MG would profit. Nick explained that a flat fee would therefore not make sense for MG but reiterated that he was open to reaching a mutually beneficial arrangement.

42. MG perceived Bartlett's offer as an opportunity to expand the business and its revenue base, and it appeared by all accounts to be a mutually beneficial partnership.

43. On May 9, 2020, Bartlett arranged for a phone call with Corey Lewis so that she could introduce Lewis to Nick. Bartlett described Lewis as one of her main business partners. During the call, Nick marketed his business by telling them what

services he would be able to provide them if they worked together.

44. On May 16, 2020, Nick had another call with Lewis and Bartlett, in which they all agreed to a basic set of terms for the proposed partnership. These terms were further clarified over text messages exchanged between Nick and Lewis over the next few days. During these exchanges, Bartlett and Lewis repeatedly explained that they wanted to provide model management services for aspiring models and social influencers and sought to partner with MG because MG was established and had the industry "figured out." Lewis and Bartlett wanted to have MG create websites for these aspiring models and influencers, similar to what MG already did for its own clients. However, the joint business, as proposed by Bartlett and Lewis, was mostly focused on providing additional services aside from the technology.

45. Shortly after the May 16 phone call, Bartlett and Lewis told Nick that they wanted to use MG as their technology partner. Indeed, and from the outset, MG, Bartlett and Lewis intended their relationship to be that of partners, they referred to each other as partners in their communications, and Lewis introduced Nick as his "technology partner" to third parties. This held true when other partners who had prior business relations with Bartlett and Lewis joined the company; they intentionally entered into the same partnership for the same business venture designed by MG, Bartlett, and Lewis. And while Bartlett had at first tried to get MG on board with only a flat monthly fee, as set forth above, MG made it clear that such an arrangement would not be acceptable. Ultimately, MG accepted a share of revenue that scaled with the success of the new venture.

46. Based on their descriptions and repeated representations, MG and Nick understood that their company (Coy) would be more of a management agency than anything else and would target different clients than MG. The proposed joint business would be centered on the idea of helping to develop aspiring social media influencers and aspiring models by providing opportunities to improve content creation and individual recognition. In other words, the new company would help its clients with

the content creation side of things, whereas MG would develop and operate the technology, just like it already did with MG's own clients.

47. Given that Bartlett and Lewis had a clear and concrete plan for a future joint business but had not yet formed a company, MG began doing business with Bartlett and her other business partners and investors directly in anticipation of their future creation of a business entity to fulfill their plan.

**IV. Defendants' NDAs with MG**

48. From the inception of the parties' collaboration, it became clear that, in order for the partnership to work, Nick and MG would need to share MG's extremely valuable trade secrets and other protected information with Bartlett and Lewis, as well as Bartlett's other business partners, Robert Hankins and Thomas Drew.

49. As a result, to protect MG's confidential and trade secret information, Bartlett and her business partners were required to sign non-disclosure agreements ("NDAs") with MG, guaranteeing that they would keep this sensitive information in confidence and would not use it for any other purpose but the proposed partnership, thus promising never to use it to compete directly with MG.

50. Bartlett signed an NDA with MG on May 21, 2020 and provided a copy to Nick on the same day. This NDA is attached and incorporated herein as **Exhibit B**.

51. Several of Bartlett's business partners also signed MG's NDAs on May 21, 2020 and provided them to Nick on the same day. This included Lewis, Hankins, and Drew. Their NDAs are attached and incorporated herein as **Exhibits C**, **D**, and **E**, respectively.

52. After the NDAs were signed, MG provided Bartlett, Lewis, Hankins and Drew its confidential and trade secret information, consisting of:

a. The design and structure of individual websites and the technology behind those websites, including the technologies, software, servers, vendors, and overall infrastructure of MG's technology platform

(hereinafter sometimes referred to as MG's "technology stack");

b. Details regarding MG's cost and accounting structure;

c. Details regarding MG's revenue model;

d. Compilations, methods, techniques and processes with regard to the information described above; and

e. Know-how and negative know-how regarding the categories set forth above, as well as such know-how and negative know-how as to setting up, running and succeeding as a company such as MG.

Said information is herein referred to collectively as "confidential and trade secret information."

## V. MG Shares Confidential and Trade Secret Information Under the NDAs

53. After the NDAs were signed, MG began sharing its confidential and trade secret information with Bartlett and her associates, Lewis, Hankins, and Drew. MG's understanding was that they were all engaging in a mutually beneficial partnership, which, in addition to the NDAs, gave MG and Nick comfort to disclose the necessary information and allow the partnership to quickly build its business from scratch so that it would soon become a productive venture. This occurred over the next several months in various emails, text message exchanges, and phone calls.

54. MG participated in all the aspects of getting the business going, including recommending target clients, providing the technology and structuring, as well as conducting interviews and making hiring decisions on behalf of the venture. Under the parties' agreement, MG would share in the profits by earning a portion of each subscriber's monthly fee for each website, as well as a portion of each individual sale of premium content. Because MG had a share of the profits involved, it had every incentive to cooperate fully and ensure its success.

### *A. Key Components of MG's Confidential Technology Disclosures*

55. MG has developed proprietary software and created a unique overall technological infrastructure. Products and services from outside vendors integrate

seamlessly with MG's own software in order to provide a single service to MG's clients. MG operates behind the scenes, making technological and procedural adjustments as necessary without interfering with each client's business operations and thus their ability to generate content and revenue. When certain vendors, products, processes, and systems are determined by MG to improve MG's own product and service offering, MG incorporates those, making the whole greater than the sum of its parts.

56. MG handles many of the technical and business operations for its clients, including the initial website development, monthly billing, accounting, and technology support. MG also ensures that content is accessible only to paying subscribers and issues takedown notices to any website found improperly reposting a client's copyrighted content.

57. [redacted]

58. MG also invented and utilizes a dynamic watermarking feature. All content posted on MG's websites is displayed with a dynamic watermark, which overlays the unique user ID number for each subscriber on photos displayed on that subscriber's device. If content is leaked and wrongfully posted on other websites, that ID number can be used to identify the individual subscriber responsible. That subscriber is then banned from the website. Nick first told Bartlett about this

technology while it was still in development. While Bartlett was excited about the idea, she did not do anything to contribute to its creation or development. Attached hereto as **Exhibit F** are true and correct copies of text messages between Nick and Bartlett discussing the watermarking feature while it was still being developed. Also attached hereto as **Exhibit G** are true and correct copies of text messages between Nick and Bartlett, in which Bartlett asked Nick how leaked content is handled. Upon information and belief, prior to Coy, MG was the only company to utilize this watermarking technology. Coy now openly boasts about its ability to handle "legalities associated with leaked content" and includes "copyright protection and leaked content removal" on its website (thecoy.com/about) as one of the services Coy provides.

59. Lewis, in particular, wanted to know all about MG's technology stack. There was no indicator that Coy was going to copy or recreate MG's platform and infrastructure. Therefore, after the NDAs were signed, Nick emailed a PDF containing MG's technology stack to Lewis. With that information, Coy obtained a list of components necessary to recreate MG's technology platform. A true and correct copy of the email to Lewis containing the attachment is attached as **Exhibit H.** A true and correct copy of the technology PDF is attached hereto as **Exhibit I**.[5]

60. Defendants also solicited and received information from MG regarding automating some parts of its clients' websites. Nick explained to Lewis some of the features that could be automated and what the various costs would be. He also explained how much time it would take to have someone manually do some of the tasks that Lewis and his clients may not want to perform.

61. MG spent over a year developing its technology and refining its overall

---

[5] While the design of websites developed by MG is viewable by the public subject to restrictions placed by MG, MG provided Defendants with its confidential technology stack, which breaks down all of the technologies MG uses that are not accessible by the public and thus not generally known to the public or the industry.

structure and processes. MG had also made mistakes along the way, necessitating expensive and time-consuming changes in the way MG conducted its business. In an instant, all of that immediately went to Bartlett and the other individual Defendants with an expectation and understanding that the parties would be working together and mutually benefit from MG's collective blood, sweat, and tears.

62. MG provided information about its technology to Defendants because Defendants claimed their investors required details of the technology that would be implemented in order to follow through with their investments in the proposed partnership with MG.

63. Upon information and belief, Defendants utilized MG's technology stack in building their own websites for Coy's clients and continue to use it to this day to operate Coy. The websites (and technology behind those websites) could not have been replicated in the time it took Coy to build their sites following the termination of Coy's partnership with MG absent misappropriation of MG's confidential and trade secret information, especially given that: (1) Defendants had no prior experience in researching and developing the technology at issue before partnering with MG; (2) it took MG over a year and countless man hours to do the same; and (3) it was Defendants that sought out MG to explore potential collaborative working relationship associated with Coy due to Defendants' lack of knowledge and experience in this area.

### ***B. Key Components of MG's Confidential Accounting Structure Disclosures***

64. Through years of trial and error, MG figured out how to implement a robust and efficient accounting structure consisting of MG's financial information, cost information including how MG calculates its costs and how those costs affect other processes of the business, how to monetize the chargeback ratio, how to calculate payments to its clients, and key components of MG's payment processing approach.

65. Defendants repeatedly solicited information on MG's accounting structure, including information related to calculating potential earnings and costs as factors in determining how to quote prices for potential clients. For example, on May 25, 2020, Bartlett sent Nick a text message requesting a call to discuss "minimum percentage tiers" that MG uses to charge its clients. Bartlett specifically requested MG's pricing information, which varies from the industry standard as well as that used by other MG competitors, such as OnlyFans,[6] and Nick provided that information to Bartlett over a phone call and several text messages. During the call with Bartlett, Nick explained the importance of a client's following and user engagement on a social media platform to potential earnings as well as how costs factor into determining the percentage to provide a price quote for a client. True and correct copies of text messages between Nick and Bartlett discussing the pricing percentages as "tiers" as well as scheduling a phone call to further discuss the same are attached hereto as **Exhibit J**.

66. It was clear that Bartlett and Lewis did not understand most, if not all, of the costs and pricing factors involved in running the business. Nick had detailed conversations with Bartlett and Lewis, in which he explained the various costs involved and went over the process as to how MG priced its services in order to factor in all of those costs. For example, there are various costs related to emails and processing fees that Lewis was unaware of until Nick explained them to him. On May 27, 2020, Lewis asked Nick for details regarding various email costs, payment processing fees, and how MG handles its revenue share and payment processing terms. True and correct copies of the text messages between Nick and Lewis are attached hereto as **Exhibit K.**

67. Defendants were also interested other aspects of MG's accounting

---

[6] As Nick explained to Bartlett, MG developed its own pricing model and did not use the 80/20 pricing model, which is considered to be the industry standard and utilized by MG's competitors including OnlyFans.

system. Lewis, in particular, asked to connect with MG's accountant and wanted to hire MG's accountant to handle all of Coy's accounting. Lewis specifically wanted an accountant familiar with MG's business model. MG's accountant was unavailable but, on behalf of the proposed partnership, Nick interviewed several candidates and selected an accountant whom he believed would be well suited for Coy. Nick walked Coy's new accountant through MG's accounting system in order to save Coy time and money. True and correct copies of text messages, in which Lewis and Nick discuss an accountant for Coy, are attached hereto as **Exhibit L**.

68. Defendants also solicited information on MG's chargeback percentages, which were unique to MG and differed from standard industry practice, as well as information on how MG monetizes the chargeback ratio. The chargeback ratio is crucial for any merchant that relies on credit card payments. Chargebacks occur when a consumer has a bank or credit card issuer roll back a charge that is claimed to be fraudulent or otherwise improper. The chargeback ratio is the percentage of the chargebacks when compared to the total number of transactions. It is critical to stay below a 1 percent ratio, or a business may be fined or even blocked by Visa or MasterCard. MG proactively monitors its chargeback ratio and takes steps to reduce fraudulent charges. Charges from certain geographical regions are subject to more scrutiny than others. Nick responded to Defendants' requests and provided this information, which was subject to the confidentiality provisions of the NDAs and (eventually) the Coy WDA. True and correct copies of Lewis' text messages with Nick whereby Nick explained various aspects of the chargeback percentage, industry averages, and how MG monetizes the chargeback ratio are attached hereto as **Exhibit M**.

69. In response to the inquiries from Bartlett, Nick also provided information related to MG's subscriber retention rates and how MG's monthly billing system was structured. Nick explained MG's billing structure, which was based on know-how and negative know-how developed by MG through trial and error over the

years.

70. As with any startup company pioneering a new business model, MG ran into pitfalls and bumps along the road and developed negative know-how along the way. Thus, if Nick noticed that Bartlett and her business associates were heading toward a potential technology or business problem MG had previously faced and overcome, he would warn them. For example, MG initially used a particular payment processor as part of its billing and accounting system. Widely used by many online companies, MG assumed the payment processor would meet its needs as well. However, MG learned by experience that the processor in question was particularly unfit for use for a company operating like MG. There were not only technical problems but also regulatory problems due to the nature of MG's operations and its structure. These problems were not readily foreseeable for a novice, and MG did not discover them until the problems actually occurred. Therefore, Nick shared MG's negative know-how with Defendants by warning them about these problems and recommending the same payment processor that MG had come to use. In fact, Nick allowed Defendants to utilize MG's payment processing account so that they could benefit from the lower prices MG had already negotiated. Notable, fixing the problems caused by the payment processor had cost MG time and money that could have been spent in other ways, such as marketing to potential clients or improving its product, and MG's negative know-how saved Coy from wasting time and effort in the same way.

***C. Key Components of MG's Confidential Revenue Model Disclosures***

71. MG spent years through trial and error developing its robust and unique revenue model, such as its formulas for determining the percentages MG charges its clients and the percentages MG keeps for itself. To develop its confidential and unique revenue model, MG, among other things, looked at competitors' revenue models and used those as a baseline to be adjusted on a client-by-client basis.

///

72. In September 2020, Bartlett solicited information related to how MG handled certain aspects of its business and how it handled certain clients. For example, she wanted to know how long the payments took and when they arrived; in addition, she sought information on how MG handled its payments to its own clients in circumstances where MG had not yet received a particular month's revenue payments. Relying, once again, on their proposed partnership, MG shared this information with the Defendants.

73. Nick also described the mechanics of MG's revenue sharing and the percentages involved to Bartlett and Lewis. MG's revenue model is complicated, and costs can change dramatically depending on the amount of web traffic. Accordingly, Nick explained how much of that works for MG so that Defendants would be aware of the costs and understand the necessary cash flow.

74. MG also taught Defendants about pricing subscriptions to maximize profit, how to create successful flash sales, how to create and market pay-per-view content and other information of similar nature that Defendants did not have and/or were not aware of prior to MG and Nick's involvement.

75. Bartlett, in particular, also wanted to know more about generating financial reports, when financial reports would arrive, how revenue was split, what revenue processes had to be handled manually, and how weekends and holidays impacted business processes. When Bartlett received the requested financial spreadsheets and reports, she asked Nick to explain them to her. Importantly, Bartlett asked Nick to identify the sources of certain revenue and how to understand various accounts. Upon information and belief, Bartlett obtained confidential and trade secret information related to MG's revenue splits, information related to financial reports, tracing revenue to particular sources and conducing data analysis in order to use that information to later compete with MG.

76. Bartlett and Lewis also did not understand some of the regulatory requirements and recommendations. For example, Nick had to explain to Lewis the

importance of having some of his clients sign particular waivers in order to protect himself and the company from later liability concerns.

77. Lewis also asked about the language and structure of various MG contracts. With client contracts, he wanted to know about particular clauses and what language to include in his own contracts so that he could get out of a contract with a client at his convenience. He also asked from a sample independent contractor contract and asked particular questions about some of the language in the sample Nick shared with him.

**VI. COY is Formed**

78. Eventually, Bartlett formed The Coy Collective, Inc. as a Delaware corporation. As far as MG and Nick were aware, Coy was only going to operate in the manner originally described by Bartlett—offering additional management-focused services to models beyond what MG already provided, while MG continued to operate the underlying technology.

79. Under its agreement with Coy, MG would create and host the web platform that Coy would use. MG had Coy sign a separate Website Development Agreement for this new site. As CEO of Coy, Bartlett signed the agreement on behalf of Coy on August 6, 2020 ("Coy WDA"). Bartlett, on behalf of Coy, provided the signed agreement to Nick (representing MG) the same day. The Coy WDA is attached and incorporated herein as **Exhibit N**. As with the other Website Development Agreements, the Coy WDA contained confidentiality provisions and limited Coy's use of MG's information and technology to the uses specified within the Coy WDA.

80. MG then assisted Coy with setting up its website, operating its subscription and payment processing system and implementing the same processes and technology underlying MG itself. MG also assisted with ensuring that Coy was performing the necessary legal compliance work for its models, assisted with setting up Coy's revenue structure and continued to answer day-to-day questions on how to successfully run the business. This saved Coy at least twelve months of development

and growing pains that could have led to Coy's demise before it ever began operating in earnest.

81. Between August 2020 and early September 2020, Bartlett approached MG about having Coy handle some of the financial aspects of MG's website for Bartlett and for her friend and fellow MG Client, Cristina Dospassos. Without rescinding any existing agreements with MG, MG worked in good faith to try to accommodate Bartlett's requests as part of the ongoing cooperative effort between MG and Coy.

82. During this time, Lewis and Bartlett still referred to their relationship with MG as a "partnership." MG operated under the assumption that MG and Coy were partners and/or joint ventures. Indeed, in July 2020, Lewis reiterated via email Coy's vision of MG being "positioned as the Technology Partner powering Coy's technology…."

**VII. Unlawful Conduct by Defendants**

83. At all the relevant times, MG operated in good faith under the belief that all the parties would benefit from the proposed partnership. However, by the autumn of 2020, it was becoming clear to MG that Coy, Bartlett, and the other Defendants had never had any intention of operating a partnership, or even including MG in their future plans at all. The entire partnership was merely a ploy designed to earn the trust of Nick and MG. Indeed, Defendants used the confidential and trade secret information they had learned from Nick and MG to set up and operate their own competing business, and this became clear once Defendants abruptly ceased any further ongoing collaborative discussions and proceeded to undersell MG in order to sign clients who were already negotiating with MG.

84. For example, by October 2020, MG had been in discussions with potential clients who were considering signing agreements with MG, clients that ostensibly would not have fit Coy's proposed business model. It was around that time that Coy, headed by Bartlett, intercepted those discussions and convinced those

clients to hire Coy instead by, *inter alia*, criticizing MG and attempting to undersell MG. Yet, when Nick confronted Bartlett in mid-October 2020, Bartlett still reiterated that she saw Coy's relationship with MG as "a mutually beneficial relationship without competition." According to Bartlett, "keeping a healthy partnership" with MG was her "main concern." Lewis, for his part, assured Nick that Coy would focus on training its clients how to develop content, and specifically that Coy would not overlap as far as targeting the same potential clients.

85. However, all of that was mere cover-up, as MG came to discover shortly thereafter. Instead of cooperating with MG, abiding by the agreements the parties had reached or fulfilling the promises Defendants had made, Defendants ratcheted up their efforts to use MG's confidential information and trade secrets against it. This included a marketing push where Bartlett used MG's systems and techniques, obtained under the NDAs, to gain traction and notoriety for Coy. For instance, Bartlett was featured in magazine articles promoting Coy in October 2020 and November 2020, in which she bragged about coming up with original business ideas for Coy that MG had already created and implemented more than a year earlier. Attached hereto as **Exhibit O** is a copy of a November 2, 2020 Maxim Magazine article accessible online, in which Bartlett discusses Coy.

86. Furthermore, upon information and belief, after obtaining MG's confidential and trade secret information, Bartlett reached out to at least one MG client, whereby she showed off her knowledge of MG's whole business in her attempt to get the client to switch to Coy by, among other things, using the percentages that MG uses as a way to convince the client to switch to Coy.

87. When it became clear that Coy was establishing itself as a direct competitor to MG and discouraging potential clients from working with MG, Nick attempted to slow down this runaway train by seeking to formalize the partnership arrangements that had been proposed to him by Bartlett and her associates, including those terms that had MG handling the technology for the partnership. Specifically,

MG sought to require Coy clients on MG's technology platform to sign agreements directly with MG because, although MG was willing to continue to work with Coy as a partner, the websites would need to go directly through MG.

88. However, on or about November 5, 2020, Bartlett responded on behalf of Coy and expressed that Coy would be terminating its partnership with MG and transitioning its technology operations to being handled in-house after December 31, 2020. Upon information and belief, Coy decided to terminate its agreement with MG so that it could compete with MG without any further pretense.

89. Shortly thereafter, MG responded with a letter establishing the proposed initial terms for ending the partnership and explaining MG's intentions, which, *inter alia*, included holding Bartlett to her own WDA, as, by that time, it had already automatically renewed for another year and had not been validly terminated. Attached hereto as **Exhibit U** is a copy of a November 16, 2020 e-mail communication, attaching the letter in question. It also warned Coy not to use MG's confidential information and trade secrets to set itself up as a direct competitor to MG and reminded Coy about the signed NDAs and other contracts in force between MG and Defendants.

90. On November 19, 2020, Coy's legal counsel sent a letter to MG threatening legal action and demanding the return of certain internet URLs, subscriber data and payment processing systems. The letter also included a request for mediation to help with the dispute. Attached hereto as **Exhibit P** is a copy of the letter from Coy's counsel. In a good-faith effort to resolve any dispute, MG released the URLs to Coy.

91. On the same day, November 19, 2021, MG's payment processor forwarded MG an email from Bartlett, in which she requested a refund from the payment processor for multiple charges to a website that was created and operated by MG for a Coy client. In the email, Bartlett mentions that a Coy software developer was testing something. Upon information and belief, Coy's developers were

attempting to duplicate MG's technology and design.

92. On December 2, 2020, Plaintiff's counsel responded to Coy's letter by requesting to use JAMS mediators in either California, New York, or Florida. Coy never responded to this letter. Attached hereto as **Exhibit Q** is a copy of the letter to Coy from Plaintiff's counsel.

93. On January 5, 2021, Plaintiff's counsel sent a letter to Bartlett requesting mediation. Attached hereto as **Exhibit R** is a copy of the letter to Bartlett from Plaintiff's counsel. Attached hereto as **Exhibit S** is a copy of the response from counsel for Bartlett.

94. In the letters sent by Plaintiff's counsel, there were three requests for selection of a mediator, all of which were ignored. Plaintiff warned in its January letters that a failure to comply would be seen as a refusal to select a mediator. Thus, Plaintiff attempted in good faith to select a mediator with Defendants, and all such attempts have failed. The Web Development Agreements on their face do not require mediation be completed before bringing any claims, but even if they did, Plaintiff's attempt to select a mediator proved unsuccessful thereby releasing Plaintiff from any further obligation to pursue this mechanism under the agreement.

95. With MG's confidential and trade secret information in hand, Coy had no further use for MG. Defendants took MG's confidential and trade secret information in order to set up a business that now directly competes with MG.

96. Coy forsook the partnership and now operates as a direct competitor to MG, using MG's confidential and trade secret information that had been developed and honed for over a year and was shared only in reliance on Defendants' representations that they sought to partner up with MG for a mutually beneficial collaborative business venture.

97. Since at least October 2020, Coy has positioned itself as a direct competitor to MG. Coy now targets the same clients as MG, and Nick has been told by current MG clients that people from Coy, and Bartlett in particular, have reached

out to them in an effort to convince them to leave MG and become Coy's clients instead. Essentially, Coy took all of the confidential and trade secret information MG had provided and replicated MG's intended contribution to the partnership. As such, Coy now uses its own employees and resources to implement MG's technology, structure and business model.

