1  COLIN H. ROLFS (State Bar No. 280654)
   crolfs@millerbarondess.com
2  MILLER BARONDESS, LLP
   2121 Avenue of the Stars, 26TH Floor
3  Los Angeles, California 90067
   Telephone: (310) 552-4400
4  Facsimile: (310) 552-8400

5  Attorneys for Defendants and
   Counterclaimants
6  THE COY COLLECTIVE, INC,
   JESSICA BARTLETT, COREY LEWIS,
7  ROBERT HANKINS, and THOMAS
   DREW

8

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MCCANDLESS GROUP, LLC,<br><br>        Plaintiff,<br><br>   v.<br><br>THE COY COLLECTIVE, et al.,<br><br>        Defendants. | **CASE NO. 2:21-cv-02069-DOC-KES**<br><br>**DEFENDANTS THE COY COLLECTIVE, INC, JESSICA BARTLETT, COREY LEWIS, ROBERT HANKINS, AND THOMAS DREW'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGEMENT AS TO PLAINTIFF'S CLAIMS** |
| THE COY COLLECTIVE, et al.,<br><br>        Counterclaimants,<br><br>   v.<br><br>MCCANDLESS GROUP, LLC and NICHOLAS MCCANDLESS,<br><br>        Counterdefendants. | Date:    Monday  October 2. 2023<br>Time:   8:30 a.m.<br>Place:   Courtroom 10A<br><br>The Hon. David O. Carter<br>and Magistrate Judge Karen E. Scott<br><br>Complaint Filed:    March 8, 2021<br>Discovery Cut-Off:  August 28, 2023<br>Motion Cut-Off:     October 2, 2023<br>Trial:                     November 7, 2023 |

**[UNREDACTED VERSION OF DOCUMENT PROPOSED
TO BE FILED UNDER SEAL]**

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

632045.6

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on October 2, 2023, at 8:30 a.m., or as soon thereafter as the matter may be heard before the Honorable David O. Carter in Courtroom 10A of the United States District Court for the Central District of California, located at 411 West Fourth Street, Santa Ana, California 92701, Defendants The Coy Collective, Inc, Jessica Bartlett, Corey Lewis, Robert Hankins, and Thomas Drew, will, and hereby do, move this Court for an order granting summary judgment or, in the alternative, partial summary judgment on each claim asserted in the Third Amended Complaint and each part of such claims, including each remedy and each alleged "trade secret" asserted under the Defend Trade Secrets Act.

This motion is based on this Motion to Compel, the accompanying Memorandum of Points and Authorities, the Statement of Undisputed Facts, the Declarations of Colin H. Rolfs, Jessica Bartlett, Corey Lewis, Robert Hankins, Thomas Drew, Matt Silk, Sarah Bostwick, and Pete Romano, exhibits thereto, all pleadings and papers on file in this action, and upon such additional evidence and arguments that the Court deems just and proper.

**Meet and Confer Pursuant to Local Rule 7-3**

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on August 25, 2023.

DATED:  September 1, 2023          MILLER BARONDESS, LLP

By:  ___/s/ *Colin H. Rolfs*___
        COLIN H. ROLFS
        Attorneys for Defendants and Counter-
        Claimants

632045.6

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

I.      INTRODUCTION ................................................................... 1

II.     BACKGROUND .................................................................... 2

    A.    The Creator Economy ................................................ 2

    B.    Bartlett Hires MG Per A WDA ................................. 2

    C.    Bartlett Starts COY With Drew And Lewis .............. 3

    D.    COY Negotiates Hiring MG As Its Developer ......... 3

    E.    Bartlett, Lewis, and Drew Sign NDAs ..................... 4

    F.    MG Discloses Its Tech Stack .................................... 4

    G.    Lewis Shares The Tech Stack With One COY Advisor ........ 4

    H.    COY And MG Execute A WDA ............................... 5

    I.    Bartlett's WDA Is Transferred To COY ................... 5

    J.    Friction Emerges Between MG And COY ................ 5

    K.    COY Considers Hiring A Different Developer ......... 5

    L.    MG Terminates The COY WDA ............................... 6

    M.    MG Refuses To Turn Over Subscriber Information ........ 6

    N.    COY Replaces MG With A New Developer, Segwik ........ 7

    O.    COY Ultimately Fails ................................................ 7

III.    MG'S ALLEGED TRADE SECRETS ................................. 8

    A.    The Tech Stack .......................................................... 8

    B.    Dynamic Watermarking And DMCA Takedowns ..... 9

    C.    Pricing For Clients .................................................... 9

    D.    Accounting Procedures .............................................. 9

    E.    Chargebacks .............................................................. 10

    F.    Discounts And Marketing ......................................... 10

IV.     LEGAL STANDARD ........................................................... 10

V.      PLAINTIFF'S CLAIMS FAIL ON THE UNDISPUTED FACTS ............... 10

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL. (310) 552-4400   FAX (310) 552-8400

A.  Hankins Should Be Dismissed ............................................................. 10

B.  First Cause of Action: Misappropriation of Trade Secrets ................. 11

    1.  MG Cannot Prove A Trade Secret .............................................. 11

    2.  MG Has Not Protected Its "Trade Secrets" ............................... 13

    3.  Defendants Did Not Misappropriate Trade Secrets ................... 14

    4.  MG Is Not Entitled To Any Remedy Under The DTSA ............ 16

C.  Second Cause of Action:  Breach of NDAs .......................................... 17

    1.  The NDAs Are Limited To The DTSA ...................................... 17

    2.  There Was No Material Breach Of The NDAs ......................... 18

D.  Third Cause of Action: Breach of Bartlett WDA ................................ 18

E.  Fourth Cause of Action:  Breach of COY WDA .................................. 20

F.  Fifth Cause of Action: Fraud (Bartlett) .............................................. 20

G.  Sixth Cause of Action: Fraud (Lewis, Hankins, and Drew) ................ 22

H.  Seventh Cause of Action: Fraud (COY) .............................................. 22

I.  Eighth and Ninth Causes of Action: Breach of Fiduciary Duty .......... 22

VI.  CONCLUSION ........................................................................................ 23

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL. (310) 552-4400  FAX (310) 552-8400

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGEMENT

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>FEDERAL CASES</u>

*Alphonso Inc. v. Tremor Video, Inc.*,
    2022 WL 17968081 (N.D. Cal. Oct. 31, 2022)................................................12

*ATEN Int'l Co. v. Uniclass Tech.*,
    2017 WL 11631178 (C.D. Cal. Apr. 24, 2017)..............................................16

*BladeRoom Grp. Ltd. v. Emerson Elec. Co.*,
    20 F.4th 1231 (9th Cir. 2021)......................................................................13

*Capstone Logistics Holdings, Inc. v. Navarrete*,
    2018 WL 6786237 (S.D.N.Y. Dec. 13, 2018)..............................................16