98. Coy has stolen more than just information from MG. Coy has stolen MG's entire business model. At every step of the way, Defendants asked for information and assistance. Thinking that Coy was going to be a long-term partner to MG, Nick provided that information to Defendants and helped them avoid mistakes that would have wasted months of time, cost many thousands of dollars to repair and permanently damaged Coy's goodwill and reputation—assuming Coy would have ever figured out the solutions to begin with. The value of the information MG provided to Defendants cannot be overstated. MG spent over a year creating and refining its platform. Everything from accounting and marketing, web technologies and pricing were carefully refined and honed based on experience and research. All of this information is what gives MG its competitive advantage. Coy obtained all of that valuable information in a few weeks without ever having to pay the costs that MG did. Upon information and belief, Coy would not be operating now if not for all of the information it obtained from MG under false, misleading and fraudulent pretenses.

99. As recently as March 4, 2021, Bartlett wrote an update on her Instagram profile where she stated, "From [Coy's] inception, our main focus was that of a technology company, however we quickly realized that we excelled in model management as well." Attached hereto as **Exhibit T** is a copy of this Instagram post. This is the exact opposite of what Bartlett, Coy and the other Defendants represented to MG. They clearly indicated that MG would handle the technology side of the proposed joint business, and Coy would handle the model-management. Defendants' real raison d'être is further clarified by Bartlett's exposition in the same post that she

would be establishing a new business called Verge for model management, which is the *exact* business she told MG she intended Coy to be as part of their proposed partnership and which, in part, informed why and how the partnership would be a logical split of their respective expertise. From the very inception, Defendants thus always intended to operate a competing technology company and misled MG to gain the benefits of its knowledge and cooperation.

100. Thus, Coy is transparently not, nor was it ever planned to be, what Defendants represented when they were obtaining MG's valuable information, including trade secrets. Now Defendants are taking credit for MG's work and innovations to further drum up business at MG's expense in the marketplace. Bartlett and Coy have also reached out to existing MG clients requesting that they terminate their existing contract or relationship with MG and instead use Coy exclusively. With this new development, MG had no choice but to initiate this litigation.

101. Since at least October 2020, Coy has been signing contracts with clients who were already in contract negotiations with MG. Coy knows MG's confidential cost and profit information, and Coy deliberately attempted to undersell MG when speaking to current MG clients. Defendants have unlawfully solicited Plaintiff's clients utilizing MG's trade secrets and other confidential information to assist in growing and developing Coy's business in breach of the NDAs and the Coy WDA, as well as various U.S. and state law. Indeed, it was MG's stolen confidential information and trade secrets that enabled Defendants to build their competing business, Coy, as quickly as they did.

102. Defendants all continue to use MG's confidential and trade secret information in direct violation of their agreements. They each individually profit at MG's expense. MG's business is its software and processes. That business has been stolen and its assets hijacked. Now, after this perfidious scheme, MG faces an existential threat from Coy using MG's own innovations against it.

///

**VIII. The Fraudulent Transfer of Plaintiff's Trade Secrets**

103. During the pendency of this litigation, it was learned that, shortly after Defendant Lewis signed the WDA with Plaintiff and received Plaintiff's trade secrets, Defendant Lewis transferred those Plaintiff's trade secrets to Andrew Geller whose role with Coy was unknown at the time of this discovery. Thus, Plaintiff was uncertain if evidence of this transfer was within or outside of The Coy Collective business.

104. In August of 2023, during the pendency of this action, it was belatedly discovered that Coy – by and through its principals, agents, employees, advisors, executives, officers and/or directors – transferred the technological "design" that was its sole valuable asset and which was acquired by the misappropriation of Plaintiff's trade secrets.

105. In August of 2023, Plaintiff also discovered that Defendant The Sheth Sangreal Foundation became an investor in The Coy Collective in or around 2022. Upon investigation, it was discovered that Andrew Geller was the Director of The Sheth Sangreal Foundation – a subsequent investor in The Coy Collective – and the recipient of Plaintiff's trade secrets in 2020. Thus, for the first time, plaintiff discovered the transfer of its trade secrets made to Andrew Geller in 2020 was to an outside third party in violation of the WDA's confidentiality provisions.

106. In August of 2023, Plaintiff discovered that The Coy Collective's current Chief Executive Officer, Matthew Silk, first became acquainted with The Coy Collective in 2021 when he was requested by his "friend" to assess the company's business prospectus at that time. Silk's friend was then identified as an attorney employed by the firm that represents The Coy Collective.

107. In August of 2023, Plaintiff discovered, after a forensic examination of its assets in or around 2022, that the sole valuable asset of The Coy Collective was its technological design and development to date which, Plaintiff alleges, consists of plaintiffs trade secrets.

108. In August of 2023, Plaintiff discovered that the discovery of this remaining asset caused Defendant The Sheth Sangreal Foundation to make a capital investment in the company in or around 2022. Defendant and Director Andrew Geller was already in possession of the subject "valuable asset" (which is Plaintiff's trade secrets) but made the subject investment into The Coy Collective upon Defendant Silk's forensic determination of the value of the asset.

109. In August of 2023, Plaintiff discovered that, in or around 2022 and with funding in place, The Coy Collective contracted with various development companies intending to Build upon Plaintiff's misappropriated trade secrets and bring new products to market.

110. In August of 2023, Plaintiff discovered that the decision to revive The Coy Collective was scrapped and, in January of 2023, it transferred its sole remaining valuable asset (Plaintiff's trade secrets) to the newly-created TMW Labs, Inc. which is owned, operated and/or controlled by The Coy Collective's fiduciary and CEO, Defendant Silk. board members, Andrew Geller, Corey Lewis and Thomas Drew who were also fiduciaries of The Coy Collective, some of whom were active defendants to this action and had sufficient notice that Plaintiff credibly alleged the transferred technology to be Plaintiff's trade secrets. In August of 2023, Plaintiff discovered that Director Juan Pablo Lopez who is the sole Director identified in public filings with the Texas Secretary of State.

**<u>FIRST CAUSE OF ACTION</u>**

**Misappropriation and Threatened Misappropriation of Trade Secrets – Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1836 *et eq.***

**(Against All Defendants)**

111. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

112. MG possesses and owns confidential trade secrets, consisting of:

a. The design and structure of individual websites and the technology

behind those websites, including the technologies, software, servers, vendors, and overall infrastructure of MG's technology platform;

b. Details regarding MG's cost and accounting structure;

c. Details regarding MG's revenue model;

d. Compilations, methods, techniques and processes with regard to the information described above; and

e. Know-how and negative know-how regarding the categories set forth above, as well as such know-how and negative know-how as to setting up, running and succeeding as a company such as MG.

113. MG's confidential information also includes "existing or contemplated business, processes and services, techniques, components, sales, markets, costs, profits, research, development, inventions, purchasing, staff, employees, compensation, contractors, suppliers, customers, prospects, marketing, pricing policies, financial information, engineering and all other data." **Exhibits B, C, D, E**, ¶ 1.

114. MG's confidential and trade secret information is the result of over a year of business experience, research, and trial and error, in addition to specialized knowledge and skills developed over the course of several years prior.

115. MG's confidential and trade secret information is not public. MG's trade secrets derive independent economic value, actual and/or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from the disclosure or use of the information.

116. MG relies on its confidential and trade secret information in order to conduct business and directly gains economic value from this information. MG relies on keeping this information secret because its business quite literally *is* its software and expertise. MG created a system of technology and business processes, in which the whole is greater than the sum of its parts.

117. MG operates primarily on the internet, and, therefore, MG's confidential and trade secret information is used in interstate commerce.

118. MG's confidential and trade secret information is subject to extensive efforts to maintain its secrecy and confidentiality. These efforts include the following:

a. Requiring customers, clients, and business partners to sign NDAs and/or other contracts containing confidentiality provisions that prevent using the confidential information or disclosing it to third parties.

b. Restricting information to a "need to know" basis for those who require the information to perform their jobs.

c. Securing the information with technical safeguards, such as passwords and user accounts with access based on the user's role.

d. MG's clients only see information related to their own websites and revenue.[7]

e. Source code and proprietary technology is stored on encrypted disk drives.

f. For its public-facing websites, MG disables the "right click" feature for end users, preventing them from viewing the source code of a given website.

g. Even if an end user were to view the website code, much of it would have been generated dynamically by MG's servers using input such as that user's unique visitor identification code, meaning an end user could not recreate a website like MG's by simply copying the public-facing HTML code.

---

[7] While Bartlett was initially an MG client, she and the other Defendants gained access to all of MG's confidential information and trade secrets vis-à-vis their partnership with MG in pursuit of creating Coy. MG does not regularly share with its clients the full extent of the information shared with Defendants in reliance on the proposed partnership.

h. MG's technology and server infrastructure (or "technology stack") is kept secret to the degree possible for websites that are accessible by the public. This includes the server structure, the software on each server, third-party vendors, and security features.

119. As such, the foregoing are protectable trade secrets under the Defend Trade Secrets Act, 18 U.S.C § 1836, et seq. ("DTSA").

120. At all relevant times, Defendants knew or had reason to know that their knowledge of MG's confidential and trade secret information was acquired under circumstances giving rise to a duty to maintain the secrecy of MG's trade secrets or limit the use of MG's trade secrets by virtue of the NDAs and the Coy WDA.

121. Bartlett, Lewis, Hankins, and Drew wrongfully obtained MG's confidential and trade secret information from MG by misrepresenting their true aims and signing the NDAs, to which none of them ever had intention of adhering. Defendants acquired MG's confidential and trade secret information under the fraudulent and false pretense of technology integration in a preferred partnership and then improperly used these trade secrets in their own technical systems and business models. Though Bartlett and her business partners had originally claimed to be working with MG in a cooperative, mutually beneficial partnership, Bartlett and her business partners Lewis, Hankins, and Drew always intended to steal MG's trade secrets in order to benefit from MG's experience and expertise—and, ultimately, in order to compete against MG directly.

122. Coy misappropriated the information by acquiring MG's confidential and trade secret information from Bartlett, Lewis, Hankins, and Drew, which all Defendants knew was information protected by NDAs and the Coy WDA. Coy also obtained MG's trade secrets despite entering into the Coy WDA, which contained robust confidentiality provisions. Coy is improperly using MG's trade secrets to directly compete with MG. The foregoing constitutes misappropriation of trade secrets prohibited under the DTSA.

123. By so misappropriating MG's confidential and trade secret information, Coy gained an unfair competitive advantage and huge head start commercializing its competing business. Indeed, by utilizing MG's confidential and trade secret information, as described herein, Defendants were able to become a competitor overnight. Essentially, Defendants were able to operate and compete without the need to spend time, effort and money developing and implementing MG's confidential and trade secret information. Unlike MG, Coy was not exposed to the risk and expense of developing these trade secrets on its own, and it did not experience growing pains. In other words, by taking valuable information from MG, Coy and the Defendants were able to take a sure thing—a tried-and-true business—and claim it for themselves.

124. On information and belief, Coy, Bartlett, Lewis, Hankins, and Drew have also misappropriated MG's confidential and trade secret information by improperly disclosing it to others, such as (but not limited to) a client and friend of Bartlett, Cristina Dospassos.

125. MG never authorized or consented to Defendants' acquisition by improper means or use of its confidential and trade secret information.

126. Defendants use, and threaten to continue to use, MG's confidential and trade secret information in interstate commerce in order to interfere with MG's relationships with its current clients, attempt to recruit MG's existing clients, disrupt MG's business and compete unfairly against MG until MG eventually can no longer continue to conduct business.

127. Defendants have each improperly used MG's confidential and trade secret information misappropriated from MG to harm MG's existing business relationships and compete directly against MG, resulting in financial and reputational harm to MG.

128. Defendants have each been unjustly enriched by using MG's confidential and trade secret information to run a competing business using MG's

own information, processes and technology.

129. MG has been harmed as a proximate result of the foregoing misappropriation of its confidential and trade secret information by Defendants, in a manner and amounts to be proven at trial. Each and every wrongful acquisition, use, and disclosure of MG's trade secrets was and continues to be a substantial factor in causing MG's harm. Defendants' use of MG's confidential and trade secret information threatens MG's very survival as a business, and monetary damages alone are an inadequate remedy. The exact extent of the harm, given Defendants' secrecy, can be determined only through discovery, but is no less than $1.5 million.

130. Defendants' misappropriation was willful and malicious, and MG is entitled to an award of exemplary damages and reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(C) and (D).

131. As more fully set forth above, the acts of Defendants were intentional, malicious, wanton, oppressive and fraudulent, with conscious disregard for Plaintiff's rights and with the intent to vex, injure, punish and annoy Plaintiff so as to cause the injuries sustained by Plaintiff, within the meaning of California Civil Code §3294. Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendants.

## SECOND CAUSE OF ACTION

**Breach of Contract – Non-Disclosure Agreements (California Law)**

**(Against Jessica Bartlett, Corey Lewis, Robert Hankins, and Thomas Drew)**

132. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

133. As set forth herein, on May 21, 2020, Bartlett, Lewis, Hankins, and Drew signed NDAs with MG in order to protect MG's confidential information. Thus, Bartlett, Lewis, Hankins, and Drew each entered into binding and valid contracts with MG. MG could share its confidential business information with Bartlett and the others who had signed NDAs in anticipation of a joint collaboration.

In exchange, Bartlett, Lewis, Hankins, and Drew would each keep all information they received in the highest confidence by not disclosing it to third parties, and they all agreed not to use the information themselves for any purpose beyond those stated in the NDAs.

134. MG's confidential information is defined as including "existing or contemplated business, processes and services, techniques, components, sales, markets, costs, profits, research, development, inventions, purchasing, staff, employees, compensation, contractors, suppliers, customers, prospects, marketing, pricing policies, financial information, engineering and all other data." **Exhibit B, C, D, E,** ¶ 1. It also includes all proposals and information and data furnished by MG. *Id.*

135. Among other things, each NDA prohibits Bartlett, Lewis, Hankins, and Drew from using MG's confidential information for any purpose other than evaluating and negotiating a proposed transaction, or, in other words, outside of the cooperative relationship between Coy and MG. *Id.* at ¶ 4.

136. MG has performed all conditions, covenants and promises required on its part to be performed in accordance with the terms and conditions of the NDAs.

137. Bartlett, Lewis, Hankins, and Drew each breached the NDAs by utilizing confidential information disclosed to them under the NDAs, which Defendants did not know previously and which was confidential information not generally known to the public, to form a competing business utilizing MG's confidential information.

138. Each NDA also requires Bartlett, Lewis, Hankins, and Drew to return all original confidential information provided by MG and destroy all "copies, reproductions, summaries, compilations, analyses, and extracts thereof or based thereon" upon MG's request. *Id.* at ¶ 10.

139. MG has reminded Bartlett of this requirement in multiple written communications, but Bartlett's only response has been to feign ignorance. She has

refused and continues to refuse to return or destroy MG's confidential information she has in her possession and refuses to acknowledge she possesses any such confidential information.

140. The foregoing conduct of Bartlett, Lewis, Hankins and Drew constitutes breaches of the NDAs.

141. MG has been damaged as a direct and proximate result of the foregoing conduct in a manner and amounts to be proven at trial, but no less than $1.5 million based on calculating the loss of business and the spreading and improper use of economically valuable secrets in the marketplace, plus interest on the foregoing sums.

142. Bartlett, Lewis, Hankins, and Drew's breaches of their NDAs with MG have caused, and continue to cause, immense damage to MG. Bartlett, Lewis, Hankins, and Drew's breaches were and continue to be significant causes of this damage to Plaintiff.

## THIRD CAUSE OF ACTION

### Breach of Contract – Website Development Agreement (California Law)

### (Against Jessica Bartlett)

143. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

144. Bartlett entered into the Bartlett WDA with MG on October 27, 2019, which is a valid and binding contract. **Exhibit A**.

145. The Bartlett WDA provides that MG will create a website for Bartlett's use but will retain ownership of all intellectual property rights. MG would also handle copyright infringement issues that arise. In exchange, Bartlett would be able to use her own independent website and earn revenue from that website. MG was also entitled to a certain percentage of the revenue earned by Bartlett's website. Finally, the agreement ensured a certain level of exclusivity.

146. The Bartlett WDA also contains a California choice of law clause. **Exhibit A**, ¶ 12.

147. MG performed all, or substantially all, of the elements of its end of the Bartlett WDA, including sharing creating a website, providing use of MG's technology, ensuring infringed images of Bartlett protected by copyright were taken down and providing a platform for Bartlett to monetize her online following.

148. All conditions required by the contract for Bartlett's performance were met.

149. The Bartlett WDA automatically renews each year unless one party provides written notice of intent not to renew at least 90 days before its renewal period begins. **Exhibit A**, ¶ 3.1.

150. The Bartlett WDA also has an integration clause that limits modifications to the agreement only by a written instrument executed by the parties. **Exhibit A**, ¶ 13(a.)

151. Bartlett's contract renewed for another twelve-month period on October 27, 2020 because she never provided contractually adequate notice within the possible cancellation period of the Bartlett WDA.

152. Nonetheless, Bartlett refuses to pay for any of the services she agreed MG would provide under the agreement, and to the extent she claims to have terminated the agreement, it is through improper means. As such, Bartlett has breached the contract by refusing to accept services for which she agreed to pay and then by improperly attempting to terminate the contract despite its clear terms.

153. The Bartlett WDA also has robust confidentiality provisions designed to protect confidential information, to which Bartlett may have access or otherwise come across. **Exhibit A**, § 5.

154. In breach of section 5 of the Bartlett WDA, Bartlett shared confidential information belonging to MG and covered by the Website Development Agreement. She also used and continues to use this confidential information to compete against MG using, among other things, MG's own technologies, processes and strategies.

///

155. Bartlett's breaches of the Bartlett WDA have caused and continue to cause immense damage to MG. Bartlett's breaches are significant causes of this damage to Plaintiff.

156. The full amount of harm, given the Bartlett's secretiveness and the type of harm suffered by Plaintiff, can be determined only in discovery, but certainly exceeds $75,000 given the value of Bartlett's website to MG.

157. Bartlett's breaches of contract were and continue to be a substantial factor in causing MG's harm.

## FOURTH CAUSE OF ACTION

### Breach of Contract – Website Development Agreement (Florida Law) (Against Coy)

158. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

159. Coy entered into the Coy WDA with MG on August 6, 2020, which is a binding and valid written contract. **Exhibit N**. This agreement was similar to the agreements MG had entered into with Bartlett. The major difference is that it was anticipated that Coy would have multiple sub-users, each with their own websites operating in connection with the main Coy website. Another difference is that the agreement could be terminated by either party upon 30 days written notice. **Exhibit N**, ¶ 3.1.

160. As with the other agreements, MG maintained ownership of all intellectual property. MG would also handle copyright infringement issues that may arise. In exchange, Coy would be able to offer its clients use of their own independent websites, from which they could earn revenue. MG would be entitled to a certain amount of the revenue earned by the Coy website family that scaled up with its usage and popularity. Finally, the agreement ensured a certain level of exclusivity.

161. Unlike the other Website Development Agreements, the Coy WDA contains a Florida choice of law clause. **Exhibit N**, ¶ 12.

162. MG performed all or substantially all of the elements of its end of the Coy WDA, including sharing creating a website, providing use of MG's technology, ensuring images infringing on Coy's copyrights were taken down and providing a platform for Coy to allow its clients to create their own websites under the Coy and MG banners.

163. All conditions for Coy's performance had been met.

164. Coy committed a material breach of the contract when it utilized its website to directly compete against MG, and Coy continues to compete against MG using MG's own technology, processes and strategies.

165. In violation of the Coy WDA, Coy has continued to use MG's software and services, even though the agreement specifically states that MG will retain all ownership.

166. The Coy WDA also has robust confidentiality provisions designed to protect confidential information, to which Coy may have access or otherwise come across. **Exhibit N**, § 5.

167. In breach of § 5 of the Coy WDA, Coy shared confidential information belonging to MG and covered by the Coy WDA. Coy also used and continues to use this confidential information to compete against MG using, among other things, MG's own technologies, processes and strategies.

168. Due to the nature of the breach and the sensitive information at issue, Coy is situated to have the information necessary to determine the full damage it has caused by its breach. However, MG has been harmed by at least $2.5 million, based on calculating the loss of business and the spreading and improper use of economically valuable information in the marketplace.

169. MG suffered and continues to suffer damages caused by Coy's breach of its agreement with MG.

///

///

**FIFTH CAUSE OF ACTION**

**Fraud (California Law)**

**(Against Jessica Bartlett)**

170. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

171. Bartlett knowingly made false statements regarding her true motives behind soliciting MG's help with starting Coy and operating Coy. For example, on May 6, 2020, Bartlett sent Nick a business proposal via text message seeking to partner up for what she represented would be a new management agency. During this initial May 6th exchange, Bartlett told Nick that she wanted to partner with MG to help her learn the ropes of running website businesses and to have MG provide its core services to this new business. When Bartlett first approached Nick about her business idea for what would eventually become Coy, she never said anything about Coy being a technology company or ultimately a competitor to MG. She merely stated that it was a "subscription-based project." Indeed, Bartlett always represented to MG that Coy would be focused on offering management services to their clients and MG would be the technology company that supported Coy as its partner, with Coy focused on assisting with the actual creation of content. At no point did Bartlett, or anyone else, state to MG or Nick that Coy was supposed to be a competing technology company. However, Bartlett's subsequent statements that she always intended Coy to be a technology company prove that she lied when she stated otherwise to Plaintiff on May 6, 2020 and in subsequent statements thereafter.

172. Bartlett also falsely represented that she was procuring MG's confidential information solely for the purpose of entering into a partnership with MG. Beginning May 6, 2020, and continuing on through the end of October 2020, Bartlett negotiated with MG and solicited confidential information from MG through multiple emails, text messages, phone calls and even actual contracts. In these communications, Bartlett claimed that she wanted to partner with MG to run together

a joint business with MG supplying its expertise on the technology side. For example, during a phone call between Bartlett, Lewis and Nick on May 16, 2020, Bartlett stated that she and Lewis wanted MG to be their technology partner because MG was already established and had the industry "figured out." In mid-October 2020, Bartlett reiterated to Nick that she saw Coy's relationship with MG as a "mutually beneficial relationship without competition" and that "keeping a healthy partnership" with MG was her "main concern." In actuality, she simply sought confidential information and technology from MG in order to create a competing business. She thus deceived MG in order to make her own company using technology and information gained from MG.

173. On October 27, 2019, Bartlett made promises to MG in the form of signing the Bartlett WDA with MG, in which she promised, *inter alia*, to keep Plaintiff's sensitive information in confidence and not to use it beyond the stated purposes in the contract. When entering into the agreement, Bartlett never had any intention of performing her end of the bargain.

174. On May 21, 2020, Bartlett made promises to MG in the form of signing an NDA, in which she promised, *inter alia*, to keep Plaintiff's sensitive information in confidence and not to use it to beyond the stated purposes in the contract. When entering into the agreement, Bartlett never had any intention of performing her end of the bargain.

175. Bartlett later concealed the fact that she was actually setting Coy up to compete against MG using MG's own information and technology structure against it.

176. Bartlett intended MG to rely on her misrepresentations, including her promise to keep MG's confidential information secret and her intention for Coy and MG to maintain a "mutually beneficial relationship without competition" so that MG would share its confidential information with her and provide her the necessary information to run her own competing business. Bartlett made her true intention and

her knowing of the falsity of her representations at the time they were made very clear when on March 4, 2021, she posted an Instagram update where she stated she always viewed Coy as a technology company first. *See supra* ¶ 87. Her intention, as described in her post, is the *opposite* of what she represented to MG, which was, as alleged herein, for MG to create a partnership with her new *management company* with its own website where it would MG's role to supply Coy's future clients with their websites, among other services.

177. Bartlett's false representations and omissions were material for several reasons, including that Plaintiff would not have turned over confidential information to Bartlett if it had known about Bartlett's false representations and omissions. Had MG known the truth, it never would have associated with or done any business with Bartlett, it would have never partnered with Coy, it would never have helped set up the business and it would have never disclosed its confidential information and trade secrets with any of the Defendants.