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .....................................................................................10

*CleanFish, LLC v. Sims*,
    2020 WL 4732192 (N.D. Cal. Aug. 14, 2020)..............................................13

*IDX Sys. Corp. v. Epic Sys. Corp.*,
    165 F. Supp. 2d 812 (W.D. Wis. 2001),
    *aff'd in relevant part*, 285 F.3d 581 (7th Cir. 2002) ....................................12

*Imax Corp. v. Cinema Techs., Inc.*,
    152 F.3d 1161 (9th Cir. 1998)...............................................................11, 12

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
    978 F.3d 653 (9th Cir. 2020)......................................................................11

*Iskander v. Laugh Factory, Inc.*,
    2020 WL 2114939 (C.D. Cal. Mar. 17, 2020) .........................................13, 14

*K.T.I. Hydraulics, Inc. v. Palmersheim*,
    2022 WL 17100470 (C.D. Cal. Aug. 11, 2022)............................................18

*OWLink Tech., Inc. v. Cypress Tech. Co.*,
    2022 WL 17885692 (C.D. Cal. Nov. 17, 2022)............................................11

*Perrin Bernard Supowitz, LLC v. Morales*,
    2023 WL 1415572 (C.D. Cal. Jan. 31, 2023) .........................................13, 16

*Unicom Monitoring, LLC v. Cencom, Inc.*,
    2013 WL 1704300 (D.N.J. Apr. 19, 2013) ..................................................16

*Wisk Aero LLC v. Archer Aviation Inc.*,
    2023 WL 3919469 (N.D. Cal. June 9, 2023) ................................................15

*Workplace Techs. Rsch., Inc. v. Project Mgmt. Inst., Inc.*,
    2023 WL 3152157 (S.D. Cal. Mar. 28, 2023)..............................................12

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp,*
   259 F.3d 1101 (9th Cir. 2001) ...........................................................................17

**STATE CASES**

*AToN Ctr., Inc. v. United Healthcare Ins. Co.,*
   311 Cal. Rptr. 3d 564 (2023) .............................................................................19

*Lazar v. Superior Ct.,*
   12 Cal. 4th 631 (1996) .......................................................................................21

*Scottsdale Ins. Co. v. Essex Ins. Co.,*
   98 Cal. App. 4th 86 (2002) ...............................................................................19

*World-Class Talent Experience, Inc. v. Giordano,*
   293 So. 3d 547 (Fla. Dist. Ct. App. 2020) ......................................................23

**FEDERAL STATUTES**

17 U.S.C. § 512 ......................................................................................................9

18 U.S.C. § 1836(b)(3)(B) ...................................................................................16

18 U.S.C. § 1839(3) .......................................................................................11, 13

18 U.S.C. § 1839(5) ..............................................................................................14

18 U.S.C. § 1839(6) ..............................................................................................15

**FEDERAL RULES**

Fed. R. Civ. P. 26 ..................................................................................................17

Fed. R. Civ. P. 26(a)(2)(B) ..................................................................................17

Fed. R. Civ. P. 37 .............................................................................................2, 17

Fed. R. Civ. P. 37(c) .............................................................................................17

Fed. R. Civ. P. 56 ..................................................................................................10

Fed. R. Civ. P. 56(a) .............................................................................................10

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

632045.6

iv

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

Plaintiff McCandless Group, LLC ("MG") asserts trade secret and related claims against Defendant The COY Collective, Inc. ("COY") and its three founders, Defendants Jessica Bartlett ("Bartlett"), Corey Lewis ("Lewis"), and Thomas Drew ("Drew"), as well as Defendant Robert Hankins ("Hankins").

COY was founded in 2020 to allow models to sell subscription content on the internet, in the manner of the popular site OnlyFans.  COY hired MG as its web developer pursuant to a development agreement.  COY chose MG because MG had experience building subscription websites.  But after three months, MG terminated the agreement.  COY was forced to hire a new developer—Segwik—to build new websites for its model clients.  Segwik never had access to MG's code or technology for the prior sites.  Segwik built these websites using its own platform.

MG nevertheless filed this lawsuit, asserting trade secret and related claims against Defendants.  These claims fail on the undisputed facts.  MG cannot establish any trade secrets that it took reasonable steps to protect.  Defendants never had access to MG's code, what MG calls its "tech stack" was a standard build, and MG's vague assertions of business know-how do not qualify as trade secrets.  MG also freely shared its alleged trade secrets in "pitch decks" and emails and on calls without requiring non-disclosure agreements.

Defendants also never misappropriated any of MG's alleged trade secrets.  Rather, Defendants' new developer Segwik used its own website platform to build new sites.  That is not misappropriation.  MG's theory is that because COY may have gained some experience in running subscription websites while working with MG, Defendants could never run a subscription website business again without misappropriating MG's trade secrets.  That is not the law.  MG cannot use the Defend Trade Secrets Act ("DTSA") as a weapon to retaliate against Defendants merely for continuing to operate their business.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

Even if MG could show misappropriation (it cannot), MG cannot prove its entitlement to damages or another remedy.  COY's business ultimately failed not long after MG's termination, shutting down its subscription websites.  After MG terminated, COY never took any MG customers or made a profit, while MG's profits increased by over $1.5 million.  MG also cannot proffer any damages expert to meet its burden, because MG failed to produce an expert report by the deadline (or to this day).  MG is barred by Federal Rule of Civil Procedure 37 from submitting any expert damages testimony.

MG's other claims—*e.g.*, breach of non-disclosure agreements—also fail for similar and additional reasons.  Summary judgment should be granted on all of MG's claims.

## II.    BACKGROUND

### A.    The Creator Economy

The "creator economy" consists of independent content creators—*e.g.*, influencers, models, podcasters, and streamers—who distribute and monetize content on the internet.  (SUF-1.)  Two of the largest companies in the space are OnlyFans and Patreon.  (SUF-2.)  OnlyFans is a service launched in 2016 that allows creators to sell subscription content.  (SUF-3.)  A creator can set up an OnlyFans page to sell content to subscribers, receive "tips," chat with subscribers, and view reporting on the financial performance of the page.  (SUF-4.)

OnlyFans has had many competitors, including MG and COY.  MG was started by Nicholas McCandless ("McCandless").  (SUF-5.)  MG's sites have similar functionality to OnlyFans—subscription content, tipping, chat, and financial reporting.  (SUF-6.)  MG distinguishes itself by claiming, "You also own your subscribers, data and all of your content."  (SUF-7; *see also* SUF-8.)