178. At the time of Bartlett's false representations and omissions, Bartlett knew her representations were false when made and that her omissions created false impressions because she knew that she was always intending to create and operate a business that directly competes with MG using MG's confidential information.

179. Bartlett had a duty to disclose the omitted information for several reasons, including that Bartlett had made disclosures regarding her intended use of MG's confidential information, which gave rise to a duty to make a full disclosure.

180. Bartlett knew that MG was unaware of Defendants' development of a competing business or Defendants' use of MG's confidential information.

181. Bartlett intended for MG to act on her representations and omissions and turn over confidential information, and MG did, in fact, turn over confidential information to Bartlett due to its reliance on Bartlett's representations and omissions.

182. MG actually and reasonably relied on the statements and promises made by Bartlett, including those contained in Bartlett's NDA with MG and the Bartlett

WDA. On the basis of the NDA and the Bartlett WDA, as well as numerous phone calls and text messages from Bartlett, as described herein, MG shared confidential information and trade secrets and provided assistance with creating and operating Coy.

183. MG's reliance on Bartlett's statements and promises was justifiable in light of MG's knowledge and experience. Others associated with MG had adhered to their agreements and kept information confidential. Moreover, MG believed that all parties involved stood to gain from the cooperative effort.

184. MG has been harmed in that it was deceived into sharing its technology and expertise that was ultimately used to compete directly with MG using its own business model and own technology.

185. Given the nature of Bartlett's fraud, and the secretive nature of Bartlett's business, Bartlett necessarily and naturally has the complete information related to the damage she has caused from stealing Plaintiff's information and business. However, MG has been harmed by at least $2.5 million, based on calculating MG's costs to develop and refine its trade secrets and confidential information that was fraudulently obtained, MG's expected share of profit from the partnership, as well as the opportunity costs associated with time spent collaborating that could have been spent either on client relations or collaborating with good-faith individuals and businesses.

186. Bartlett's conduct was intentional, malicious and fraudulent, justifying the award of punitive and exemplary damages.

187. MG's reliance on Bartlett's false statements and false promises was and continues to be a substantial factor in causing its harm.

188. MG is entitled to any and all compensatory and punitive damages flowing from Bartlett's fraud in procuring MG's confidential information.

189. As more fully set forth above, the acts of Defendants were intentional, malicious, wanton, oppressive and fraudulent, with conscious disregard for Plaintiff's

rights and with the intent to vex, injure, punish and annoy Plaintiff so as to cause the injuries sustained by Plaintiff, within the meaning of California Civil Code §3294. Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendants.

**SIXTH CAUSE OF ACTION**

**Fraud (California Law)**

**(Against Corey Lewis, Robert Hankins, and Thomas Drew)**

190. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

191. On May 21, 2020, Lewis, Hankins and Drew each made promises to MG in the form of signing NDAs, including, *inter alia*, promises to keep Plaintiff's sensitive information in confidence and not to use it to beyond the stated purposes in the contract. When entering into these agreements, Lewis, Hankins and Drew never had any intention of performing the promises contained in the agreements. They were already in league with Bartlett to take MG's technology, information and business model for themselves.

192. Lewis knowingly made false statements regarding his true motives, including in multiple phone calls and text messages. For example, during his May 16, 2020 phone call with Bartlett and Nick, Lewis told Nick that he and Bartlett wanted to provide model management services to aspiring models and social influencers and wanted MG to serve as Coy's technology partner because MG was already established and had the industry "figured out." Lewis concealed the fact that he, Bartlett and the other Defendants were setting Coy up to compete directly against MG.

193. Lewis, Hankins and Drew intended MG to rely on their misrepresentations, and particularly their false promises in the NDAs they signed, so that MG would share its confidential information and assist with creating Coy. Bartlett made Coy's founders' true intentions and their knowing of the falsity of their representations at the time they were made very clear when on March 4, 2021 she

posted an Instagram update where she stated she always viewed Coy as a technology company first. *See supra* ¶ 87. Coy's founders' intentions, as described in Bartlett's post, are the exact *opposite* of what they represented to MG. Had MG known the truth, it never would have associated with or done any business with Lewis, Hankins or Drew.

194. MG actually relied on the NDAs to keep its confidential information out of the hands of competitors. On that basis, MG shared confidential information and provided assistance with creating and operating Coy.

195. MG's reliance on the NDAs was justifiable in light of MG's knowledge and experience. Others associated with MG had adhered to their agreements and kept information confidential. Moreover, MG believed that all parties involved stood to gain from the cooperative effort.

196. MG has been harmed in that it was deceived into sharing its technology and expertise that was ultimately used to compete directly with MG using its own business model and own technology.

197. Given the nature of Lewis, Hankins and Drew's fraud, as well as the secretive nature of Lewis, Hankins and Drew's business, Lewis, Hankins and Drew necessarily and naturally have the complete information related to the damages they have caused by stealing Plaintiff's information and business. However, MG has been harmed by at least $2.5 million, based on calculating MG's costs over the last year to develop and refine the technology, know-how and confidential information that was fraudulently obtained, MG's expected share of profit from the partnership, as well as the opportunity costs associated with time spent collaborating that could have been spent either on client relations or collaborating with good-faith individuals and businesses.

198. Lewis, Hankins and Drew's conduct was intentional, malicious, and fraudulent, justifying the award of punitive and exemplary damages.

///

199. MG's reliance on Lewis, Hankins, and Drew's false promises was and continues to be a substantial factor in causing its harm.

200. As more fully set forth above, the acts of Defendants were intentional, malicious, wanton, oppressive and fraudulent, with conscious disregard for Plaintiff's rights and with the intent to vex, injure, punish and annoy Plaintiff so as to cause the injuries sustained by Plaintiff, within the meaning of California Civil Code §3294. Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendants.

**SEVENTH CAUSE OF ACTION**

**Fraud (California Law)**

**(Against Coy)**

201. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

202. On August 6, 2019, Coy made promises to MG in the form of a Website Development Agreement with MG signed by Bartlett as CEO of Coy (the "Coy WDA"). When entering into the Coy WDA, Coy never had any intention of performing its end of the bargain.

203. Coy intended MG to rely on its misrepresentations and those made by its founders prior to being incorporated, including emails, text messages, phone calls and earlier NDAs signed by its founders. These promises centered largely on keeping MG's information confidential and out of the hands of competitors. Bartlett made Coy's true intention and its knowing of the falsity at the time the misrepresentations were made very clear when on March 4, 2021, she posted an Instagram update where she stated she always viewed Coy as a technology company first. *See supra* ¶ 87. Coy's intention, as described in her post, is the exact *opposite* of what she represented to MG. Had MG known the truth, it never would have associated with or done any business with Bartlett.

///

204. MG actually relied on the statements and promises made by Coy's officers and founders, including the promises contained within the Coy WDA and the earlier NDAs. On the basis of the NDAs, the Coy WDA, as well as the various statements, texts, emails and phone calls outlined above, MG shared confidential information with Coy.

205. MG's reliance on Coy's false statements and promises was justifiable in light of MG's knowledge and experience. Others associated with MG had adhered to their agreements and kept information confidential. Moreover, MG believed that all parties involved stood to gain from the cooperative effort.

206. MG has been harmed in that it was deceived into sharing its technology and expertise that was ultimately used to compete directly with MG using its own business model and own technology.

207. Given the nature of Coy's fraud and the secretive nature of Coy's business, Coy necessarily and naturally has the complete information of damage it has caused from stealing Plaintiff's information and business. However, MG has been harmed by at least $2.5 million, based on calculating MG's costs over the last year to develop and refine the technology, know-how and confidential information that was fraudulently obtained, MG's expected share of profit from the partnership, as well as the opportunity costs associated with time spent collaborating that could have been spent either on client relations or collaborating with good-faith individuals and businesses.

208. Coy's conduct was intentional, malicious and fraudulent, justifying the award of punitive and exemplary damages.

209. MG's reliance on Coy's false statements and promises was and continues to be a substantial factor in causing its harm.

210. As more fully set forth above, the acts of Defendants were intentional, malicious, wanton, oppressive and fraudulent, with conscious disregard for Plaintiff's rights and with the intent to vex, injure, punish and annoy Plaintiff so as to cause the

injuries sustained by Plaintiff, within the meaning of California Civil Code §3294. Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendants.

## EIGHTH CAUSE OF ACTION

### Breach of Fiduciary Duty

### (Against Jessica Bartlett, Corey Lewis, Robert Hankins, and Thomas Drew)

211. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

212. Bartlett, Lewis, Hankins and Drew each, knowingly or unknowingly, entered into a partnership and/or joint venture with MG in May 2020 by entering into an agreement whereby: (1) MG shared in the management and control of the partnership and/or venture, including by making hiring decisions and exercising control over the technology and creative design used; (2) MG contributed valuable services, such as providing technology and creating the websites. MG also offered technical expertise, industry expertise, and business expertise; and (3) MG shared in the profits by receiving a portion of each website subscriber's monthly subscription fee and a portion of each individual sale of premium content.[8]

213. The parties' intent was clear, as Bartlett and Lewis frequently referred to MG as their partner and described their relationship as a partnership. They also introduced Nick to third parties as their "technology partner."

214. Even after the contract between MG and Coy was signed in August 2020, Bartlett, Lewis and Nick all referred to their relationship as a "partnership."

215. As partners and/or joint venturers with MG, Bartlett, Lewis, Hankins and Drew each owed MG fiduciary duties of care, loyalty and good faith.

216. Bartlett, Lewis, Hankins and Drew each breached their fiduciary duties, including care, loyalty, and good faith owed to MG by concealing their true motives

---

[8] Additionally, the existence of a partnership has been judicially admitted by Defendants and/or is subject to judicial estoppel.

and goals, leveraging the trust engendered by the partnership and/or joint venture with MG in order to obtain knowledge and skills and by ultimately creating a business expressly designed to compete directly against their partner/joint venturer, MG.

217. By entering into a partnership and/or joint venture with MG under false pretenses, Bartlett, Lewis, Hankins and Drew breached their fiduciary duties of care and loyalty owed to MG the instant those duties came into being.

218. The breaches of fiduciary duties by Bartlett, Lewis, Hankins and Drew have actually and proximately caused harm to MG.

219. Since the above-described breaches are breaches of fiduciary duties, including care, loyalty and good faith (which includes candor), the breach is inherently secretive, which makes the full extent of the damage known only to Bartlett, Lewis, Hankins and Drew absent discovery. However, MG has been harmed by at least $2.5 million, based on calculating MG's costs and opportunity costs cooperating in good faith with partners who have breached their fiduciary duties to harm MG for their own benefit.

220. As more fully set forth above, the acts of Defendants were intentional, malicious, wanton, oppressive and fraudulent, with conscious disregard for Plaintiff's rights and with the intent to vex, injure, punish and annoy Plaintiff so as to cause the injuries sustained by Plaintiff, within the meaning of California Civil Code §3294. Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendants.

## NINTH CAUSE OF ACTION

**Breach of Fiduciary Duty**

**(Against Coy)**

221. Plaintiff realleges and incorporates by reference each of the allegations in paragraphs 1 through 90 set forth above.

222. Coy and MG entered into a partnership or joint venture by entering into an agreement whereby: (1) MG shared in the management and control of the

partnership and/or venture, including by making hiring decisions and exercising control over the technology and creative design used; (2) MG contributed valuable services, such as providing technology and creating the websites. MG also offered technical expertise, industry expertise, and business expertise; and (3) MG shared in the profits by receiving a portion of each website subscriber's monthly subscription fee and a portion of each individual sale of premium content.[9]

223. The parties' intent was clear, as Bartlett and Lewis frequently referred to MG as their partner and described Coy's relationship with MG as a partnership. They also introduced MG to third parties as Coy's "technology partner."

224. The partnership was originally formed in May 2020, and the fiduciary breaches at issue took place both before and after the contract between Coy and MG was signed in August 2020. The language in the contract between MG and Coy could not eliminate the reality of the partnership that existed when all parties involved behaved and continued as though there were in fact a partnership. For example, even after the contract between MG and Coy was signed in August 2020, Defendants and MG still referred to their relationship as a "partnership."

225. As partners and/or joint venturers with MG, Coy owed MG fiduciary duties of care and loyalty.

226. Coy breached its fiduciary duties, including care, loyalty and good faith owed to MG by concealing its true motives and goals, leveraging the trust engendered by the partnership and/or joint venture with MG in order to obtain knowledge and skills and by ultimately becoming a direct competitor against its partner/joint venturer, MG.

227. By entering into a partnership and/or joint venture with MG under false pretenses, Coy breached its fiduciary duties of care, loyalty and good faith owed to MG the instant those duties came into being.

---

[9] Additionally, the existence of a partnership has been judicially admitted by Defendants and/or is subject to judicial estoppel.

228. The breaches of fiduciary duties by Coy have actually and proximately caused harm to MG.

229. Since the above-described breaches are breaches of fiduciary duties, including care, loyalty, and good faith (which includes candor), the breach is inherently secretive, which makes the full extent of the damage known only to Coy absent discovery. However, MG has been harmed by at least $2.5 million, based on calculating MG's costs and opportunity costs cooperating in good faith with partners who have breached their fiduciary duties to harm MG for their own benefit.

230. As more fully set forth above, the acts of Defendants were intentional, malicious, wanton, oppressive and fraudulent, with conscious disregard for Plaintiff's rights and with the intent to vex, injure, punish and annoy Plaintiff so as to cause the injuries sustained by Plaintiff, within the meaning of California Civil Code §3294. Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendants.

## TENTH CAUSE OF ACTION

### Conversion

### (Against All Defendants)

231. Plaintiff incorporates by reference in this cause of action each allegation of the preceding paragraphs as though fully set forth herein.

232. Plaintiff is the rightful owner of trade secrets provided to Defendants The Coy Collective, Bartlett, Drew, Hankin and Lewis under a confidentiality agreement set forth in the WDA. Those trade secrets were knowingly and intentionally transferred to Defendants TMW Labs, Inc., Silk, Geller and The Sheth Sangreal Foundation and Lopez.

233. Defendants and each of them substantially interfered with Plaintiff's property by knowingly and intentionally refusing to return Plaintiff's trade secrets and to refrain from further use, circulation, "rebuilding", repurposing or in any way utilizing those trade secrets. Instead, Defendants and each of them concocted a

scheme to transfer the trade secrets to a third party corporation TMW Labs, Inc. that, prior to discovery of the scheme, was a third party to this litigation and would not have been bound by any subsequent judgment.

234. Plaintiff did not consent to the misappropriation of its trade secrets or the transfer thereof;

235. The misappropriation of Plaintiff's trade secrets has caused irreparable harm to Plaintiff; and

236. Defendants' conduct, and each of them, was the substantial factor in causing the subject irreparable harm.

237. As more fully set forth above, the acts of Defendants were intentional, malicious, wanton, oppressive and fraudulent, with conscious disregard for Plaintiff's rights and with the intent to vex, injure, punish and annoy Plaintiff so as to cause the injuries sustained by Plaintiff, within the meaning of California Civil Code §3294. Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendants.

## ELEVENTH CAUSE OF ACTION

### Intentional Interference with Contractual Relations

### (Against All Defendants)

238. Plaintiff incorporates by reference in this cause of action each allegation of the preceding paragraphs as though fully set forth herein.

239. Plaintiff claims that Defendants intentionally interfered with Plaintiff's contractual relationships with its clients as alleged above which were intended to convey a future economic benefit to Plaintiff;

240. Defendants and each of them knew the existence of these contracts with third party clients;

241. Defendants and each of them prevented performance or made performance more expensive or difficult by attempting to interfere in Plaintiff's contractual relationships with its third party client;

242. Defendants and each of them intended to disrupt the performance of these contracts and knew that disruption of the performance of these contracts we're likely to occur;

243. The misappropriation of Plaintiff's trade secrets has caused irreparable harm to Plaintiff; and

244. Defendants' conduct, and each of them, was the substantial factor in causing the subject irreparable harm.

245. As more fully set forth above, the acts of Defendants were intentional, malicious, wanton, oppressive and fraudulent, with conscious disregard for Plaintiff's rights and with the intent to vex, injure, punish and annoy Plaintiff so as to cause the injuries sustained by Plaintiff, within the meaning of California Civil Code §3294. Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendants.

246. As more fully set forth above, the acts of Defendants were intentional, malicious, wanton, oppressive and fraudulent, with conscious disregard for Plaintiff's rights and with the intent to vex, injure, punish and annoy Plaintiff so as to cause the injuries sustained by Plaintiff, within the meaning of California Civil Code §3294. Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendants.

## TWELVTH CAUSE OF ACTION

**Negligent Interference with Contractual Relations**

**(Against All Defendants)**

247. Plaintiff incorporates by reference in this cause of action each allegation of the preceding paragraphs as though fully set forth herein.

248. Plaintiff claims that Defendants negligently interfered with Plaintiff's contractual relationships with its clients as alleged above which were intended to convey a future economic benefit to Plaintiff;

///

249. Defendants and each of them knew the existence of these contracts with third party clients;

250. Defendants and each of them prevented performance or made performance more expensive or difficult by attempting to interfere in Plaintiff's contractual relationships with its third party client;

251. Defendants and each of them intended to disrupt the performance of these contracts and knew that disruption of the performance of these contracts we're likely to occur;

252. The misappropriation of Plaintiff's trade secrets has caused irreparable harm to Plaintiff; and

253. Defendants' conduct, and each of them, was the substantial factor in causing the subject irreparable harm.

**THIRTEENTH CAUSE OF ACTION**

**Fraudulent Transfer (Cal. Civ. Code § 3439)**

**(Against Defendant Coy, Lewis, Drew, Silk, Geller, The Sheth Sangreal Foundation, TMW Labs, Inc. and Lopez)**

254. Plaintiff incorporates by reference in this cause of action each allegation of the preceding paragraphs as though fully set forth herein.

255. California Civil Code § 3439.04(a) states as follows: A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows: (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

256. Plaintiff is defined as a "creditor" pursuant to Civil Code § 3439(c) and a "person who has a claim" against Defendants.

257. Plaintiff is the rightful owner of trade secrets at issue in this litigation.

258. Defendants Transferred those trade secrets in the possession of Defendants The Coy Collective, The Sheth Sangreal, Geller, Lewis, Drew and Silk

to Defendants TMW Labs, Inc., Geller, Silk, Lewis, Drew and Lopez viz. by establishing a shell corporation with all of the same principal owners, exectives, directors, officers, investors, board members, advisors and/or agents.

259. In or around January 2023, Defendants and each of them conspired to unlawfully transfer plaintiffs trade secrets to a third party to this action and newly-created corporation, TMW Labs, Inc. which is owned, in whole or in part, and/or controlled by its executives, officers, directors and board members identified as Defendants Silk, Geller, Lopez, Lewis and Drew as it became reasonably apparent that The Coy Collective would be ultimately held responsible for Plaintiff's damages attorneys' fees and costs related to this litigation and the misappropriation of its trade secrets.

260. In or around January 2023, Plaintiff's trade secrets were actually transferred to TMW Labs, Inc. which was identified as the only valuable asset within The Coy Collective's business model.

261. The subject transfer of Plaintiff's trade secret tended to hinder, delay and/ or defraud Plaintiff as the transfer was done during the pendency of this litigation with full knowledge by all Defendants and related third parties as to the allegations set forth therein;

262. The misappropriation of Plaintiff's trade secrets has caused irreparable harm to Plaintiff; and

263. Defendants' conduct, and each of them, was the substantial factor in causing the subject irreparable harm.

264. As more fully set forth above, the acts of Defendants were intentional, malicious, wanton, oppressive and fraudulent, with conscious disregard for Plaintiff's rights and with the intent to vex, injure, punish and annoy Plaintiff so as to cause the injuries sustained by Plaintiff, within the meaning of California Civil Code §3294. Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendants.

265. A temporary and final injunction to prevent or restrain further infringement and misappropriation of Plaintiff's trade secrets.

**FOURTEENTH CAUSE OF ACTION**

**Unfair Business Practices (Bus. & Prof. Code § 17200)**

**(Against All Defendants)**

266. Plaintiff incorporates by reference in this cause of action each allegation of the preceding paragraphs as though fully set forth herein.

267. Defendants and each of them violated Penal Code § 496 which provides as follows: (a) Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170…. (c) Any person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees.

268. As a result of Defendants' wrongful conduct, Plaintiff has suffered and continues to suffer monetary harm in an amount to be determined at trial.

269. Defendants have admitted that the value of the asset transferred from The Coy Collective to TMW Labs, Inc. is valued, at a minimum, of $1.3 million.

270. As more fully set forth above, the acts of Defendants were intentional, malicious, wanton, oppressive and fraudulent, with conscious disregard for Plaintiff's rights and with the intent to vex, injure, punish and annoy Plaintiff so as to cause the injuries sustained by Plaintiff, within the meaning of California Civil Code §3294. Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendants.

///

## FIFTEENTH CAUSE OF ACTION

**Declaratory Relief**

**(Against All Defendants)**

271. Plaintiff incorporates by reference in this cause of action each allegation of the preceding paragraphs as though fully set forth herein.

272. An actual controversy exists between Plaintiff on the one hand and Defendants, on the other hand, in that Plaintiff contends that Defendants were bound by the confidentiality provision of the WDA which was negligently and intentionally violated in order to compete with Plaintiff and interference with its contractual and prospective business relations.

273. Defendants deny the aforesaid contentions of Plaintiff.

274. Plaintiff requests a declaration from this Court that each defendant is liable to plaintiff for the allegations set forth herein. Such a determination is appropriate and necessary in that Plaintiff have no adequate or speedy remedy at law and the requested judicial declaration will avoid a multiplicity of suits, result in judicial economy, and further the interests of justice.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

ON THE FIRST CAUSE OF ACTION

1. Compensatory damages according to proof at trial;
2. Disgorgement of profits due to unjust enrichment;
3. Punitive and exemplary damages as awarded at trial pursuant to 18 U.S.C. § 1836(b)(3)(C);
4. A temporary and final injunction to prevent or restrain further infringement and misappropriation of Plaintiff's trade secrets;
5. A reasonable royalty;
6. Plaintiff's costs, including reasonable attorneys' fees, pursuant to U.S.C. § 1836(b)(3)(D);

ON THE SECOND CAUSE OF ACTION

7. Expectation damages exceeding $1.5 million;

8. A temporary and final injunction to prevent or restrain further use and disclosure of Plaintiff's intellectual property and confidential information;

9. Plaintiff's costs, including reasonable attorneys' fees, as provided by the contract;

ON THE THIRD CAUSE OF ACTION

10. Expectation damages exceeding $75,000;

11. A temporary and final injunction to prevent or restrain further use and disclosure of Plaintiff's intellectual property and confidential information;

12. Plaintiff's costs, including reasonable attorneys' fees, as provided by the contract;

ON THE FOURTH CAUSE OF ACTION

13. Expectation damages exceeding $2.5 million;

14. A temporary and final injunction to prevent or restrain further use and disclosure of Plaintiff's intellectual property and confidential information;

15. Plaintiff's costs, including reasonable attorneys' fees, as provided by the contract;

16. Reasonable royalties;

ON THE FIFTH CAUSE OF ACTION

17. Damages according to proof but of no less than $2.5 million;

18. Punitive and exemplary damages as awarded at trial;

ON THE SIXTH CAUSE OF ACTION

19. Damages according to proof but of no less than $2.5 million;

20. Punitive and exemplary damages as awarded at trial;

ON THE SEVENTH CAUSE OF ACTION

21. Damages according to proof but of no less than $2.5 million;

22. Punitive and exemplary damages as awarded at trial;

ON THE EIGTH CAUSE OF ACTION

23. Compensatory damages according to proof but of no less than $2.5 million;

24. Punitive and exemplary damages as awarded at trial;

25. Disgorgement of profits;

ON THE NINTH CAUSE OF ACTION

26. Compensatory damages according to proof but of no less than $2.5 million;

27. Punitive and exemplary damages as awarded at trial;

28. Disgorgement of profits;

ON THE TENTH CAUSE OF ACTION

29. Compensatory damages according to proof but of no less than $2.5 million;

30. Punitive and exemplary damages as awarded at trial;

ON THE ELEVENTH CAUSE OF ACTION

31. Compensatory damages according to proof but of no less than $2.5 million;

32. Punitive and exemplary damages as awarded at trial;

33. Disgorgement of profits;

ON THE TWELVTH CAUSE OF ACTION

34. Compensatory damages according to proof but of no less than $2.5 million;

35. Disgorgement of profits;

ON THE THIRTEENTH CAUSE OF ACTION

36. Compensatory damages according to proof but of no less than $2.5 million;

37. Punitive and exemplary damages as awarded at trial;

38. Disgorgement of profits;

39. Reasonable attorneys' fees and costs;

ON THE FOURTEENTH CAUSE OF ACTION

40. Compensatory damages according to proof but of no less than $2.5 million;

41. Punitive and exemplary damages as awarded at trial;

42. Treble damages;

43. Disgorgement of profits;

44. Reasonable attorneys' fees and costs;

ON THE FIFTEENTH CAUSE OF ACTION

45. That Defendants be held to have duties to Plaintiff in this action consistent with the WDA;

46. That the rights, duties and obligations between Plaintiff and Defendants be fully determined by this Court; and

47. That Plaintiff be granted such other and further relief as this Court may deem just and proper

ON THE ALL CAUSES OF ACTION

1. Costs of suit incurred herein;

2. Pre- and post-judgment interest; and

3. Such other and further relief as the Court may deem just and proper.

***DEMAND FOR JURY TRIAL***

Plaintiff hereby demands a jury trial on all issues so triable pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the U.S. Constitution.