### B.    Bartlett Hires MG Per A WDA

Bartlett is a social media personality and model.  (SUF-10.)  Around 2019, McCandless convinced Bartlett to hire MG to develop a subscription website for

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    her.  (SUF-11.)  On October 27, 2019, Bartlett and MG executed a Web

2    Development Agreement (the "Bartlett WDA").  (SUF-12.)

3         **C.**     **Bartlett Starts COY With Drew And Lewis**

4        In 2020, Bartlett, Drew, and Lewis founded COY—a technology company

5    allowing its creator clients to offer subscription content to their followers.  (SUF-

6    18.)  Bartlett, Drew, and Lewis conceptualized COY as a more "selective"

7    OnyFans—they would hand-pick influencers and offer additional services like

8    photo-shoots.  (SUF-19.)

9        Bartlett, Drew, and Lewis vetted different options for building COY's

10    subscription platform, including hiring MG as a developer, hiring Segwik as a

11    developer, or using a platform called Uscreen.  (SUF-20.)  COY ultimately hired

12    MG.  (SUF-21.)  When COY selected MG as its developer, everyone at COY was

13    excited to work with MG.  (SUF-22.)

14        The suggestion to use Uscreen came from Hankins, a photographer and friend

15    of Drew and Lewis.  (SUF-23.)  Hankins proposed joining COY to manage COY's

16    Uscreen relationship.  (SUF-24.)  Shortly after COY decided not to use Uscreen,

17    Hankins had no further involvement with COY.  (SUF-25.)

18         **D.**     **COY Negotiates Hiring MG As Its Developer**

19        On May 6, 2020, Bartlett texted McCandless to ask if he would be interested

20    in being COY's developer: "Hey Nick! Working on a subscription based project

21    with a couple investors and pitching you as our developer."  (SUF-26.)  On May 9,

22    2020, Bartlett set up a call to discuss the project with McCandless and Lewis.

23    (SUF-27.)  On May 10, 2020, Bartlett asked McCandless to provide Lewis with a

24    login to her site, so Lewis could see the user experience.  (SUF-29.)  McCandless

25    provided the login the next day, May 11.  (SUF-31.)

26        On May 12, 2020, McCandless proposed some terms for MG to serve as

27    COY's developer.  (SUF-32.)  These included that "McCandless Group would be

28    marketed as the Technology Partner powering your technology" and that MG would

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

3

retain "the code/technology" while COY would "own all of the content and the relationships with the models." (SUF-33.)

On May 14, 2020, Bartlett set up a call with McCandless and Lewis to discuss the proposal. (SUF-35.) On May 16, 2023, McCandless had an over 2-hour call with Lewis. (SUF-36.) McCandless admits he disclosed what he contends are "trade secrets" about his payment processing on this call, prior to any non-disclosure agreement. (SUF-37.) On May 19, 2020, McCandless sent Lewis estimated upkeep costs for hosting and email services. (SUF-38.) Also on May 19, 2020, Drew sent McCandless a detailed list of requirements for COY's sites. (SUF-39.)

### E.      Bartlett, Lewis, and Drew Sign NDAs

On May 20, 2020, McCandless sent non-disclosure agreements ("NDAs") to Bartlett, Lewis, and Drew. (SUF-40.) They signed on May 21. (SUF-41.) Hankins also signed an NDA on May 22. (SUF-42.) The NDAs are governed by California law. (SUF-43.)

### F.      MG Discloses Its Tech Stack

On May 23, 2020, after the NDAs were signed, McCandless sent Lewis a document entitled, "McCandless Group Model Platform Technology Stack." (SUF-44.) The documents listed the names of the technologies used by MG. (SUF-45.) The document did not disclose any source code. (SUF-46.) At no point has COY ever had access to MG's source code. (SUF-47.)

### G.      Lewis Shares The Tech Stack With One COY Advisor

On May 27, 2020, Lewis sent the technology stack document to the manager of COY's principal investor, Andrew Geller ("Geller"). (SUF-48.) Geller was advising COY on its business. (SUF-49.) McCandless was aware that COY was collecting information to share with its investors. (SUF-26, 28, 34.) The only other person Lewis sent the document to was Drew. (SUF-53.) Drew never sent the document to anyone else. (SUF-54.)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**H.**  **COY And MG Execute A WDA**

COY and MG continued to negotiate pricing and terms for MG to serve as COY's developer in June and July 2020.  (SUF-55.)  On August 6, 2023, COY's designer, Maria Deligiorgio, provided designs for the COY websites to MG.  (SUF-56.)  MG later copied these designs for its own sites, without permission.  (SUF-57.)

Also on August 6, COY and MG entered into a Web Development Agreement (the "COY WDA").  (SUF-58.)  The COY WDA provided that MG would serve as the developer for COY's subscription websites.  (SUF-60.)

**I.**  **Bartlett's WDA Is Transferred To COY**

In August 2020, Bartlett and MG agreed that her and one other model's site would transfer to COY, except that COY would pay MG a minimum amount for these two specific sites.  (SUF-76.)  On September 7, 2020, McCandless emailed Bartlett to confirm that the Bartlett WDA had terminated.  (SUF-77.)

**J.**  **Friction Emerges Between MG And COY**

COY successfully recruited thirteen models and asked MG to build their websites.  (SUF-78.)  By October 2020, however, friction emerged between COY and MG.  (SUF-79.)  MG had difficulty launching a number of sites for COY on time, frustrating COY.  (SUF-80.)  MG will be able to show Defendants venting a great deal of frustration at McCandless internally starting at this time.  But the undisputed record is that Defendants never acted inappropriately on any of those frustrations.  For his part, McCandless began to view COY as competing with MG in recruiting models.  (SUF-81.)  On October 19, 2020, McCandless texted Bartlett to tell her MG would refuse to build a website for a model because MG "had active conversations with" her.  (SUF-82.)

**K.**  **COY Considers Hiring A Different Developer**

As friction emerged, COY began to explore switching developers.  In October 2020, COY reached out to Dionna McPhatter ("McPhatter").  (SUF-84.)  COY ultimately decided not to replace MG with McPhatter.  (SUF-90.)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

**L.  MG Terminates The COY WDA**

On November 2, 2020, McCandless' business partner—Jason Moskowitz ("Moskowitz")—sent a letter to COY demanding significant changes to the terms of the COY WDA, stating MG would otherwise shut down all COY sites on December 31.  (SUF-91, 92.)  The letter concluded, "[i]f the result is that you can't accept this and need to move in another direction—perhaps even becoming our competitor—we are fully aware of that and will be helpful during this transition." (SUF-93.)  On November 3, 2020, Bartlett notified Moskowitz that COY was not interested in the changed terms so "would be taking the option in which sites are terminated on Dec. 31st."  (SUF-94.)

On November 9, 2020 Moskowitz sent COY another letter.  (SUF-95.) Moskowitz notified COY that MG was refusing to transfer the domains of most of COY's clients to COY.  (SUF-96.)  Prior to sending the letter, McCandless explained to Moskowitz why he was withholding the domains:

> Yep, I have done many things like this to lock people in without them even knowing it so can definitely use this as leverage . . . .