///

///

///

///

Respectfully submitted,

DATED: September 1, 2023 BY: Gerard Fox Law, P.C.

Gerard P. Fox
Cirstan Fitch
*Attorneys for Plaintiff McCandless Group, LLC*

# EXHIBIT – A –

MCCANDLESS GROUP

# WEBSITE DEVELOPMENT AGREEMENT

THIS AGREEMENT ("Agreement") is entered into as of the date on the signature page (the "Effective Date") by and between McCandless Group, LLC, with its principal place of business located at 3141 Michelson Drive #1307, Irvine, CA 92612 (the ("Developer") and Jessica Marie Bartlett with a principal place of business located at 550 North Figueroa Street #5027, Los Angeles, CA 90012 (the "Customer" or "you" or "your") each individually a "Party" and collectively the "Parties."

**WHEREAS,** Developer is engaged in the business of website and software development.

**WHEREAS**, Customer wishes to utilize the services of Developer in connection with the development of software identified as the Jessica Marie Bartlett Website (the "Website").

**NOWTHEREFORE,** in consideration of the promises and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties agree as follows:

**1. Services.** Subject to the terms and conditions of this Agreement, the Customer hereby retains Developer to perform the services set out below ("Services" or "Work").

1.1 General.

a. Developer will perform the services of website development and support of the Website according to specifications set forth therein (the "Website").

b. The Website will be for Customer's brand that allows the Customer to provide exclusive content to the Customer's audience through the Website.

c. Customer will cooperate with Developer's reasonable requests for information, content, and data necessary for the completion of the Website.

1.2 Services to be provided:

a. The Developer will provide the Customer with a Website that provides support for exclusive content of the Customer including both photos and videos that are made exclusive to those subscribed by paying for a subscription. Subscribers will also have the ability to chat with the Customer through the website.

b. The design and interface of the Website will follow the template assigned to it by the Developer.

c. The Customer guarantees that the Developer will be supplied with the Work to be completed.

d. The Website shall contain a statement substantially similar to "Powered by McCandless Group" and such copyright and trademark notices as the Developer reasonably believes are appropriate.

e. The Developer will be providing the Product "AS-IS" and no custom development will be included under this Agreement excepting that included in the functionalities above. Any maintenance, repair, modification, upgrade or enhancement of the Website shall be pursuant to a separate mutually acceptable written agreement between the Customer and the Developer.

f. It is understood and agreed that the Customer will use the Website and its content to promote their exclusive content with the purpose of monetizing the Customer's fans and shall not be used for any other purposes without written permission from the Developer.

**2. <u>Compensation.</u>**

2.1 In consideration of the Services to be provided by Developer to the Customer hereunder, the Customer shall pay to Developer the following compensation ("Compensation"):

a. Fifteen percent (15%) of the Gross Revenue collected from the Website in perpetuity.

(i) Developer shall be responsible for collecting sales charges generated from the Website and shall remit Customer's eighty-five percent (85%) of the Gross Revenue (a "Distribution").

(ii) Distributions shall be made no later than on the end of the first (1st) week of each month for the amount owed as a result of the prior months' sales.

(iii) Developer shall provide Customer with access to the reporting software used to track revenue.

2.2 "Gross Revenue" shall mean:

a. All sales collected by Developer from the Website of any kind.

b. All sales generated from social media and other sites which Customer uses to market products and services offered on the Website.

**3. <u>Term and Termination</u>.**

3.1 This Agreement shall commence on the Effective Date and shall continue for a period of twelve (12) months (the "Initial Term") and shall renew for successive twelve

(12) month periods (each a "Renewal Term") unless terminated by either party by providing written notice to the other Party no less than ninety (90) days prior to Renewal Period of its intent to not renew the Agreement.

3.2 Customer may not terminate this Agreement at any time, for any reason, during the Initial Term. Any such termination shall be a material breach of this Agreement for which Developer may collect damages including those liquidated damages as stated below.

3.3 Customer grants exclusivity to the Developer by the Customer and shall not provide for any subscription services using any other means rather than the Website to be developed for the period of twelve (12) months after the Website's launch date and for any Renewal Period.

4. **<u>Relationship of the Parties.</u>** The Developer is and shall remain an independent contractor of the Customer and nothing contained in this Agreement shall be deemed to create an employer/employee, principal/agent, partnership or joint venture relationship between the parties. The Customer shall not provide the Developer with any benefits that the Customer may provide to its employees and shall not be required to withhold income taxes on, or to pay payroll taxes with respect to, the sums to be paid to the Developer hereunder. The Developer agrees that he shall be solely responsible for all excise, self-employment and other taxes relating to the receipt of payments hereunder. As an independent contractor, it is expressly agreed that the Developer operates at his/her own expense and risk. The Developer is not authorized to execute any agreements, make any changes in any agreements, incur or assume any obligations, liabilities or responsibilities, or perform any other act in the name of or on behalf of the Customer. Each party shall have the obligation to supervise, manage, contract, direct, procure, pay, perform or cause to be performed all work and other obligations to be performed by such party pursuant to the terms of this Agreement and shall be liable for the acts or omissions of its or his/her employees and agents in performing its or his/her respective obligations or exercising its or his/her respective rights hereunder.

5. **<u>Confidential Information.</u>**

5.1 Definition of Confidential Information. For the purposes of this Agreement, "Confidential Information" means any information disclosed by either party to the other party, either directly or indirectly, in writing, orally or by inspection of tangible objects which is designated or described by the disclosing party as "Confidential," "Proprietary" or some similar designation, or which should reasonably be understood by the receiving party, because of the circumstances of disclosure or the nature of the information itself to be confidential or proprietary to the disclosing party. Confidential Information shall include, but not be limited to, the pricing and payment terms contained in this Agreement. In the event Developer is included in any image, video or content posted by Customer in Customer's Content, Customer shall maintain identification of Developer confidential and may not under any circumstances disclose Developer's identity. Confidential Information may also include information disclosed to

a receiving party by third parties on behalf of the disclosing party. Confidential Information shall not include any information which (i) is publicly known through no action or inaction of the receiving party; (ii) was already in the possession of the receiving party at the time of disclosure without an obligation of confidentiality, direct or indirect, to the disclosing party; (iii) is obtained by the receiving party from an independent third party without a breach of such third party's obligations of confidentiality; or (iv) is independently developed by the receiving party without use of or reference to materials provided by the disclosing party.

5.2 Non-use and Nondisclosure. Each party agrees that it will not use any Confidential Information of the other party for any purpose except for the purpose of this Agreement. Each party agrees that it will not disclose any of the other party's Confidential Information to anyone except for such party's own directors, officers, employees, and attorneys who are required to have the information in connection with the purpose of this Agreement ("Representatives"). In the event that a receiving party is required by law to disclose Confidential Information obtained from the disclosing party, the receiving party shall give the disclosing party prompt written notice of such requirement as soon as possible prior to such disclosure and shall provide the disclosing party with assistance in obtaining an order protecting the information from disclosure.

5.3 Each party agrees that it shall take reasonable measures to protect the secrecy of and avoid the disclosure and the unauthorized use of the other party's Confidential Information. Without limiting the foregoing, each party shall take at least those measures that it takes to protect its own most highly confidential information and shall ensure that each of its Representatives who have access to the other party's Confidential Information has signed a non-use and nondisclosure agreement in content similar to the provisions hereof, prior to any disclosure of Confidential Information to such Representative. Neither party shall make any copies of the other party's Confidential Information without the disclosing party's prior written consent.

5.4 Term of Confidentiality. The term of this Confidentiality Section shall remain in effect until terminated by either party with written notice to the other party, but such termination shall have no effect on either party's obligations hereunder with respect to Confidential Information already disclosed. The obligations of each receiving party hereunder as to any Confidential Information shall continue in perpetuity from the date such Confidential Information is disclosed or if applicable until such information is no longer a trade secret of the disclosing party, whichever occurs last, and shall survive termination of this Agreement.

**6. <u>Ownership of Intellectual Property.</u>**

6.1 Except as may be otherwise granted herein, title to and ownership of all intellectual property rights including, without limitation, any patent, trademark, copyright or intellectual or industrial property right (the "Developer Intellectual Property") relating to the Software shall at all times remain with Developer. Customer expressly acknowledges that it does not have and shall not, by virtue of this Agreement, acquire any title or proprietary rights whatsoever of any kind in or over the

Software or any improvements, updates, adaptation, modification, research, development, derivation, addition, extension, changes, or other Developer Intellectual Property related to the Software.

6.2 Developer hereby grants to Customer a perpetual, non-exclusive, non-transferable, royalty-free, worldwide right to use the Software for those purposes intended by this Agreement.

6.3 Customer reserves all its respective rights, title, and ownership in its respective intellectual property owned or developed independently of this Agreement, including images, videos, written content and other personal content ("Customer Intellectual Property"). Developer expressly acknowledges that it does not have and shall not, by virtue of this Agreement, acquire any title or proprietary rights whatsoever of any kind in or over Customer Intellectual Property.

6.4 Developer may use, reproduce and copy Customer Intellectual Property for the purposes of planning, operating, managing, optimizing, implementing and maintaining the Website, subject to the maintenance of confidentiality in accordance with Section 5 herein.

**7. <u>Customer Content.</u>**

7.1 All Content on the Website is the sole responsibility of the person who originated such content. All Content transmitted by Customer is at Customer's own risk and Customer is solely responsible and liable for any damage or loss to resulting therefrom. Developer reserves the right to remove any objectionable Content in their sole discretion.

7.2 Customer understands that by providing Content in connection with the Service Customer hereby grants Developer a non-exclusive, worldwide, royalty free, perpetual, irrevocable, sublicensable and transferable right to fully exploit such Content (including all related intellectual property rights) in connection with Developer's business.

**8. <u>Customer Representations.</u>**

8.1 Customer will use the Website and its content to promote their exclusive content with the purpose of monetizing the Customer's followers and shall not be used for any other purposes without written permission from the Developer.

8.2 Customer shall post unique content on the Website at least one (1) time daily, five (5) days a week, for the subscribers for the life of the term.

8.3 Customer commits themselves to promote the Website and its content at least one (1) time weekly on social media for the life of the term.

8.4 Customer will include the url to the Website in the bio of their social media accounts for the life of the term. Customer has the right to include other links in the bio in the case of a brand deal with such requirement.

8.5 Customer will be using the following social media channel for all of the social media promotions mentioned above:

a. Instagram: @jessicambartlett

b. Should the name of the Customer's account be changed, this name will be deemed to have been recognized and valid within this agreement along with the new account name.

8.6 In the event Customer fails to deliver any of the requirements as contained in Sections 8.1 – 8.5, Customer shall pay to Developer the amount of Seven Thousand Five Hundred Dollars ($7,500) in liquidated damages upon notice from Developer of such failure without the curing of such within five (5) days. This right to cure shall be available to Customer one (1) time and thereafter no right to cure shall exist following a second (2nd) failure to adhere to the above obligations.

8.7 Customer warrants and represents that all information as contained in the attached ADULT MODEL RELEASE: 2257 COMPLIANT FORM is true and accurate.

**9. Indemnity.** At all times, Customer shall protect, indemnify, defend and hold the Developer, including its affiliates and subsidiaries, officers, directors, shareholders, members, employees, agents, representatives, successors and assigns harmless from and against any and all penalties, claims, losses, liabilities, damages, charges, costs and/or expenses (including, without limitation, attorneys' fees and court costs) rising out of or resulted from or in any way or in any manner connected with or related to any acts or omissions or breach of this Agreement, of Customer, including but not limited to subsection 8.7 herein.

**10. Warranty, Disclaimer and Limitation of Liability.**

10.1 Your use of the Service is at your sole risk. The Service and the associated materials and content are provided on an "as is" and "as available" basis. Except as otherwise expressly provided in this Agreement, Developer, its parent, subsidiary and other affiliated companies, and their respective officers, directors, employees, agents and other representatives (collectively, the "Developer Parties"), expressly disclaim all warranties of any kind, whether express or implied, including, but not limited to the implied warranties of merchantability, fitness for a purpose and non- infringement. Without limiting the generality of the foregoing, the Developer Parties make no warranty that: (i) the Service will meet your requirements; (ii) the Service will be uninterrupted, timely, secure, or error-free; and/or (iii) any errors in the Service will be corrected.

10.2 The Developer Parties shall not under any circumstances be liable for any damages of any kind arising out of, in connection with or relating to the use of or inability to use the Service, including any liability: (i) as a publisher of information; (ii) for any incorrect or inaccurate information or any 'bug' of the Service; (iii) for any unauthorized access to or disclosure of your transmissions or data; (iv) for statements or conduct of any third party on or via the Service; (v) for any disputes between users of the Service or between a User of the Service and you; (vi) for lost data; (vii) cost of procurement of substitute products or services; (viii) for any technical malfunction that may arise from problems with computer systems, software code, servers, computer equipment, mobile phones, software, infrastructure connections or any combination

thereof. or (ix) for any other matter relating to the Service or any third party. This is a comprehensive limitation of liability that applies to all damages of any kind, including any direct, indirect, special, incidental or consequential damages, whether based on breach of contract, breach of warranty, tort (including negligence), product liability or otherwise, even if an individual advises the Developer Parties of the possibility of such damages. The limitations of liability set forth herein are fundamental elements of the basis of the bargain between the Developer and you. The products, information and services offered on and through the Service would not be provided to you without such limitations.

10.3 Notwithstanding the foregoing, the sole and entire maximum liability of the Developer Parties for any reason, and your sole and exclusive remedy for any cause or claim whatsoever, shall be limited to any amounts paid by you to Developer during the three (3) months prior to the date any cause of action may have occurred.

10.4 You agree that regardless of any statute or law to the contrary, any claim you may bring must be filed within one (1) year after the cause of action accrues or it will be permanently barred.

10.5 Some jurisdictions do not allow the disclaimer of certain warranties or the limitation or exclusion of liability for certain types of damages. accordingly, some of the above disclaimers and limitations may not apply to you.

10.6 If you are a California resident, you shall and hereby do waive California Civil Code Section 1542, which says: “A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which, if known by him must have materially affected his settlement with the debtor.”

**11.** **<u>Force Majeure</u>.** A party will be not be considered in breach or in default because of and will not be liable to the other party for, any delay or failure to perform its obligations under this agreement by reason of fire, earthquake, flood, explosion, strike, riot, war, terrorism, or similar event beyond that party’s reasonable control (each a “Force Majeure Event”). However, if a Force Majeure Event occurs, the affected party shall, as soon as practicable:

a. Notify the other party of the Force Majeure Event and its impact on performance under this agreement; and

b. Use reasonable efforts to resolve any issues resulting from the Force Majeure Event and perform its obligations under this agreement.

**12.** **<u>Governing Law, Jurisdiction</u>**. If any dispute arises under the terms of this Agreement, the parties agree to select a mutually agreeable neutral third party to help them mediate such. If mediation is unsuccessful, the Parties agree that any dispute shall be in all respects construed in accordance with and governed by the laws of the State of California without regard to conflict of law principles. Costs and fees (including attorneys’ fees) associated with the mediation or arbitration shall be responsibility of each individual party.

**13. <u>Miscellaneous</u>.**

a. Entire Agreement; Modification. This Agreement sets forth the entire agreement and understanding of the parties hereto concerning the subject matter hereof, and, except as otherwise specifically provided below, supersedes all prior and contemporaneous correspondence, agreements, arrangements and understandings, both oral and written, between the parties hereto concerning the subject matter hereof. No modification hereof shall be binding upon the parties hereto except by written instrument duly executed by such parties or their duly authorized representatives.

b. Invalidity of Particular Provisions. If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the other terms of this Agreement, or the application of such terms or provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

c. Counterparts. This Agreement may be executed in any number of counterparts, including electronically, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

d. This Agreement may be delivered by email, and email copies of executed signature pages shall be binding as originals.

e. Interpretation. The paragraph headings of this Agreement are inserted for convenience only and shall not constitute a part of this Agreement in construing or interpreting any provision hereof. Whenever the context requires, words used in the singular shall be construed to include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine or neuter gender.

f. Notices. All notices given under this Agreement must be in writing. A notice is effective upon receipt and shall be sent via one of the following methods: delivery in person, overnight courier service, certified or registered mail, postage prepaid, return receipt requested, or by any other means agreed to by the Parties, such as email.

g. This agreement will become effective when all parties have signed it. The date this agreement is signed by the last party to sign it (as indicated by the date associated with that party’s signature) will be deemed the Execution Date of this agreement.

h. Each party shall use all reasonable efforts to take, or cause to be taken, all actions necessary or desirable to consummate and make effective the transactions this agreement contemplates or to evidence or carry out the intent and purposes of this agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement effective the date stated above.

| DEVELOPER: | CUSTOMER: |
|---|---|
| Business Name: McCandless Group, LLC | Business Name: Jessica Marie Bartlett |
| Address: 3141 Michelson Drive, Unit 1307, Irvine, CA 92612 | Address: 550 North Figueroa Street #5027, Los Angeles, CA 90012 |
| Telephone Number: 919-791-6441 | Telephone Number: 805-835-8052 |
| Email Address: nick@nickmccandless.com | Email Address: jbartlett@berkeley.edu |
| By: DocuSigned by: Nicholas McCandless CC0CECA0BA5C475... Signature | By: DocuSigned by: Jessica Bartlett F1B789CDC1A4452... Signature |
| Full Name: Nicholas McCandless<br>Title: CEO/Owner/Founder | Full Name: Jessica Marie Bartlett |
| Date: 10/27/2019 | Date: 10/27/2019 |

**EXHIBIT A**

**ADULT MODEL RELEASE: 2257 COMPLIANT FORM**

# ADULT MODEL RELEASE: 2257 COMPLIANT FORM:

## Model Name:

| | |
|---|---|
| MODEL'S LEGAL NAME: | **Jessica Marie Bartlett** |
| STAGE NAME [IF ANY]: | Jessica Bartlett |
| ALIAS [IF ANY]: | Jessica Bartlett |
| MAIDEN NAME: | |
| PROFESSIONAL NAME: | |
| ALSO KNOWN AS: | |
| ALSO KNOWN AS: | |
| If model has additional names, must include: | |

## Identification Produced: **First form of identification produced**

| | |
|---|---|
| Driver's License Number: | California – F4389157 |
| Passport Number: | |
| State Identification Card Number: | |
| School I.D. Number: | |
| Selective Service Card Number: | |
| Work Identification Card Number: | |
| Date of Birth of Model: | 06/10/1996 |
| Address of Model: | 550 North Figueroa Street #5027 |
| City: | Los Angeles |
| State: | California |

## TERMS AND CONDITIONS:

I, the undersigned model (hereafter model) do hereby voluntarily authorize and give permission to Company/Producer below (hereafter Producer) to the exclusive use of: photographs, video, electronic and digital reproductions in any form of my person or personal property

From the date of execution of this General Release and Authorization, the undersigned hereto does hereby grant, release and assign to Producer any and all claims of right whatsoever in and to all photographs or printed materials of the undersigned or by the undersigned and delivered to

Producer for any purpose chosen by Producer.

From execution hereto and for value received and acknowledged below by model Producer shall exclusively and irrevocably own in perpetuity all right, title and interest, including copyright, in and to the digitized photographs, reproductions, video and any digitized printed material of the undersigned with no rights expressly reserved by the model.

Model also grants Producer and its designees the right to use her name, likeness, image voice, appearance, and performance as embodied in the Product whether recorded on or transferred to videotape, film, slides, photographs, audio tapes, or other media, now known or later developed. This grant includes without limitation the right to edit, mix or duplicate and to use or re-use the Product in whole or part as Producer may elect. Producer or its designee shall have complete ownership of the Product in which model appears, including copyright interests, and model acknowledges that she has no interest or ownership in the Product or its copyright.

Model also confirms that she/he has the right to enter into this Agreement, that she/he is not restricted by any commitments to any parties, and that Producer has no financial commitment or obligations to me as a result of this Agreement besides the consideration already paid.

I hereby give all clearances, © 2019 McCandless Group, LLC bodied in the Product. I expressly release and indemnify Producer and its officers, employees, agents and designees from any and all claims known and unknown arising out of or in any way connected with the above granted uses and representations. The rights granted Producer herein are perpetual and worldwide survive my death and any other occurrence.

In consideration of all the above, I hereby acknowledge receipt of reasonable and fair consideration from the Producer received and paid.

## AS TO MODEL:

| | |
|---|---|
| MODEL'S SIGNATURE: | DocuSigned by: Jessica Bartlett F1B789CDC1A4452... |
| Dated on: | 10/27/2019 |

I the above-signed model do hereby certify and swear under unsworn declaration of perjury that the following is true and correct by my above signature and that I agree with such terms.

I swear that I am above 18 years of age

I swear that I have disclosed my correct legal name

I swear that I have disclosed all other names that I have been known by to producer

I swear that I have produced a legal identification card

I swear that I have not provided any false or misleading information to producer

## AS TO PRODUCER:

| | |
|---|---|
| Producer's Name: | Nicholas McCandless |
| Company Name: | McCandless Group, LLC |

| | |
|---|---|
| Dated on: | October 27, 2019 |

# EXHIBIT – B –

MCCANDLESS GROUP

## MUTUAL CONFIDENTIALITY AGREEMENT

**THIS MUTUAL CONFIDENTIALITY AGREEMENT** (this "Agreement") is entered into as of the date on the signature page (the "Effective Date") by and between McCandless Group, LLC, with its principal place of business located at 127 Bowery, Irvine, CA 92612 (the "Developer") and Jessica Bartlett with a principal place of business located at 404 Cool Valley Dr, Paso Robles, CA 93446 (the "Partner" or "you" or "your") each individually a "Party" and collectively the "Parties."