(SUF-97.)  McCandless admits he retained these domains, despite having no use for them.  (SUF-98.)

**M.  MG Refuses To Turn Over Subscriber Information**

The payment processing account for COY's websites was a critical part of COY's business, because it stored subscriber information and allowed for recurring subscription charges.  (SUF-99.)  The COY WDA obligated MG to set up the account for payment processing in COY's name: "***Customer*** will establish an account for payment processing with the payment processor ***assigned to Customer*** by Developer."  (SUF-100 (emphasis added).)

McCandless, however, had set up an account with the payment processing company—CCBill—in MG's name.  (SUF-101.)  McCandless refused to turn over the account to COY or transfer the subscribers.  (SUF-102.)  McCandless admits he

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

6

1  intended to deny COY its subscriber data. (SUF-103.) In fact, McCandless checked

2  with CCBill prior to attempting to change the terms of the WDA, to confirm CCBill

3  would let him withhold subscriber data from COY. (SUF-104.)

4    MG's withholding of internet domains and subscriber information was

5  disastrous for COY. (SUF-105.) COY could not relaunch its websites using the

6  same domains or maintain the existing subscribers to its creators' websites. (*Id.*)

7    **N.**   **COY Replaces MG With A New Developer, Segwik**

8    COY was forced to hire a new developer to rebuild its creators' websites—

9  Segwik. (SUF-108.) COY asked Segwik to build websites with the same basic

10  functionality as OnlyFans. (SUF-110.) COY never provided MG's "tech stack"

11  document to Segwik or disclosed its contents to Segwik. (SUF-111.) The only data

12  that Segwik obtained from the prior MG websites was COY's clients' data (*i.e.*,

13  subscriber information, chat history, and photos and videos). (SUF-114.) This

14  information belonged to COY. (SUF-172.) As McCandless had told COY, MG

15  would own "the code/technology" but COY would "own all of the content." (SUF-

16  116.)

17    Segwik had a pre-existing website platform which it used to launch new

18  websites for COY's clients. (SUF-117.) Segwik built only a few elements of these

19  websites, without any knowledge of MG's tech stack. (SUF-118.) Segwik's build

20  differs from MG's in a number of ways. (SUF-119, 132.)

21    For payment processing, COY set up a new account with CCBill. (SUF-120.)

22  For DMCA takedowns, COY hired third-parties—first Slashed Content and then Be

23  Safe Management—that specialized in these service. (SUF-121.) COY never asked

24  these companies to provide anything other than their standard services. (SUF-122.)

25    **O.**   **COY Ultimately Fails**

26    COY ultimately did not succeed in relaunching its clients' websites, shutting

27  them all down before the end of 2021. (SUF-123.) After MG terminated, COY

28  never reached profitability. (SUF-124.) COY contends this was the result of MG's

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

1   breaches, per COY's counterclaims.  (Dkt. 112.)

2   **III.   MG'S ALLEGED TRADE SECRETS**

3        Defendants asked MG to identify its trade secrets in discovery.  MG's

4   descriptions are vague, but the general categories are as follows.

5        **A.     The Tech Stack**

6        MG contends that its "technology stack" is a trade secret:

7        The "technology stack" consists of utilizing servers node.js with
        express and MongoDB Database, react with redux, FFmpeg to
8        transcode and process videos, TinyPNG to compress images, S3
        for storing data, CloudFront to serve private content securely, Nginx to
9        reverse proxy and static server react builds, Socket io for chat, CCBill
        for payment processing, hosting services through Amazon AWS EC2
10       instances, S3 to store media files, Amazon Route 53, and AWS
11       CloudWatch to monitor server resource utilization.

12

13   (SUF-132.)  MG contends this stack "allows users to handle and manage data" and

14   is "built for scalability."  (*Id*.)

15       The core of this stack is a common "MERN" stack—**M**ongoDB, **E**xpress,

16   **R**eact, **N**ode.  (SUF-133.)  This build is publicly described on MongoDB's website.

17   (SUF-134.)  The remainder of the stack consists of popular third-party services for

18   hosting, image compression, and video encoding, all of which are publicly

19   advertised by the relevant third-parties.  (SUF-135.)  As COY's expert explains,

20   MG's tech stack is a common, generally known build.  (SUF-136.)

21       McCandless admitted during his deposition that he disclosed substantial

22   portions of this tech stack in MG's pitch decks.  (SUF-137.)  McCandless does not

23   recall ever asking anyone to sign an NDA before seeing MG's pitch deck.  (SUF-

24   138.)

25       This technology stack was developed by a third-party developer in India—

26   Rayo Infotech ("Rayo").  (SUF-139.)  McCandless does not have an NDA covering

27   this stack.  (SUF-140.)  MG's agreement with Rayo covers *only* information that

28   MG shares with Rayo (*not* the other way around).  (SUF-141.)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

The final component of MG's stack is CCBill, a payment processor.  (SUF-142.)  OnlyFans also uses CCBill.  (SUF-144.)  McCandless admits anyone who visited an MG site could determine that MG used CCBill.  (SUF-145.)  McCandless also admits he disclosed his alleged "trade secrets" regarding payment processing to Lewis on May 16, 2020, *prior* to Lewis executing an NDA.  (SUF-146.)  This call was over two hours.  (SUF-147.)

### B.   Dynamic Watermarking And DMCA Takedowns

MG contends that its trade secrets include a "dynamic watermarking feature" and "DMCA practices."  (SUF-148.)  Watermarking is a common, well-known practice.  (SUF-149.)  MG's watermarking practices were disclosed in MG's pitch deck, which he shares without requiring NDAs.  (SUF-151.)

"DMCA practices" is a reference to the Digital Millenium Copyright Act, which allows online service providers to avoid liability if they take down infringing content in response to requests.  *See* 17 U.S.C. § 512.  During his deposition, MG admitted that his DMCA practices consist of using Google to search for infringing images and then submitting takedown requests.  (SUF-152.)  MG also discloses its DMCA services in its pitch deck.  (SUF-153.)

### C.   Pricing For Clients

MG contends that its trade secrets include "pricing for potential clients." (SUF-154.)  During his deposition, McCandless admitted this consists of reviewing how popular a potential client is on social media and then making a "judgement call" about what revenue split to offer.  (SUF-155.)  McCandless also admitted that he discloses his revenue split offers to potential clients without requiring an NDA. (SUF-156.)

### D.   Accounting Procedures

MG also contends various basic accounting procedures are "trade secrets." (SUF-157.)  For example, MG contends its trade secrets include its revenue model, which consists of calculating gross revenue and then subtracting costs.  (*Id.*)  MG

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   also contends he has developed a system to "lay[] out the amount of money owed to
2   each client" and then pay clients via PayPal.  (SUF-158.)