WHEREAS, the Parties are contemplating business transactions or a collaboration (the "Proposed Transaction") that will require each to disclose information to the other that is confidential, proprietary and competitively sensitive, for example, regarding software, technology, data, customers, products, processes, and business objectives (each as either a "Disclosing Party" or "Receiving Party");

WHEREAS, the Parties are willing to disclose said confidential and proprietary information to each other according to the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. For purposes of this Agreement, the term "Confidential Information" shall mean information, directly or indirectly relating to the Disclosing Party or its affiliates, shareholders, officers, directors or employees and obtained by the Receiving Party in connection with its evaluation of the Proposed Transaction prior to or after the date of this Agreement, (including information conceived or originated, discovered or developed by the Receiving Party by reference to such information or containing such information), and whether orally, in documents, through and by observation or otherwise, together with all summaries, compilations, analyses, and reports created by the Receiving Party from such information or that contains such information. Without limiting the intended generality of the foregoing, Confidential Information shall include the Disclosing Party's existing or contemplated business, processes and services, techniques, components, sales, markets, costs, profits, research, development, inventions, purchasing, staff, employees, compensation, contractors, suppliers, customers, prospects, marketing, pricing policies, financial information, engineering and all other data. Confidential Information also includes, but is not limited to, all proposals and all information and data furnished by or on behalf of the Disclosing Party or any of its Representatives (as defined below).

2. The term "documents" includes, but is not limited to, writings, drawings, graphs, charts, photographs, tape recordings, computer application files, disc drives, tapes, compact discs, e-mail, electronic data, and other media, and data compilations in whatever form recorded or stored from which information can be obtained and/or translated if necessary, through detection devices, into reasonably usable form and any reproductions thereof.

3. As used in this Agreement, the term "Representative" means, as to any person, such person's wholly owned affiliates and their directors, officers, employees, agents and advisers (including, without limitation, investment bankers, accountants and legal counsel). As used in this Agreement, "wholly owned affiliate" shall mean, with respect to any person which (a) controls such person either directly or indirectly; or (b) is controlled directly or indirectly by such person; or (c) is directly or indirectly controlled by a person which directly or indirectly controls such person. "Control" means, for purposes of this definition of "wholly owned affiliate", the right to exercise a majority of the voting rights (with the exception of voting rights attaching to de minimis shareholdings required by applicable laws to be held by other person(s)) in the appointment of the directors or similar representatives on the governing body of such person or, if there are no such voting rights, the power to appoint the management or otherwise direct the business or determine the policy of such person. As used in this Agreement, the term "person" shall be broadly interpreted to include, without limitation, any organ, ministry, agency or instrumentality of any country or any other governmental, quasi-governmental or political subdivision thereof; any corporation, company, partnership or joint venture; or any other entity or individual. In connection with the evaluation of the Proposed Transaction, the Parties are willing, in accordance with the terms and conditions of this Agreement, to disclose to the each other certain proprietary confidential information relating to the Proposed Transaction and the Area.

4. Subject to the immediately succeeding paragraph, unless otherwise agreed to in writing by the Disclosing Party, the Receiving Party agrees: (a) to keep all Confidential Information confidential and not to directly or indirectly disclose, disseminate, or reveal, and to use its best efforts to prevent the use, dissemination, disclosure, or revelation of, any Confidential Information to any person other than those of its Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and to cause those persons to observe the terms of this Agreement; (b) not to directly or indirectly use Confidential Information for any purpose other than in connection with the evaluation and negotiation of the Proposed Transaction; and (c) not to disclose to any person (other than those of its Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and, in the case of its Representatives, each of whom the Receiving Party will cause to observe the terms of this Agreement as if he or she had been a party hereto) any information about the Proposed Transaction, or the terms or conditions thereof or any facts or circumstances relating thereto or the status thereof, including, without limitation, the fact that Confidential Information has been or will be made available to the Receiving Party or its Representatives or that discussions are taking place with respect to the Proposed Transaction. The Receiving Party will be responsible for any breach of the terms of this Agreement by it or its Representatives.

5. Neither Party will disclose to any person (other than those of its Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and, in the case of its Representatives, each of whom the Party will cause to observe the terms of this Agreement as if he or she had been a party hereto) any information about the Proposed Transaction, or the terms or

conditions thereof or any facts or circumstances relating thereto or the status thereof, including, without limitation, the fact that Confidential Information has been or will be made available to the Parties or their Representatives or that discussions are taking place with respect to the Proposed Transaction.

6. Confidential Information does not include, however, information that (a) is or becomes generally available to the public other than as a result of a disclosure, act or omission by the Receiving Party or its Representatives without the Disclosing Party's consent, (b) is or becomes available to the Receiving Party on a non-confidential basis from a person other than the Disclosing Party or its Representatives and other than as a result of a breach of an obligation of confidentiality to the Disclosing Party or its Representatives or a breach of any other obligation of such person not to transmit the information to the Receiving Party or any of its Representatives or (c) was known or developed independently by the Receiving Party without reference to any Confidential Information, or was available to the Receiving Party prior to its disclosure by the Disclosing Party. The onus of establishing that any of the above exceptions applies shall in each case be on the Receiving Party.

7. In the event that the Receiving Party is requested pursuant to, or required by, applicable law, regulation, rule or order of a duly empowered court, tribunal or governmental entity having jurisdiction over it or its Representatives, to disclose any Confidential Information, the Receiving Party shall, to the extent permitted by such applicable law, regulation, rule or order, provide the Disclosing Party with prompt notice of such request or requirement in order to enable the Disclosing Party to seek an appropriate protective order or other remedy, to consult with the Receiving Party with respect to the Disclosing Party's taking steps to resist or narrow the scope of such request or requirement, or to waive compliance, in whole or in part, with the terms of this Agreement. The Receiving Party will furnish only the portion of the Confidential Information that is legally required and will, at the Disclosing Party's sole expense, use its reasonable best efforts to ensure that all Confidential Information and other information that is so disclosed will be accorded confidential treatment by the Receiving Party thereof.

8. This Agreement does not obligate the Disclosing Party to produce any Confidential Information whatsoever. In the event that the Disclosing Party chooses to produce Confidential Information, this Agreement does not create a continuing obligation to produce any other information or to update any information that has been previously produced.

9. All documents containing, and all other tangible and intangible forms of, Confidential Information, including copies thereof, shall belong to and remain the sole property of the Disclosing Party. The Receiving Party shall acquire no proprietary interest in or right to any of the Confidential Information absent written agreement by the Disclosing Party.

10. The Receiving Party shall not take or make copies of the Confidential Information or any of it, or authorize any other person to do so, other than for the purpose of supplying the Confidential Information to any of its Representatives to whom disclosure of such information is permitted under the terms of this Agreement. If at any time the Disclosing Party, in its sole discretion, so requests in writing, then the Receiving Party will promptly deliver to the Disclosing Party all original Confidential Information with respect to the relevant Proposed Transaction and promptly deliver to the Disclosing Party or destroy all copies, reproductions, summaries, compilations, analyses and extracts thereof or

based thereon in the possession of the Receiving Party or its Representatives, whether maintained in written form or in any electronic or computerized format, and certify to the Disclosing Party that all such originals have been delivered to the Disclosing Party and that such destruction has occurred.

11. The Receiving Party acknowledges that neither the Disclosing Party nor any of its Representatives makes any express or implied representation or warranty as to the accuracy or completeness of any Confidential Information, and the Receiving Party agrees that none

of such persons shall have any liability to the Receiving Party or any of its Representatives relating to or arising from its or their use of any Confidential Information or for any errors therein or omissions therefrom. The Receiving Party also agrees that it is not entitled to rely on the accuracy or completeness of any Confidential Information. The Receiving Party acknowledges and agrees that the Confidential Information is being provided solely for the purpose of assisting its independent evaluation and analysis of the Disclosing Party and its assets.

12. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT OR LAW TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF PROFITS DUE TO BUSINESS INTERRUPTIONS OR OTHERWISE, IN CONNECTION WITH THIS AGREEMENT.

13. In the event of litigation relating to this Agreement, the non-prevailing Party as finally determined by a court of competent jurisdiction shall be liable and pay to the other Party all reasonable costs incurred by such other Party in connection therewith, including, but not limited to, reasonable attorneys' fees incurred by such other Party in connection with such litigation, including any appeal therefrom.

14. It is further understood and agreed that no failure or delay by the Disclosing Party in exercising or pursuing any right, power, privilege or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise or pursuit thereof preclude any other or further exercise or pursuit thereof or the exercise or pursuit of any other right, power, privilege or remedy hereunder.

15. This Agreement shall be effective as of the date on the signature page (the "Effective Date") and expire on the fifth anniversary thereof. This Agreement may not be amended, modified, superseded or cancelled, nor may any of the terms, covenants, representations, warranties or conditions hereof be waived, except by a written instrument executed by the parties.

16. If any provision of this Agreement becomes or is found to be illegal or unenforceable for any reason, such clause or provision must first be modified to the extent necessary to make this Agreement legal and enforceable and then if necessary, second, severed from the remainder of the Agreement to allow the remainder of the Agreement to remain in full force and effect.

17. This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

IN WITNESS WHEREOF, the Parties have executed this Agreement effective the date stated above.

| **DEVELOPER:** | **PARTNER:** |
| --- | --- |
| Business Name: McCandless Group, LLC<br><br>Address: 127 Bowery, Irvine, CA 92612<br><br>Telephone Number: 919-791-6441<br><br>Email Address: nick@nickmccandless.com | Business Name: Jessica Bartlett<br><br>Address: 404 Cool Valley Dr, Paso Robles, CA 93446<br><br>Telephone Number: 805-835-8052<br><br>Email Address: jessicambartlett1@gmail.com |
| By: DocuSigned by: Nicholas McCandless CC0CECA0BA5C475...<br>Signature<br><br>Full Name: Nicholas McCandless<br>Title: CEO/Owner/Founder<br><br>Date: 5/21/2020 | By: DocuSigned by: Jessica Bartlett 15862633FAD24C0...<br>Signature<br><br>Full Name: Jessica Bartlett<br><br>Date: 5/21/2020 |

# EXHIBIT – C –

MCCANDLESS GROUP

## MUTUAL CONFIDENTIALITY AGREEMENT

**THIS MUTUAL CONFIDENTIALITY AGREEMENT** (this "Agreement") is entered into as of the date on the signature page (the "Effective Date") by and between McCandless Group, LLC, with its principal place of business located at 127 Bowery, Irvine, CA 92612 (the "Developer") and Corey Lewis with a principal place of business located at 40 Harrison St Apt 36 L, New York, NY 10013 (the "Partner" or "you" or "your") each individually a "Party" and collectively the "Parties."

WHEREAS, the Parties are contemplating business transactions or a collaboration (the "Proposed Transaction") that will require each to disclose information to the other that is confidential, proprietary and competitively sensitive, for example, regarding software, technology, data, customers, products, processes, and business objectives (each as either a "Disclosing Party" or "Receiving Party");

WHEREAS, the Parties are willing to disclose said confidential and proprietary information to each other according to the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. For purposes of this Agreement, the term "Confidential Information" shall mean information, directly or indirectly relating to the Disclosing Party or its affiliates, shareholders, officers, directors or employees and obtained by the Receiving Party in connection with its evaluation of the Proposed Transaction prior to or after the date of this Agreement, (including information conceived or originated, discovered or developed by the Receiving Party by reference to such information or containing such information), and whether orally, in documents, through and by observation or otherwise, together with all summaries, compilations, analyses, and reports created by the Receiving Party from such information or that contains such information. Without limiting the intended generality of the foregoing, Confidential Information shall include the Disclosing Party's existing or contemplated business, processes and services, techniques, components, sales, markets, costs, profits, research, development, inventions, purchasing, staff, employees, compensation, contractors, suppliers, customers, prospects, marketing, pricing policies, financial information, engineering and all other data. Confidential Information also includes, but is not limited to, all proposals and all information and data furnished by or on behalf of the Disclosing Party or any of its Representatives (as defined below).

2. The term "documents" includes, but is not limited to, writings, drawings, graphs, charts, photographs, tape recordings, computer application files, disc drives, tapes, compact discs, e-mail, electronic data, and other media, and data compilations in whatever form recorded or stored from which information can be obtained and/or translated if necessary, through detection devices, into reasonably usable form and any reproductions thereof.

3. As used in this Agreement, the term "Representative" means, as to any person, such person's wholly owned affiliates and their directors, officers, employees, agents and advisers (including, without limitation, investment bankers, accountants and legal counsel). As used in this Agreement, "wholly owned affiliate" shall mean, with respect to any person which (a) controls such person either directly or indirectly; or (b) is controlled directly or indirectly by such person; or (c) is directly or indirectly controlled by a person which directly or indirectly controls such person. "Control" means, for purposes of this definition of "wholly owned affiliate", the right to exercise a majority of the voting rights (with the exception of voting rights attaching to de minimis shareholdings required by applicable laws to be held by other person(s)) in the appointment of the directors or similar representatives on the governing body of such person or, if there are no such voting rights, the power to appoint the management or otherwise direct the business or determine the policy of such person. As used in this Agreement, the term "person" shall be broadly interpreted to include, without limitation, any organ, ministry, agency or instrumentality of any country or any other governmental, quasi-governmental or political subdivision thereof; any corporation, company, partnership or joint venture; or any other entity or individual. In connection with the evaluation of the Proposed Transaction, the Parties are willing, in accordance with the terms and conditions of this Agreement, to disclose to the each other certain proprietary confidential information relating to the Proposed Transaction and the Area.

4. Subject to the immediately succeeding paragraph, unless otherwise agreed to in writing by the Disclosing Party, the Receiving Party agrees: (a) to keep all Confidential Information confidential and not to directly or indirectly disclose, disseminate, or reveal, and to use its best efforts to prevent the use, dissemination, disclosure, or revelation of, any Confidential Information to any person other than those of its Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and to cause those persons to observe the terms of this Agreement; (b) not to directly or indirectly use Confidential Information for any purpose other than in connection with the evaluation and negotiation of the Proposed Transaction; and (c) not to disclose to any person (other than those of its Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and, in the case of its Representatives, each of whom the Receiving Party will cause to observe the terms of this Agreement as if he or she had been a party hereto) any information about the Proposed Transaction, or the terms or conditions thereof or any facts or circumstances relating thereto or the status thereof, including, without limitation, the fact that Confidential Information has been or will be made available to the Receiving Party or its Representatives or that discussions are taking place with respect to the Proposed Transaction. The Receiving Party will be responsible for any breach of the terms of this Agreement by it or its Representatives.

5. Neither Party will disclose to any person (other than those of its Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and, in the case of its Representatives, each of whom the Party will cause to observe the terms of this Agreement as if he or she had been a party hereto) any information about the Proposed Transaction, or the terms or

conditions thereof or any facts or circumstances relating thereto or the status thereof, including, without limitation, the fact that Confidential Information has been or will be made available to the Parties or their Representatives or that discussions are taking place with respect to the Proposed Transaction.

6. Confidential Information does not include, however, information that (a) is or becomes generally available to the public other than as a result of a disclosure, act or omission by the Receiving Party or its Representatives without the Disclosing Party's consent, (b) is or becomes available to the Receiving Party on a non-confidential basis from a person other than the Disclosing Party or its Representatives and other than as a result of a breach of an obligation of confidentiality to the Disclosing Party or its Representatives or a breach of any other obligation of such person not to transmit the information to the Receiving Party or any of its Representatives or (c) was known or developed independently by the Receiving Party without reference to any Confidential Information, or was available to the Receiving Party prior to its disclosure by the Disclosing Party. The onus of establishing that any of the above exceptions applies shall in each case be on the Receiving Party.

7. In the event that the Receiving Party is requested pursuant to, or required by, applicable law, regulation, rule or order of a duly empowered court, tribunal or governmental entity having jurisdiction over it or its Representatives, to disclose any Confidential Information, the Receiving Party shall, to the extent permitted by such applicable law, regulation, rule or order, provide the Disclosing Party with prompt notice of such request or requirement in order to enable the Disclosing Party to seek an appropriate protective order or other remedy, to consult with the Receiving Party with respect to the Disclosing Party's taking steps to resist or narrow the scope of such request or requirement, or to waive compliance, in whole or in part, with the terms of this Agreement. The Receiving Party will furnish only the portion of the Confidential Information that is legally required and will, at the Disclosing Party's sole expense, use its reasonable best efforts to ensure that all Confidential Information and other information that is so disclosed will be accorded confidential treatment by the Receiving Party thereof.

8. This Agreement does not obligate the Disclosing Party to produce any Confidential Information whatsoever. In the event that the Disclosing Party chooses to produce Confidential Information, this Agreement does not create a continuing obligation to produce any other information or to update any information that has been previously produced.

9. All documents containing, and all other tangible and intangible forms of, Confidential Information, including copies thereof, shall belong to and remain the sole property of the Disclosing Party. The Receiving Party shall acquire no proprietary interest in or right to any of the Confidential Information absent written agreement by the Disclosing Party.

10. The Receiving Party shall not take or make copies of the Confidential Information or any of it, or authorize any other person to do so, other than for the purpose of supplying the Confidential Information to any of its Representatives to whom disclosure of such information is permitted under the terms of this Agreement. If at any time the Disclosing Party, in its sole discretion, so requests in writing, then the Receiving Party will promptly deliver to the Disclosing Party all original Confidential Information with respect to the relevant Proposed Transaction and promptly deliver to the Disclosing Party or destroy all copies, reproductions, summaries, compilations, analyses and extracts thereof or

based thereon in the possession of the Receiving Party or its Representatives, whether maintained in written form or in any electronic or computerized format, and certify to the Disclosing Party that all such originals have been delivered to the Disclosing Party and that such destruction has occurred.

11. The Receiving Party acknowledges that neither the Disclosing Party nor any of its Representatives makes any express or implied representation or warranty as to the accuracy or completeness of any Confidential Information, and the Receiving Party agrees that none

of such persons shall have any liability to the Receiving Party or any of its Representatives relating to or arising from its or their use of any Confidential Information or for any errors therein or omissions therefrom. The Receiving Party also agrees that it is not entitled to rely on the accuracy or completeness of any Confidential Information. The Receiving Party acknowledges and agrees that the Confidential Information is being provided solely for the purpose of assisting its independent evaluation and analysis of the Disclosing Party and its assets.

12. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT OR LAW TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF PROFITS DUE TO BUSINESS INTERRUPTIONS OR OTHERWISE, IN CONNECTION WITH THIS AGREEMENT.

13. In the event of litigation relating to this Agreement, the non-prevailing Party as finally determined by a court of competent jurisdiction shall be liable and pay to the other Party all reasonable costs incurred by such other Party in connection therewith, including, but not limited to, reasonable attorneys' fees incurred by such other Party in connection with such litigation, including any appeal therefrom.

14. It is further understood and agreed that no failure or delay by the Disclosing Party in exercising or pursuing any right, power, privilege or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise or pursuit thereof preclude any other or further exercise or pursuit thereof or the exercise or pursuit of any other right, power, privilege or remedy hereunder.

15. This Agreement shall be effective as of the date on the signature page (the "Effective Date") and expire on the fifth anniversary thereof. This Agreement may not be amended, modified, superseded or cancelled, nor may any of the terms, covenants, representations, warranties or conditions hereof be waived, except by a written instrument executed by the parties.

16. If any provision of this Agreement becomes or is found to be illegal or unenforceable for any reason, such clause or provision must first be modified to the extent necessary to make this Agreement legal and enforceable and then if necessary, second, severed from the remainder of the Agreement to allow the remainder of the Agreement to remain in full force and effect.

17. This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

IN WITNESS WHEREOF, the Parties have executed this Agreement effective the date stated above.

| DEVELOPER: | PARTNER: |
| --- | --- |
| Business Name: McCandless Group, LLC<br><br>Address: 127 Bowery, Irvine, CA 92612<br><br>Telephone Number: 919-791-6441<br><br>Email Address: nick@nickmccandless.com<br><br>DocuSigned by: Nicholas McCandless CC0CECA0BA5C475...<br>By: ___________<br>Signature<br><br>Full Name: Nicholas McCandless<br>Title: CEO/Owner/Founder<br><br>Date: 5/21/2020 | Business Name: Corey Lewis<br><br>Address: 40 Harrison St Apt 36 L, New York, NY 10013<br><br>Telephone Number: 917-693-6384<br><br>Email Address: Corey@1and1life.com<br><br>DocuSigned by: F2FE8E81199B4A5...<br>By: ___________<br>Signature<br><br>Full Name: Corey Lewis<br><br>Date: 5/21/2020 |

# EXHIBIT – D –

MCCANDLESS GROUP

## MUTUAL CONFIDENTIALITY AGREEMENT

**THIS MUTUAL CONFIDENTIALITY AGREEMENT** (this "Agreement") is entered into as of the date on the signature page (the "Effective Date") by and between McCandless Group, LLC, with its principal place of business located at 127 Bowery, Irvine, CA 92612 (the "Developer") and Robert Hankins with a principal place of business located at 909 N Croft Ave #308, Los Angeles, CA 90069 (the "Partner" or "you" or "your") each individually a "Party" and collectively the "Parties."

WHEREAS, the Parties are contemplating business transactions or a collaboration (the "Proposed Transaction") that will require each to disclose information to the other that is confidential, proprietary and competitively sensitive, for example, regarding software, technology, data, customers, products, processes, and business objectives (each as either a "Disclosing Party" or "Receiving Party");

WHEREAS, the Parties are willing to disclose said confidential and proprietary information to each other according to the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. For purposes of this Agreement, the term "Confidential Information" shall mean information, directly or indirectly relating to the Disclosing Party or its affiliates, shareholders, officers, directors or employees and obtained by the Receiving Party in connection with its evaluation of the Proposed Transaction prior to or after the date of this Agreement, (including information conceived or originated, discovered or developed by the Receiving Party by reference to such information or containing such information), and whether orally, in documents, through and by observation or otherwise, together with all summaries, compilations, analyses, and reports created by the Receiving Party from such information or that contains such information. Without limiting the intended generality of the foregoing, Confidential Information shall include the Disclosing Party's existing or contemplated business, processes and services, techniques, components, sales, markets, costs, profits, research, development, inventions, purchasing, staff, employees, compensation, contractors, suppliers, customers, prospects, marketing, pricing policies, financial information, engineering and all other data. Confidential Information also includes, but is not limited to, all proposals and all information and data furnished by or on behalf of the Disclosing Party or any of its Representatives (as defined below).

2. The term "documents" includes, but is not limited to, writings, drawings, graphs, charts, photographs, tape recordings, computer application files, disc drives, tapes, compact discs, e-mail, electronic data, and other media, and data compilations in whatever form recorded or stored from which information can be obtained and/or translated if necessary, through detection devices, into reasonably usable form and any reproductions thereof.

3. As used in this Agreement, the term "Representative" means, as to any person, such person's wholly owned affiliates and their directors, officers, employees, agents and advisers (including, without limitation, investment bankers, accountants and legal counsel). As used in this Agreement, "wholly owned affiliate" shall mean, with respect to any person which (a) controls such person either directly or indirectly; or (b) is controlled directly or indirectly by such person; or (c) is directly or indirectly controlled by a person which directly or indirectly controls such person. "Control" means, for purposes of this definition of "wholly owned affiliate", the right to exercise a majority of the voting rights (with the exception of voting rights attaching to de minimis shareholdings required by applicable laws to be held by other person(s)) in the appointment of the directors or similar representatives on the governing body of such person or, if there are no such voting rights, the power to appoint the management or otherwise direct the business or determine the policy of such person. As used in this Agreement, the term "person" shall be broadly interpreted to include, without limitation, any organ, ministry, agency or instrumentality of any country or any other governmental, quasi-governmental or political subdivision thereof; any corporation, company, partnership or joint venture; or any other entity or individual. In connection with the evaluation of the Proposed Transaction, the Parties are willing, in accordance with the terms and conditions of this Agreement, to disclose to the each other certain proprietary confidential information relating to the Proposed Transaction and the Area.