3       To the extent MG contends these "trade secrets" include the portion of its
4   website that allows clients to see their revenue, McCandless admits to disclosing the
5   layout of MG's reporting pages (and its chat) without an NDA.  (SUF-161.)

6   **E.     Chargebacks**

7       MG contends that it has "created a system for managing chargebacks."  (SUF-
8   162.)  Chargebacks occur when subscribers ask their credit card company to reverse
9   charges, resulting in a loss of payment.  (SUF-163.)  McCandless admitted during
10  his deposition that anyone with a basic understanding of online payments would
11  realize it is important to have a low chargeback ratio.  (SUF-164.)  MG describes its
12  "system" for keeping chargebacks low as "limiting transactional amounts on new
13  customers, monitoring for irregular activity, addressing customer concerns
14  promptly, and ensuring clients are not abusing the system."  (SUF-162.)

15  **F.     Discounts And Marketing**

16      MG finally contends its trade secrets consist of various discounts offered to
17  subscribers, content pricing, and "marketing" through "social media" and on MG's
18  websites.  (SUF-165.)  These supposed "trade secrets" are public facing—*i.e.*, prices
19  and marketing are customer-facing parts of a business.

20  **IV.    LEGAL STANDARD**

21      Summary judgment is appropriate where there is "no genuine dispute as to
22  any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.
23  Civ. P. 56(a).  Rule 56 mandates summary judgment "against a party who fails to
24  make a showing sufficient to establish the existence of an element essential to that
25  party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

26  **V.     PLAINTIFF'S CLAIMS FAIL ON THE UNDISPUTED FACTS**

27  **A.     Hankins Should Be Dismissed**

28      Hankins' involvement with COY was limited.  Hankins hoped to join COY to

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

1  manage its relationship with Uscreen.  (SUF-24.)  But COY selected MG over

2  Uscreen.  (SUF-25.)  Shortly afterwards, Hankins had no further involvement with

3  COY.  (*Id.*)  This all occurred in the summer of 2020 (*id.*), well before MG

4  terminated the COY WDA.  Hankins is entitled to summary judgment on all claims.

### B.  First Cause of Action: Misappropriation of Trade Secrets

6      To succeed on a claim under the DTSA, a plaintiff must prove: "(1) that the

7  plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade

8  secret; and (3) that the misappropriation caused or threatened damage to the

9  plaintiff."  *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657-58 (9th

10  Cir. 2020).  MG cannot satisfy these elements.

### 1.  MG Cannot Prove A Trade Secret

12      A plaintiff "must identify the trade secrets and carry the burden of showing

13  they exist."  *InteliClear*, 978 F.3d at 658.  Among other things, a "trade secret" must

14  be "financial, business, scientific, technical, economic, or engineering information"

15  that "derives independent economic value, actual or potential, from not being

16  generally known to, and not being readily ascertainable through proper means by,

17  another person who can obtain economic value from the disclosure or use of the

18  information."  18 U.S.C. § 1839(3).

19      A plaintiff must be specific to substantiate a trade secret.  The plaintiff

20  "should describe the subject matter of the trade secret with *sufficient particularity* to

21  separate it from matters of general knowledge in the trade or of special knowledge

22  of those persons . . . skilled in the trade."  *Imax Corp. v. Cinema Techs., Inc.*, 152

23  F.3d 1161, 1164-65 (9th Cir. 1998).  The plaintiff must also "*clearly refer* to

24  tangible trade secret material" instead of referring to a "system which *potentially*

25  qualifies for trade secret protection."  *Id.* at 1167.  "The Plaintiff must do more than

26  merely 'identify a kind of technology and then invite the court to hunt through the

27  details in search of items meeting the statutory definition.'"  *OWLink Tech., Inc. v.*

28  *Cypress Tech. Co.*, 2022 WL 17885692, at *5 (C.D. Cal. Nov. 17, 2022).

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

MG cannot meet its burden of proving a trade secret.  The code behind MG's website is not at issue.  What is at issue is the "tech stack" disclosed by MG.  This stack is "generally known" or "readily ascertainable."  MG uses the popular MERN stack, combined with other well-known third-party components for the features MG's websites offer.  (SUF-133-135.)  There is nothing unique about this combination.  (SUF-136.)  MG also uses the same payment processor as OnlyFans.  (SUF-143.)  Anyone who visited MG's site could see that MG uses CCBill.  (SUF-144.)

The remainder of MG's supposed "trade secrets" consist of vague assertions about MG's business practices—*e.g.*, McCandless making "judgment call[s]" about revenue splits, paying clients via PayPal, and "addressing customer concerns promptly."  (*See supra* § III.)  These vague descriptions cannot qualify for trade secret protections.  *See Imax Corp.*, 152 F.3d at 1164 (affirming summary judgment where plaintiff failed to identify the "precise numerical dimensions and tolerances" of its claimed trade secrets).  "Long lists of general areas of information containing unidentified trade secrets are not substitutes for particularized and concrete trade secrets."  *IDX Sys. Corp. v. Epic Sys. Corp.*, 165 F. Supp. 2d 812, 819 (W.D. Wis. 2001), *aff'd in relevant part*, 285 F.3d 581 (7th Cir. 2002).

MG also cannot meet its burden of explaining how its vague business practices are distinct from existing practices in the creator economy.  *See Alphonso Inc. v. Tremor Video, Inc.*, 2022 WL 17968081, at *4 (N.D. Cal. Oct. 31, 2022) (trade secret disclosure insufficient because "it does not adequately explain how its alleged trade secrets are distinct from existing technology"); *Workplace Techs. Rsch., Inc. v. Project Mgmt. Inst., Inc.*, 2023 WL 3152157, at *9 (S.D. Cal. Mar. 28, 2023) ("PMI's articulation of its trade secret was simply too vague to convey an understanding of its parameters or to separate it from matters of general knowledge.").

General business knowledge within an industry cannot constitute trade

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

secrets.  *See CleanFish, LLC v. Sims*, 2020 WL 4732192, at *4 (N.D. Cal. Aug. 14, 2020) (holding "broad description of these purported 'trade secrets' is indistinguishable from matters of general knowledge within the parties' industry (i.e., the seafood distribution business), such that Plaintiff has not met its burden to identify protectable trade secrets").  Nor can MG claim trade secret protection for its "general business operations strategies."  *Iskander v. Laugh Factory, Inc.*, 2020 WL 2114939, at *7 (C.D. Cal. Mar. 17, 2020) (granting summary judgment).