4. Subject to the immediately succeeding paragraph, unless otherwise agreed to in writing by the Disclosing Party, the Receiving Party agrees: (a) to keep all Confidential Information confidential and not to directly or indirectly disclose, disseminate, or reveal, and to use its best efforts to prevent the use, dissemination, disclosure, or revelation of, any Confidential Information to any person other than those of its Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and to cause those persons to observe the terms of this Agreement; (b) not to directly or indirectly use Confidential Information for any purpose other than in connection with the evaluation and negotiation of the Proposed Transaction; and (c) not to disclose to any person (other than those of its Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and, in the case of its Representatives, each of whom the Receiving Party will cause to observe the terms of this Agreement as if he or she had been a party hereto) any information about the Proposed Transaction, or the terms or conditions thereof or any facts or circumstances relating thereto or the status thereof, including, without limitation, the fact that Confidential Information has been or will be made available to the Receiving Party or its Representatives or that discussions are taking place with respect to the Proposed Transaction. The Receiving Party will be responsible for any breach of the terms of this Agreement by it or its Representatives.

5. Neither Party will disclose to any person (other than those of its Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and, in the case of its Representatives, each of whom the Party will cause to observe the terms of this Agreement as if he or she had been a party hereto) any information about the Proposed Transaction, or the terms or

conditions thereof or any facts or circumstances relating thereto or the status thereof, including, without limitation, the fact that Confidential Information has been or will be made available to the Parties or their Representatives or that discussions are taking place with respect to the Proposed Transaction.

6. Confidential Information does not include, however, information that (a) is or becomes generally available to the public other than as a result of a disclosure, act or omission by the Receiving Party or its Representatives without the Disclosing Party's consent, (b) is or becomes available to the Receiving Party on a non-confidential basis from a person other than the Disclosing Party or its Representatives and other than as a result of a breach of an obligation of confidentiality to the Disclosing Party or its Representatives or a breach of any other obligation of such person not to transmit the information to the Receiving Party or any of its Representatives or (c) was known or developed independently by the Receiving Party without reference to any Confidential Information, or was available to the Receiving Party prior to its disclosure by the Disclosing Party. The onus of establishing that any of the above exceptions applies shall in each case be on the Receiving Party.

7. In the event that the Receiving Party is requested pursuant to, or required by, applicable law, regulation, rule or order of a duly empowered court, tribunal or governmental entity having jurisdiction over it or its Representatives, to disclose any Confidential Information, the Receiving Party shall, to the extent permitted by such applicable law, regulation, rule or order, provide the Disclosing Party with prompt notice of such request or requirement in order to enable the Disclosing Party to seek an appropriate protective order or other remedy, to consult with the Receiving Party with respect to the Disclosing Party's taking steps to resist or narrow the scope of such request or requirement, or to waive compliance, in whole or in part, with the terms of this Agreement. The Receiving Party will furnish only the portion of the Confidential Information that is legally required and will, at the Disclosing Party's sole expense, use its reasonable best efforts to ensure that all Confidential Information and other information that is so disclosed will be accorded confidential treatment by the Receiving Party thereof.

8. This Agreement does not obligate the Disclosing Party to produce any Confidential Information whatsoever. In the event that the Disclosing Party chooses to produce Confidential Information, this Agreement does not create a continuing obligation to produce any other information or to update any information that has been previously produced.

9. All documents containing, and all other tangible and intangible forms of, Confidential Information, including copies thereof, shall belong to and remain the sole property of the Disclosing Party. The Receiving Party shall acquire no proprietary interest in or right to any of the Confidential Information absent written agreement by the Disclosing Party.

10. The Receiving Party shall not take or make copies of the Confidential Information or any of it, or authorize any other person to do so, other than for the purpose of supplying the Confidential Information to any of its Representatives to whom disclosure of such information is permitted under the terms of this Agreement. If at any time the Disclosing Party, in its sole discretion, so requests in writing, then the Receiving Party will promptly deliver to the Disclosing Party all original Confidential Information with respect to the relevant Proposed Transaction and promptly deliver to the Disclosing Party or destroy all copies, reproductions, summaries, compilations, analyses and extracts thereof or

based thereon in the possession of the Receiving Party or its Representatives, whether maintained in written form or in any electronic or computerized format, and certify to the Disclosing Party that all such originals have been delivered to the Disclosing Party and that such destruction has occurred.

11. The Receiving Party acknowledges that neither the Disclosing Party nor any of its Representatives makes any express or implied representation or warranty as to the accuracy or completeness of any Confidential Information, and the Receiving Party agrees that none

of such persons shall have any liability to the Receiving Party or any of its Representatives relating to or arising from its or their use of any Confidential Information or for any errors therein or omissions therefrom. The Receiving Party also agrees that it is not entitled to rely on the accuracy or completeness of any Confidential Information. The Receiving Party acknowledges and agrees that the Confidential Information is being provided solely for the purpose of assisting its independent evaluation and analysis of the Disclosing Party and its assets.

12. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT OR LAW TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF PROFITS DUE TO BUSINESS INTERRUPTIONS OR OTHERWISE, IN CONNECTION WITH THIS AGREEMENT.

13. In the event of litigation relating to this Agreement, the non-prevailing Party as finally determined by a court of competent jurisdiction shall be liable and pay to the other Party all reasonable costs incurred by such other Party in connection therewith, including, but not limited to, reasonable attorneys' fees incurred by such other Party in connection with such litigation, including any appeal therefrom.

14. It is further understood and agreed that no failure or delay by the Disclosing Party in exercising or pursuing any right, power, privilege or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise or pursuit thereof preclude any other or further exercise or pursuit thereof or the exercise or pursuit of any other right, power, privilege or remedy hereunder.

15. This Agreement shall be effective as of the date on the signature page (the "Effective Date") and expire on the fifth anniversary thereof. This Agreement may not be amended, modified, superseded or cancelled, nor may any of the terms, covenants, representations, warranties or conditions hereof be waived, except by a written instrument executed by the parties.

16. If any provision of this Agreement becomes or is found to be illegal or unenforceable for any reason, such clause or provision must first be modified to the extent necessary to make this Agreement legal and enforceable and then if necessary, second, severed from the remainder of the Agreement to allow the remainder of the Agreement to remain in full force and effect.

17. This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

IN WITNESS WHEREOF, the Parties have executed this Agreement effective the date stated above.

| DEVELOPER: | PARTNER: |
|---|---|
| Business Name: McCandless Group, LLC<br><br>Address: 127 Bowery, Irvine, CA 92612<br><br>Telephone Number: 919-791-6441<br><br>Email Address: nick@nickmccandless.com | Business Name: Robert Hankins<br><br>Address: 909 N Croft Ave #308, Los Angeles, CA 90069<br><br>Telephone Number: 323-455-8273<br><br>Email Address: Rob@iament.io |
| DocuSigned by:<br>By: Nicholas McCandless<br>CC0CECA0BA5C475...<br>Signature | DocuSigned by:<br>By: [signature]<br>758E397D10994CF...<br>Signature |
| Full Name: Nicholas McCandless<br>Title: CEO/Owner/Founder | Full Name: Robert Hankins |
| Date: 5/24/2020 | Date: 5/21/2020 |

# EXHIBIT – E –

MCCANDLESS GROUP

## MUTUAL CONFIDENTIALITY AGREEMENT

**THIS MUTUAL CONFIDENTIALITY AGREEMENT** (this "Agreement") is entered into as of the date on the signature page (the "Effective Date") by and between McCandless Group, LLC, with its principal place of business located at 127 Bowery, Irvine, CA 92612 (the "Developer") and Thomas Drew with a principal place of business located at 565 Broome St #S9C, New York, NY 10013 (the "Partner" or "you" or "your") each individually a "Party" and collectively the "Parties."

WHEREAS, the Parties are contemplating business transactions or a collaboration (the "Proposed Transaction") that will require each to disclose information to the other that is confidential, proprietary and competitively sensitive, for example, regarding software, technology, data, customers, products, processes, and business objectives (each as either a "Disclosing Party" or "Receiving Party");

WHEREAS, the Parties are willing to disclose said confidential and proprietary information to each other according to the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. For purposes of this Agreement, the term "Confidential Information" shall mean information, directly or indirectly relating to the Disclosing Party or its affiliates, shareholders, officers, directors or employees and obtained by the Receiving Party in connection with its evaluation of the Proposed Transaction prior to or after the date of this Agreement, (including information conceived or originated, discovered or developed by the Receiving Party by reference to such information or containing such information), and whether orally, in documents, through and by observation or otherwise, together with all summaries, compilations, analyses, and reports created by the Receiving Party from such information or that contains such information. Without limiting the intended generality of the foregoing, Confidential Information shall include the Disclosing Party's existing or contemplated business, processes and services, techniques, components, sales, markets, costs, profits, research, development, inventions, purchasing, staff, employees, compensation, contractors, suppliers, customers, prospects, marketing, pricing policies, financial information, engineering and all other data. Confidential Information also includes, but is not limited to, all proposals and all information and data furnished by or on behalf of the Disclosing Party or any of its Representatives (as defined below).

2. The term "documents" includes, but is not limited to, writings, drawings, graphs, charts, photographs, tape recordings, computer application files, disc drives, tapes, compact discs, e-mail, electronic data, and other media, and data compilations in whatever form recorded or stored from which information can be obtained and/or translated if necessary, through detection devices, into reasonably usable form and any reproductions thereof.

3. As used in this Agreement, the term "Representative" means, as to any person, such person's wholly owned affiliates and their directors, officers, employees, agents and advisers (including, without limitation, investment bankers, accountants and legal counsel). As used in this Agreement, "wholly owned affiliate" shall mean, with respect to any person which (a) controls such person either directly or indirectly; or (b) is controlled directly or indirectly by such person; or (c) is directly or indirectly controlled by a person which directly or indirectly controls such person. "Control" means, for purposes of this definition of "wholly owned affiliate", the right to exercise a majority of the voting rights (with the exception of voting rights attaching to de minimis shareholdings required by applicable laws to be held by other person(s)) in the appointment of the directors or similar representatives on the governing body of such person or, if there are no such voting rights, the power to appoint the management or otherwise direct the business or determine the policy of such person. As used in this Agreement, the term "person" shall be broadly interpreted to include, without limitation, any organ, ministry, agency or instrumentality of any country or any other governmental, quasi-governmental or political subdivision thereof; any corporation, company, partnership or joint venture; or any other entity or individual. In connection with the evaluation of the Proposed Transaction, the Parties are willing, in accordance with the terms and conditions of this Agreement, to disclose to the each other certain proprietary confidential information relating to the Proposed Transaction and the Area.

4. Subject to the immediately succeeding paragraph, unless otherwise agreed to in writing by the Disclosing Party, the Receiving Party agrees: (a) to keep all Confidential Information confidential and not to directly or indirectly disclose, disseminate, or reveal, and to use its best efforts to prevent the use, dissemination, disclosure, or revelation of, any Confidential Information to any person other than those of its Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and to cause those persons to observe the terms of this Agreement; (b) not to directly or indirectly use Confidential Information for any purpose other than in connection with the evaluation and negotiation of the Proposed Transaction; and (c) not to disclose to any person (other than those of its Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and, in the case of its Representatives, each of whom the Receiving Party will cause to observe the terms of this Agreement as if he or she had been a party hereto) any information about the Proposed Transaction, or the terms or conditions thereof or any facts or circumstances relating thereto or the status thereof, including, without limitation, the fact that Confidential Information has been or will be made available to the Receiving Party or its Representatives or that discussions are taking place with respect to the Proposed Transaction. The Receiving Party will be responsible for any breach of the terms of this Agreement by it or its Representatives.

5. Neither Party will disclose to any person (other than those of its Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and, in the case of its Representatives, each of whom the Party will cause to observe the terms of this Agreement as if he or she had been a party hereto) any information about the Proposed Transaction, or the terms or

conditions thereof or any facts or circumstances relating thereto or the status thereof, including, without limitation, the fact that Confidential Information has been or will be made available to the Parties or their Representatives or that discussions are taking place with respect to the Proposed Transaction.

6. Confidential Information does not include, however, information that (a) is or becomes generally available to the public other than as a result of a disclosure, act or omission by the Receiving Party or its Representatives without the Disclosing Party's consent, (b) is or becomes available to the Receiving Party on a non-confidential basis from a person other than the Disclosing Party or its Representatives and other than as a result of a breach of an obligation of confidentiality to the Disclosing Party or its Representatives or a breach of any other obligation of such person not to transmit the information to the Receiving Party or any of its Representatives or (c) was known or developed independently by the Receiving Party without reference to any Confidential Information, or was available to the Receiving Party prior to its disclosure by the Disclosing Party. The onus of establishing that any of the above exceptions applies shall in each case be on the Receiving Party.

7. In the event that the Receiving Party is requested pursuant to, or required by, applicable law, regulation, rule or order of a duly empowered court, tribunal or governmental entity having jurisdiction over it or its Representatives, to disclose any Confidential Information, the Receiving Party shall, to the extent permitted by such applicable law, regulation, rule or order, provide the Disclosing Party with prompt notice of such request or requirement in order to enable the Disclosing Party to seek an appropriate protective order or other remedy, to consult with the Receiving Party with respect to the Disclosing Party's taking steps to resist or narrow the scope of such request or requirement, or to waive compliance, in whole or in part, with the terms of this Agreement. The Receiving Party will furnish only the portion of the Confidential Information that is legally required and will, at the Disclosing Party's sole expense, use its reasonable best efforts to ensure that all Confidential Information and other information that is so disclosed will be accorded confidential treatment by the Receiving Party thereof.

8. This Agreement does not obligate the Disclosing Party to produce any Confidential Information whatsoever. In the event that the Disclosing Party chooses to produce Confidential Information, this Agreement does not create a continuing obligation to produce any other information or to update any information that has been previously produced.

9. All documents containing, and all other tangible and intangible forms of, Confidential Information, including copies thereof, shall belong to and remain the sole property of the Disclosing Party. The Receiving Party shall acquire no proprietary interest in or right to any of the Confidential Information absent written agreement by the Disclosing Party.

10. The Receiving Party shall not take or make copies of the Confidential Information or any of it, or authorize any other person to do so, other than for the purpose of supplying the Confidential Information to any of its Representatives to whom disclosure of such information is permitted under the terms of this Agreement. If at any time the Disclosing Party, in its sole discretion, so requests in writing, then the Receiving Party will promptly deliver to the Disclosing Party all original Confidential Information with respect to the relevant Proposed Transaction and promptly deliver to the Disclosing Party or destroy all copies, reproductions, summaries, compilations, analyses and extracts thereof or

based thereon in the possession of the Receiving Party or its Representatives, whether maintained in written form or in any electronic or computerized format, and certify to the Disclosing Party that all such originals have been delivered to the Disclosing Party and that such destruction has occurred.

11. The Receiving Party acknowledges that neither the Disclosing Party nor any of its Representatives makes any express or implied representation or warranty as to the accuracy or completeness of any Confidential Information, and the Receiving Party agrees that none

of such persons shall have any liability to the Receiving Party or any of its Representatives relating to or arising from its or their use of any Confidential Information or for any errors therein or omissions therefrom. The Receiving Party also agrees that it is not entitled to rely on the accuracy or completeness of any Confidential Information. The Receiving Party acknowledges and agrees that the Confidential Information is being provided solely for the purpose of assisting its independent evaluation and analysis of the Disclosing Party and its assets.

12. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT OR LAW TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF PROFITS DUE TO BUSINESS INTERRUPTIONS OR OTHERWISE, IN CONNECTION WITH THIS AGREEMENT.

13. In the event of litigation relating to this Agreement, the non-prevailing Party as finally determined by a court of competent jurisdiction shall be liable and pay to the other Party all reasonable costs incurred by such other Party in connection therewith, including, but not limited to, reasonable attorneys' fees incurred by such other Party in connection with such litigation, including any appeal therefrom.

14. It is further understood and agreed that no failure or delay by the Disclosing Party in exercising or pursuing any right, power, privilege or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise or pursuit thereof preclude any other or further exercise or pursuit thereof or the exercise or pursuit of any other right, power, privilege or remedy hereunder.

15. This Agreement shall be effective as of the date on the signature page (the "Effective Date") and expire on the fifth anniversary thereof. This Agreement may not be amended, modified, superseded or cancelled, nor may any of the terms, covenants, representations, warranties or conditions hereof be waived, except by a written instrument executed by the parties.

16. If any provision of this Agreement becomes or is found to be illegal or unenforceable for any reason, such clause or provision must first be modified to the extent necessary to make this Agreement legal and enforceable and then if necessary, second, severed from the remainder of the Agreement to allow the remainder of the Agreement to remain in full force and effect.

17. This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

IN WITNESS WHEREOF, the Parties have executed this Agreement effective the date stated above.

| DEVELOPER: | PARTNER: |
|---|---|
| Business Name: McCandless Group, LLC<br><br>Address: 127 Bowery, Irvine, CA 92612<br><br>Telephone Number: 919-791-6441<br><br>Email Address: nick@nickmccandless.com | Business Name: Thomas Drew<br><br>Address: 565 Broome St #S9C, New York, NY 10013<br><br>Telephone Number: 616-460-8405<br><br>Email Address: TDrew@1and1life.com |
| By: DocuSigned by: Nicholas McCandless CC0CECA0BA5C475...<br>Signature<br><br>Full Name: Nicholas McCandless<br>Title: CEO/Owner/Founder<br><br>Date: 5/21/2020 | By: DocuSigned by: 31D4D0E10A54456...<br>Signature<br><br>Full Name: Thomas Drew<br><br>Date: 5/21/2020 |

# EXHIBIT – F –

Apr 2, 2020, 1:06 PM

Hey Nick! I'm so appreciative of your efforts in getting my Reddit thread deleted and being proactive about not allowing my content to get out! Thank you so much for that. However, as inevitably so, some people I'm not too thrilled about seeing the content have been sent screen recordings of some of my content which I regret sending out. That being said, is there any way that we can delete messages from the chat? At least for people who haven't unlocked it

Hey Jessica, did they say who or where they saw the content so I can make sure that's addressed?

Which messages are you wanting removed? I can look into having them removed from conversations where the user did not unlock it

I think someone who's subscribed just sent it to them so not anything you can prevent unfortunately (unless you're able to figure out some raya/Snapchat technology when you can detect if someone screenshots 😂)

I really appreciate that!






Another vid for you.. don't you wish these were your hands? 😜



🔒 $13

I'd like these three deleted

I needed to steer clear of these and stick to the BTS vids 🤦🏻‍♀️

If this was an app, we would certainly be able to detect screenshots and screen recording because it would be actual software installed on the phone, but unfortunately Apple and Google don't take nicely to these kinds of apps plus they take 30% of revenue in the App Store which is nuts.

We are exploring watermarking technologies where if someone were to screenshot something, it would contain their user ID on it so we know who shared it, but the challenge is having it overlap the photo or video would likely upset customers and if we just put it in the corner for example, the person could easily just crop that out, but we are investigating some technologies we can take advantage of. I do have my team monitoring the web for your content however and we do use image and video recognition technologies to get anything we find pulled down immediately as we take keeping your content exclusive VERY SERIOUS.

I will speak with my team about handling this ASAP. It may take us a day or two, but I'll do my best to get this taken care of ASAP for you 🙏

Just curious, how was it sent to them? I'm asking to see if I have a way of tracing it back to who sent them

I appreciate you guys, thanks so much!!

I'm not sure, it's not someone I want to probe with but to my understanding someone sent it to them.. but also who knows they could've signed up themselves as a different name, no way of knowing

Of course! I'm here to not only help you make the most money possible, but also protect you and your content and ensure that you're happy with everything revolving your website.

Ahhhh I understand. If you were comfortable sharing with me the legal name of the person that claims they "received" it from someone else, I can dive into our billing logs and see if I come across a match. They can fake their name on the site, but they can't fake the name on their billing info and I can pull that data. Just let me know and I can then at least let you know if they have an account on your site and if so, what they have bought

Apr 18, 2020, 7:10 PM

Amazing, thank you!!

I think you may have mentioned this before but do we think we could add a user ID code as a watermark to prevent leaks?

That is something we have started working on, the only concern, which is why we are going to make it optional and up to the model, is that we wouldn't want it to be too distributive to the photo or video, but at the same time, if it's not large enough, nothing stops them from just cropping it out which is why we take monitoring very seriously, but we do have that in the pipeline

disruptive*

Awesome! Idk if it's possible to move it around per photo but I'm sure if we make it small enough and placed it right next to us in the photo it shouldn't be too disruptive and harder to crop out

Yep we are developing it so that the model can easily place it and size it how they want as each photo and video is different

That's awesome!

# EXHIBIT – G –

Just let me know what those dimensions ended up being and I'll get you photos

Just to avoid the issues we had prior, can you have Maria modify the mobile and desktop PSDs to be exactly how you want them as what she sent is different from what you are saying

I should be the same in what I'm saying for mobile

But yes I'll have her redo them for desktop to be 4 images

Ok so what she did for mobile is what you want exactly for mobile and desktop?

Yes for mobile!

Desktop I like how she has it off center

But I want 4 photos so it's consistent with mobile

Everything is the same for the PSD except desktop shows 3 instead of 4

Ok just have her redo the desktop to avoid any confusion and we will design the mobile to match exactly

Loved "Ok just have her redo the desktop to avoid any confusion and we will design the mobile to match exactly "

9/7/20, 6:00 PM

How do you handle leaked content that isn't hosted in the US?

"The leaked content is a big thing. How is the legal team going about it besides just submitting a DMCA? Because sites like thothub etc that aren't based out of The US don't have to abide by our copyright laws etc so stuff slips through the wall."

Sites based out of the US are definitely more difficult as they don't operate under US legislation and therefore do not have to abide by the same Copyright laws. Most sites we are still able to get the content taken down from. For those that we can't and they do not cooperate, we get them removed from all of the search engines so that at least people can't find the content

Loved “Sites based out of the US are definitely more difficult as they don’t operate under US legislation and therefore do not have to abide by the same Copyright laws. Most sites we are still able to get the content taken down from. For those that we can’t and they do not cooperate, we get them removed from all of the search engines so that at least people can’t find the content ”

Awesome thank you

9/7/20, 7:11 PM

Can we get the watermark added on videos?

That’s something we are currently exploring. You will notice that if you watch on the computer it displays during videos but when you watch in full screen or on the phone it goes away because it pops into the native player which is out of our control. We are exploring options with this though

Hmm

I would suggest just adding watermarks to the video but I guess we’d have to make 1000’s manually

Obviously not feasible

9/7/20, 8:56 PM

Yea that would not work. We found a creative way of pulling it off with photos without having to generate multiple versions, but with video its different as it pops into a native player but we have a potential solution we are exploring

9/8/20, 1:25 PM

Hey Nick!

Update on shop now with Juju’s site? Also for juju, please add a twitter link

http://twitter.com/theliljuju

The Shop Now has been on her internal site, it will be added to landing page this week along with the bottom section of landing page once we have that updated PSD and the images. Maria should be able to tell you those aspect ratios since we will be building it exactly how she designs it

Adding her Twitter now

Twitter added 👍🏼

# EXHIBIT – H –

From: **Nick McCandless** nick@nickmccandless.com
Subject: McCandless Group Model Platform Technology Stack
Date: May 23, 2020 at 10:01 PM
To: Corey Lewis corey@1and1life.com

Attached is the overview of our technology stack. Let me know of any questions.

PDF
McCandless Group...ck.pdf

**Nick McCandless**
Owner/Founder
McCandless Group

919-791-6441
nick@nickmccandless.com
www.nickmccandless.com

# EXHIBIT – I –

[redacted]

[redacted]

[redacted]

# EXHIBIT – J –

May 25, 2020, 7:26 PM

Hey Nick! Would love to get your advice on our minimum percentage tiers depending on followings! Do you have time for a phone call in the next couple days?

Sure! What's your schedule like tomorrow?

Awesome, thank you! Whenever works for you!

Great! Let's plan on 10am PST tomorrow. Sound good?

I'm on the east coast.. any chance we could do a littleee later 😂

How about 12pm PST so 3pm your time?

Perfect!! Thank you!