MG contends that because Defendants may have gained some experience in running subscription websites while working with MG, Defendants can never run a subscription website again without misappropriating MG's trade secrets.  That is not the law.  *See Perrin Bernard Supowitz, LLC v. Morales*, 2023 WL 1415572, at *6 (C.D. Cal. Jan. 31, 2023) ("if all of the identified information is indeed a trade secret, then Pablo's and Savino's obligations under trade secret law would effectively eviscerate their right to compete").

## 2.  MG Has Not Protected Its "Trade Secrets"

A plaintiff is also required to prove that it "has taken reasonable measures to keep . . . secret" the information it contends constitutes a trade secret.  18 U.S.C. § 1839(3).  MG cannot meet this burden either.

*First*, McCandless admits he disclosed his "trade secrets" regarding payment processing to Lewis on May 16, before he ever sent Lewis an NDA.  (SUF-146.)  The call was over two hours.  (SUF-147.)  McCandless also sent Lewis MG's internal hosting and email costs, prior to sending an NDA.  (SUF-38.)  "[M]isappropriation cannot occur if someone 'discloses his trade secret to others who are under no obligation to protect the confidentiality of the information.'"  *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 20 F.4th 1231, 1246 (9th Cir. 2021).

*Second*, MG has freely disclosed the details of its business and technologies to numerous potential clients, without requiring an NDA.  McCandless sends out "pitch decks" disclosing substantial portions of MG's "tech stack" (SUF-137),

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  watermarking (SUF-151), DMCA practices (SUF-153), and other details of MG's

2  business.  McCandless has also disclosed to potential clients the layout of its

3  financial reporting.  (SUF-161.)  McCandless has further disclosed MG's pricing to

4  potential clients without requiring an NDA.  (SUF-156.)

5      *Third*, MG provides logins to view MG's sites without requiring an NDA.

6  McCandless provided a subscriber login to Lewis on May 11, 2020, before he

7  signed an NDA.  (SUF-31.)  McCandless also offered to provide a client login to

8  Lewis at the same time.  (SUF-30.)  McCandless provided a login to another

9  potential customer on May 27, 2020, without requiring an NDA.  (SUF-160.)  In

10  February of 2020, McCandless provided a client login to Bartlett's site to someone

11  helping her manage the site, also without requiring an NDA.  (SUF-14.)

12      *Fourth*, MG does not have the right to prevent its developer, Rayo, from

13  using or disclosing the technology platform it used for MG's websites.  MG has a

14  confidentiality agreement with Rayo, but the agreement's definition of "Proprietary

15  Information" is limited to information that MG "may provide to [Rayo]" (*not* the

16  other way around).  (SUF-141.)  The agreement does not cover Rayo's code and

17  technology.  This is unsurprising—granting MG the right to control access to

18  Rayo's technology would preclude Rayo from servicing its other customers.  MG

19  has no right to control disclosure of its own tech stack.

20      MG has freely disclosed and failed to protect its supposed trade secrets,

21  precluding MG from asserting a claim under the DTSA.  *See Iskander*, 2020 WL

22  2114939, at *8 (granting summary judgment where plaintiff shared information

23  without requiring a confidentiality agreement).

24          **3.      Defendants Did Not Misappropriate Trade Secrets**

25      Misappropriation means either (1) the "acquisition of a trade secret of another

26  by a person who knows or has reason to know that the trade secret was acquired by

27  improper means;" or (2) the "disclosure or use of a trade secret of another without

28  express or implied consent."  18 U.S.C. § 1839(5).  "[S]imply pointing out that

632045.6

14

1  products are 'the same or conceptually similar' is insufficient to survive summary

2  judgment." *Wisk Aero LLC v. Archer Aviation Inc.*, 2023 WL 3919469, at *14

3  (N.D. Cal. June 9, 2023).

4      MG cannot prove misappropriation by any Defendant. There is no evidence

5  that any Defendant ever acquired any of MG's alleged trade secrets by improper

6  means. *See* 18 U.S.C. § 1839(6) (defining "improper means" as "theft, bribery,

7  misrepresentation, breach or inducement of a breach of a duty to maintain secrecy,

8  or espionage through electronic or other means").

9      Nor did any Defendant disclose or use any of MG's trade secrets without

10  consent. No Defendant ever disclosed MG's tech stack to COY's new developer

11  Segwik. (SUF-111.) *See Wisk Aero*, 2023 WL 3919469, at *27 ("Wisk's expert

12  does not actually connect the retained document to the requirement implemented . . .

13  ."). Segwik used its own technology to build COY's sites. (SUF-117-118.) The

14  only data that Segwik obtained was COY's clients' data. (SUF-114.) This

15  information belonged to COY. McCandless specifically told COY that MG would

16  own "the code/technology" but COY would "own all of the content." (SUF-33.)

17      The only disclosure of the "tech stack" occurred when Lewis sent it to Geller.

18  (SUF-48.) This was a permitted disclosure. Lewis' NDA specifically allows for the

19  disclosure to "Representatives who are actively and directly participating in the

20  evaluation and negotiation of the Proposed Transaction." (SUF-51.) The term

21  "Representatives" includes "advisers." (SUF-52.) Geller was directly involved in

22  advising COY on whether to retain MG as its developer. (SUF-49.) McCandless

23  knew that COY was collecting information to share with investors. (SUF-26, 28,

24  34.) And even if this disclosure were some technical violation, MG could not show

25  any damages or its entitlement to any other remedy for this de minimis disclosure.

26      To the extent MG contends that Defendants gained some general working

27  knowledge of how to run a subscription website business from working with MG,

28  that is not misappropriation. *See Perrin Bernard Supowitz, LLC*, 2023 WL

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

1    1415572, at *7 ("The Court will not conclude that either DTSA or CUTSA was

2    enacted with an intent to broadly ban competition . . . , or more generally that trade

3    secret law curtails open competition so severely.").

4                    **4.    <u>MG Is Not Entitled To Any Remedy Under The DTSA</u>**

5          Even if MG could prove a violation of the DTSA, MG still could not show its

6    entitlement to any remedy.  The DTSA authorizes injunctive relief, "damages for

7    actual loss," "damages for any unjust enrichment," or "a reasonable royalty."  18

8    U.S.C. § 1836(b)(3)(B).

9          MG cannot show any grounds for an injunction because COY shut down its

10   subscription websites.  (SUF-123.)  Nor can MG show any losses.  After MG

11   terminated, COY never competed with MG to sign any new models.  (SUF-126.)

12   COY signed up only one new model, and that model was never a potential MG

13   client.  (SUF-128.)  MG cannot show any lost profits when it never lost any

14   customers to COY.  *See ATEN Int'l Co. v. Uniclass Tech.*, 2017 WL 11631178, at

15   *3 (C.D. Cal. Apr. 24, 2017) (granting summary judgment for failure to show

16   plaintiff would have made sales but-for patent infringement).  Indeed, MG's profits

17   grew by $1.5 million the year after it terminated the COY WDA.  (SUF-130.)