❤️

Awesome! I will call you then, looking forward to it!

May 26, 2020, 12:16 PM

May 30, 2020, 11:02 PM

Nick! Corey was telling me you have a service which handles messages

Can we pay a flat rate to try it out for a week on my site so we can see the type of job they do?

Sure let me figure that out as everyone we do that with is on a higher revenue share so let me work that out and also working on the tiered numbers as well, just beyond swamped with the move this weekend, I'll get back to you and let you know by Monday 👍

No rush at all!!

Good luck with your move!!

We just want to test it out to see if we should use your ppl for our girls

Thanks! We will be in touch Monday 👍

# EXHIBIT – K –

[redacted]

[redacted]

[redacted]

# EXHIBIT – L –

6/23/20, 12:21 PM

How you holding up my man

Hanging in there, just thankful I have business booming to occupy my mind 🙏🏼

How are thing with you?

And the team

I'm solid. We ready to rock, but wanted to give you some space. Willing to push back our launch a week or two

Lmk if/when we can chat with that accountant too. Wasn't trying to stress you out

But ready to onboard you for the personal and company branding, as well as get going with Coy

Major move happens in the next week or so

Happened* in the last week or so*

I appreciate it, I'm back to the grind so I don't want to delay anything. On the accountant there is a delay there as I'm actually in the process of onboarding an assistant for my accountant since he's being overworked right now but I'll have that locked down here in the next week or so

Awesome

Awesome! Let's hop on the phone later today and catch up over everything 👍🏼

But I'm ready to rock 💪🏼

Yeah, even if it's not your guy specifically, and have someone in mind, that would be great. I'm not trying to have my a newbie learn these books

Would be great to have someone who gets this business model

Yea definitely not! I got you covered, just give me until next week and I'll have that lined up for you 👍🏼

Yeah, especially with us also having to pay you accordingly, and all that good stuff. Just want to make sure it's all good and smooth sailing since we are in bed together fully.

Got a few hoes lined up for the DBA (still trying to solidify that name) too. I've been playing around with a bunch, but nothing that has allowed me to have that "ah" moment that I usually like to have with my team

So we are still at the drawing board with it. We spend about a n hour a day on it lol

Yep completely get it! Accounting is critical and getting it right from the beginning is essential

Names are hard but you know it when you know it, we will get that nailed down 👍🏼

Have you spoken with Rachel recently?

I haven't spoken to Ray, I was letting her team go through that due dilligence process. But we can follow up.

I'll follow up personally to see what her concerns may be

As you said

I feel like she's down

But the Partners

Probably like fuck it

Yep, I feel Rachel will need to be the one to light a fire under their ass about it because it's costing her a fortune each month

Yeah they don't give af

Lol

She's the image

And the girls

I'm launching Patreon models left and right and the results are insane, just hate seeing her lose out

It's like bro

Protect your image

# EXHIBIT – M –

[redacted]

[redacted]

# EXHIBIT – N –

MCCANDLESS GROUP

# WEBSITE DEVELOPMENT AGREEMENT

THIS AGREEMENT ("Agreement") is entered into as of the date on the signature page (the "Effective Date") by and between McCandless Group, LLC, with its principal place of business located at 88 SW 7th St #2203, Miami, FL 33130 (the ("Developer") and Coy Collective, INC with a principal place of business located at 40 Harrison St Apt 36 L, New York, NY 10013 (the "Customer" or "you" or "your") each individually a "Party" and collectively the "Parties."

**WHEREAS,** Developer is engaged in the business of website and software development.

**WHEREAS**, Customer wishes to utilize the services of Developer in connection with the development of software identified as the Coy Collective, INC Websites (each individually a "Website" and collectively the "Websites").

**NOWTHEREFORE,** in consideration of the promises and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties agree as follows:

**1.** **Services.** Subject to the terms and conditions of this Agreement, the Customer hereby retains Developer to perform the services set out below ("Services" or "Work").

1.1 General.

a. Developer will perform the services of website development and support of the Websites according to specifications set forth therein.

b. The Websites will be for Customer's brand that allows the Customer to provide exclusive content to the Customer's audience through the Websites.

c. Customer will cooperate with Developer's reasonable requests for information, content, and data necessary for the completion of the Websites.

d. Customer will cover any and all costs affiliated with the Websites including, but not limited to servers/hosting services, email services, upkeep expenses, and any other fees required to build and operate the Websites.

1.2 Services to be provided:

a. The Developer will provide the Customer with Websites that provide support for exclusive content of the Customer including both photos and videos that are made exclusive to those subscribed by paying for a subscription. Subscribers will also have the ability to chat with the Customer through the Websites.

b. The design and interface of the Websites will follow the template assigned to it by the Developer.

c. The Customer guarantees that the Developer will be supplied with the Work to be completed.

d. The Websites shall contain a statement substantially similar to "Powered by McCandless Group" and such copyright and trademark notices as the Developer reasonably believes are appropriate.

e. The Developer will be providing the Product "AS-IS" and no custom development will be included under this Agreement excepting that included in the functionalities above. Any maintenance, repair, modification, upgrade or enhancement of the Websites shall be pursuant to a separate mutually acceptable written agreement between the Customer and the Developer.

f. It is understood and agreed that the Customer will use the Websites and its content to promote their exclusive content with the purpose of monetizing the Customer's fans and shall not be used for any other purposes without written permission from the Developer.

**2. <u>Compensation.</u>**

2.1 In consideration of the Services to be provided by Developer to the Customer hereunder, the Customer shall pay to Developer the following compensation ("Compensation"):

a. Upon execution of this Agreement or another date as mutually agreed to by the Parties, which shall be prior to Developer working on the Customer's Website, the Customer shall pay to Developer Three Thousand Dollars ($3,000) for each Website assigned to Developer.

b. Upon launch of a Customer's Website, the Customer shall pay to Developer service fees (collectively the "Monthly Service Fees") for each Website assigned to Developer. Monthly Service Fees shall be paid no later than on the end of the first (1st) day of each calendar month for the amount owed as a result of the prior months' activity.

2.2 "Monthly Service Fees" shall consist of:

a. Fees based upon the number of users who have access to the content (each individually a "Subscriber" and collectively the "Subscribers") on each Website based on the following tiers:

0 - 20,000 subscribers = $1.80 per Subscriber per month
20,001 - 50,000 subscribers = $1.65 per Subscriber per month
50,001 - 90,000 subscribers = $1.50 per Subscriber per month

90,001 - 150,000 subscribers = $1.35 per Subscriber per month
150,001 subscribers - 200,000 subscribers = $1.20 per Subscriber per month
200,001 subscribers and up = $1 per Subscriber per month

b. One Dollar ($1) for each photo and/or video purchased (each individually a "Content Unlock" and collectively the "Content Unlocks") on each Website.

**3. <u>Term and Termination</u>.**

3.1 Developer or Customer may terminate this Agreement at any time without cause by providing written notice to the other Party no less than thirty (30) days before termination. Upon termination, Developer will retain all ownership in any and all software and services provided to Customer and Developer will terminate the existence of any and all Websites affiliated with the Customer.

3.2 If Customer terminates Agreement, the Customer must pay to Developer all Monthly Service Fees owed up to the termination date.

**4. <u>Relationship of the Parties</u>.** The Developer is and shall remain an independent contractor of the Customer and nothing contained in this Agreement shall be deemed to create an employer/employee, principal/agent, partnership or joint venture relationship between the parties. The Customer shall not provide the Developer with any benefits that the Customer may provide to its employees and shall not be required to withhold income taxes on, or to pay payroll taxes with respect to, the sums to be paid to the Developer hereunder. The Developer agrees that he shall be solely responsible for all excise, self-employment and other taxes relating to the receipt of payments hereunder. As an independent contractor, it is expressly agreed that the Developer operates at his/her own expense and risk. The Developer is not authorized to execute any agreements, make any changes in any agreements, incur or assume any obligations, liabilities or responsibilities, or perform any other act in the name of or on behalf of the Customer. Each party shall have the obligation to supervise, manage, contract, direct, procure, pay, perform or cause to be performed all work and other obligations to be performed by such party pursuant to the terms of this Agreement and shall be liable for the acts or omissions of its or his/her employees and agents in performing its or his/her respective obligations or exercising its or his/her respective rights hereunder.

**5. <u>Confidential Information.</u>**

5.1 Definition of Confidential Information. For the purposes of this Agreement, "Confidential Information" means any information disclosed by either party to the other party, either directly or indirectly, in writing, orally or by inspection of tangible objects which is designated or described by the disclosing party as "Confidential," "Proprietary" or some similar designation, or which should reasonably be understood by the receiving party, because of the circumstances of disclosure or the nature of the information itself to be confidential or proprietary to the disclosing party. Confidential Information shall include, but not be limited to, the pricing and payment terms

contained in this Agreement. Confidential Information may also include information disclosed to a receiving party by third parties on behalf of the disclosing party. Confidential Information shall not include any information which (i) is publicly known through no action or inaction of the receiving party; (ii) was already in the possession of the receiving party at the time of disclosure without an obligation of confidentiality, direct or indirect, to the disclosing party; (iii) is obtained by the receiving party from an independent third party without a breach of such third party's obligations of confidentiality; or (iv) is independently developed by the receiving party without use of or reference to materials provided by the disclosing party.

5.2 Non-use and Nondisclosure. Each party agrees that it will not use any Confidential Information of the other party for any purpose except for the purpose of this Agreement. Each party agrees that it will not disclose any of the other party's Confidential Information to anyone except for such party's own directors, officers, employees, and attorneys who are required to have the information in connection with the purpose of this Agreement ("Representatives"). In the event that a receiving party is required by law to disclose Confidential Information obtained from the disclosing party, the receiving party shall give the disclosing party prompt written notice of such requirement as soon as possible prior to such disclosure and shall provide the disclosing party with assistance in obtaining an order protecting the information from disclosure.

5.3 Each party agrees that it shall take reasonable measures to protect the secrecy of and avoid the disclosure and the unauthorized use of the other party's Confidential Information. Without limiting the foregoing, each party shall take at least those measures that it takes to protect its own most highly confidential information and shall ensure that each of its Representatives who have access to the other party's Confidential Information has signed a non-use and nondisclosure agreement in content similar to the provisions hereof, prior to any disclosure of Confidential Information to such Representative. Neither party shall make any copies of the other party's Confidential Information without the disclosing party's prior written consent.

5.4 Term of Confidentiality. The term of this Confidentiality Section shall remain in effect until terminated by either party with written notice to the other party, but such termination shall have no effect on either party's obligations hereunder with respect to Confidential Information already disclosed. The obligations of each receiving party hereunder as to any Confidential Information shall continue in perpetuity from the date such Confidential Information is disclosed or if applicable until such information is no longer a trade secret of the disclosing party, whichever occurs last, and shall survive termination of this Agreement.

**6. <u>Ownership of Intellectual Property.</u>**

6.1 Except as may be otherwise granted herein, title to and ownership of all intellectual property rights including, without limitation, any patent, trademark, copyright or intellectual or industrial property right (the "Developer Intellectual Property") relating to the Software shall at all times remain with Developer. Customer expressly acknowledges that it does not have and shall not, by virtue of this

Agreement, acquire any title or proprietary rights whatsoever of any kind in or over the Software or any improvements, updates, adaptation, modification, research, development, derivation, addition, extension, changes, or other Developer Intellectual Property related to the Software.

6.2 Developer hereby grants to Customer a non-exclusive, non-transferable, royalty-free, worldwide right to use the Software for those purposes intended by this Agreement.

6.3 Customer reserves all its respective rights, title, and ownership in its respective intellectual property owned or developed independently of this Agreement, including images, videos, written content and other personal content ("Customer Intellectual Property").

6.4 Developer may use, reproduce and copy Customer Intellectual Property for the purposes of planning, operating, managing, optimizing, implementing and maintaining the Website, subject to the maintenance of confidentiality in accordance with Section 5 herein.

**7. <u>Customer Content.</u>**

7.1 All Content on the Website is the sole responsibility of the person who originated such content. All Content transmitted by Customer is at Customer's own risk and Customer is solely responsible and liable for any damage or loss to resulting therefrom. Developer reserves the right to remove any objectionable Content in their sole discretion.

7.2 Customer understands that by providing Content in connection with the Service Customer hereby grants Developer a non-exclusive, worldwide, royalty free, perpetual, irrevocable, sublicensable and transferable right to fully exploit such Content (including all related intellectual property rights) in connection with the Website.

**8. <u>Customer Representations.</u>**

8.1 Customer will use the Websites and its content to promote their exclusive content with the purpose of monetizing the Customer's followers and shall not be used for any other purposes without written permission from the Developer.

8.2 Customer will establish an account for payment processing with the payment processor assigned to Customer by Developer.

8.3 Customer will cover any and all costs affiliated with the Websites including, but not limited to servers/hosting services, email services, upkeep expenses, and any other fees required to build and operate the Websites.

8.4 Customer will provide Developer with an ADULT MODEL RELEASE: 2257 COMPLIANT FORM along with a copy of valid photo identification for each model involved in any capacity of each Website.

8.5 Customer warrants and represents that all information as contained in the ADULT MODEL RELEASE: 2257 COMPLIANT FORMS are true and accurate.

**9.** **Indemnity.** At all times, Customer shall protect, indemnify, defend and hold the Developer, including its affiliates and subsidiaries, officers, directors, shareholders, members, employees, agents, representatives, successors and assigns harmless from and against any and all penalties, claims, losses, liabilities, damages, charges, costs and/or expenses (including, without limitation, attorneys' fees and court costs) rising out of or resulted from or in any way or in any manner connected with or related to any acts or omissions or breach of this Agreement, of Customer.

**10.** **Warranty, Disclaimer and Limitation of Liability.**

10.1 Customer's use of the Service is at their sole risk. The Service and the associated materials and content are provided on an "as is" and "as available" basis. Except as otherwise expressly provided in this Agreement, Developer, its parent, subsidiary and other affiliated companies, and their respective officers, directors, employees, agents and other representatives (collectively, the "Developer Parties"), expressly disclaim all warranties of any kind, whether express or implied, including, but not limited to the implied warranties of merchantability, fitness for a purpose and non-infringement. Without limiting the generality of the foregoing, the Developer Parties make no warranty that: (i) the Service will meet your requirements; (ii) the Service will be uninterrupted, timely, secure, or error-free; and/or (iii) any errors in the Service will be corrected.

10.2 The Developer Parties shall not under any circumstances be liable for any damages of any kind arising out of, in connection with or relating to the use of or inability to use the Service, including any liability: (i) as a publisher of information; (ii) for any incorrect or inaccurate information or any 'bug' of the Service; (iii) for any unauthorized access to or disclosure of your transmissions or data; (iv) for statements or conduct of any third party on or via the Service; (v) for any disputes between users of the Service or between a User of the Service and you; (vi) for lost data; (vii) cost of procurement of substitute products or services; (viii) for any technical malfunction that may arise from problems with computer systems, software code, servers, computer equipment, mobile phones, software, infrastructure connections or any combination thereof. or (ix) for any other matter relating to the Service or any third party. This is a comprehensive limitation of liability that applies to all damages of any kind, including any direct, indirect, special, incidental or consequential damages, whether based on breach of contract, breach of warranty, tort (including negligence), product liability or otherwise, even if an individual advises the Developer Parties of the possibility of such damages. The limitations of liability set forth herein are fundamental elements of the basis of the bargain between the Developer and you. The products, information and services offered on and through the Service would not be provided to you without such limitations.

10.3 Notwithstanding the foregoing, the sole and entire maximum liability of the Developer Parties for any reason, and your sole and exclusive remedy for any cause or claim whatsoever, shall be limited to any amounts paid by you to Developer during the three (3) months prior to the date any cause of action may have occurred.

10.4 You agree that regardless of any statute or law to the contrary, any claim you may bring must be filed within three (3) months after the cause of action accrues or it will be permanently barred.

10.5 Some jurisdictions do not allow the disclaimer of certain warranties or the limitation or exclusion of liability for certain types of damages. accordingly, some of the above disclaimers and limitations may not apply to you.

10.6 If you are a California resident, you shall and hereby do waive California Civil Code Section 1542, which says: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which, if known by him must have materially affected his settlement with the debtor."

**11. Force Majeure.** A party will be not be considered in breach or in default because of and will not be liable to the other party for, any delay or failure to perform its obligations under this agreement by reason of fire, earthquake, flood, explosion, strike, riot, war, terrorism, or similar event beyond that party's reasonable control (each a "Force Majeure Event"). However, if a Force Majeure Event occurs, the affected party shall, as soon as practicable:

a. Notify the other party of the Force Majeure Event and its impact on performance under this agreement; and

b. Use reasonable efforts to resolve any issues resulting from the Force Majeure Event and perform its obligations under this agreement.

**12. Governing Law, Jurisdiction.** If any dispute arises under the terms of this Agreement, the parties agree to select a mutually agreeable neutral third party to help them mediate such. If mediation is unsuccessful, the Parties agree that any dispute shall be in all respects construed in accordance with and governed by the laws of the State of Florida without regard to conflict of law principles. Costs and fees (including attorneys' fees) associated with the mediation or arbitration shall be responsibility of each individual party.

**13. Miscellaneous.**

a. Entire Agreement; Modification. This Agreement sets forth the entire agreement and understanding of the parties hereto concerning the subject matter hereof, and, except as otherwise specifically provided below, supersedes all prior and contemporaneous correspondence, agreements, arrangements and understandings, both oral and written, between the parties hereto concerning the subject matter hereof. No modification hereof shall be binding upon the parties hereto except by written instrument duly executed by such parties or their duly authorized representatives.

b. Invalidity of Particular Provisions. If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the other terms of this Agreement, or the application of such terms or provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

c. Counterparts. This Agreement may be executed in any number of counterparts, including electronically, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

d. This Agreement may be delivered by email, and email copies of executed signature pages shall be binding as originals.

e. Interpretation. The paragraph headings of this Agreement are inserted for convenience only and shall not constitute a part of this Agreement in construing or interpreting any provision hereof. Whenever the context requires, words used in the singular shall be construed to include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine or neuter gender.

f. Notices. All notices given under this Agreement must be in writing. A notice is effective upon receipt and shall be sent via one of the following methods: delivery in person, overnight courier service, certified or registered mail, postage prepaid, return receipt requested, or by any other means agreed to by the Parties, such as email.

g. This agreement will become effective when all parties have signed it. The date this agreement is signed by the last party to sign it (as indicated by the date associated with that party's signature) will be deemed the Execution Date of this agreement.

h. Each party shall use all reasonable efforts to take, or cause to be taken, all actions necessary or desirable to consummate and make effective the transactions this agreement contemplates or to evidence or carry out the intent and purposes of this agreement.

*[Rest of Page Intentionally Left Blank; Signature Page to Follow]*

IN WITNESS WHEREOF, the parties have executed this Agreement effective the date stated above.

| **DEVELOPER:** | **CUSTOMER:** |
| --- | --- |
| Business Name: McCandless Group, LLC | Business Name: Coy Collective, INC |
| Address: 88 SW 7th St #2203, Miami, FL 33130 | Address: 40 Harrison St Apt 36 L, New York, NY 10013 |
| Telephone Number: 919-791-6441 | Telephone Number: 805-835-8052 |
| Email Address: nick@nickmccandless.com | Email Address: jessica@thecoyco.com |
| By: DocuSigned by: Nicholas McCandless CC0CECA0BA5C475... <br> Signature | By: DocuSigned by: Jessica Marie Bartlett F31117673199472... <br> Signature |
| Full Name: Nicholas McCandless <br> Title: CEO/Owner/Founder | Full Name: Jessica Marie Bartlett <br> Title: CEO, President |
| Date: 8/6/2020 | Date: 8/6/2020 |

# EXHIBIT – O –

THE ALL-NEW MDX
CLICK FOR COLOR
PLATINUM WHITE PEARL
ACURA
EXPLORE NOW

MAXIM

ENTERTAINMENT STYLE RIDES LUXURY GEAR FOOD & DRINK TRAVEL SPORTS WOMEN VIDEO MAXIM

HOME > NEWS

# HOW INSTAGRAM ENTREPRENEUR JESSICA BARTLETT IS HELPING HER FELLOW INFLUENCERS GET RICH

Jessica Bartlett founded COY Co. to help models and creators turn big Instagram followings into big profits.

THOMAS HERD · NOV 2, 2020



Instagram/@jessicambartlett

**Presented by T1**

Thanks to social media platforms such as TikTok and Instagram, chasing fame and fortune has never been easier. However, those social media outlets are constantly changing their algorithms and allocating what content is seen at what time. This can diminish someone's engagement, thus leading to fewer advertisement agreements, which means less notoriety and money. Fortunately, social media expert and influencer Jessica Bartlett has created a whole new system that gives the power back to the user.



Courtesy of T1

Bartlett founded COY (Capitalize On You) Co. after realizing that directing followers on Instagram to her website resulted in more traffic. Bartlett's website was completely her own, with special content not seen on her social media with the addition of a paywall to monetize her likeness and content. It was a unique experience that Bartlett controlled, and it was more favorable than her social media page.



Courtesy of T1

Bartlett decided that if every creator-owned their platform, they would be able to promote their own unique brand rather than rely on advertising for others. COY Co. was then born into a subscription-based service that constructs each influencer's individual platform and gets them paid because followers desiring to view the page must pay a fee.



Courtesy of T1

COY Co. helps creators large and small build and capitalize on their brand. The service also acts as an advisor, helping influencers determine which exclusive content will resonate best with their followers. COY Co. users can sit back and relax because the service will automatically use digital marketing tactics to help grow the user's following. Users also do not have to worry about their content being leaked and losing the exclusivity factor because COY Co. has the best-in-class copyright and content protection.

This service is a complement to social media for those who have been able to amass a large and loyal following and want to monetize. COY Co. cares about its creators and helps each person achieve their brand goals. Creators and subscribers are getting an exclusive experience. Subscribers are engaging in the lives of their favorite influences, artists, supermodels, athletes, and celebrities, but in a whole new way. The content on COY Co. platforms help closely connect subscribers and creators.

jessicambartlett
1.1m followers
View Profile







Instagram



RECENT



NEWS
TESLA MAY MAKE MORE MONEY ON BITCOIN THAN FROM SELLING CARS
BY STEVE HUFF · 2 HOURS AGO



GEAR
SONY VAIO Z CARBON FIBER LAPTOP IS WORLD'S LIGHTEST WITH INTEL H-SERIES CHIP
BY MAXIM VIDEO · 6 HOURS AGO



STYLE
ASTON MARTIN PARTNERS WITH LUXURY WATCHMAKER GIRARD-PERREGAUX FOR LIMITED-EDITION TIMEPIECES
BY STEVE HUFF · 8 HOURS AGO



ENTERTAINMENT
HOW MODEL & DESIGNER ROCKY BARNES BECAME AN IMPOSSIBLY COOL INFLUENCER
BY ZEYNEP YENISEY · 10 HOURS AGO



STYLE
LACOSTE DEBUTS ECO-CONSCIOUS 'LOOP POLO' SHIRT
BY MAXIM STAFF · 10 HOURS AGO



RIDES
THIS BUGATTI CHIRON 'TERRACROSS 4X4' IS A TRAIL-CONQUERING HYPERCAR CONCEPT
BY BRANDON FRIEDERICH · 11 HOURS AGO

STYLE
G-SHOCK BLINGS OUT G-STEEL WATCH LINE WITH GOLD-ACCENTED GST-B100
BY MAXIM STAFF · 12 HOURS AGO

ENTERTAINMENT
JIM HENSON'S INSANE 1960S COFFEE ADS FEATURING MURDEROUS MUPPETS GO VIRAL
BY STEVE HUFF · FEB 21, 2021

RIDES
CARROLL SHELBY'S PERSONAL 1966 COBRA 427 'SUPER SNAKE' IS HEADED TO AUCTION
BY BRANDON FRIEDERICH · FEB 20, 2021

SEE MORE

California Seniors with No Life Insurance Get a $250k Policy for $18/month
Smart Lifestyle Trends
The Most Sought After Lawyers in Calexico. See the List
Find Attorneys | Sponsored
4 Sisters Took Same Photo for 40 Years. Last One is Just Sad
Poplively
The Horrifying Truth About CBD
Spruce
Doctors Stunned: Mole & Skin Tag Removal Has Never Been Easier (No Surgery)
Skincell
Best & Worst Refinance Mortgage Companies Of 2021
Comparisons.org
How Dogs Cry For Help: 3 Warning Signs Your Dogs Is Crying For Help
DogFoodExpose.com
This is Where the Majority of Singles over 50 Are Finding Love in Calexico
SilverSingles
READ THIS NEXT
POWERED BY PUBEXCHANGE
RUIN MY WEEK — RARELY SEEN PHOTOS FROM THE EARLY 2000S (50 PICS)
GUNAXIN — SURPRISING REAL STORIES BEHIND EIGHT CLASSIC WRESTLERS
GUNAXIN — MOVIE HAPPY MEALS FOR ADULTS
CAVEMAN CIRCUS — LINKAGE



© 2021 Maxim Media Inc

# EXHIBIT – P –

BAILEY DUQUETTE P.C.