18         MG also cannot obtain any damages for unjust enrichment—*i.e.*, "net profits

19   enjoyed as a result of . . . misconduct."  *Capstone Logistics Holdings, Inc. v.

20   Navarrete*, 2018 WL 6786237, at *6 (S.D.N.Y. Dec. 13, 2018).  COY never

21   distributed any profits to Lewis, Drew, or Bartlett, and none of them took a salary.

22   (SUF-129.)  COY itself also never made a profit after MG terminated.  (SUF-124.)

23         The only remaining remedy is a "reasonable royalty."  But Defendants have

24   not produced any competent evidence of royalty rates for licensing any of the

25   alleged trade secrets as issue.  *See Unicom Monitoring, LLC v. Cencom, Inc.*, 2013

26   WL 1704300, at *8 (D.N.J. Apr. 19, 2013) ("[T]he failure to present competent

27   evidence regarding how the factfinder should perform the reasonable royalty

28   calculation is fatal to Unicom's claim for reasonable royalty damages.").

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

In fact, Defendants have not properly disclosed any damages expert.  The deadline to disclose expert reports was August 9, 2023.  (Dkt. 139 at 3.)  *See also* Fed. R. Civ. P. 26(a)(2)(B).  On August 9, MG disclosed the name of one damages expert but did not produce *any* report.  (SUF-166-167.)  To this day, MG has never disclosed a report.  (*Id.*)  The consequence of MG's disregard of Rule 26 is the automatic exclusion of MG's expert under Federal Rule of Civil Procedure 37.

The only exception is if MG can prove its failure "was substantially justified or is harmless."  Fed. R. Civ. P. 37(c).  MG cannot meet this burden.  MG contends that its expert was unable to provide a damages analysis "[a]s a result of not having a complete record of Defendants' finances."  (Dkt. 172 at 10.)  But MG's *first and only* request to COY for financial records was served on July 13, 2023.  (SUF-168.)  COY's responses to these requests were due August 14, 2023—*after* expert disclosures.  (SUF-169.)  If MG wanted specific financial records for its report, it needed to request them sufficiently in advance of the deadline.  In any event, MG could still have produced at least a preliminary report but instead chose to disclose no report at all.  *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp*, 259 F.3d 1101, 1106 (9th Cir. 2001) (affirming exclusion of expert where "defendants could have issued a preliminary report to be supplemented").

MG also cannot show that its failure to produce an expert report was harmless.  *See id.* at 1107 ("the burden is on the party facing sanctions to prove harmlessness").  Defendants are moving for summary judgment on damages without ever having received an expert report from MG, much less deposing MG's expert regarding that report.  For MG to attempt to produce an expert damages analysis now, after discovery has closed, would be far from harmless.  *See id.* (late production of report not harmless).

## C.   Second Cause of Action:  Breach of NDAs

### 1.   The NDAs Are Limited To The DTSA

MG's inability to prove misappropriation of trade secrets is also fatal to MG's

claim against Lewis, Bartlett, and Drew for breach of their NDAs.  The NDAs are governed by California law.  (SUF-43.)  California law makes the scope of these NDAs co-extensive with the DTSA.  *See K.T.I. Hydraulics, Inc. v. Palmersheim*, 2022 WL 17100470, at \*6 (C.D. Cal. Aug. 11, 2022) ("The clear import of the caselaw interpreting Section 16600 is that the breach of contract claim cannot be based on post-employment competitive activity or even on Defendant's use of confidential (but not trade secret) information post-employment.").  Because Lewis, Bartlett, and Drew did not misappropriate any trade secrets, they cannot be liable under the NDAs for continuing to pursue a subscription website business.

## 2.   <u>There Was No Material Breach Of The NDAs</u>

In any event, Lewis, Bartlett, and Drew never breached the NDAs.  The NDAs were required by MG prior to MG sending Lewis MG's "technology stack" document.  (SUF-43-44.)  Lewis only ever shared this document with Drew and Geller.  The disclosure to Geller was allowed by Lewis' NDA.  Moreover, damages are a necessary element of a claim for breach of contract, and MG cannot show any damages.  (*See supra* § IV.B.4.)

## D.   <u>Third Cause of Action: Breach of Bartlett WDA</u>

MG's theory for breach of the Bartlett WDA is that the contract "renews each year unless one party provides written notice" and "Bartlett's contract renewed for another twelve-month period on October 27, 2020 because she never provided contractually adequate notice."  (Dkt. 89 ¶¶ 128-130.)  MG alleges that Bartlett did not pay for MG's services during this renewal period.  (*Id.* ¶ 131.)

The undisputed facts do not support this theory.  In August 2020, Bartlett and McCandless agreed by email that Bartlett's site would transfer to COY.  (SUF-76.)  In return, COY agreed that it would pay MG a minimum amount for her site.  (*Id.*)  This terminated the Bartlett WDA, except to the extent it continued under the COY WDA (which MG itself later terminated).  McCandless confirmed this in a September 7, 2020 email:

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

> [A]s of September 1, 2020 any and all financial responsibilities that McCandless Group, LLC committed to in our Website Development Agreement are no longer the responsibility of McCandless Group, LLC.

(SUF-77.)  MG's contention that all of its obligations under the Bartlett WDA terminated while Bartlett's continued is nonsense.  That is not how contracts work.  *See Scottsdale Ins. Co. v. Essex Ins. Co.*, 98 Cal. App. 4th 86, 95 (2002) (agreement is illusory "when one of the parties assumes no obligation").

Because Bartlett's website transferred to COY, any agreement as to Bartlett's website terminated when MG terminated the COY WDA.  What ended up happening in practice is that MG kept Bartlett's site running until February 2021, when MG took the site down.  (SUF-106.)  McCandless admits MG had no contract in place with Bartlett at this point:

> Q.  After approximately February of 2021, was McCandless Group required by any contract to operate a website for Jessica Bartlett?
>
> A.  It was not required of us.

(SUF-107.)  Based on the undisputed facts and McCandless' admissions, the Bartlett WDA did not renew.[1]

The only remaining part of MG's claim for breach of the Barlett WDA is its allegation that Bartlett breached the confidentiality provision because she "used and continued to use . . . confidential information to compete against MG."  (Dkt. 89 ¶ 133.)  This fails for the same reason as MG's claim for breach of Bartlett's NDA, discussed above.

---

[1] MG's admission it stopped operating Bartlett's website also defeats its claim, even if the contract renewed.  *See AToN Ctr., Inc. v. United Healthcare Ins. Co.*, 311 Cal. Rptr. 3d 564, 580 (2023) (breach of contract requires "plaintiff's performance or excuse for nonperformance").