November 19, 2020

**VIA EMAIL**

McCandless Group, LLC
c/o Mr. Jason Moskowitz
Partner, Strategic Relations
jason@jasland.com
jason@themccandlessgroup.com

**Re: Demand & Request for Mediation**

Mr. Moskowitz:

We represent The Coy Collective, Inc. ("CC") in connection with its burgeoning dispute with McCandless Group, LLC ("MG"). It is our understanding that MG is refusing to turn over the following items related to CC's clients: i) domains, ii) payment processing account, and iii) subscriber database. If this is not the case and MG is now prepared to turn over those items, please arrange to have this done immediately and disregard our request for mediation.

In the event you are continuing to maintain that those items belong to MG, we hereby requests, in accordance with Section 12 of the Website Development Agreement dated August 6, 2020 (the "Agreement"), that a mediation be conducted without delay. We attach to this letter a list of Florida mediators; please let us know no later than close of business Monday November 23rd which mediator is acceptable to MG.

The position MG takes in its letter dated November 3rd is curious to say the least. As much as the Agreement grants MG rights to the software and code powering the websites (which is not disputed), it does not in any way suggest the URLs, the subscriber data or the payment processing account belong to MG. Quite the contrary, Section 8.2 of the Agreement expressly provides for

the payment processing account to be with CC. The Agreement also does not purport to make the subscribers of CC's clients unknown to CC's clients, which would be an absurd result. Under that position, CC would have turned over, to an independent contractor charged to develop and support websites, and without any express language to that effect, the sole ownership of the identity of its subscribers. The fact that MG unilaterally secured the domains, the payment processing account, and terms with subscribers, all in its own name instead of on behalf of CC, does not make its position less egregious.

For the avoidance of doubt, MG's proposed transition plan to shut down the websites on December 31st, 2020 is not the source of the present dispute, CC is not asking for the websites.

A mediator should be helpful in bringing the parties to a quick resolution by pointing to the business advantages of a settlement over litigation and perhaps tampering MG's exuberant and expansionist contractual views. But in the event no resolution is achieved, CC will pursue legal action for the damages caused by the wrongful withholding.

CC reserves all rights, and this letter is without prejudice to any other rights, remedies or claims that it may have.

Sincerely,

Marc Duquette, Esq.
Bailey Duquette P.C.
Tel: +1 212.484.1946 Ext. 201
Email: marc@baileyduquette.com

Enclosures

**List of Proposed Florida Mediators**

Francis Carter (https://www.flcarterpa.com/)

Pamela Perry (https://pamperrylaw.com/service/mediation-arbitration/)

Gill Freeman (https://www.jamsadr.com/freeman/)

Sarah Clasby Engel (https://engel-firm.com/about-us/)

Brian Spector (http://bspector.com/)

Hon. Norman Gerstein (https://www.floridamediators.org/norman-gerstein)

John Salmon (https://www.floridamediators.org/john-salmon)

Rosa Rodriguez (https://sd-adr.com/attorney/rosa-i-rodriguez/)

Manuel R. Morales (http://www.moraleslaw.com/)

Diana Santa Maria (https://www.santamarialaw.net/diana-santa-maria-certified-by-florida-supreme-court-as-civil-me.html)

Peggy Gehl (https://peggygehl.com/)

Tom Lynch (https://www.tomlynchmediation.com/)

Bill Hearon (http://www.hearonmediation.com/)

# EXHIBIT – Q –

FOX
Gerard Fox Law

**VIA EMAIL**

December 2, 2020

Marc Duquette, Esq.
Bailey Duquette P.C.
104 Charlton Street, Suite 1W
New York, NY 10014
marc@baileyduquette.com

**Re: Demand & Request for Mediation**

Mr. Duquette:

We represent McCandless Group, LLC ("MG") in connection with the discussion and possible dispute regarding The Coy Collective, Inc. ("CC").

MG disagrees with your characterization of its obligations and any assertions that it is not fully performing its obligations under the Agreement that have been made in your November 19, 2020 letter.

Thus, we agree that a mediation may be necessary. However, there is no requirement that the mediator or mediation be in Florida. Our preference would be to both narrow and broaden the scope to JAMS mediators, an organization we trust, in California, New York, and Florida. Please let us know if this is acceptable to you, in which case, we propose an exchange of possible JAMS mediators by December 7. 2020.

Sincerely,

Tim Lamoureux, Esq.

Gerard Fox Law P.C.
(310) 441-0500
tlamoureux@gerardfoxlaw.com

# EXHIBIT – R –

FOX
Gerard Fox Law

**VIA EMAIL**

January 5, 2021

Jessica M. Bartlett
550 N Figueroa St. #5027
Los Angeles, CA 90012
jbartlett@berkeley.edu

**Re: <u>Notice of Breach – Demand for Mediation</u>**

Ms. Bartlett:

I represent McCandless Group, LLC ("MG") and am writing to you regarding your breach of the agreement with MG that you signed on October 27, 2019 ("Agreement"). You agreed to a term of 12 months in the Agreement which would renew for another 12 months unless you provided written notice terminating the Agreement to MG with at least 90 days' notice. You never gave such notice, so the Agreement renewed on October 27, 2020. Afterward, on December 19, 2020, you first communicated an intent to terminate the Agreement.

On December 19, 2020 you texted MG stating that you intended to terminate the Agreement. Your statement in the text that you and MG, in discussion with Nick McCandless, agreed to terminate the Agreement on September 7, 2020 is, however, inaccurate. As Mr. McCandless' email on August 8, 2020 indicated, the additional deal that was discussed was for Coy Collective Inc. ("Coy") to be able to have business dealings with you and Cristina Dospassos in addition to the "current and active agreements" MG had with you. Afterward, business continued as normal and, in fact, ramped up for several months. It is thus clear that there was never any communication of your intent to terminate your Agreement, and no written emails or text subsequent to Mr. McCandless' August 8, 2020 email indicate otherwise.

Thus, to the extent you are choosing to terminate the Agreement, it is during a new 12-month term that commenced on October 27, 2020. Per Section 3.2 of the Agreement, any termination prior to October 27, 2021 constitutes a material breach of the Agreement. As such, MG is entitled to actual damages resulting from this breach.

In addition, the Agreement sets forth several obligations in relation to the website for which MG has been providing you services ("MG Website"). Among them, you are obligated to include a link to the MG Website on your social media but have ceased doing so, and it is our understanding that you have also entirely ceased promoting the MG Website for at least one week. You have five days to cure this breach or you will also incur additional liquidated damages of, at minimum, $15,000, which can further increase through fact discovery and as your breaches multiply.

You are in breach of the Agreement and MG is entitled to recovery on all of its damages arising from this breach. Per Section 12 of the Agreement, you have agreed to mediate any disputes with MG. By January 8, 2021, please let me know if you agree to a JAMS mediation to be conducted by the Los Angeles JAMS office, at such time I will circulate a list of JAMS mediators for your consideration and agreement. If you fail to expeditiously cooperate in a mediation, this can be considered another breach of the Agreement leading to greater damages, and MG will seek maximum recovery of any and all damages arising from all of your breaches of the Agreement.

Sincerely,

Tim Lamoureux, Esq.

Gerard Fox Law P.C.
(310) 441-0500
tlamoureux@gerardfoxlaw.com

# EXHIBIT – S –

BAILEY DUQUETTE P.C.

February 2, 2021

**VIA E-MAIL**
Gerard Fox Law P.C.
Attn: Tim Lamoureux, Esq. (tlamoureux@gerardfoxlaw.com)

**Re: Jessica Bartlett & Cristina Dospassos/Response to Demand for Mediation**

Dear Mr. Lamoureux:

We write in response to your letters on behalf of McCandless Group, LLC ("**MG**") dated January 5, 2021 and January 7, 2021, respectively (the "**Letters**"), requesting mediation with our clients, Jessica Bartlett ("**Ms. Bartlett**") and Cristina Dospassos ("**Ms. Dospassos**" and together our "**Clients**"). Both Letters contain several incorrect factual assertions which our Clients would like to address in turn.

First, it is not accurate that the agreements our Clients signed with MG ("**Agreement(s)**") auto-renewed. Quite the opposite, their non-renewal was agreed in connection with a planned website migration. In fact, additional consideration was agreed and paid by our Clients to MG in connection with the migration and non-renewal as more fully described below.

Between April 2020 and August 6, 2020, our Clients worked closely with MG to hash out the details for a collaborative launch of their new model website platform under the umbrella of The Coy Collective Inc. ("**Coy**"), with MG creating and operating the websites. It was obvious that this migration came with the non-renewal of the Agreements.

Nevertheless, two days after the August 6, 2020 agreement between MG and Coy was achieved and the migration was now set to move forward, Ms. Bartlett, on behalf of Ms. Dospassos and herself, discussed with Nick McCandless ("**Mr. McCandless**") how to handle the Agreements in the context of the migration. The non-renewal of the Agreements was agreed in exchange for guaranteed monthly payments for the months remaining on the term ("**Guaranteed Payments**"). Without the Guaranteed Payments, the monthly payments under the Agreements were otherwise set to drop significantly because of the migration. The goal was to achieve an orderly end to the Agreements by ensuring that MG would be made whole and not lose any revenue for the final months left on our Clients' Agreements.

The Guaranteed Payments for each Agreement were negotiated by Ms. Bartlett via text message and finally agreed with Mr. McCandless on August 9, 2020. Our Clients have shown us notes, invoices and text messages supporting the same and describing the agreed upon terms for the final months of the Agreements. That our Clients' Agreements with MG would expire at the end of the term was clear and unambiguous both during the discussions about the migration to Coy and their agreement to make Guaranteed Payments for the few remaining months under the Agreements.

BAILEY DUQUETTE P.C.

The parties acted accordingly; Ms. Bartlett was invoiced by and paid MG Guaranteed Payments equal to $3,761.84/month for the remaining months of the term of her Agreement. Ms. Dospassos was similarly invoiced by and paid MG Guaranteed Payments equal to $3,563.59/month for the remaining months on the term of her Agreement. Our Clients have MG invoices and payment stubs confirming the above. What's more, Ms. Bartlett's negotiations with Mr. McCandless regarding the appropriate Guaranteed Payment for each Agreement were cordial and in good faith - given that they each had full intentions of continuing their relationships through Coy. At one point in the text message discussions, Mr. McCandless even specifically mentions that he is "onboard with" the arrangement with our Clients but "wouldn't be onboard with this being a reoccurring situation with other models I have onboard." (*See* Mr. McCandless' text messages dated August 9, 2020).

Second, your description of MG's email dated September 7, 2020 (the "**Email**") in your Letter to Ms. Bartlett is inaccurate and misleading. We note here that your Letter makes reference to an email from MG to Ms. Bartlett dated August 8, 2020 which our Clients were unable to locate so we have assumed you meant to reference MG's Email to Ms. Bartlett dated September 7, 2020 instead.[1] The Email provides in relevant part as follows:

> "The purpose of this email is to confirm and receive acknowledgment from you that as of September 1, 2020 any and all financial responsibilities that McCandless Group, LLC committed to in our Website Development Agreement are no longer the responsibility of McCandless Group, LLC and all communication and obligations related to payments affiliated with JessicaMBartlett.com are now handled exclusively between yourself and Coy Collective INC. Please confirm that the following information in this email notification is accurate and acknowledge that you are waiving any and all distribution obligations from McCandless Group, LLC."

It is unambiguous from the above language that the purpose of the Email was for MG to confirm to Ms. Bartlett that, in connection with the website migration, any and all financial responsibilities and obligations of MG pursuant to its Agreement with Ms. Bartlett were to become the responsibility of Coy, including all communications and obligations related to payments affiliated with Ms. Bartlett's website. MG's position in its Letter to Ms. Bartlett that "the additional deal that was discussed [prior to the Email] was for [Coy] to be able to have business dealings with [Ms. Bartlett] and Cristina Dospassos in addition to the 'current and active agreements' [with] MG" does not hold water in light of the clear language in the Email.

It is unrealistic that MG would have sought confirmation from Ms. Bartlett that any and all financial responsibilities and obligations of MG pursuant to its Agreement with Ms. Bartlett were to become the responsibility of Coy had MG not agreed that the Agreements were to expire, and the websites migrated to the Coy platform. Why else would MG have transferred all financial responsibility and obligations related to payments if MG was meant to continue operating Ms. Bartlett's website pursuant to the Agreement for another year long term? It also does not make any business sense for Ms. Bartlett to maintain two competing active websites

---

[1] If an email dated August 7, 2020 does exist, please forward to us. We see that you reference a quote "current and active agreements" in your Letter to Ms. Bartlett but we do not see that language in the Sept. 7th email.

BAILEY DUQUETTE P.C.

offering exclusive content to her customers. The only reasonable explanation for MG and Ms. Bartlett's conduct following their August 8th agreement not to renew is that the non-renewal had been agreed to by MG.

We feel that the position taken by your client is in bad faith; trying to renege on his agreement after having accepted guaranteed payments is particularly ignoble and we look forward to exposing his behavior to a mediator or arbitrator should we advance down this path.

Independently of any dispute over the renewal or non-renewal of the Agreements, our Clients hereby expressly revoke the right to use their name and likeness granted pursuant to the 2257 Releases, which right is revocable. Failure to immediately cease and desist from using such right may result in MG's infringement of the federal Lanham Act (15 U.S. Code § 1125) and expose your client to statutory damages, treble damages (when appropriate) and attorney's fees and costs. Your client may also violate California's statutory Right of Publicity Law (California Civil Code § 3344) prohibiting the unauthorized use or misappropriation of another person's name or likeness exposing your client to actual damages, profits attributable to the unauthorized use, punitive damages (when appropriate), and attorney's fees and costs. If MG fails to cease use of the name and likeness of our Clients, we will take such action as is necessary to protect their rights.

Our Clients reserve all rights, and this letter is without prejudice to any other rights, remedies or claims that they may have.

Yours Sincerely,

Alexandre Sauveplane, Esq.
Bailey Duquette P.C.
Tel: +1 212.484.1946
Email: alex@baileyduquette.com

# EXHIBIT – T –

7:08 56%

Instagram Log In Open App

47,949 likes

**jessicambartlett** Hi loves! I'm back at it again with some shameless self promo! 👋 I'm very excited to announce that as my company the COY Co. continues to evolve, we have officially expanded to offer more model management through our new division @VERGEagency! From @thecoy.co's inception, our main focus was that of a technology company, however we quickly realized that we excelled in model management as well. That being said, it only felt right to separate and distinguish the agency aspect of the company from the tech side as we continue to expand in that realm. All of our OG COY Creators will be represented by @VERGEagency with sites powered by The COY Co. and you'll also see some new faces represented by us on various other platforms coming soon! 😉 The COY Co. will continue to provide best in class technology, content protection, and deliver the most premium experience possible to our valued customers while Verge Agency will create and deliver high level content, connect your favorite models and creators with exciting collaborations, and drive traffic to grow our client's audiences. I'm so grateful for the continued support from both my clients and our customers and am excited to see where this new venture takes us! 💙 If you or anyone you know is looking to monetize their following or amplify their revenue numbers, you know who to call 🤑

View all 1,181 comments

**itmystayle** @yaslenxoxo 🔥🔥🔥🔥🔥

See More Posts From Jessica Bartl... Open App

# EXHIBIT – U –

**From:** **Jason Moskowitz** jason@themccandlessgroup.com
**Subject:** Follow-up on Transition
**Date:** November 16, 2020 at 11:33 AM
**To:** jessica@thecoyco.com, nick@nickmccandless.com

JM

Jessica:

Following up on our correspondence on November 9, 2020.

As part of your elected transition, and referencing the letter attached that detailed the transition process, this is a courtesy reminder that the following sites will have their payment processing changed to OFF on November 30, 2020, and then taken down on December 31, 2020.

Juju - http://SincerelyJuju.com
Sabina Kontor - http://SabinaKontor.com
Alexa Collins - http://TheAlexaCollins.com
Vanessa Christine - http://VanessaChristineX.com
Alissa Hale - http://AshayEHale.com
Alexis Clark - http://TheAlexisClark.com
Natalia Garibotto - http://NataGata.com

If you'd like to speak to me about this email or the attached letter, I can send you my availability. Thank you.

--

**Partner, Strategic Relations**
McCandless Group

jason@themccandlessgroup.com

www.themccandlessgroup.com

PDF

CoyCo Letter 2.pdf

Dear Jessica:

Thank you for your kind text on 11/3/20 in response to our McCandless Group ("MG") text plus letter sent two days earlier on 11/1/20.

As you mentioned in your text, your response to our letter is that you are "taking the option in which sites are terminated on Dec. 31st."

This letter is to follow up on your decision by detailing out the transition process while noting some decisions to be made, ramifications of obligations and the future. If you believe anything, I have detailed below is inaccurate, please reply with comments and I will further review and respond. I am genuinely trying to stay factual and transparent as I understand everything.

*I must point out here clearly, this letter at this time is not an offer, a promise or a guarantee to do anything, and we reserve the right to change our minds about any item below. This entire letter at this time is for discussion purposes only and not a guarantee of anything of any kind. We will, however, be sending a final letter at some point in the future or perhaps in its place, some new agreement.*

Our thinking as to transition and the future is as follows and considers previously mutually agreed upon and fully executed agreements.

1) <u>Coy Collective client's websites that have URL's that are owned by MG:</u>

a) Payment processing on these websites will be changed to OFF on November 30, 2020.

b) These websites will remain available for customer use through December 31, 2020 on which date they will be taken down.

  a. This is done to fulfill all customer's 30-day billing cycles who have unfulfilled paid subscriptions on November 30, 2020.

c) As usual, the disposition of all chargebacks/refunds/voids on the site will be accounted for.

d) List of the sites that have URL's that are owned by MG

  (i) Juju - http://SincerelyJuju.com
  (ii) Sabina Kontor - http://SabinaKontor.com
  (iii) Alexa Collins - http://TheAlexaCollins.com
  (iv) Vanessa Christine - http://VanessaChristineX.com
  (v) Alissa Hale - http://AshayEHale.com
  (vi) Macy Mariano - http://MacyMariano.com
  (vii) Dasha Mart – http://Dasha-Mart.com

e) MG intends to retain ownership of these URLs, preserve MG's rights and fully realize the value that MG has created, but is open to the idea of negotiating an alternate disposition of these valuable assets.

2) <u>Coy Collective client's websites that have URL's that are owned by the clients themselves:</u>

a) Payment processing on these websites will be changed to OFF on November 30, 2020.

- b) These websites will remain available for customer use through December 31, 2020 on which date they will be taken down.
    - a. This is done to fulfill all customer's 30-day billing cycles who have unfulfilled paid subscriptions on November 30, 2020.
- c) As usual, the disposition of all chargebacks/refunds/voids on the site will be accounted for.
- d) List of the sites that have URL's that are owned by the clients themselves:
    - (i) Alexis Clark - http://TheAlexisClark.com
    - (ii) Natalia Garibotto - http://NataGata.com

3) <u>Coy Collective client's websites that have not yet been launched and will not be launched, with URL's are owned by MG:</u>

- (i) Mikayla Demaiter - https://mikaylademaiter.com
- (ii) Meghan Mariie - https://IoMeghanMariie.com

a) MG intends to retain ownership of these URLs, preserve MG's rights and fully realize the value that MG has created, but is open to the idea of negotiating an alternate disposition of these valuable assets.

4) <u>MG client's websites that have URL's that are owned by MG:</u>

- a) The following sites have agreements in place with MG and the URLs are owned by MG. The expiration dates are noted below. MG has heavily invested into these agreements and will continue to honor these agreements and all of its terms, until they terminate.
    - i. Jessica Bartlett - http://JessicaMBartlett.com (expires 10/26/2021)
    - ii. Kiki Passo (aka "Cristina D Dospassos") - http://KikiPasso.com (expires 12/25/2021)
- b) As a courtesy and with good reason, MG suggests reviewing those agreements and the obligations that are immortalized there; especially Sections 3.2, Sections 3.3, Section 5, Section 8 and the 2257 Compliant Form.
- c) MG intends to retain ownership of these URLs, preserve MG's rights and fully realize the value that MG has created, but is open to the idea of negotiating an alternate disposition of these valuable assets.

5) <u>Mutual Confidentiality Agreements and Confidentiality Agreements</u>

- a) MG has in its possession individual mutually agreed upon and fully executed Mutual Confidentiality Agreements (aka NDAs) with Jessica Bartlett, Corey Lewis, Joshua Cherry, Robert Hankins, and Thomas Drew; as well a Confidentiality Agreements (Section 5 of the Website Development Agreement) with Coy Collective, Jessica Bartlett and Kiki Passo; and encourages their immediate review.
- b) It is important to note that it is MG's right to enforce these agreements in the past, now and in the future, and it is reasonable to assume that MG has every intention to do so should it come to our attention that any part of these agreements has been violated or breached. It is especially advisable to have your legal counsel review these agreements as you have noted your intention to possibly position yourself as a

competitor to MG and use your confidential knowledge of MG's business and business practices as a foundation for your business. Further, it would be advisable to seek legal advice before using any of our confidential information in your business plans. Breaches of these agreements will be taken very seriously as they can be highly damaging to MG, and one intent of these mutually agreed upon and fully executed agreements was clearly to protect MG's business from his type of breach and activity.

6) Customer Privacy

a) In your text dated 11/5/20, you mentioned "…to begin coordinating transferring ccBill information of our clients and their subscribers.." MG cannot give anyone customer names or customer data. All customers signed up to become MG customers as disclosed in the Terms of Service, Privacy Policy, etc. They did not agree to become customers of another third party so we can't transfer confidential customer information outside of MG and we are bound to each customer to protect their privacy. In addition, all customer credit card information is exclusively retained by credit card company.
b) Additionally, in your text dated 11/5/20, you introduce a concept "so as to transfer liability." MG is uncertain as to what this means, and we are skeptical that this is legally possible as it relates to our legal, professional, moral and ethical obligations to protect our customer's privacy.

7) Commissions on Referrals

a) At this time, MG will continue to offer you 5% commission on referrals for clients who fully execute pre-approved MG Website Development Agreements.

Jessica, again MG would like to stress that this is very much NOT personal, we think only the best of you as we do all of our relationships. MG has created a highly valuable business and as would be expected, intends to do everything possible to enforce our rights, uphold our agreement's obligations, realize value it creates and prevent the unauthorized use of our trade practices, confidential information and so on.

I am available to walk through this point-by-point. Let's schedule something if you like to do that.

Kindly yours,

Jason Moskowitz
Partner – McCandless Group

Cc: Nick McCandless/McCandless Group