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

E.     <u>Fourth Cause of Action:  Breach of COY WDA</u>

MG's claim for breach of the COY WDA asserts two breaches. (Dkt. 89 ¶¶ 144-145.)  *First*, MG contends that "COY has continued to use MG's software and services, even though the agreement specifically states that MG will retain all ownership."  (*Id.* ¶ 144.)  Section 6.1 of the COY WDA provides:

> Except as may be otherwise granted herein, title to and ownership of all intellectual property rights including, without limitation, any patent, trademark, copyright or intellectual or industrial property right (the "Developer Intellectual Property") relating to the Software shall at all times remain with Developer.

(SUF-67.)  The term "Software" is not defined.  (SUF-68.)  In any event, COY has never claimed ownership over any of MG's intellectual property.  (SUF-69.)

*Second*, MG contends that COY breached the confidentiality provision in the COY WDA by using "confidential information to compete against MG." (Dkt. 89 ¶ 145.)  The undisputed facts are to the contrary.  The term "Confidential Information" in the COY WDA is limited to information:

> designated or described by the disclosing party as "Confidential," "Proprietary" or some similar designation, or which should reasonably be understood by the receiving party, because of the circumstances of disclosure or the nature of the information itself to be confidential or proprietary to the disclosing party.

(SUF-70; *see also* SUF-71.)

This claim fails on the undisputed facts for reasons similar to the trade secret and NDA claims.  COY never disclosed or used the "technology stack" or any other information designated by MG as "Confidential," except as permitted.  (*See supra* § IV.B.3.)  MG also cannot show any damages from any purported breach of confidentiality.  (*See supra* § IV.B.4.)

F.     <u>Fifth Cause of Action: Fraud (Bartlett)</u>

The elements of fraud are "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 638 (1996). MG asserts two theories of fraud against Bartlett. Neither have merit.

*First*, MG contends that Bartlett "never said anything about Coy being a technology company or ultimately a competitor to MG." (Dkt. 89 ¶ 150.) But the nature of the proposed relationship between COY and MG was disclosed. McCandless acknowledged that COY would be a technology company on May 12, 2020, when he proposed that MG would "be marketed as the Technology Partner powering ***your technology***." (SUF-32-33 (emphasis added).) The COY WDA provided COY "wishes to utilize the services of Developer in connection with ***the development of software identified as the Coy Collective, INC Websites***." (SUF-61 (emphasis added).)

COY's website also described COY as "a full service technology company." (SUF-73.) McCandless knew this, because he built that website. On August 31, 2020, Bartlett emailed this description directly to McCandless. (SUF-74.) McCandless expressed no surprise—he admits he never asked why COY was describing itself that way. (SUF-75.) The nature of the relationship——COY as a technology company, with MG as its developer—was not a secret. As for whether COY was a "competitor," MG was aware that COY wanted to recruit models and build websites for them. That is what the COY WDA was for. (SUF-62.) Whether that made COY a "competitor" or not, it was also no secret.

*Second*, MG contends that Bartlett was secretly setting about to steal MG's technology, under the pretense of partnering with MG. (Dkt. 89 ¶¶ 150-154.) This is false. When COY selected MG as its developer, Bartlett and everyone at COY was excited to work with MG. (SUF-22.) Friction only emerged later, and it was MG who terminated. There was no intent to "steal" any of MG's technology (SUF-59)—COY never did such a thing. (*See supra* § IV.B.3.) Moreover, MG cannot sustain its burden of proving damages. (*See supra* § IV.B.4.)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL. (310) 552-4400   FAX: (310) 552-8400

### G.   Sixth Cause of Action: Fraud (Lewis, Hankins, and Drew)

MG's fraud claim against Lewis, Drew, and Hankins also relies on the theory that they falsely represented they would keep MG's information confidential when they were secretly setting about to steal MG's technology.  (Dkt. 89 ¶¶ 169-171.) This theory of fraud fails for the same reasons.

### H.   Seventh Cause of Action: Fraud (COY)

MG's fraud claim against COY contends that COY "never had any intention" of performing under the COY WDA.  (Dkt. 89 ¶ 179.)  The undisputed record is to the contrary.  Everyone at COY was excited to work with MG at the start (SUF-22), and it was MG who chose to terminate.

### I.   Eighth and Ninth Causes of Action: Breach of Fiduciary Duty

The premise of MG's eighth and ninth causes of action for breach of fiduciary duty is that COY, Bartlett, Lewis, and Drew entered into a partnership with MG. (Dkt. ¶¶ 188, 197.)  The COY WDA, signed on August 6, 2020, expressly disclaims any partnership.  (SUF-63.)  On Defendants' motion to dismiss, the Court let this claim proceed only as to a partnership "between May 6, 2020, until August 6, 2020."  (Dkt. 86 at 14.)

The undisputed facts have eliminated the possibility of even this limited partnership.  *First*, McCandless admits:

> Q:  Would you ever enter into a partnership without a signed agreement?
> . . . .
> A:  ***We would have some contract in place***.

(SUF-65 (emphasis added).)  Here, there was no written partnership agreement.  The contract in place was the COY WDA, which disclaims a partnership.

*Second*, McCandless admits that the "partnership" he is referring to was documented at least in part by the COY WDA:

> I'm asking if you put the terms of the partnership you're referring to into the web development agreement?

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

THE WITNESS: There was terms involved with the partnership in the web development agreement.

(SUF-64.)  This is equally fatal, because the COY WDA includes an integration clause.  (SUF-72.)  If the COY WDA involved the subject matter of the alleged partnership—as admitted by McCandless—then it also superseded and eliminated the alleged partnership.  *See World-Class Talent Experience, Inc. v. Giordano*, 293 So. 3d 547, 549 (Fla. Dist. Ct. App. 2020) ("A merger clause 'make[s] extrinsic agreements unenforceable unless they are contained within the written contract.'").

*Finally*, the course of conduct between the parties evidences only negotiations for the retention of MG as a web developer finalized by a WDA.  (*See supra* § II.) Defendants referred to this vendor-vendee relationship as a "partnership," but McCandless' admits this is just casual shorthand for a vendor relationship.  (SUF-66.)

No partnership was formed.  But even if a partnership was formed, MG's breach of fiduciary duty claim merely rehashes MG's fraud theory, which fails as discussed above.  (*See* Dkt. 86 ¶¶ 192, 201.)

## VI.   CONCLUSION

The Court should grant summary judgment.

DATED:  September 1, 2023          MILLER BARONDESS, LLP

By:  /s/ Colin H. Rolfs

COLIN H. ROLFS
Attorneys for Defendants and Counter-Claimants

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants, certifies that this brief contains 6,991 words, which complies with the word limit of L.R. 11-6.1.

DATED: September 1, 2023          MILLER BARONDESS, LLP

By:    /s/ *Colin H. Rolfs*
_____
COLIN H. ROLFS
Attorneys for Defendants and Counter-Claimants

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400