# EXHIBIT A

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3

    _____ )
 4                                   )
    MCCANDLESS GROUP, LLC,           )
 5                                   )
              Plaintiff,             )
 6                                   )
          vs.                        )
 7                                   )Case No.
    THE COY COLLECTIVE, et al.,      )
 8                                   )2:21-cv-02069-DOC-KES
              Defendants.            )
 9  _____ )
                                     )
10  THE COY COLLECTIVE, et al.       )
                                     )
11             Counterclaimants,     )
                                     )
12          vs                       )
                                     )
13  MCCANDLESS GROUP, LLC and        )
    NICHOLAS MCCANDLESS,             )
14                                   )
              Counterdefendants.     )
15  _____ )
16
             -- C O N F I D E N T I A L --
17
          DEPOSITION OF NICHOLAS MCCANDLESS
18
                Thursday, August 17, 2023
19
20
21
22  Reported by:
    KATHLEEN E. BARNEY
23  CSR No. 5698, RPR
    NADIA NEWHART
24  CSR No. 8714
    Job No. 6058696
25  PAGES 1 - 218
```

Page 1

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3
 4     _____
                                     )
 5     MCCANDLESS GROUP, LLC,        )
                                     )
 6              Plaintiff,           )
                                     )
 7          vs.                      )
                                     )Case No.
 8     THE COY COLLECTIVE, et al.,   )
                                     )2:21-cv-02069-DOC-KES
 9              Defendants.          )
       _____)
10                                   )
       THE COY COLLECTIVE, et al.    )
11                                   )
                Counterclaimants,    )
12                                   )
            vs.                      )
13                                   )
       MCCANDLESS GROUP, LLC and     )
14     NICHOLAS MCCANDLESS,          )
                                     )
15              Counterdefendants.   )
                                     )
16     _____)
17
18
19          Deposition of NICHOLAS MCCANDLESS, Volume I,
20     taken on behalf of Defendants and Counterclaimants,
21     beginning at 10:12 a.m. and ending at 5:32 p.m. on
22     Thursday, August 17, 2023, before KATHLEEN E.
23     BARNEY, Certified Shorthand Reporter No. 5698.
24
25
```

<div align="right">Page 2</div>

CONFIDENTIAL

```
1    BY MR. ROLFS:

2        Q    You recall earlier in this deposition, I

3    asked you if there was any confidentiality agreement

4    between Rayo Infotech and McCandless Group, and you

5    identified one agreement, correct?              01:38:10

6        A    I do believe that's what I said.

7        Q    Is the agreement that you were referring to

8    when I asked if Mr. Prajapati ever sent you a

9    nondisclosure agreement that same agreement?

10       A    I believe so.                          01:38:33

11       Q    If you'd please go to the page that has on

12   the bottom MCCANDLESS 22161.  You'll see the fourth

13   text down on the chain from Mr. Prajapati says (as

14   read):

15          "Yes, but they do not have any platform    01:38:57

16    code."

17          What, to your knowledge, was Mr. Prajapati

18   referring to in this text message?

19          MR. CHING:  Objection.  The document speaks

20   for itself.  Calls for speculation.            01:39:10

21          You can answer if you know.

22          THE WITNESS:  I believe he's referring

23   to that he never gave the code to Coy.  I believe

24   that's what he's referring to.

25   BY MR. ROLFS:                                   01:39:31
```

Page 28

CONFIDENTIAL

```
 1        Q    No one at Rayo Infotech ever provided any

 2   code to Coy, correct?

 3             MR. CHING:  Objection.  Calls for

 4   speculation.

 5             You can answer if you know.              01:39:39

 6             THE WITNESS:  To the best of my knowledge, we

 7   never sent them the code repository.

 8   BY MR. ROLFS:

 9        Q    And when you say "we," are you referring to

10   both McCandless Group and Rayo Infotech?            01:39:55

11        A    To the best of my knowledge, Rayo Infotech

12   and McCandless Group did not send them the code

13   repository.

14        Q    If you go to the next page, third text chain

15   down, you'll see a text message from you that says   01:40:23

16   (as read):

17             "Just need all of the details on the

18        protocols."

19             Do you see that?

20        A    Yes.                                       01:40:33

21        Q    What protocols were you asking Mr. Prajapati

22   for?

23             MR. CHING:  Objection.  Vague as to

24   "protocols."  The document speaks for itself and

25   calls for speculation.                              01:40:43
```

Page 29

CONFIDENTIAL

```
 1              MR. CHING:  Objection.  Calls for

 2      speculation.

 3              You can answer if you know.

 4              THE WITNESS:  I do not recall.

 5      BY MR. ROLFS:                                    01:41:53

 6         Q   Can you recall the year that you first spoke

 7      with Mr. Prajapati about these protocols?

 8              MR. CHING:  Objection.  Calls for

 9      speculation.

10              You can answer if you know.            01:42:02

11              THE WITNESS:  I do not recall.

12      BY MR. ROLFS:

13         Q   What is the first year that you can remember

14      speaking with Mr. Prajapati about these protocols?

15              MR. CHING:  Objection.  Asked and answered,  01:42:22

16      calls for speculation.

17              You can answer if you know.

18              THE WITNESS:  I do not recall.

19      BY MR. ROLFS:

20         Q   Did Rayo Infotech build McCandless Group's   01:42:32

21      current tech stack?

22         A   In collaboration with myself, yes.

23         Q   Did Rayo Infotech also build the version of

24      the tech stack that McCandless Group used in 2020?

25         A   Yes.                                     01:42:54
```

                                                    Page 31

CONFIDENTIAL

1     A    Yes.

2     Q    Who?

3     A    Scott Robinson and I believe Jason Moskowitz,

4     but I'm not a hundred percent sure.

5     Q    Is there anyone else who sent the pitch deck        11:16:04

6     for McCandless Group outside of McCandless Group

7     other than you, Scott Robinson, and possibly Jason

8     Moskowitz?

9     A    I do not recall anyone else.

10         MR. ROLFS:  I'm going to ask the court             11:16:38

11    reporter to mark this exhibit as next in order.

12         (Exhibit 4 was marked for identification and

13         is attached hereto.)

14    BY MR. ROLFS:

15    Q    Mr. McCandless, do you recognize this email?       11:17:11

16    A    It was a while ago, so I do not remember

17    this.

18    Q    Is this an email that you sent to Jason

19    Newman on July 31, 2020?

20         MR. CHING:  Objection.  Document speaks for        11:17:36

21    itself.  Calls for speculation.

22         You can answer if you know.

23         THE WITNESS:  Based on this document, I'd go

24    off what the document says.

25    ////

                                                    Page 44

CONFIDENTIAL

1   BY MR. ROLFS:

2       Q   Do you remember ever sending an email to

3   Jason Newman?

4       A   I'm not recalling Jason Newman.

5       Q   You don't know who Jason Newman is, sitting          11:17:57

6   here today?

7       A   I do not recall who he is.

8       Q   Do you have any reason to doubt that this is

9   a copy of an email that you sent to Jason Newman on

10   July 31, 2020?                                               11:18:18

11       A   I don't have a reason to doubt it.

12       Q   At the time that you sent this email to Jason

13   Newman, did you have a nondisclosure or

14   confidentiality agreement with Mr. Newman or his

15   company?                                                    11:18:40

16       A   I do not recall.

17       Q   You do not recall any confidentiality or

18   nondisclosure agreement between McCandless Group and

19   Mr. Newman or his company, correct?

20           MR. CHING:   Objection.   Asked and answered.      11:18:55

21           THE WITNESS:   I do not recall.

22   BY MR. ROLFS:

23       Q   You'll see that there is an attachment to

24   this email, correct?

25       A   Where?                                              11:19:10

Page  45

CONFIDENTIAL

1     Q    Well, you'll see under "Subject," there's an

2   attachments line?

3     A    Yes, I do see that.

4     Q    And you'll see the attachment is identified

5   as McCandless Group Deck.PDF, correct?          11:19:21

6     A    That's what it says.

7     Q    Is that the pitch deck for McCandless Group?

8          And you're free to look at the actual

9   attachment that follows the email to verify.

10    A    This would have been a deck we used at one    11:20:05

11   point, yes.

12    Q    Do you know which version of the McCandless

13   Group pitch deck this is?

14    A    This was a general company deck that was

15   used.  I do not recall, but this is a different     11:20:25

16   iteration than what we primarily used for

17   influencers.

18    Q    About how many times did you use this

19   iteration of the pitch deck?

20         MR. CHING:  Objection.  Calls for            11:20:39

21   speculation.

22         You can answer if you know.

23         THE WITNESS:  I do not recall.

24   BY MR. ROLFS:

25    Q    About how many times have you personally sent  11:20:48

Page 46

CONFIDENTIAL

```
 1    a version of the McCandless Group pitch deck outside

 2    of McCandless Group?

 3         MR. CHING:  Objection.  Calls for

 4    speculation.

 5         You can answer if you know.                11:20:56

 6         THE WITNESS:  I do not recall.

 7    BY MR. ROLFS:

 8      Q   Do you think that you've sent a copy of the

 9    McCandless Group pitch deck outside of McCandless

10    Group more or less than 100 times?               11:21:08

11         MR. CHING:  Objection.  Calls for

12    speculation.

13         You can answer if you know.

14         THE WITNESS:  I do not recall.  I believe it

15    would be less than 100, but I do not recall.     11:21:21

16    BY MR. ROLFS:

17      Q   Do you think that you sent the McCandless

18    Group pitch deck outside of McCandless Group more

19    than 50 times?

20         MR. CHING:  Objection.  Calls for            11:21:30

21    speculation.

22         You can answer if you know.

23         THE WITNESS:  I do not recall.

24    BY MR. ROLFS:

25      Q   Can you give me any estimate whatsoever of  11:21:36
```

Page 47

CONFIDENTIAL

1    the amount of times that you have sent the

2    McCandless Group pitch deck outside of McCandless

3    Group?

4        A    I -- I do not.  I do not know.

5        Q    I'd like to go to the page that's Bates          11:21:50

6    numbered, in rather small writing, unfortunately,

7    McCandless 06982.

8            This slide includes the tech stack for

9    McCandless Group, correct?

10       A    This tech stack indicates what software        11:22:28

11   languages my team has experience with.

12       Q    Is there any aspect of the tech stack of

13   McCandless Group that you disclosed to Coy that is

14   not listed on this slide?

15           MR. CHING:  Objection.  Vague and ambiguous      11:22:48

16   as to "tech stack."

17           THE WITNESS:  I believe there is.

18   BY MR. ROLFS:

19       Q    What are those components?

20           MR. CHING:  Objection.  Vague and ambiguous      11:23:04

21   as to the term "components."

22           THE WITNESS:  Can you define what you mean by

23   "components"?

24   BY MR. ROLFS:

25       Q    I want to know if there's any information       11:23:14

Page 48

CONFIDENTIAL

```
1    that you disclosed to Coy about McCandless Group's
2    tech stack that is not listed on this slide.  And if
3    there is, please tell me that information.
4         MR. CHING:  Objection.  Vague and ambiguous
5    as to "tech stack."                              11:23:29
6         THE WITNESS:  From what I recall, we -- in
7    the tech stack sent to Coy, we covered the security
8    of our technology, our payment processing, how we
9    handle scalability.  I believe there was vendors and
10   services in the tech stack specific to that tech    11:23:53
11   stack we have for influencers not listed here.  So
12   there was elements.  I do not recall all of them.
13   BY MR. ROLFS:
14      Q   What vendors and services did you disclose to
15   Coy that are not listed on this slide?             11:24:12
16      A   CCBill, which would be our payment processor.
17   AWS.  MongoDB.  The flow of how all of our tech
18   stack components flow together and integrate.  How
19   we handle the security of our tech stack.  I believe
20   there to be more, but that's what I'm recalling at   11:25:31
21   this moment.
22      Q   What about the security of the McCandless
23   Group tech stack did you disclose to Coy that is not
24   listed on this slide?
25      A   From what I recall, the technologies we used   11:25:46
```

Page 49

CONFIDENTIAL

1    to ensure the security.

2        Q   What technologies are you referring to?

3        A   From what I recall, how we protect the

4    content and who has access to the content.  But I do

5    not fully recall.                                11:26:21

6        Q   What aspects of how McCandless Group protects

7    its content did you disclose to Coy?

8        A   At least what was in the tech stack.  I do

9    not recall it all.

10       Q   And when you refer to security, are you      11:26:44

11   referring to copyright protection?

12       A   It consists of more than that, but that's a

13   component.

14       Q   What other components does security consist

15   of other than copyright protection?               11:27:09

16       A   Protecting our -- protecting the content on

17   the site itself.  Protecting our code.  Who has

18   access to the content.  That's what I'm recalling

19   right now.

20       Q   When you refer to who has access to the      11:27:43

21   content, are you referring to the fact that one had

22   to be a subscriber to access content on a McCandless

23   Group website?

24       A   That is correct.

25       Q   You referred to something you disclosed to   11:27:58

                                             Page 50

CONFIDENTIAL

1    Coy as the flow of how the tech stack fit together.

2    I may be misstating that somewhat.

3         Do you remember what I'm referring to?

4    A    Yes, I do.

5    Q    What flow are you referring to?                11:28:31

6    A    We had a diagram on the tech stack.

7    Q    What did that diagram look like?

8    A    From what I recall, there were circles with

9    various different technologies and services, arrows

10   pointing to how they all connected together, the      11:28:54

11   flow of how it all works together.

12   Q    When did you disclose that diagram to Coy?

13   A    When I provided them with the tech stack.

14   Q    Did you provide them with the tech stack on

15   one or multiple occasions?                            11:29:10

16   A    I believe I provided it one time.

17   Q    Are you referring to a document that is

18   titled "Architecture of Technology"?

19   A    I do not recall.

20   Q    Is the diagram that you're referring to       11:29:30

21   contained in the document that you disclosed at one

22   time to Coy about the McCandless Group tech stack?

23   A    From what I recall, yes.

24        MR. ROLFS:  I'm going to ask the court

25   reporter to please mark this as Exhibit 5.           11:30:09

                                          Page 51

CONFIDENTIAL

```
1          (Exhibit 5 was marked for identification and

2      is attached hereto.)

3   BY MR. ROLFS:

4      Q   Do you recognize this document,

5   Mr. McCandless?                                    11:30:39

6      A   Yes, I do.

7      Q   Is this an email that you sent to Gerry

8   Libretti on December 7, 2020?

9      A   That's what this document would show.

10     Q   And you have no reason to doubt that you did,  11:31:11

11  in fact, send this email to Mr. Libretti on

12  December 7, 2020, correct?

13     A   I don't believe so.

14     Q   Do you remember who Gerry Libretti is?

15     A   I do not recall.                            11:31:31

16     Q   You'll see on the CC line there's a name, Ben

17  Cohen.

18         Do you see that?

19     A   I do.

20     Q   Who is Ben Cohen, if you remember?          11:31:47

21     A   I do not recall.

22     Q   Has McCandless Group ever had a

23  confidentiality or nondisclosure agreement with

24  Gerry Libretti or his company?

25     A   I do not recall.                            11:32:05
```

Page 52

CONFIDENTIAL

1        Q    You do not recall McCandless Group ever

2    having a nondisclosure or confidentiality agreement

3    with Gerry Libretti, correct?

4            MR. CHING:  Objection.  Asked and answered.

5            THE WITNESS:  I do not recall.              11:32:21

6    BY MR. ROLFS:

7        Q    Did McCandless Group ever have a

8    confidentiality or nondisclosure agreement with Ben

9    Cohen or his company?

10           MR. CHING:  Objection.  Asked and answered.   11:32:35

11           THE WITNESS:  I do not recall.

12   BY MR. ROLFS:

13       Q    Please take a look at the attachment to this

14   email.  And then once you've had a chance to review

15   it, let me know if this is a version of the          11:32:52

16   McCandless Group pitch deck.

17       A    Yes, it is.

18       Q    I'd like you to please go to the page 9964.

19   One of the things that's described on this page of

20   the pitch deck is the security features offered by    11:33:48

21   McCandless Group, correct?

22           MR. CHING:  Objection.  Vague and ambiguous

23   as to "described."

24           THE WITNESS:  This states we have content

25   protection.                                           11:34:04

Page 53

CONFIDENTIAL

1    BY MR. ROLFS:

2        Q    Is there any information about the content

3    protection offered by McCandless Group that you

4    disclosed to Coy that is not listed on this page?

5        A    Yes, we did.                                    11:34:18

6        Q    What information?

7        A    From what I recall, we disclosed our

8    watermark technology.   We discussed our DMCA notice

9    process and how we issued DMCA notices.

10        That's what I recall.                               11:34:49

11        Q    Let's now skip ahead to page 9969.   And

12    you'll see on this page there's a reference to:

13            "Our proprietary technology

14            watermarks all content."

15            Do you see that?                                11:35:16

16        A    Yes.

17        Q    Is there anything that you disclosed about

18    McCandless Group's watermarking technology that is

19    not contained on this page?

20        A    Yes.   They had access to see how our          11:35:33

21    watermark technology appears on the content.

22        Q    How did you give Coy that access?

23        A    Through having access levels to see the

24    content, they were able to see how the watermark

25    appeared on the content.                                11:35:59

Page 54

CONFIDENTIAL

1      Q   Isn't it true that any subscriber to any of

2   the McCandless Group websites could see the

3   watermark on any of the photos?

4      A   They could, but not knowing what the purposes

5   of it were for.                                    11:36:13

6      Q   You'll see at the bottom of this slide

7   there's a reference to:

8          "Our DMCA team handles any and

9          all copyright infringement to swiftly

10         remove from any leaked content."          11:36:27

11         Do you see that?

12     A   Yes, I do.

13     Q   Is there any information about McCandless

14   Group's DMCA practices that you disclosed to Coy

15   that are not listed here on this slide?           11:36:45

16     A   I believe I disclosed to them the actual

17   process in which our team handles it.

18     Q   What process are you referring to?

19     A   When content is leaked, we submit to three

20   different sources to have the content removed.  We   11:37:22

21   submit to the owner, the responsible party of the

22   website directly.  We report it to the web hosting

23   provider, and we also report it to the Google search

24   engine.

25     Q   Are there any aspects of McCandless Group's   11:37:40

Page 55

CONFIDENTIAL

1    DMCA practices other than what you just listed that

2    you disclosed to Coy that is not contained on this

3    slide at page 9969?

4        A   I do not recall if there was anything else.

5        Q   How did you disclose that additional        11:38:10

6    information that you just listed to Coy?

7        A   I believe it was disclosed over a phone call,

8    I believe.

9        Q   When did that phone call occur?

10       A   I do not recall, but it would have been      11:38:34

11   sometime when we were in partnership.

12       Q   Do you recall that there was a call on

13   May 16th with Corey Lewis, Robert Hankins, and Josh

14   that you had regarding Coy and McCandless Group?

15       A   I do not recall a Josh.                      11:39:11

16       Q   Do you recall a call that occurred on

17   May 16th, 2020, with Corey Lewis and Robert Hankins?

18       A   I do remember a call with Robert Hankins and

19   Corey Lewis.  I do not remember the date.

20       Q   Is the call that you disclosed these DMCA    11:39:36

21   practices that call that you had with Robert Hankins

22   and Corey Lewis?

23           MR. CHING:  Objection.  Vague.

24           You can answer if you understand.

25           THE WITNESS:  I do not believe it was on that  11:39:55

                                                    Page 56

CONFIDENTIAL

```
 1    phone call, no.

 2    BY MR. ROLFS:

 3        Q   Who was on the phone call that you disclosed

 4    these DMCA practices to Coy?

 5        A   I believe on that call would have been        11:40:06

 6    Jessica Bartlett, possibly Corey Lewis and Thomas

 7    Drew.  I'm not a hundred percent sure.

 8        Q   And the call that we were just talking about

 9    with Robert Hankins, did that call happen before or

10    after this other call that we're talking about where   11:40:32

11    you disclosed the DMCA practices?

12            MR. CHING:  Objection.  Vague.

13            You can answer if you understand.

14            THE WITNESS:  Sorry.  Can you rephrase that?

15    BY MR. ROLFS:                                          11:40:44

16        Q   We've been discussing two calls.  There was

17    one call that we discussed that you remember Robert

18    Hankins was on, correct?

19        A   That's correct.

20        Q   And we've been discussing a second call where  11:40:54

21    you remember disclosing some aspects of McCandless

22    Group's DMCA practices, correct?

23        A   That's correct.

24        Q   Which of those calls was first?

25        A   The one with Robert Hankins.                   11:41:06
```

Page 57

CONFIDENTIAL

```
 1        Q    Approximately how long after the call with

 2   Robert Hankins was the second call that you remember

 3   disclosing DMCA practices?

 4        A    I believe it would have been several months

 5   later.                                              11:41:28

 6        Q    Let's take a look at the page 9970.  And this

 7   page is entitled "Financials," correct?

 8        A    That is correct.

 9        Q    This page details aspects of McCandless

10   Group's financial reporting for influencer sites,    11:42:01

11   correct?

12            MR. CHING:  Objection.  Vague.

13            THE WITNESS:  Very broadly.  It doesn't

14   really disclose much.

15   BY MR. ROLFS:                                        11:42:14

16        Q    Are there any aspects of how McCandless Group

17   reported influencer financial information that you

18   disclosed to Coy that are not contained on this

19   page?

20        A    Yes.                                       11:42:25

21        Q    What are those aspects?

22        A    From what I recall, how we calculate the

23   money that gets paid out to influencers, how we

24   handle our payment processing percentage.  How we

25   handle chargebacks and refunds.  How we handle       11:42:46
```

Page 58

CONFIDENTIAL

```
 1    distributing payments even on revenue we haven't
 2    collected from CCBill yet.  How we handle and manage
 3    the chargeback ratio.
 4          That is what I'm recalling at this time.
 5      Q   When you referred to how money is paid out to    11:43:20
 6    influencers, what are you referring to?
 7      A   In terms of how we calculate the amount of
 8    money that an influencer is paid based off of
 9    various factors.
10      Q   What factors are you referring to?             11:43:43
11      A   Chargebacks, refunds, payment processing
12    percentages.  And also the schedule of when we
13    receive payments from our payment processor versus
14    when we send them out.
15      Q   I'd like you to try and remember in as much    11:44:07
16    detail as possible what you told Coy about these
17    details about how McCandless Group paid out
18    influencers.  What exactly did you tell Coy?
19      A   From what I recall, that we removed the
20    payment processing percentage off of the top.  So we   11:44:36
21    split payments after the payment processing
22    percentage is taken.
23          I remember disclosing that despite the
24    schedule of when CCBill pays us, we pay out -- we up
25    front money we haven't collected from our payment    11:45:00
```

Page 59

CONFIDENTIAL

1    processor yet based upon the monthly earnings of

2    that influencer.  Our subtraction of any chargebacks

3    or refunds.

4          That is what I recall at this time.

5      Q   You referenced chargebacks or refunds.  Could      11:45:27

6    you tell me exactly what you told Coy about

7    McCandless Group's chargebacks and refunds?

8      A   I'm not going to recall exactly.  I remember

9    discussing our chargeback ratio, discussing why we

10   don't accept certain countries related to              11:45:55

11   chargebacks.  I remember discussing the subtraction

12   of chargebacks and refunds from what we pay out to

13   influencers.  The importance of maintaining a low

14   chargeback ratio and why.

15         That is what I recall at this time.              11:46:29

16     Q   What is a chargeback ratio?

17     A   A chargeback ratio is the number of

18   chargebacks divided by the number of transactions.

19     Q   What is a chargeback?

20     A   A chargeback is when a customer goes to their    11:46:44

21   bank or card provider and disputes the transaction.

22     Q   So when a chargeback is made, that revenue

23   might not actually come to McCandless Group,

24   correct?

25     A   It is typically subtracted at a later point.     11:47:00

Page 60

CONFIDENTIAL

```
1        Q    The higher the chargeback ratio, the less

2   money McCandless Group makes, right?

3        A    Not necessarily.  Because the chargeback

4   ratio is based on transactions, not dollar amounts.

5        Q    Is it ever better to have a higher chargeback     11:47:20

6   ratio?

7        A    It's never better, but you could have more

8   money deducted on a lower chargeback ratio.

9        Q    How could that occur?

10        A    If you had chargebacks on smaller            11:47:35

11   transactions, but there was more of them versus less

12   chargebacks on higher dollar amounts.

13        Q    Isn't it true that you would always want to

14   have the lowest chargeback ratio possible?

15        A    That is what you would want, yes.            11:47:57

16        Q    It's pretty obvious, right?

17             MR. CHING:  Objection.  Vague as to

18   "obvious."  And also calls for speculation.

19             THE WITNESS:  I wouldn't state that it's

20   obvious.                                               11:48:11

21   BY MR. ROLFS:

22        Q    Do you think it's complicated to reach the

23   conclusion that having a low chargeback ratio is

24   good?

25             MR. CHING:  Same objections.                 11:48:24
```

Page 61

CONFIDENTIAL

1        THE WITNESS:  Understanding why a low

2   chargeback ratio is important is not something that

3   most people understand.

4   BY MR. ROLFS:

5        Q   Do you think there's anyone who runs a          11:48:49

6   business that accepts payment processing that

7   doesn't know that a low chargeback ratio is good?

8        MR. CHING:  Objection.  Calls for a legal

9   conclusion and vague.

10        THE WITNESS:  If you have payment processing,   11:49:01

11   your goal would be to have a lower chargeback ratio.

12   BY MR. ROLFS:

13        Q   And everyone who runs a business that uses

14   payment processing would know that a low chargeback

15   ratio is good, correct?                               11:49:15

16        MR. CHING:  Objection.  Vague.  Calls for a

17   legal conclusion.

18        THE WITNESS:  I wouldn't say that everyone

19   knows that, no.

20   BY MR. ROLFS:                                         11:49:24

21        Q   Would you say that at least half of the

22   people who earn money from some aspect of online

23   payment processing understand that having a low

24   chargeback ratio is good?

25        MR. CHING:  Same objections.                     11:49:36

Page  62

CONFIDENTIAL

1          THE WITNESS:  I would have no way of

2     quantifying if it's over or below half.

3     BY MR. ROLFS:

4          Q   Wouldn't you agree that the majority of

5     people who earn money from some aspect of online          11:50:07

6     payment processing understand that a low chargeback

7     ratio is good?

8          MR. CHING:  Objection.  Calls for a legal

9     conclusion.  Vague.

10          THE WITNESS:  If they understand what a          11:50:24

11     chargeback is and they're involved in the details of

12     the finances, they would conclude that more than

13     likely, yes.

14          MR. ROLFS:  I'd like to ask the court

15     reporter to mark this as Exhibit 6.          11:50:40

16          (Exhibit 6 was marked for identification and

17     is attached hereto.)

18     BY MR. ROLFS:

19          Q   Do you recognize this document,

20     Mr. McCandless?          11:51:08

21          A   In terms of the deck?

22          Q   Is this an email that you sent on October 31,

23     2020, to the email address kaleyokelley@hotmail.com

24     attaching the McCandless Group pitch deck?

25          A   That's what this document states.          11:51:24

Page 63

CONFIDENTIAL

```
 1        Q    Do you have any reason to doubt that you, in

 2   fact, sent this email?

 3        A    I do not.

 4        Q    Has McCandless Group ever had a nondisclosure

 5   or confidentiality agreement with Kayley O'Kelley?        11:51:41

 6        A    I do not recall.

 7        Q    You do not recall McCandless Group ever

 8   having a confidentiality or nondisclosure agreement

 9   with Kayley O'Kelley, correct?

10        MR. CHING:   Asked and answered.                     11:52:02

11        THE WITNESS:   I do not recall.

12        MR. ROLFS:   I'm going to ask the court

13   reporter to mark this as Exhibit 7.

14        (Exhibit 7 was marked for identification and

15    is attached hereto.)                                     11:53:05

16   BY MR. ROLFS:

17        Q    Do you recognize this document,

18   Mr. McCandless?

19        A    Roughly, I do.

20        Q    Is this an email that you sent to Dante        11:53:16

21   Deiana on October 2, 2022, attaching the McCandless

22   Group pitch deck?

23        A    That is what this document states.

24        Q    Do you have any reason to doubt that you, in

25   fact, sent this email?                                    11:53:34
```

Page 64

CONFIDENTIAL

1        A    I do not.

2        Q    Does McCandless Group have a nondisclosure or

3    confidentiality agreement with Dante Deiana?

4        A    I do not recall.

5        Q    Have you ever asked anyone you sent the         11:53:56

6    McCandless Group pitch deck to to execute a

7    nondisclosure or confidentiality agreement before

8    you sent them the pitch deck?

9            MR. CHING:   Objection.   Vague.

10            THE WITNESS:   I do not recall.              11:54:30

11    BY MR. ROLFS:

12        Q    You do not recall a single instance where you

13    asked someone to sign a nondisclosure or

14    confidentiality agreement before you sent them the

15    McCandless Group pitch deck, correct?                11:54:42

16            MR. CHING:   Objection.   Vague.   Calls for

17    speculation.   Asked and answered.

18            THE WITNESS:   I do not recall.

19    BY MR. ROLFS:

20        Q    McCandless Group runs a website for Lindsay    11:55:23

21    Brewer, correct?

22        A    That is correct.

23            MR. ROLFS:   I'm going to ask the court

24    reporter to mark this as Exhibit 8.

25    ////

Page 65

CONFIDENTIAL

```
 1          (Exhibit 8 was marked for identification and
 2      is attached hereto.)
 3  BY MR. ROLFS:
 4      Q    This is a screenshot of the main page from
 5  Lindsay Brewer's website built by McCandless Group,     11:56:01
 6  correct?
 7      A    That's correct.
 8      Q    Anyone who visited this website could see
 9  that the website offered exclusive content, correct?
10      A    That's what it states, yes.               11:56:22
11      Q    Anyone who visited this website could see
12  that the website offered a private chat feature,
13  correct?
14      A    That is correct.
15      Q    Anyone who visited this website could see    11:56:35
16  that it offered a tips feature, correct?
17      A    That is correct.
18      Q    Anyone who visited this website could see
19  that it offered a paywall feature by virtue of the
20  login, correct?                                    11:56:56
21          MR. CHING:  Objection.  Vague as to "paywall
22  feature."
23          You can answer if you know.
24          THE WITNESS:  The login would not necessarily
25  indicate there's a paywall.                        11:57:14
```

Page 66

CONFIDENTIAL

1    BY MR. ROLFS:

2        Q   Do you think there is anyone who could -- who

3    would visit the Lindsay Brewer website with some

4    knowledge of web development who would not realize

5    that there was a paywall on this website?                11:57:23

6        A   If they dug through it, they would see there

7    was a paywall.

8        Q   And when you say "dug through it," you don't

9    mean access any code, correct?  You just mean look

10   through the public portion of the website?              11:57:53

11          MR. CHING:  Objection.  Vague.

12          THE WITNESS:  If they went through the

13   website, they would see there was a paywall.

14          MR. ROLFS:  I'm going to ask the court

15   reporter to mark this as Exhibit 8 -- Exhibit 9.  My    11:58:25

16   apologies.  Exhibit 9.

17          (Exhibit 9 was marked for identification and

18      is attached hereto.)

19   BY MR. ROLFS:

20       Q   This is the FAQ page from Lindsay Brewer's       11:58:50

21   website built by McCandless Group, correct?

22       A   That is correct.

23       Q   Is this the standard FAQ language that

24   McCandless Group uses for its influencer websites?

25       A   Yes.                                             11:59:10

                                                    Page 67

CONFIDENTIAL

```
 1        Q    You'll see under "How do I cancel the

 2    subscription?":

 3                  "If you would like to cancel your

 4           subscription from rebilling, please go

 5           to your profile page and press the          11:59:23

 6           Cancel Subscription button or you may

 7           contact CCBill's consumer support

 8           department at

 9           https://support.CCBill.com."

10           Do you see that?                             11:59:39

11        A    Yes, I do.

12        Q    At the bottom of the website, you see there's

13    a reference to "Powered by McCandless Group,"

14    correct?

15        A    Yes, I do.                                 11:59:51

16        Q    Do all of the pages -- strike that.

17           Do all of the FAQ pages for influencers built

18    by McCandless Group say "Powered by McCandless

19    Group"?

20        A    Yes, they do.                              12:00:05

21        Q    Do all of the FAQ pages for influencer

22    websites built by McCandless Group direct people to

23    contact CCBill's consumer support department?

24        A    From what I recall, yes.

25        Q    Anyone who visited the FAQ page for a       12:00:22
```

Page 68

CONFIDENTIAL

1   McCandless Group influencer site would know that

2   McCandless Group uses CCBill, correct?

3            MR. CHING:  Objection.  Vague.

4            THE WITNESS:  They would know we use CCBill.

5   They would not understand why.                    12:00:39

6        MR. ROLFS:  I think now is a good time for a

7   break.

8            THE VIDEOGRAPHER:  The time is 12:00 p.m.

9   We're off the record.

10           (Lunch recess.)                            12:01:21

11           THE VIDEOGRAPHER:  The time is 12:48 p.m.

12   We're back on record.

13   BY MR. ROLFS:

14     Q   Mr. McCandless, you contend that you

15   disclosed some of the McCandless Group's trade     12:48:32

16   secrets to Coy on a May 16, 2020 call, correct?

17           MR. CHING:  Calls for a legal conclusion.

18           You can answer.

19           THE WITNESS:  I don't recall it was disclosed

20   on that call.                                       12:48:49

21           MR. ROLFS:  I'm going to mark this exhibit as

22   Exhibit 10.

23           (Exhibit 10 was marked for identification and

24      is attached hereto.)

25   ////

CONFIDENTIAL

1    BY MR. ROLFS:

2        Q    Have you seen this document before,

3    Mr. McCandless?

4        A    Yes, I have.

5        Q    These are the McCandless Group LLC's          12:49:38

6    Supplemental Responses to Interrogatories From

7    Counterclaimant The Coy Collective, Inc., correct?

8        A    That's what it states.

9        Q    Could you please go to the second to last

10   page.                                                 12:49:55

11           Is that your signature on the verification

12   page?

13       A    Yes, it is.

14       Q    You verified these responses under penalty of

15   perjury, correct?                                     12:50:12

16       A    Yes.

17       Q    You did your best to respond to these

18   interrogatories truthfully, correct?

19       A    Correct.

20       Q    I'd like you to please go to page 10.        12:50:22

21           Do you see Interrogatory No. 6 asks:

22               "Identify all communications from

23           you to Coy containing any trade secret

24           you contend was misappropriated in

25           your complaint."                              12:50:53

Page 70

CONFIDENTIAL

1           Do you see that?

2      A    Yes, I do.

3      Q    Now, if you'll look in the second paragraph

4   of the response, the second sentence says:

5              "On May 16, 2020, Nick and Lewis          12:51:06

6           had a phone call discussing use of

7           high-risk payment processors."

8           Do you see that?

9      A    Yes, I do.

10     Q    You disclosed McCandless Group's trade      12:51:18

11  secrets on May 16, 2020, to Lewis on this phone

12  call, correct?

13     A    I do not recall everything we discussed about

14  high-risk payment processors on that call.  It was a

15  discussion.  What we discussed on that call about    12:51:46

16  it, I don't remember.

17     Q    My question was a little bit different,

18  because the interrogatory question asks you about

19  trade secrets, correct?

20     A    Correct.                                     12:51:58

21     Q    The information you disclosed on the May 16,

22  2020 call included McCandless Group's trade secrets,

23  correct?

24          MR. CHING:  Objection.  Rifkind.

25          You can answer.                              12:52:14

Page 71

CONFIDENTIAL

1          THE WITNESS:  I do not recall.

2     BY MR. ROLFS:

3          Q     You were asked in this interrogatory to

4     identify communications from you to Coy containing

5     trade secrets, correct?                              12:52:38

6          A     That is correct.

7          Q     You identified a May 16, 2020 call, correct?

8          A     That is correct.

9          Q     You were trying to answer these questions

10    honestly, correct?                                   12:52:46

11         A     That is correct.

12         Q     On May 16, 2020, you believe that you

13    disclosed trade secrets to Lewis on a phone call,

14    correct?

15         A     I could have, yes.                        12:53:04

16         Q     When you verified these interrogatories, you

17    believed that you disclosed trade secrets to Lewis

18    on a May 16, 2020 call, correct?

19              MR. CHING:  Objection.  Rifkind.

20              You can answer.                            12:53:23

21              THE WITNESS:  I believe so.

22    BY MR. ROLFS:

23         Q     How long was that call?

24         A     I do not recall.

25         Q     Who was on the call?                      12:53:33

Page 72

CONFIDENTIAL

```
1        A   According to this, Lewis.   I do not recall
2   anyone else being on it.
3        Q   Do you remember if the call was more or less
4   than an hour?
5        A   I do not recall.                          12:53:48
6        Q   Do you remember it being a fairly long call?
7            MR. CHING:  Objection.  Vague.
8            THE WITNESS:  I do not recall.
9   BY MR. ROLFS:
10       Q   Did you discuss CCBill on this call?        12:54:06
11       A   If we discussed high-risk payment processors,
12   it's a possibility.
13       Q   Is there any other high-risk payment
14   processor you would have discussed with Mr. Lewis on
15   this phone call?                                   12:54:27
16       A   I do not recall.
17       Q   Do you recall what you told Mr. Lewis about
18   high-risk payment processors on this May 16, 2020
19   call?
20       A   I do not recall.                          12:54:47
21       Q   Do you remember disclosing anything else
22   about McCandless Group's business other than
23   high-risk payment processors on this call?
24       A   I do not recall.
25       Q   Can you tell me anything at all, other than  12:55:08
```

Page 73

CONFIDENTIAL

1    that the call involved high-risk payment processors,

2    about what you told Mr. Lewis on this call?

3         A    No.   There's nothing else.

4         Q    Just to clarify, there's nothing else that

5    you remember or do you specifically remember that        12:55:30

6    you only discussed high-risk payment processors?

7         A    I do not remember discussing anything else

8    besides high-risk payment processors.

9         Q    What, if anything, do you remember that you

10   told Mr. Lewis about high-risk payment processors?       12:55:50

11        A    I do not recall.

12        Q    Mr. Lewis had not signed a confidentiality

13   agreement with McCandless Group at the time of this

14   call, correct?

15        A    I do not recall.                               12:56:11

16             MR. ROLFS:   I'm going to mark this as

17   Exhibit 11.

18             (Exhibit 11 was marked for identification and

19        is attached hereto.)

20   BY MR. ROLFS:                                            12:57:21

21        Q    Do you recognize this document?

22        A    Yes, I do.

23        Q    This is the nondisclosure agreement that you

24   sent to Mr. Lewis on May 20th, 2020, correct?

25        A    That is what this indicates, yes.              12:57:38

Page 74

CONFIDENTIAL

1      Q   Mr. Lewis had not signed a nondisclosure

2   agreement at the time of the May 16, 2020 call,

3   correct?

4      A   That's what this would indicate.

5      Q   Do you have any reason to doubt that        12:57:54

6   Mr. Lewis had not, in fact, signed a nondisclosure

7   agreement at the time of the May 16, 2020 call?

8      A   No.

9      Q   Do you recall that Mr. Rob Hankins was also

10  on that May 16, 2020, call?                        12:58:18

11         MR. CHING:  Objection.  Foundation.

12         You can answer if you know.

13         THE WITNESS:  I do not recall.

14  BY MR. ROLFS:

15     Q   Do you remember that he wasn't or do you not   12:58:29

16  remember one way or the other?

17     A   I don't recall one way or the other.

18     Q   Do you remember that an individual named Josh

19  Chery was on that call?

20         MR. CHING:  Objection.  Foundation.          12:58:53

21         You can answer if you know.

22         THE WITNESS:  I do not recall.

23  BY MR. ROLFS:

24     Q   Has McCandless Group ever had a

25  confidentiality or nondisclosure agreement with Josh   12:59:03

                                          Page 75

CONFIDENTIAL

```
1    Chery?

2        A   I do not recall.

3        Q   You disclosed McCandless Group's trade

4    secrets to Mr. Corey Lewis on a May 16, 2020 call

5    prior to Mr. Lewis executing a confidentiality        12:59:26

6    agreement, correct?

7            MR. CHING:  Objection.  Calls for a legal

8    conclusion.  And calls for speculation.

9            You can answer if you know.

10           THE WITNESS:  I don't recall what information  12:59:37

11   I gave them about high-risk payment processors.

12           MR. ROLFS:  I'm going to have the court

13   reporter mark this as Exhibit 12.

14           (Exhibit 12 was marked for identification and

15     is attached hereto.)                               01:00:52

16   BY MR. ROLFS:

17       Q   Do you recognize this document,

18   Mr. McCandless?

19       A   I do not recall, but it has my name on it.

20       Q   Do you have any reason to doubt that you sent  01:01:03

21   this May 27, 2020 email to Melissa Mugridge and Jeff

22   Duncan?

23       A   No.

24       Q   Do you remember who Melissa Mugridge is?

25       A   I do not recall.                             01:01:21
```

Page 76

CONFIDENTIAL

1     Q   Do you remember who Jeff Duncan is?

2     A   I believe Jeff Duncan was the manager of

3  Francesca Farago.

4     Q   Who is Francesca Farago?

5     A   She was a client of McCandless Group.    01:01:46

6     Q   When was Francesca Farago a client of

7  McCandless Group?

8     A   I believe at some point in 2020.

9     Q   Did you send this email to Jeff Duncan to try

10  to pitch him and his client, Francesca Farago, on   01:02:10

11  using McCandless Group to create a website?

12     A   It was used for pitching Francesca Farago.

13     Q   At the time you sent this email, Francesco

14  Farago was not yet a McCandless Group client,

15  correct?                             01:02:35

16     A   I do not recall if she was signed before this

17  or not.

18     Q   In this email, you're providing Melissa

19  Mugridge and Jeff Duncan a subscriber login to

20  Jessica M. Bartlett's McCandless Group website,   01:03:17

21  correct?

22     A   That is what it appears, yes.

23     Q   Did you ask Melissa Mugridge to sign a

24  confidentiality or nondisclosure agreement with

25  McCandless Group before you sent this information?  01:03:36

Page 77

CONFIDENTIAL

1         A   I do not recall.

2         Q   Did you ask Mr. Jeff Duncan to sign a

3    confidentiality or nondisclosure agreement with

4    McCandless Group before you sent this email?

5         A   I do not recall.                          01:03:53

6         Q   Have you provided subscriber login

7    credentials to models and their representatives to

8    try to pitch them on building a McCandless Group

9    website?

10        A   I may have.  I do not recall.             01:04:18

11        Q   Do you remember ever asking for someone to

12   sign a confidentiality or nondisclosure agreement

13   before you sent them a subscriber login for one of

14   the McCandless Group websites?

15            MR. CHING:  Objection.  Vague.            01:04:55

16            THE WITNESS:  I do not recall.

17   BY MR. ROLFS:

18        Q   If you please look at the attachment to this

19   email.  Could you tell me what this attachment

20   consists of?                                       01:05:19

21        A   Which attachment specifically?

22        Q   Are there different -- well, scratch that.

23            Let's look at pages 5476 and 5477.  What do

24   those pages show?

25        A   This shows the chat component of the site.  01:06:17

Page 78

CONFIDENTIAL

```
 1        Q    This shows the chat component of the

 2   McCandless Group website, correct?

 3        A    Correct.  This would show what a

 4   conversation -- a one-on-one conversation would look

 5   like.                                                01:06:42

 6        Q    Now, let's look at pages 5478 through 5479.

 7             What do these pages show?

 8        A    This is showing boxes where a model's

 9   earnings would show.

10        Q    These pages depict the financial reporting  01:07:11

11   system that models see for the McCandless Group

12   websites, correct?

13        A    That a model would see, yes.

14             MR. ROLFS:  I'm going to ask the court

15   reporter to mark this as Exhibit 13.                 01:07:53

16             (Exhibit 13 was marked for identification and

17        is attached hereto.)

18   BY MR. ROLFS:

19        Q    Do you recognize this text message chain,

20   Mr. McCandless?                                      01:08:19

21        A    I don't recall these messages, but it has my

22   name.

23        Q    Do you have any reason to doubt that this is

24   a text message chain between you and Jessica

25   Bartlett?                                            01:08:40
```

Page 79

CONFIDENTIAL

```
 1        A    No.

 2        Q    If you look at the first text message in the

 3   chain, it's from you, and it says:

 4             "Here is subscriber account for

 5        Corey, testsub@gmail.com,                    01:08:49

 6        test@123!sub."

 7        Do you see that?

 8        A    Yes, I do.

 9        Q    You were providing Mr. Corey Lewis a

10   subscriber account in this text message chain,    01:09:04

11   correct?

12        A    This was sent to Jessica Bartlett.

13        Q    Do you see it says:

14             "Here is a subscriber account for

15        Corey"?                                       01:09:18

16        A    I do see that.

17        Q    You were sending Jessica Bartlett a

18   subscriber account for Corey Lewis, correct?

19        A    That's what the text says.

20        Q    Do you have any reason to doubt that what the   01:09:32

21   text says is accurate, that you were sending a

22   subscriber account to Corey Lewis through Jessica

23   Bartlett?

24             MR. CHING:  Objection.  Document speaks for

25   itself.                                            01:09:45
```

Page 80

CONFIDENTIAL

```
 1        THE WITNESS:  That's what the text says.

 2   BY MR. ROLFS:

 3       Q    Do you have any reason to doubt that the text

 4   is accurate?

 5       A    I don't.                                    01:09:54

 6       Q    Mr. Corey Lewis had not signed the

 7   confidentiality agreement with McCandless Group on

 8   May 11, 2020, when you sent this text message,

 9   correct?

10       A    I believe that to be correct.              01:10:13

11        MR. ROLFS:  I'm going to ask the court

12   reporter to please mark this as Exhibit 14.

13        (Exhibit 14 was marked for identification and

14    is attached hereto.)

15   BY MR. ROLFS:                                        01:11:03

16       Q    Do you recognize this document,

17   Mr. McCandless?

18       A    I briefly recall this, yes.

19       Q    This is a text message chain between you and

20   Ms. Jessica Bartlett, correct?                       01:11:40

21       A    That is correct.

22       Q    Could you please go to page 3125.  You'll see

23   the third text message down from you says:

24             "For the person who will be

25        managing the site for you, what email          01:12:11
```

Page 81

CONFIDENTIAL

```
 1          would you like to use for their

 2          login?"

 3          Do you see that?

 4     A    Yes.

 5     Q    And you'll see two text messages down,      01:12:20

 6   Ms. Jessica Bartlett provides an email for Jay

 7   Laurent, correct?

 8     A    Yes.

 9     Q    Did you provide Mr. Jay Laurent with a login

10   for Jessica Bartlett's site?                       01:12:43

11     A    I do not recall.

12          MR. ROLFS:  I'm going to ask the court

13   reporter to mark this as Exhibit 15.

14          (Exhibit 15 was marked for identification and

15     is attached hereto.)                             01:13:40

16   BY MR. ROLFS:

17     Q    Do you recognize this document,

18   Mr. McCandless?

19     A    I don't recall the conversation, but it's got

20   my name.                                           01:14:01

21     Q    Do you have any reason to doubt that this is

22   a text message chain between you and Jessica

23   Bartlett?

24     A    I do not.

25     Q    If you could please go to page 3144.  Do you  01:14:12
```

Page 82

CONFIDENTIAL

1   see the two text messages in blue from you provide

2   the first one, JayLaurentOfficial@gmail.com, and the

3   second one is a string of numbers and symbols --

4   letters and symbols.  Does that help refresh your

5   recollection that you provided Mr. Jay Laurent with     01:14:45

6   a login for Jessica Bartlett's site?

7        A    That's how it appears, yes.

8        Q    Does McCandless Group use different levels of

9   access for its websites?

10       A    Yes, we do.                                    01:15:05

11       Q    Is one of those levels subscriber-level

12  access?

13       A    Yes.

14       Q    Is one of those creator-level access?

15       A    Yes.                                           01:15:16

16       Q    Are there any others?

17       A    Yes.  We have a content manager access, as

18  well as an admin access.

19       Q    What kind of access did you grant Mr. Jay

20  Laurent?                                                 01:15:36

21       A    I do not recall.

22       Q    If you could please go back to Exhibit 14 and

23  look at page 3125.  And do you see the second blue

24  text message from you asks:

25            "For the person who will be                    01:16:29

Page 83

CONFIDENTIAL

```
 1          managing the site for you, what email

 2          would you like to use for their

 3          login?"

 4          Jessica Bartlett responds two text messages

 5     later, "Jay Laurent," correct?                    01:16:39

 6     A   That's correct.

 7     Q   What kind of access would you have granted

 8  someone who would be managing a site for a model?

 9     A   I do not recall at this time.

10     Q   It wouldn't have been subscriber-level        01:17:04

11  access, though, correct?

12          MR. CHING:  Objection.  Calls for

13  speculation.

14          You can answer if you know.

15          THE WITNESS:  It would not have been         01:17:15

16  subscriber access.

17  BY MR. ROLFS:

18     Q   The access you granted Jay Laurent would

19  either have been creator-level access or

20  content-manager-level access, correct?             01:17:25

21          MR. CHING:  Objection.  Calls for

22  speculation.

23          THE WITNESS:  I believe so.

24  BY MR. ROLFS:

25     Q   What features can someone with creator-level  01:17:39
```

Page 84

CONFIDENTIAL

1    access access on a McCandless Group website?

2        A    During this time, what I recall is ability to

3    post content, manage the chat, and see the

4    reporting.

5        Q    And when you say "see the reporting," are you    01:18:08

6    referring to the financial reporting showing the

7    performance of the site?

8        A    Seeing their earnings, yes, for a creator.

9        Q    What was different, if anything, about the

10   level of access that a content manager login would    01:18:25

11   provide?

12       A    From what I recall, a content manager would

13   not show their earnings they're reporting.

14       Q    Does McCandless Group have a nondisclosure or

15   confidentiality agreement with Jay Laurent?    01:18:53

16       A    I do not recall.

17       Q    How did McCandless Group's DMCA takedown

18   service work in 2020?

19       A    From what I recall in 2020, if we found

20   content was leaked or if we were informed that    01:19:31

21   content was leaked, we would report it to the source

22   where the content is, to the web hosting provider,

23   and to the Google search engine.

24       Q    How did McCandless Group go about trying to

25   find infringing content?    01:20:03

Page 85

CONFIDENTIAL

1          A    We would search on the behalf of our clients.

2          Q    What would McCandless Group use to search for

3     infringing content?

4          A    Search engines.  Popular sources where leaked

5     content would appear.                                01:20:27

6          Q    What search engines did McCandless Group use

7     to look for infringing content?

8          A    Primarily Google.

9          Q    What popular sources would McCandless Group

10    check to look for infringing content?                01:20:50

11          MR. CHING:  Objection.  Vague as to

12    "popular."

13          THE WITNESS:  The most common one I recall is

14    Reddit.

15    BY MR. ROLFS:                                         01:21:01

16          Q    Do you recall any other sources that

17    McCandless Group would check for infringing content?

18          A    Instagram.  There's various forum sites.  I'm

19    not recalling all of them.

20          Q    Tell me all of them that you can recall.    01:21:32

21          A    Twitter.  Google Images.  That's what I

22    recall.

23          Q    How did McCandless Group use the search

24    engine Google to look for infringing content?

25          A    Through various search terms that we        01:22:26

Page 86

CONFIDENTIAL

| | |
|---|---|
| 1 | discovered leaked content would typically appear. |
| 2 | Q   What kind of search terms would those be? |
| 3 | A   We would put the client's name in parentheses |
| 4 | for direct match and then search common key terms |
| 5 | like "leaked," "nude," "OnlyFans," and other search   01:22:58 |
| 6 | terms that would relate to the nature of the |
| 7 | content. |
| 8 | Q   Who at McCandless Group was responsible for |
| 9 | looking for leaked infringing content? |
| 10 | A   I do not recall at this time, during this   01:23:22 |
| 11 | time. |
| 12 | Q   Did McCandless Group hire any employees in |
| 13 | 2020 -- scratch that. |
| 14 | Did McCandless Group have any employees in |
| 15 | 2020 who were responsible for searching for   01:23:46 |
| 16 | infringing content? |
| 17 | A   I'm not recalling. |
| 18 | Q   Did McCandless Group contract with anyone who |
| 19 | is not an employee to search for infringing content |
| 20 | in 2020?   01:24:13 |
| 21 | A   I do not believe so. |
| 22 | Q   Were there individuals working for McCandless |
| 23 | Group in 2020 whose job it was to search for |
| 24 | infringing content? |
| 25 | A   I believe so, but I'm not a hundred percent   01:24:35 |

Page 87

CONFIDENTIAL

```
1    sure.

2        Q   Do you recall the names of anyone McCandless

3    Group has used to search for infringing content?

4            MR. CHING:  Objection.  Vague as to time.

5            THE WITNESS:  During what time period?        01:25:05

6    BY MR. ROLFS:

7        Q   Any time period.

8        A   I've had people on my team search for

9    content -- sorry.  What was the question again?

10       Q   I was asking if you can give me the names of  01:25:23

11   any of the people McCandless Group has used at any

12   time to search for infringing content?

13       A   From what I recall, I have had Connor search

14   for content, I have searched for content, my clients

15   have searched for their own content.  I have someone  01:25:51

16   on my team now who actively searches for content.

17   His name is just escaping me this second.  And the

18   people that were running chat portions of my

19   clients' sites would also inform me of content that

20   was leaked to shut down.                              01:26:25

21       Q   Were the people who ran the chat portions

22   actively searching for infringing content?

23       A   I'm not recalling during this time.

24       Q   Can you think of anyone else besides Connor

25   McCandless, yourself, clients, and the people who     01:26:49
```

Page 88

CONFIDENTIAL

```
1    ran the chat portions of McCandless Group who

2    McCandless Group has used to search for infringing

3    content?

4        A    Yes.  I have someone right now that handles

5    that for us as his full responsibility.           01:27:11

6        Q    When did that individual start working for

7    McCandless Group?

8        A    I do not -- I do not recall.

9        Q    Do you remember approximately what year that

10   person started working for McCandless Group?       01:27:33

11       A    I'm not recalling.

12       Q    Was that person working for McCandless Group

13   in 2020?

14       A    I do not recall.

15           MR. CHING:  Do you want to take five minutes?  01:27:55

16           MR. ROLFS:  Sure.

17           THE VIDEOGRAPHER:  The time is 1:27 p.m.  Off

18   record.

19           (Recess.)

20           THE VIDEOGRAPHER:  The time is 1:34 p.m.        01:34:36

21   We're back on record.

22   BY MR. ROLFS:

23       Q    Mr. McCandless, before the break we were

24   discussing an individual whose name you can't recall

25   who helps identify infringing content for McCandless  01:34:50
```

Page 89

CONFIDENTIAL

```
 1    Group, correct?

 2        A    That is correct.

 3        Q    Are you able to remember his name now or you

 4    still can't recall?

 5        A    It's -- it starts with a T.  Taras, something    01:35:06

 6    like that.  It's a foreign name.

 7        Q    Is Taras an employee of McCandless Group?

 8        A    He is not an employee, no.

 9        Q    Is Taras an independent contractor of

10    McCandless Group?                                          01:35:36

11        A    Yes.

12        Q    Is McCandless Group's contract with Taras

13    personally or is it with a company that Taras works

14    for?

15        A    From what I recall, it's with him personally.    01:35:53

16        Q    Is there any confidentiality or nondisclosure

17    agreement between Taras and McCandless Group?

18        A    I believe so, but I'm not a hundred percent

19    positive.

20        Q    What can you tell me about this contract that    01:36:16

21    you believe exists with Taras?

22        A    It would be the normal contract we use that

23    would include nondisclosure, confidentiality

24    provisions.  It could have had noncompete

25    provisions.  That's what I recall it would have           01:36:52
```

Page 90

CONFIDENTIAL

```
1    been.

2        Q   You just referred to a normal contract.  What

3    are you referring to?

4        A   What I'm referring to is a nondisclosure

5    agreement that we would send.                          01:37:07

6        Q   Is that the same nondisclosure agreement that

7    you sent to Corey Lewis?

8        A   I do not recall if it was the same.

9        Q   Would it have been a similar nondisclosure

10   agreement?                                              01:37:29

11           MR. CHING:  Vague as to "similar."

12           You can answer.

13           THE WITNESS:  I do not recall.

14   BY MR. ROLFS:

15       Q   Does McCandless Group have a confidentiality   01:37:41

16   or nondisclosure agreement with Connor McCandless?

17       A   We have an independent contractor agreement

18   that has nondisclosure provisions.

19       Q   Connor McCandless is an independent

20   contractor of McCandless Group?                        01:38:02

21       A   That is correct.

22       Q   How long has Connor McCandless been an

23   independent contractor of McCandless Group?

24       A   I do not recall exactly.  I do not recall

25   exactly.                                                01:38:33
```

Page 91

CONFIDENTIAL

```
 1    McCandless Group offering to potential clients?

 2            MR. CHING:  Objection.  Vague.

 3            You can answer.

 4            THE WITNESS:  We offer different revenue

 5    share percentages to influencers based upon the      01:41:12

 6    potential we saw in them.

 7    BY MR. ROLFS:

 8        Q    What different revenue share options did

 9    McCandless Group offer in 2020 depending on the

10    following of the influencer?                         01:41:27

11        A    In terms of what exactly?

12        Q    What different revenue share options did

13    McCandless Group offer in 2020?

14        A    We would have different revenue share

15    percentages in terms of what they kept versus what   01:41:51

16    we kept.

17        Q    How did you decide what revenue share to

18    offer a potential client?

19        A    By analyzing the performance of who we would

20    be signing, reviewing their social media accounts to 01:42:08

21    look at their following, their engagement, and based

22    upon the data we had on similar clients, have an

23    understanding of how well they would perform.

24    Therefore, that would determine what percentage we

25    would offer.                                         01:42:26
```

Page 93

CONFIDENTIAL

```
 1        Q    Who made the decision, after reviewing the
 2   data you just described, of what percentage to offer
 3   an influencer?
 4        A    On most deals it was me.
 5        Q    Were there any particular rules you followed    01:42:40
 6   in determining what revenue share percentage to
 7   offer a client based on the data you reviewed?
 8             MR. CHING:   Objection.   Vague as to "rules."
 9             THE WITNESS:   What do you mean by "rules"?
10   BY MR. ROLFS:                                             01:43:12
11        Q    I'm asking if there is any criteria that you
12   could tell me that you used to decide, based on the
13   data that you reviewed, what revenue share
14   percentage to offer a model?
15             MR. CHING:   Objection.   Vague.               01:43:29
16             THE WITNESS:   We would look at their
17   following, their engagement, compare them to other
18   clients we have and how they're performing to
19   determine what percentage we would offer.
20   BY MR. ROLFS:                                             01:43:41
21        Q    Were there any rules you followed that you
22   applied to that data in order to decide what revenue
23   share to offer a model?
24             MR. CHING:   Objection.   Vague.
25             THE WITNESS:   Again, what do you mean by      01:43:54
```

Page 94

CONFIDENTIAL

1    "rules"?

2    BY MR. ROLFS:

3        Q    Did you have any rule that you would offer a

4    particular revenue share based on a particular

5    number of, say, Instagram followers?                    01:44:11

6            MR. CHING:  Objection.  Vague.

7            You can answer if you know.

8            THE WITNESS:  We would look at followers,

9    their engagement, and the quality of their audience,

10   look at the data we have from similar clients.  And    01:44:28

11   typically the higher their earning potential, we

12   would offer a more favorable revenue share to them.

13   BY MR. ROLFS:

14       Q    Was the ultimate decision of what revenue

15   share to offer based on that criteria yours?            01:44:44

16           MR. CHING:  Objection.  Asked and answered.

17           THE WITNESS:  Can you rephrase that question?

18   BY MR. ROLFS:

19       Q    Were you the ultimate decisionmaker in

20   deciding what revenue share to offer a model based     01:45:02

21   on the consideration of all the data you just

22   described?

23           MR. CHING:  Objection.  Asked and answered.

24           THE WITNESS:  Yes, I was.

25   ////

Page 95

CONFIDENTIAL

```
 1    BY MR. ROLFS:

 2        Q    You didn't apply any written rules in

 3    deciding what revenue share to offer a model based

 4    upon your analysis of the data we just described,

 5    correct?                                            01:45:32

 6            MR. CHING:  Objection.  Vague.

 7            You can answer if you know.

 8            THE WITNESS:  I do not recall if I had

 9    written rules.

10    BY MR. ROLFS:                                       01:45:41

11        Q    You made a judgment call, based on reviewing

12    all the data, about what revenue share to offer a

13    model, correct?

14            MR. CHING:  Objection.  Vague.

15            You can answer if you understand.           01:45:53

16            THE WITNESS:  Can you rephrase that?

17    BY MR. ROLFS:

18        Q    Do you know what a judgment call is,

19    Mr. McCandless?

20        A    Yes, I know what a judgment call is.       01:46:00

21        Q    Did you make a judgment call, based on all of

22    the data you considered, in deciding what revenue

23    share to offer a model?

24        A    Yes, I did.

25            MR. ROLFS:  I'm going to ask the court       01:46:42
```

Page 96

CONFIDENTIAL

1    reporter to mark this as Exhibit 16.

2            (Exhibit 16 was marked for identification and

3        is attached hereto.)

4    BY MR. ROLFS:

5        Q   Do you recognize this email, Mr. McCandless?    01:47:10

6        A   I don't remember sending this one

7    specifically, but I remember sending similar

8    e-mails.

9        Q   Do you have any reason to doubt that this is

10   an email that you sent to someone named Madi on        01:47:31

11   August 19, 2020?

12       A   No, I do not.

13       Q   If you could please look at the paragraph

14   that follows the list of domains and look at the

15   second sentence.  Do you see that it says:            01:47:49

16           "We offer both self-managed and

17           fully managed options, with

18           self-managed operating at an 80/20

19           revenue share and fully managed

20           operating at a 60/40 revenue share."          01:48:07

21       Do you see that?

22       A   I do see that.

23       Q   Did you require Madi to sign a nondisclosure

24   or confidentiality agreement before you sent her

25   this email?                                            01:48:21

Page 97

CONFIDENTIAL

```
 1        A    I do not believe so.

 2        Q    Have you ever asked any model to sign a

 3   confidentiality or nondisclosure agreement before

 4   sending them proposed pricing terms for their

 5   website?                                            01:48:33

 6        A    No, because I do not disclose to them how we

 7   calculated the percentage we offered them.

 8        Q    You disclosed the percentages you were

 9   offering to models for their revenue share without

10   requiring them to sign a confidentiality agreement,   01:49:02

11   correct?

12        A    The revenue shares varied based on the

13   client, but yes.

14        MR. ROLFS:   I'm going to ask the court

15   reporter to mark this as Exhibit 17.                01:49:44

16        (Exhibit 17 was marked for identification and

17     is attached hereto.)

18   BY MR. ROLFS:

19        Q    Do you recognize this email, Mr. McCandless?

20        A    Yes.                                       01:50:09

21        Q    This is an email you sent to a Kevin Mohr on

22   February 27, 2020, correct?

23        A    That's what it states.

24        Q    Do you have any reason to doubt that you sent

25   this email?                                          01:50:34
```

Page 98

CONFIDENTIAL

```
 1        A    I do not.

 2        Q    Do you see in the final sentence in the first

 3   paragraph, it says:

 4                   "Please contact our payment

 5            processing partner at https:              01:50:45

 6            Support.CCBill.com so that you don't

 7            miss out on the amazing content."

 8            Do you see that?

 9        A    I do see that.

10        Q    Why did you refer to CCBill as your payment   01:50:58

11   processing partner?

12        A    Because that's what they were.

13        Q    CCBill was your partner, correct?

14            MR. CHING:  Objection.  Calls for a legal

15   conclusion.  And vague as to the word "partner."   01:51:14

16            THE WITNESS:  CCBill was who we used for our

17   payment processing.

18   BY MR. ROLFS:

19        Q    And you called the company that you used for

20   payment processing your partner, correct?          01:51:27

21            MR. CHING:  Objection.  Calls for a legal

22   conclusion.  And vague as to the word "partner."

23            THE WITNESS:  It states "partner" in the

24   email.

25   ////
```

Page 99

CONFIDENTIAL

1    BY MR. ROLFS:

2        Q    You used the word "partner" to describe

3    McCandless Group's relationship to CCBill, correct?

4            MR. CHING:   Objection.   Vague as to the word

5    "partner" and calls for a legal conclusion.        01:51:49

6            THE WITNESS:   In this email, yes.

7    BY MR. ROLFS:

8        Q    Were all of the terms of your partnership

9    with CCBill contained in the services agreement for

10   payment processing you signed with CCBill?        01:52:06

11           MR. CHING:   Objection.   Calls for a legal

12   conclusion.   Vague as to the word "partnership."

13           THE WITNESS:   I do not recall.

14   BY MR. ROLFS:

15       Q    Does McCandless Group have a services       01:52:20

16   agreement with CCBill?

17       A    Yes.   We would have an agreement with them.

18       Q    Are there any terms of the relationship

19   between McCandless Group and CCBill that are not

20   contained in that agreement?                        01:52:37

21       A    I do not recall.

22       Q    When you described CCBill as a partner, you

23   were referring to the arrangement between McCandless

24   Group and CCBill documented by your services

25   agreement with CCBill, correct?                     01:52:56

Page 100

CONFIDENTIAL

1          MR. CHING:  Objection.  Calls for a legal

2     conclusion.  Vague as to the word "partner."

3          THE WITNESS:  We're stating that we use them

4     as our payment processing.

5     BY MR. ROLFS:                                    01:53:12

6          Q   And you use -- and you use CCBill for payment

7     processing pursuant to a services agreement between

8     McCandless Group and CCBill, correct?

9          A   Yes, we do.

10         Q   One of McCandless Group's pitches to          01:53:23

11    potential clients is that if they go with McCandless

12    Group, they will get to own their own subscribers,

13    correct?

14         MR. CHING:  Objection.  Vague.

15         THE WITNESS:  I'm not recalling -- I'm not       01:54:06

16    recalling.

17         MR. ROLFS:  I'm going to ask the court

18    reporter to please mark this as Exhibit 18.

19         (Exhibit 18 was marked for identification and

20     is attached hereto.)                               01:54:42

21    BY MR. ROLFS:

22         Q   Do you recognize this document?

23         A   I don't recall, but it looks like something

24    similar we would send or I would send.

25         Q   Do you have any reason to doubt that this is  01:54:57

Page 101

CONFIDENTIAL

```
1    sent to Coy?

2          MR. CHING:  Objection.  Foundation.  And

3    vague.

4          THE WITNESS:  After the first page, the

5    subsequent pages were sent to Coy.            02:01:31

6    BY MR. ROLFS:

7      Q   And the first couple pages are notes and

8    questions about that letter that would subsequently

9    be sent to Coy, correct?

10     A   I don't recall who this communication is   02:01:52

11   between, this first page.

12     Q   Let's start with the first note.  The second

13   sentence says:

14           "That's an important asset now

15           that I understand you own the     02:02:09

16           domains."

17         You didn't write that, correct?

18         MR. CHING:  Objection.  Document speaks for

19   itself.

20         THE WITNESS:  I don't recall if I typed that  02:02:24

21   or not, who that's from.

22   BY MR. ROLFS:

23     Q   The text in blue below says:

24           "Yep, I have done many things

25     like this to lock people in without   02:02:39
```

Page 106

CONFIDENTIAL

1          them even knowing it, so we can

2          definitely use this as leverage since

3          I own and control all of their

4          domains, except for a couple that the

5          models already owned."                              02:02:49

6          Do you see that?

7     A    I do see that.

8     Q    You wrote that, correct?

9          MR. CHING:  Objection.  Foundation.

10         THE WITNESS:  I believe so.                         02:03:02

11    BY MR. ROLFS:

12    Q    You weren't lying when you wrote that,

13    correct?  That accurately describes your business

14    practices?

15         MR. CHING:  Objection.  Argumentative.              02:03:15

16         THE WITNESS:  I wouldn't say that's our

17    business practice.

18         (Reporter clarification.)

19         THE WITNESS:  I'm saying I'm not -- sorry.

20         Can you ask the question again?  I'm              02:03:40

21    confused.

22    BY MR. ROLFS:

23    Q    I'll just ask a new question.

24    A    Yeah.

25    Q    When you wrote this, you weren't              02:03:44

                                          Page 107

CONFIDENTIAL

```
 1    misrepresenting anything about your business

 2    practices, correct?

 3         MR. CHING:  Objection.  Calls for a legal

 4    conclusion.

 5         THE WITNESS:  I wouldn't state this was our    02:03:55

 6    business practice.

 7    BY MR. ROLFS:

 8       Q   That's not exactly my question,

 9    Mr. McCandless.  What I was asking you is when you

10    wrote this, you weren't misrepresenting anything to    02:04:05

11    whoever you wrote this to, correct?

12         MR. CHING:  Objection.  Calls for a legal

13    conclusion.  And vague.  I think there's a double

14    negative.

15         THE WITNESS:  I'm not clear on that.    02:04:24

16    BY MR. ROLFS:

17       Q   Were you trying to accurately describe your

18    business practices to whoever you wrote this to?

19         MR. CHING:  Objection.  Vague as to "business

20    practices."    02:04:42

21         THE WITNESS:  I'm responding to -- I wouldn't

22    say this is a general business practice.  I'm just

23    commenting on the domains.

24    BY MR. ROLFS:

25       Q   Were you trying to mislead whoever you wrote    02:05:30
```

Page 108

CONFIDENTIAL

```
 1    this to?

 2         MR. CHING:  Objection.  Calls for a legal

 3    conclusion.  And calls for speculation as to what

 4    someone else might believe.

 5         THE WITNESS:  I didn't have the intent of      02:05:45

 6    misleading.

 7    BY MR. ROLFS:

 8      Q   Do you recall that you wrote this to Jason

 9    Moskowitz?

10         MR. CHING:  Objection.  Foundation.           02:05:55

11         THE WITNESS:  I don't recall sending this to

12    Jason Moskowitz, but it could have been him,

13    considering the conversations we were having.

14    BY MR. ROLFS:

15      Q   McCandless Group did, in fact, refuse to turn 02:06:15

16    over the domains to Coy that are referenced in this

17    sentence you wrote, correct?

18         MR. CHING:  Objection.  Calls for

19    speculation.  Legal conclusion.  And vague.

20         THE WITNESS:  Which sentence are you           02:06:33

21    referring to?

22    BY MR. ROLFS:

23      Q   You say:

24              "I own and control all of their

25              domains except for a couple that the     02:06:40
```

                                                    Page 109

CONFIDENTIAL

1          models already owned."

2          Do you see the reference to "all of their

3     domains"?

4       A    Yes.

5       Q    Now, there were some domains for Coy's model    02:06:48

6     websites that you built that were owned by the

7     models, correct?

8       A    Sorry.  Can you ask that question again?

9       Q    Some of the domains for the websites that

10    McCandless Group built for Coy were owned by the    02:07:09

11    models, correct?

12      A    That is correct.

13      Q    Most of the domains for the websites

14    McCandless Group built for Coy were owned by

15    McCandless Group, correct?                          02:07:22

16      A    From what I recall, yes.

17      Q    McCandless Group acquired those domains,

18    correct?

19          MR. CHING:  Objection.  Vague as to

20    "acquired."                                          02:07:34

21          THE WITNESS:  We purchased the domains.

22    BY MR. ROLFS:

23      Q    And those domains that we're talking about

24    McCandless Group refused to turn over to Coy after

25    McCandless Group terminated the web development    02:07:49

Page 110

CONFIDENTIAL

```
 1    agreement between Coy and McCandless Group, correct?

 2              MR. CHING:  Objection.  Foundation.  And

 3    vague.

 4              THE WITNESS:  We turned over a couple of the

 5    domains.                                            02:08:04

 6    BY MR. ROLFS:

 7        Q    Which domains did you turn over?

 8        A    KikiPasso.com and JessicaMBartlett.com.

 9        Q    When did you turn over Kiki Passo's domain?

10        A    I believe it would have been February 2021, I  02:08:24

11    believe.

12        Q    When did you turn over Jessica Bartlett's

13    domain?

14        A    It would have been at the same time, so I

15    believe February 2021.                              02:08:44

16        Q    You did not turn over any of the other

17    domains at any point in 2021, did you?

18              MR. CHING:  Objection.  Vague.

19              THE WITNESS:  From what I recall, no.

20    BY MR. ROLFS:                                       02:09:05

21        Q    And that's because, like you wrote here in

22    this blue text, you thought that controlling their

23    domains was leverage, correct?

24        A    No.  It's because my contract stated that we

25    owned the services that we provided and we purchased  02:09:27
```

<div align="right">Page 111</div>

CONFIDENTIAL

```
1    those domains.

2        Q   You believe that McCandless Group owned the

3    domains that we're referring to?

4        A   Yes.

5        Q   And you believe that you had a right to          02:09:44

6    continue using those domains even though they

7    consisted in most cases of the names of the models,

8    correct?

9            MR. CHING:  Objection.  Vague as to the word

10   "right."                                                02:10:03

11           THE WITNESS:  We were not using the domains.

12   BY MR. ROLFS:

13       Q   You kept domains that you were not using,

14   correct?

15       A   That is correct.                                02:10:13

16       Q   You kept those domains solely as leverage

17   against Coy, correct?

18           MR. CHING:  Objection.  Calls for

19   speculation.  And a legal conclusion.

20           THE WITNESS:  No.  I kept them because the      02:10:26

21   contract stated that we owned them.

22   BY MR. ROLFS:

23       Q   You didn't use the domains, did you?

24       A   No, we didn't.

25       Q   You kept domains you had no use for, correct?   02:10:33
```

Page 112

CONFIDENTIAL

1          MR. CHING:   Objection.  Asked and answered.

2          THE WITNESS:   Correct.

3    BY MR. ROLFS:

4       Q    When did you first learn that Coy wanted to

5    be a technology company?                        02:10:58

6       A    When Jessica Bartlett posted on Instagram

7    that Coy was going to be a technology company from

8    the beginning.

9       Q    When was that?

10      A    After the partnership ended.  So it would    02:11:13

11   have been sometime during the earlier half of 2021,

12   I believe.

13         MR. ROLFS:   I'm going to ask the court

14   reporter to please mark this exhibit as 20.

15         (Exhibit 20 was marked for identification and   02:11:57

16      is attached hereto.)

17   BY MR. ROLFS:

18      Q    This is an email that Jessica Bartlett sent

19   you on August 31, 2020, correct?

20      A    Correct.                                 02:12:37

21      Q    I'd like you to please look at the section

22   under "About" on the first page.  You'll see it

23   says:

24              "At Coy Co. we empower creators

25              to capitalize on you.  Coy Co. is a     02:12:55

                                         Page 113

CONFIDENTIAL

```
 1          full-service technology company."

 2          Do you see that?

 3     A    I do see that.

 4     Q    After you received this email, did you ever

 5  reach out to Jessica Bartlett to ask why Coy was      02:13:09

 6  describing itself as a full-service technology

 7  company?

 8     A    I did not ask her.

 9     Q    Did you ever reach out to Corey Lewis to ask

10  why Coy was describing itself as a full-service        02:13:22

11  technology company?

12     A    I did not ask Corey, from my knowledge.

13     Q    Did you ever contact Thomas Drew to ask why

14  Coy was describing itself as a full-service

15  technology company?                                    02:13:37

16     A    From the best of my knowledge, no.

17     Q    Did you ever reach out to anyone else at Coy

18  to ask why Coy was describing itself as a

19  full-service technology company?

20     A    I do not believe so.                           02:13:52

21     Q    I apologize if I've already asked this, but

22  did you ever provide any of McCandless Group's code

23  for its websites to anyone at Coy?

24          MR. CHING:  Objection.  Vague as to "code."

25          You can answer.                                02:14:25
```

<div align="right">Page 114</div>

CONFIDENTIAL

```
 1          THE WITNESS:  Define what you mean by "code."
 2    BY MR. ROLFS:
 3      Q    What do you understand website code to be?
 4      A    Website code would be the inner working
 5    language that is written within the technology that   02:14:35
 6    makes it operate.
 7      Q    Did you ever send any of the coding language
 8    for McCandless Group's websites to anyone at Coy?
 9      A    They were provided the tech stack with all
10    the languages we used, the technologies we used, and   02:14:52
11    how they worked together, yes.
12      Q    My question was a little bit different,
13    Mr. McCandless.  I'm specifically asking you about
14    the actual coding language, not -- let me strike
15    that.                                                  02:15:05
16          I'm asking you specifically about the actual
17    code that was behind the McCandless Group websites.
18    Did you ever send that to anyone at Coy?
19          MR. CHING:  Objection.  Vague.
20          You can answer.                                  02:15:20
21          THE WITNESS:  I never sent the code directly,
22    but through discovery, we see that they went through
23    the code.
24    BY MR. ROLFS:
25      Q    What are you referring to when you say "they   02:15:31
```

Page 115

CONFIDENTIAL

```
 1            had."

 2            And some sites are listed.

 3                "Do we have any way of accessing

 4            these sites somehow, even though they

 5            are down, to see as much of the source        02:19:15

 6            code as possible or getting as much

 7            information on these sites before they

 8            shut them down?"

 9            Did you write that, Mr. McCandless?

10            MR. CHING:  Objection.  Document speaks for    02:19:25

11     itself.

12            THE WITNESS:  Yes, I did.

13     BY MR. ROLFS:

14        Q    You were asking Mr. Prajapati to try to

15     obtain the source code for the Coy websites that it   02:19:31

16     built after you terminated the Coy website

17     development agreement, correct?

18        A    For the purposes of seeing what they stole

19     from us.

20        Q    You didn't have permission from Coy to access  02:19:45

21     the code for any of these websites, did you?

22        A    Source code is public.

23        Q    Is McCandless Group's source code public?

24        A    No, it's not.

25        Q    I thought you just said that source code was   02:20:08
```

Page 118

CONFIDENTIAL

```
 1    public.

 2       A    Source code can be public if you don't put

 3    security measures in place, which is why I asked if

 4    we were able to see it.   We never had any access to

 5    their website, so any type of source code we could        02:20:25

 6    have gotten would have been public.

 7       Q    Did you ask Mr. Prajapati to only obtain

 8    public source code in this text chain?

 9          MR. CHING:   Objection.   Document speaks for

10    itself.                                                    02:20:38

11          THE WITNESS:   I did not state the word

12    "public," but we never had access to anything.   So

13    the only source code we could have accessed would

14    have been public.

15    BY MR. ROLFS:                                              02:20:46

16       Q    Did Mr. Prajapati, in fact, access any of

17    Coy's source code?

18       A    I do not recall.

19          MR. ROLFS:   Let's take a break.

20          MR. CHING:   Sure.                                   02:21:11

21          THE VIDEOGRAPHER:   The time is 2:21 p.m.   Off

22    the record.

23          (Recess.)

24          THE VIDEOGRAPHER:   The time is 2:35 p.m.

25    We're back on record.                                     02:35:16
```

Page 119

CONFIDENTIAL

```
 1          MR. ROLFS:  I'm going to ask the court

 2     reporter to mark this as Exhibit 22.

 3          (Exhibit 22 was marked for identification and

 4       is attached hereto.)

 5     BY MR. ROLFS:                                    02:35:41

 6       Q   Do you recognize this document,

 7     Mr. McCandless?

 8       A   I do not recall, but this is my user name on

 9     Skype.

10       Q   Is this a text message chain between you and   02:36:17

11     someone named Mark Lenteken?

12       A   Yes, that's what it says.

13       Q   Do you have any reason to doubt that that is

14     accurate?

15       A   No, I do not.                                02:36:36

16       Q   Who is Mark Lenteken?

17       A   Based on this conversation, I believe he was

18     a designer.

19       Q   You'll see the date of this text message

20     chain is February 18, 2021, correct?                 02:37:05

21       A   Yes.

22       Q   That's approximately two months after Coy and

23     McCandless Group's relationship ceased, correct?

24       A   Correct.

25       Q   You're asking Mr. Lenteken to do a design for  02:37:21
```

                                                    Page 120

CONFIDENTIAL

1    you in this text chain, correct?

2        A    Yes.

3        Q    You provided Mr. Lenteken a design on

4    page 14752, correct?

5        A    Yes.                                      02:37:44

6        Q    This design was a design you received from

7    Coy, correct?

8        A    Yes.

9        Q    McCandless Group copied the design that it

10   received from Coy for its own webpages, didn't it?    02:38:04

11          MR. CHING:   Objection.  Foundation.

12          THE WITNESS:  We modified a design.

13   BY MR. ROLFS:

14       Q    You took a design that Coy had provided you,

15   modified it, and used it for your own websites,      02:38:23

16   correct?

17       A    We used it to influence a modified design.

18       Q    If you look at the text message on page 14752

19   that you sent, underneath the design it says:

20            "So you'll see this design in              02:38:52

21          elements.  We already built this, but

22          we want to change the design without

23          changing the elements."

24          Do you see that?

25       A    I do see that.                             02:39:00

                                        Page 121

CONFIDENTIAL

1          Q    McCandless Group used the elements from a Coy

2     Collective web design for its own websites, correct?

3          MR. CHING:  Objection.  Foundation.

4          THE WITNESS:  Sorry.  Can you ask the

5     question again?                                    02:39:26

6     BY MR. ROLFS:

7          Q    McCandless Group used the elements from a

8     design from The Coy Collective for its own websites,

9     correct?

10         MR. CHING:  Objection.  Foundation.  And       02:39:38

11    vague.

12         THE WITNESS:  We used it as a -- to influence

13    a modified design for our websites.

14    BY MR. ROLFS:

15         Q    You specifically told Mr. Lenteken that you   02:39:52

16    did not want him to change the elements of the

17    design, correct?

18         MR. CHING:  Objection.  Document speaks for

19    itself.  And foundation.

20         THE WITNESS:  I did say "without changing the   02:40:07

21    elements."

22    BY MR. ROLFS:

23         Q    And you weren't making any kind of mistake in

24    terms of your directions to Mr. Lenteken when you

25    told him that, correct?                             02:40:25

Page 122

CONFIDENTIAL

1          MR. CHING:  Objection.  Vague.

2          THE WITNESS:  That was stated because we

3   created technology to manage the design that we

4   owned that we wanted to modify, so it wasn't a copy.

5   BY MR. ROLFS:                                        02:40:45

6      Q   Are you contending, Mr. McCandless, that

7   McCandless Group owned this image on the top of

8   page 14752?

9          MR. CHING:  Objection.  Foundation.  Calls

10  for a legal conclusion.                              02:40:56

11         THE WITNESS:  I'm not stating that we owned

12  that image.  I'm stating that we owned the

13  technology behind it.

14  BY MR. ROLFS:

15     Q   The image was provided to you by Coy         02:41:07

16  Collective, correct?

17         MR. CHING:  Objection.  Foundation.

18         THE WITNESS:  I believe it was provided by

19  someone working with Coy.

20  BY MR. ROLFS:                                        02:41:22

21     Q   And you directed Mr. Lenteken to use that

22  image that was provided by Coy for McCandless

23  Group's websites without changing the elements,

24  correct?

25         MR. CHING:  Objection.  Document speaks for   02:41:35

                                              Page 123

CONFIDENTIAL

```
 1          MR. CHING:  Objection.  Calls for

 2    speculation.

 3          THE WITNESS:  I do not recall.

 4    BY MR. ROLFS:

 5      Q   When you terminated McCandless Group's    02:50:43

 6    agreement with Coy, you intended to cut Coy off from

 7    the subscriber data for the Coy websites, correct?

 8          MR. CHING:  Objection.  Foundation.

 9          THE WITNESS:  We were going to follow the

10    contract that we had with Coy.                     02:50:56

11    BY MR. ROLFS:

12      Q   That's not exactly what I asked you,

13    Mr. McCandless.  I asked you if, when you terminated

14    McCandless Group's agreement with Coy, you intended

15    to cut Coy off from the subscriber data for the Coy  02:51:05

16    websites?

17          MR. CHING:  Objection.  Foundation.  And

18    vague.

19          THE WITNESS:  The data that was ours, we were

20    not going to provide.                               02:51:18

21    BY MR. ROLFS:

22      Q   That wasn't my question.

23          My question was, when you terminated

24    McCandless Group's agreement with Coy, you intended

25    to cut Coy off from the subscriber data for the Coy  02:51:31
```

Page 129

CONFIDENTIAL

1   websites, correct?

2          MR. CHING:  Objection.  Vague and foundation.

3          THE WITNESS:  They wouldn't have access to

4   that data.

5   BY MR. ROLFS:                                    02:51:43

6      Q   It was your intent that they wouldn't have

7   access to that data, correct?

8      A   Yes.

9      Q   In fact, you checked with CCBill prior to

10  terminating McCandless Group's agreement with Coy to  02:51:55

11  make sure you could cut Coy off from the subscriber

12  data for its websites, correct?

13         MR. CHING:  Objection.  Vague.

14         THE WITNESS:  I'm sorry.  Can you ask that

15  question again?                                  02:52:08

16  BY MR. ROLFS:

17     Q   You checked with CCBill prior to terminating

18  the Coy agreement to make sure that you could cut

19  Coy off from the subscriber data for its websites,

20  correct?                                         02:52:18

21         MR. CHING:  Objection.  Vague.  And calls for

22  speculation.

23         THE WITNESS:  I don't recall exactly what I

24  asked them.

25         MR. ROLFS:  I'll ask the court reporter to   02:52:29

Page 130

CONFIDENTIAL

1    mark this as next in order.

2          (Exhibit 24 was marked for identification and

3       is attached hereto.)

4          MR. CHING:  Is this Exhibit 24?

5          THE COURT REPORTER:  Yes.                    02:52:49

6    BY MR. ROLFS:

7       Q   Do you recognize this document,

8    Mr. McCandless?

9       A   Yes.

10      Q   Is this a text message chain between you and     02:53:11

11   someone at CCBill named Rita?

12      A   Yes.   It's a Skype message conversation.

13      Q   And the date of this text message chain is

14   October 16, 2020, correct?

15      A   That is correct.                              02:53:29

16      Q   That is before you notified Coy that you were

17   going to terminate the Coy WDA, correct?

18      A   That is correct.  Because conflicts were

19   arising between the partnership.

20      Q   If you look at the last message on the first    02:53:46

21   page, it says:

22            "I just want to confirm

23            something.  I am assuming that in

24            terms of customer data, relationships,

25            terms, et cetera, all of that remains         02:53:56

Page 131

CONFIDENTIAL

```
1          exclusive with me and my company even

2          though Coy Co receives the earnings on

3          their sites, correct?  I am just

4          wanting to confirm that in the event

5          where I decide to no longer work with        02:54:07

6          them, that they would have to get

7          their own account, resulting in higher

8          fees, no account history like I have,

9          no transfer of customer data/info,

10         et cetera, since it's all ran under          02:54:21

11         me, correct?"

12         Do you see that?

13    A    I do see that.

14    Q    You wrote that, correct?

15    A    I did write that.                             02:54:30

16    Q    The next text message in the chain from Rita

17  says, "That is all correct."

18         Do you see that?

19    A    Yes.

20    Q    And you respond:                             02:54:37

21             "Perfect!  Thanks for confirming

22         that for me."

23         Correct?

24    A    Yes.

25    Q    You checked with CCBill prior to terminating 02:54:45
```

Page 132

CONFIDENTIAL

1    the agreement with Coy to make sure you could cut

2    Coy off from the subscriber data for its websites,

3    didn't you?

4        A    I asked so I know -- I knew what the path

5    forward would be.                                    02:55:01

6        Q    You asked specifically if you could cut Coy

7    off from its subscriber data, and you were told yes;

8    isn't that true?

9            MR. CHING:  Objection.  Foundation and vague.

10           THE WITNESS:  I did not state "cut off."      02:55:15

11   BY MR. ROLFS:

12       Q    You asked Rita if Coy would lose access to

13   account history, customer data and info if you

14   terminated the Coy Co agreement, correct?

15       A    Yes, because they never had access to that   02:55:34

16   data.  And they knew that.

17       Q    You wanted to make sure that Coy Co could not

18   have that data if you terminated the contract,

19   correct?

20           MR. CHING:  Objection.  Foundation and vague.  02:55:48

21           THE WITNESS:  I just wanted to understand the

22   path moving forward.

23   BY MR. ROLFS:

24       Q    Why did you ask Rita if Coy Co would have

25   access to customer data and info if you terminated     02:56:01

Page 133

CONFIDENTIAL

```
 1    the Coy Co agreement?

 2          MR. CHING:  Objection.  Asked and answered.

 3          THE WITNESS:  So I understood the steps

 4    moving forward.

 5    BY MR. ROLFS:                                      02:56:11

 6       Q   Was one of the steps moving forward to -- was

 7    one of the steps moving forward to make sure that

 8    Coy would not have access to customer data and info

 9    after you terminated the Coy Co agreement?

10       A   It was to understand if they would have that  02:56:24

11    data or not.

12       Q   What did you find out?

13       A   They informed me they wouldn't.

14       Q   After you learned that Coy Co wouldn't have

15    access to its data, you decided to cut -- to          02:56:41

16    terminate the Coy agreement, correct?

17          MR. CHING:  Objection.  Vague and foundation.

18          THE WITNESS:  That is incorrect.

19    BY MR. ROLFS:

20       Q   You knew that cutting Coy off from the        02:56:52

21    customer data and info would cripple Coy's business,

22    didn't you?

23          MR. CHING:  Objection.  Foundation.  Calls

24    for speculation.

25          THE WITNESS:  That is incorrect.  I did not    02:57:01
```

Page 134

CONFIDENTIAL

```
 1    BY MR. ROLFS:

 2        Q    Mr. McCandless, this is a yes or no question.

 3    Did you want Coy to have access to customer and data

 4    info after you terminated the Coy WDA?

 5            MR. CHING:   Objection.   Asked and answered.    03:00:36

 6    Misstates the witness's prior testimony.   And

 7    relevance.

 8            THE WITNESS:   No, because they agreed to a

 9    McCandless Group service.

10    BY MR. ROLFS:                                           03:00:45

11        Q    CCBill told you that it was possible to

12    transfer customers under Coy Co's CCBill account to

13    a new Coy Co account, correct?

14            MR. CHING:   Objection.   Foundation.

15            THE WITNESS:   I recall the opposite of that.   03:01:05

16            MR. ROLFS:   Let's mark this as Exhibit 25.

17            (Exhibit 25 was marked for identification and

18        is attached hereto.)

19            MR. ROLFS:   I think I pulled the wrong one.

20    BY MR. ROLFS:                                           03:02:02

21        Q    Mr. McCandless, do you recognize this

22    document?

23        A    I do.

24        Q    And is this a text message chain between you

25    and Rita at CCBill?                                     03:02:36
```

Page 138

CONFIDENTIAL

```
 1        A    Both Jessica and McCandless did.

 2        Q    How long was that website kept active?

 3        A    So I believe we transferred the domain to her

 4   February of 2021, so it would have been before -- it

 5   would have had to be before then.                    03:42:58

 6        Q    When did McCandless Group stop operating the

 7   Jessica Bartlett website?

 8        A    Before February 2021.  Or before the domain

 9   was transferred.

10        Q    After February 2021, McCandless Group did not  03:43:14

11   operate a website for Jessica Bartlett, correct?

12        A    If February 2021 is when I transferred the

13   domain, that's when I believe -- that's when I

14   believe we transferred the domain.  Once the domain

15   was transferred, we no longer operated a site.        03:43:35

16        Q    After approximately February 2021, did

17   McCandless Group have any obligation to continue

18   operating a website for Jessica Bartlett?

19             MR. CHING:  Objection.  Vague.

20             THE WITNESS:  What do you mean by           03:43:57

21   "obligation"?

22   BY MR. ROLFS:

23        Q    After approximately February of 2021, was

24   McCandless Group required by any contract to operate

25   a website for Jessica Bartlett?                       03:44:07
```

Page 152

CONFIDENTIAL

1        A    It was not required of us.

2        Q    After approximately February 2021 when

3    McCandless Group stopped operating a website for

4    Jessica Bartlett, did McCandless Group continue to

5    maintain images of Jessica Bartlett on its AWS          03:44:28

6    servers?

7            MR. CHING:  Objection.  Vague as to "continue

8    to maintain images."

9            THE WITNESS:  There were images on our

10    servers that I did not know about until the             03:44:40

11    counterclaims came through.

12    BY MR. ROLFS:

13        Q    When McCandless Group stopped operating the

14    Jessica Bartlett website, did you ask anyone to

15    delete Jessica Bartlett's images from McCandless       03:45:03

16    Group's Amazon servers?

17        A    After we were aware that the images were on

18    the servers and in consulting with counsel, yes.

19        Q    What was the first time you requested that

20    Jessica Bartlett's images be removed from McCandless   03:45:24

21    Group's Amazon servers?

22        A    I believe it to be sometime after the

23    counterclaims were filed.

24            MR. ROLFS:  I am going to ask the court

25    reporter to mark this as Exhibit 28.                   03:45:56

Page 153

CONFIDENTIAL

```
1    BY MR. ROLFS:

2        Q    Mr. McCandless, this is a yes or no question.

3    Did you want Coy to have access to customer and data

4    info after you terminated the Coy WDA?

5            MR. CHING:   Objection.   Asked and answered.   03:00:36

6    Misstates the witness's prior testimony.   And

7    relevance.

8            THE WITNESS:   No, because they agreed to a

9    McCandless Group service.

10   BY MR. ROLFS:                                     03:00:45

11       Q    CCBill told you that it was possible to

12   transfer customers under Coy Co's CCBill account to

13   a new Coy Co account, correct?

14           MR. CHING:   Objection.   Foundation.

15           THE WITNESS:   I recall the opposite of that.   03:01:05

16           MR. ROLFS:   Let's mark this as Exhibit 25.

17           (Exhibit 25 was marked for identification and

18       is attached hereto.)

19           MR. ROLFS:   I think I pulled the wrong one.

20   BY MR. ROLFS:                                     03:02:02

21       Q    Mr. McCandless, do you recognize this

22   document?

23       A    I do.

24       Q    And is this a text message chain between you

25   and Rita at CCBill?                                03:02:36
```

Page 138

CONFIDENTIAL

```
1        A    Both Jessica and McCandless did.

2        Q    How long was that website kept active?

3        A    So I believe we transferred the domain to her

4   February of 2021, so it would have been before -- it

5   would have had to be before then.              03:42:58

6        Q    When did McCandless Group stop operating the

7   Jessica Bartlett website?

8        A    Before February 2021.  Or before the domain

9   was transferred.

10       Q    After February 2021, McCandless Group did not  03:43:14

11  operate a website for Jessica Bartlett, correct?

12       A    If February 2021 is when I transferred the

13  domain, that's when I believe -- that's when I

14  believe we transferred the domain.  Once the domain

15  was transferred, we no longer operated a site.     03:43:35

16       Q    After approximately February 2021, did

17  McCandless Group have any obligation to continue

18  operating a website for Jessica Bartlett?

19          MR. CHING:  Objection.  Vague.

20          THE WITNESS:  What do you mean by          03:43:57

21  "obligation"?

22  BY MR. ROLFS:

23       Q    After approximately February of 2021, was

24  McCandless Group required by any contract to operate

25  a website for Jessica Bartlett?              03:44:07
```

                                        Page 152

CONFIDENTIAL

```
 1        A    It was not required of us.

 2        Q    After approximately February 2021 when

 3   McCandless Group stopped operating a website for

 4   Jessica Bartlett, did McCandless Group continue to

 5   maintain images of Jessica Bartlett on its AWS        03:44:28

 6   servers?

 7             MR. CHING:  Objection.  Vague as to "continue

 8   to maintain images."

 9             THE WITNESS:  There were images on our

10   servers that I did not know about until the           03:44:40

11   counterclaims came through.

12   BY MR. ROLFS:

13        Q    When McCandless Group stopped operating the

14   Jessica Bartlett website, did you ask anyone to

15   delete Jessica Bartlett's images from McCandless      03:45:03

16   Group's Amazon servers?

17        A    After we were aware that the images were on

18   the servers and in consulting with counsel, yes.

19        Q    What was the first time you requested that

20   Jessica Bartlett's images be removed from McCandless  03:45:24

21   Group's Amazon servers?

22        A    I believe it to be sometime after the

23   counterclaims were filed.

24             MR. ROLFS:  I am going to ask the court

25   reporter to mark this as Exhibit 28.                  03:45:56
```

                                        Page 153

CONFIDENTIAL

```
 1    BY MR. ROLFS:

 2        Q    Mr. McCandless, were you willing to continue

 3    providing services to Coy under the existing terms

 4    of the Coy-McCandless Group web development

 5    agreement?                                        04:22:26

 6            MR. CHING:  Objection.  Calls for a legal

 7    conclusion.  Vague.  Asked and answered.

 8            THE WITNESS:  We may have accepted them with

 9    additional terms added.  There would have had to

10    have been modifications because they were competing  04:22:39

11    with our business.

12    BY MR. ROLFS:

13        Q    There would have had to have been

14    modifications to the Coy-McCandless Group web

15    development agreement for you to continue providing  04:22:49

16    services to Coy, correct?

17            MR. CHING:  Calls for a legal conclusion.

18    And vague.

19            THE WITNESS:  The terms would have to be

20    modified.                                         04:23:05

21            It was also discussed through multiple text

22    messages that there would not be competition, that

23    they would -- we would benefit each other.  They

24    would not compete with us.  It would be mutually

25    beneficial.  Those were their words.              04:23:16
```

Page 177

CONFIDENTIAL

```
 1        A   I do not write code.

 2        Q   Do you know how to read code?

 3            MR. CHING:  Objection.  Vague.

 4            THE WITNESS:  I understand some code.

 5   BY MR. ROLFS:                                   04:25:17

 6        Q   Can you give me a sense of what -- can you

 7   give me a sense of what your proficiency in reading

 8   code is?

 9            MR. CHING:  Objection.  Vague.

10            THE WITNESS:  That's -- there's a -- it's    04:25:35

11   opinionated.  I wouldn't know how to answer that.

12   BY MR. ROLFS:

13        Q   If someone were to ask you in a casual

14   conversation how well you could read code, what

15   would you tell them?                             04:25:47

16        A   Well, enough to run a successful software

17   company and manage a team of software developers.

18        Q   What languages of code can you read?

19        A   HTML, CSS, some -- I have a basic

20   understanding of PHP.  That's what I'm recalling.   04:26:18

21            I'm not a programmer, but I can look at code

22   and make a sense of what it's doing.

23        Q   Are you familiar with a MERN tech stack?

24   M-E-R-N.

25            MR. CHING:  Objection.  Calls for expert    04:26:49
```

Page 179

CONFIDENTIAL

```
1    testimony.

2         THE WITNESS:  I don't believe so.

3         MR. ROLFS:  I'm going to mark this as

4    Exhibit 33.

5         (Exhibit 33 was marked for identification and   04:27:04

6      is attached hereto.)

7    BY MR. ROLFS:

8      Q   Mr. McCandless, I don't know if you've seen

9    this document before.  Do you see at the bottom

10   there's a website www.MongoDB.com/MERN-stack?        04:27:35

11     A   I do see that.

12     Q   MongoDB is a service utilized by McCandless

13   Group, correct?

14     A   Correct.

15     Q   And do you have any reason to doubt that this   04:27:56

16   is a printout of a page from the MongoDB website?

17        MR. CHING:  Objection.  Calls for

18   speculation.

19        You can answer if you know.

20        THE WITNESS:  I would not know.               04:28:15

21   BY MR. ROLFS:

22     Q   Do you have any reason to doubt that this is

23   a printout of a portion of the MongoDB website?

24        MR. CHING:  Objection.  Calls for

25   speculation.                                       04:28:25
```

Page 180

CONFIDENTIAL

```
 1      A    There's no relationship between App Company

 2   and McCandless Group, but there is a relationship

 3   between the partners.

 4      Q    The partners in McCandless Group are the same

 5   partners in The App Company, correct?              04:38:16

 6           MR. CHING:  Objection.  Relevance.  And

 7   vague.

 8           THE WITNESS:  They were brought in at a later

 9   point into McCandless Group.

10   BY MR. ROLFS:                                      04:38:28

11      Q    The current partners of McCandless Group are

12   the same as the current partners of The App Company,

13   correct?

14           MR. CHING:  Objection.  Relevance.  Vague.

15           THE WITNESS:  Correct.                     04:38:44

16   BY MR. ROLFS:

17      Q    You mentioned another job, something about

18   size --

19      A    Bite Size.

20      Q    What was Bite Size?                        04:38:50

21      A    Bite Size Networks, they were an

22   entertainment studio in Hollywood that I was a

23   producer for.

24      Q    When did you work with Bite Size?

25      A    If I'm remembering correctly, it was in 2012.  04:39:08
```

Page 187

CONFIDENTIAL

1   BY MR. ROLFS:

2       Q   Do you have an agreement with Jason Moskowitz

3   documenting the terms of your partnership with him?

4           MR. CHING:   Objection.   Calls for a legal

5   conclusion.                                         05:14:03

6           THE WITNESS:   We do have a signed agreement

7   with Jason Moskowitz.

8   BY MR. ROLFS:

9       Q   Would you ever enter into a partnership

10  without a signed agreement?                         05:14:16

11          MR. CHING:   Objection.   Calls for

12  speculation.   And calls for a legal conclusion.

13          THE WITNESS:   We would have some contract in

14  place.

15  BY MR. ROLFS:                                       05:14:28

16      Q   You would have to have some contract in place

17  to have a partnership, correct?

18          MR. CHING:   Objection.   Mischaracterizes the

19  witness's prior testimony.   Also calls for a legal

20  conclusion.                                         05:14:40

21          THE WITNESS:   We would have partnerships and

22  establish them with contracts.

23  BY MR. ROLFS:

24      Q   Your partnership with Coy was documented by a

25  web development agreement, correct?                 05:14:58

Page 200

CONFIDENTIAL

```
 1          MR. CHING:  Objection.  Calls for a legal
 2    conclusion.
 3          THE WITNESS:  There was various
 4    communications where we were communicating as
 5    partners.  The defendants were using the word        05:15:11
 6    "partner," and we all agreed that we were going to
 7    be partners.  That was mutually beneficial.
 8    BY MR. ROLFS:
 9      Q   Mr. McCandless, my question was a little bit
10    different.                                           05:15:20
11          Was your partnership with my clients
12    documented by a web development agreement?
13          MR. CHING:  Objection.  Calls for a legal
14    conclusion.
15          THE WITNESS:  We have a web development        05:15:31
16    agreement with them.
17    BY MR. ROLFS:
18      Q   Mr. McCandless, was your partnership with my
19    clients documented by a web development agreement?
20          MR. CHING:  Objection.  Calls for a legal      05:15:41
21    conclusion.
22          THE WITNESS:  The partnership was established
23    before the web development agreement.
24    BY MR. ROLFS:
25      Q   Was the partnership you're referring to put    05:15:51
```

Page 201

CONFIDENTIAL

1   in writing in the form of a web development

2   agreement?

3        MR. CHING:  Objection.  Calls for a legal

4   conclusion.  Asked and answered.

5        THE WITNESS:  I wouldn't -- I cannot comment   05:16:00

6   on that from a legal perspective.  I don't --

7   BY MR. ROLFS:

8     Q   You have said that you had a partnership.

9     A   We did.

10    Q   Was your partnership documented by a web   05:16:15

11  development agreement?

12       MR. CHING:  Objection.  Calls for a legal

13  conclusion.  Asked and answered.

14       THE WITNESS:  We agreed on a partnership

15  before the web development agreement.  The   05:16:28

16  partnership was established.

17  BY MR. ROLFS:

18    Q   That's not what I'm asking you,

19  Mr. McCandless.

20       I'm asking if you put the terms of the   05:16:34

21  partnership you're referring to into the web

22  development agreement?

23       MR. CHING:  Objection.  Calls for a legal

24  conclusion.

25       THE WITNESS:  There was terms involved with   05:16:45

Page 202

CONFIDENTIAL

1    the partnership in the web development agreement.

2    BY MR. ROLFS:

3        Q   Did the partnership you're referring to have

4    any assets?

5            MR. CHING:  Objection.  Calls for a legal        05:17:07

6    conclusion.  And vague.

7            THE WITNESS:  I -- I do not recall.

8            MR. ROLFS:  I think I'm done for the day.

9            MR. CHING:  I have a few questions of my own,

10   actually.                                                05:17:37

11

12                        EXAMINATION

13   BY MR. CHING:

14       Q   Did you enter into a confidentiality

15   agreement with Rayo Tech?                                05:17:48

16       A   Yes, I did.

17       Q   When?

18       A   Before working together on the influencer

19   platform for McCandless Group.

20       Q   And the influence -- influencer platform        05:18:04

21   you're talking about is the tech stack?

22       A   Yes.

23       Q   And would you work with Rayo Tech without a

24   contract?

25       A   No.                                              05:18:11

                                                        Page  203

CONFIDENTIAL

| | |
|---|---|
| 1 | knowledge about what we're providing.  It doesn't |
| 2 | have our tech stack in here, doesn't have our |
| 3 | confidential information about our revenue share |
| 4 | percentage.  It doesn't disclose all of our |
| 5 | methodologies, how we calculate how -- our          05:21:40 |
| 6 | accounting methods.  This is just pretty basic. |
| 7 | BY MR. CHING: |
| 8 |    Q    Do your -- does your -- is your trade secrets |
| 9 | more detailed than the information that is revealed |
| 10 | in these pitch decks?                                05:21:57 |
| 11 |       MR. ROLFS:  Objection.  Vague and leading. |
| 12 |       THE WITNESS:  Yes. |
| 13 | BY MR. CHING: |
| 14 |    Q    Does your -- do your websites for your models |
| 15 | and influencers contain information related to the   05:22:13 |
| 16 | CCBill? |
| 17 |       MR. ROLFS:  Objection.  Leading. |
| 18 |       THE WITNESS:  Yes. |
| 19 | BY MR. CHING: |
| 20 |    Q    Why does it contain that information?     05:22:19 |
| 21 |       MR. ROLFS:  Objection.  Calls for a |
| 22 | narrative. |
| 23 |       THE WITNESS:  So that if people have issues, |
| 24 | they know the payment processor to contact. |
| 25 | //// |

Page 206

CONFIDENTIAL

```
 1        Q    And could these terms differ after

 2   negotiating than what was initially advertised?

 3            MR. ROLFS:  Objection.  Leading.

 4            THE WITNESS:  Yes.

 5   BY MR. CHING:                                    05:27:32

 6        Q    Earlier do you remember that you testified

 7   that Corey Lewis was provided a test account to

 8   access a version of your website?

 9        A    Yes, I do remember saying that.

10        Q    And what level access was Corey given, based  05:28:30

11   on that login and password?

12        A    It was subscriber access.

13        Q    And so is a subscriber access something that

14   if someone paid for it, they would have access to

15   that?                                            05:28:50

16        A    That's correct.

17        Q    And earlier you testified that in -- on

18   May 20th, 2019 -- or 2020, you had a call with Corey

19   Lewis and it was related to your trade secrets.

20            Do you recall that?                     05:29:12

21            MR. ROLFS:  Objection.  Misstates testimony.

22            THE WITNESS:  Sorry, what was the date of

23   that?

24   BY MR. CHING:

25        Q    Sorry, one second.                     05:29:21
```

Page 210

CONFIDENTIAL

```
 1

 2

 3        I, the undersigned, a Certified Shorthand

 4   Reporter of the State of California, do hereby

 5   certify:

 6          That the foregoing proceedings were taken

 7   before me at the time and place herein set forth;

 8   that any witnesses in the foregoing proceedings,

 9   prior to testifying, were placed under oath; that a

10   record of the proceedings was made by me using

11   machine shorthand which was thereafter transcribed

12   under my direction; further, that the foregoing is

13   an accurate transcription thereof.

14          I further certify that I am neither

15   financially interested in the action nor a relative

16   or employee of any attorney of any of the parties.

17          IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20   Dated: 8/21/23

21

22

23

     KATHLEEN E. BARNEY

24   CSR No. 5698

25

                                        Page  214
```

CONFIDENTIAL

```
 1
 2
 3        I, the undersigned, a Certified Shorthand
 4   Reporter of the State of California, do hereby
 5   certify:
 6            That the foregoing proceedings were taken
 7   before me at the time and place herein set forth;
 8   that any witnesses in the foregoing proceedings,
 9   prior to testifying, were placed under oath; that a
10   record of the proceedings was made by me using
11   machine shorthand which was thereafter transcribed
12   under my direction; further, that the foregoing is
13   an accurate transcription thereof.
14            I further certify that I am neither
15   financially interested in the action nor a relative
16   or employee of any attorney of any of the parties.
17            IN WITNESS WHEREOF, I have this date
18   subscribed my name.
19
20   Dated: 8/21/23
21
22
23
              NADIA NEWHART
24            CSR No. 8714
25
```

Page 215

# EXHIBIT B

| Number of participants | 2 |
|---|---|
| Participants | +18058358052 Jessica Bartlett (owner) +19197916441 Nick McCandless |
| Number of messages | 12 |
| First message sent date/time | May 11, 2020 11:45:17 |
| Last message sent date/time | May 11, 2020 12:33:10 |

**+19197916441 Nick McCandless**   May 11, 2020 11:45:17

Here is subscriber account for Corey;testsub@gmail.com;Test@123!Sub

**+19197916441 Nick McCandless**   May 11, 2020 11:50:39

Confirming functionality of the delete on the messages as well. I am going to have that expedited so this is no longer anything to worry about either

**+18058358052 Jessica Bartlett**   May 11, 2020 12:15:40

Thank you!!

**+19197916441 Nick McCandless**   May 11, 2020 12:17:16

👍

**+18058358052 Jessica Bartlett**   May 11, 2020 12:21:15

The account looks great thanks!



EXHIBIT
13
McCandless

CONFIDENTIAL

**+18058358052 Jessica Bartlett**                    May 11, 2020 12:21:44

Question tho, for messages, has it always been blurred there as well?

**+19197916441 Nick McCandless**                    May 11, 2020 12:25:12

Yes

**+19197916441 Nick McCandless**                    May 11, 2020 12:25:59

We are adding the option to send mass messages so they aren't blurred and just fully covered and we can also increase the level of blur so it's less transparent if you'd like

**+18058358052 Jessica Bartlett**                    May 11, 2020 12:31:47

Sounds food!

**+18058358052 Jessica Bartlett**                    May 11, 2020 12:31:57

I think a more intense blur would be good for messages

**+19197916441 Nick McCandless**                    May 11, 2020 12:33:03

Got it! Will update this and reprocess the blurred images so that they are all more intense and less transparent

**+18058358052 Jessica Bartlett**                    May 11, 2020 12:33:10

Loved "Got it! Will update this and reprocess the blurred images so that they are all more intense and less transparent"

CONFIDENTIAL

# EXHIBIT C

1    Gerard P. Fox (SBN 151649)
      gfox@gerardfoxlaw.com
2    Marina Bogorad (SBN 217524)
      mbogorad@gerardfoxlaw.com
3    1880 Century Park East, Suite 1410
      Los Angeles, California 90067
4    Telephone: (310) 441-0500
      Facsimile: (310) 441-4447
5
      Attorneys for Plaintiff/Counterclaimants
6    McCandless Group LLC and Nicholas McCandless

7

8              **UNITED STATES DISTRICT COURT**

9    **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

| | |
|---|---|
| 11   McCandless Group, LLC, | Case No. 2:21-cv-02069 |
| 12         Plaintiff, | Hon. David O. Carter |
| 13   v. | Courtroom 9D |
| 14   The Coy Collective, Inc., *et. al.*, | **MCCANDLESS GROUP LLC.'S** |
| 15         Defendants. | **SUPPLEMENTAL RESPONSE TO INTERROGATORIES FROM COUNTER-CLAIMANT THE COY** |
| 16   The Coy Collective, Inc., *et. al.*, | **COLLECTIVE, INC., SET ONE** |
| 17         Counter-claimants, | |
| 18   v. | |
| 19   McCandless Group LLC and Nicholas McCandless, | |
| 20 | |
| 21         Counter-defendants. | |

22

23   **PROPOUNDING PARTY:**     Defendant, THE COY COLLECTIVE, INC.,

24   **RESPONDING  PARTY:**     Plaintiff and Counter-defendants, MCCANDLESS
                                    GROUP LLC

25   **SET NO:**                     ONE

26

27                                        EXHIBIT
                                       10

28                                       McCandless

- 1 -

MCCANDLESS GROUP LLC.'S RESPONSE TO REQUEST FOR INTERROGATORIES FROM DEFENDANT THE
COY COLLECTIVE, INC., SET ONE

Plaintiff MCCANDLESS GROUP LLC. ("McCandless Group" or "Responding Party") hereby submits supplemental responses to defendant THE COY COLLECTIVE, INC. ("Coy" or "Propounding Party")'s first set of interrogatories ("Interrogatories") as follows:

### PRELIMINARY STATEMENT

Responding Party makes these responses solely for the purposes of this action and based on the information currently known and available to Responding Party. Responding Party reserves all and waives none of his objections as to the admissibility of any information or documents provided in response to the Interrogatories. Responding Party has not fully completed its investigation of the facts relating to this action, has not fully completed discovery in this action, and has not completed its preparation for trial. All of the responses contained herein are based upon such information and are based upon such information and documents presently available to and specifically known to Responding Party. It is anticipated that further discovery, independent investigation, legal research and analysis may supply additional facts and documents, add meaning to known facts, as well as establish new factual conclusions and legal contentions, all of which may lead to substantial additions to, changes in and variations from the contentions herein set forth.

Responding Party reserves its rights, but assumes no obligation beyond those imposed by the Federal Rules of Civil Procedure, to produce evidence of any subsequently discovered facts or documents. Responding Party accordingly reserves the right to change any and all responses herein as additional documents may be discovered, facts are ascertained, analyses are made, legal research is completed, and contentions are made. The responses contained herein are made in a good faith effort to supply as much factual information and as much specification as is presently known, but should in no way be prejudicial in relation to further discovery, research, and/or analysis.

Except for explicit facts admitted herein, no incidental or implied admissions are intended hereby. The fact that Responding Party has answered or objected to any of

Coy's Interrogatories or any part thereof should not be taken as an admission that Responding Party accepts or admits the existence of any facts set forth or assumed by such Interrogatory or that such answer or objection constitutes admissible evidence. The fact that Responding Party has not answered part or all of any of Coy's Interrogatories is not intended and shall not be construed to be a waiver of all or any part of any objection to any Interrogatory propounded.

Responding Party has made a diligent effort to respond to Coy's Interrogatories as it understands and interprets each such Interrogatory. If Coy subsequently asserts a differing interpretation, Responding Party reserves the right to supplement its objections and/or responses.

## GENERAL OBJECTIONS

A.    Responding Party objects to the Interrogatories to the extent they call for information subject to a claim of privilege, including, without limitation, the attorney-client privilege and/or the attorney-work product doctrine. Responding Party hereby claims such privileges, and Responding Party will supply no information responsive to any such Interrogatory. If any such information is produced, it will be deemed to be inadvertent and not a waiver of any privilege, protection or doctrine.

B.    Responding Party objects to the Interrogatories to the extent Coy purports thereby to alter or extend Responding Party's obligation to respond to the Interrogatories beyond those set forth in the Federal Rules of Civil Procedure and applicable law.

C.    Responding Party objects to the Interrogatories as unduly burdensome, oppressive and overbroad to the extent they (1) seek discovery obtainable from some source other than Responding Party that is more convenient, less burdensome or less expensive, or (2) seek information that could and should more appropriately be sought through other means of discovery.

D.    Responding Party objects to the Interrogatories to the extent they seek information that is neither relevant to the subject matter of this action, nor reasonably calculated to lead to the discovery of admissible evidence.

E.     Responding Party objects to the Interrogatories to the extent they call for legal conclusions. In Responding to the Interrogatories, Responding Party will not disclose any legal conclusions or other information that involves a disclosure of his attorneys' impressions, conclusions, opinions, legal research, theories or work product.

Subject to and without waiving the foregoing General Objections, Responding Party makes the following specific objections and supplemental responses to the Interrogatories:

## INTERROGATORIES

**INTERROGATORY NO. 1:**

IDENTIFY ALL trade secrets YOU contend were misappropriated in YOUR COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 1:**

**CONFIDENTIAL**

Responding Party objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Responding Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. Responding Party further objects to this request as it seeks information that is not proportional to the needs and expediency of the case. Responding Party further objects that the definition of the term "IDENTIFY" in this regard is vague, overbroad, and unduly burdensome.

Notwithstanding the above stated objections, Responding Party responds as follows: Defendants misappropriated McCandless Group's technology behind their individual websites, referred to as the "technology stack." The "technology stack" consists of utilizing servers node.js with express and MongoDB Database, react with redux, FFmpeg to transcode and process videos, TinyPNG to compress images, S3 for storing data, CloudFront to serve private content securely, Nginx to reverse proxy and

- 4 -
MCCANDLESS GROUP LLC'S RESPONSE TO INTERROGATORIES FROM COUNTER-PLAINTIFF THE COY COLLECTIVE, INC., SET ONE

static server react builds, Socket io for chat, CCBill for payment processing, hosting services through Amazon AWS EC2 instances, S3 to store media files, Amazon Route 53, and AWS CloudWatch to monitor server resource utilization.

Further, the technology allows users to handle and manage data. Website settings are stored on MongoDB which decides theme and other options. Users can register and then subscribe to view exclusive content. Active subscribers can also engage in chat with the models. Subscribers can update profile settings and manage their subscription access. Subscribers can tip and purchase locked content on the model's exclusive content feed and in private chat. The technology stack includes security and privacy protection, meaning that only users with a specific role can access the data with the correct JWT token. API routes are also protected based on user roles. Uploaded content is stored on S3 with a unique id and the content is served with a signed url with CloudFront.

Sites are built for scalability. Specifically, sites are hosted across infinitely scalable AWS server instances to allow for no limitations of traffic, bandwidth, and activity. Databases are hosted across MongoDB databases that are built for infinite scalability. Dedicated server instances for video transcoding and processing services that websites leverage for videos. Image processing is carried out by the same node.js instance which is responsible for the API. This scalability gives the capacity to launch over 200 websites a week.

Additionally, the technology stack includes our dynamic watermarking feature. The watermarking feature assigns a unique watermark to each user address when visiting or viewing a piece of content. That way, if content is leaked, it is leaked with the unique watermark, allowing us to identify the account associated with the link and restrict that account's access moving forward. Once identified, DMCA practices are used to enforce the Copyright and have leaked content removed from other sites.

Defendants also misappropriated McCandless Group's costs and accounting structure. This includes identification and pricing for potential clients, which is based on factors such as number of followers, engagement on social media posts, age of

their social media accounts, how long their audience has been following them, and any niches that potential clients may have beyond their physical appearance. Utilizing these factors, we attempt to identify an appropriate revenue sharing proposal.

Additionally, costs associated with launching a website often varies. For McCandless Group, our technology stack and streamlined technology makes the launch process extremely efficient and cost effective. Additional costs include servers and hosting, which are based on traffic to the site, payment processing fees, and emails. Further, McCandless Group's revenue model, which is dependent on the revenue sharing agreement, and calculated by utilizing the gross revenue, subtracting the combined 6.95% payment processing fee, subtracting the total of chargebacks and refunds, and then paying the client based on the agreed upon percentage of revenue.

Further, McCandless group built a system for handling collection, calculations, and processing of payments for hundreds of clients. Each client had a subaccount using CCBill to easily organize the revenue generated from each site in addition to the fees and deductions. Those numbers were then plugged into our technology, creating the revenue calculations stated above. An in-house reporting system was built to generate a monthly report based on the calculations clearly laying out the amount of money owed to each client. Payments are now streamlined using Heartland for ACH payments, AMEX FX for international payments, and manually distributing payments via PayPal for a small amount of clients.

McCandless Group created a system for managing chargebacks, as remaining under 1% in terms of chargeback ratio is crucial to maintain good standing with major credit card companies. Utilizing technology to detect fraud such as limiting transactional amounts on new customers, monitoring for irregular activity, addressing customer concerns promptly, and ensuring clients are not abusing the system, McCandless Group is able to maintain a chargeback percentage much lower than industry standard.

McCandless Group has also developed important processes for optimizing retention rates. Processes such as discounting all of the individually purchased content

by a percentage, discounting a subscriber's first month or offering a discount for the first month for a returning subscriber were crucial processes in developing McCandless Group's retention rate. These processes were learned through exhaustive testing of promo offers, technologies, and strategies in order to optimize the retention rates.

McCandless Group was also able to maximize their revenue through methods of working with their clients. For instance, McCandless Group developed a process to be able to recommend pricing of subscriptions based on their content, audience, and data retained on similar clients. The recommendations vary by clients but are suggested in order to maximize the client's revenue. Marketing through social media and within the websites in terms of the captions, messaging, and pricing for content have also proven a process developed by McCandless Group through trial and error which maximizes revenue.

**INTERROGATORY NO. 2:**

IDENTIFY ALL COMMUNICATIONS from YOU to BARTLETT containing ANY trade secret YOU contend was misappropriated in YOUR COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 2:**

Responding  Party objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Responding  Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. Responding  Party further objects to this request as it seeks information that is not proportional to the needs and expediency of the case.

Notwithstanding the above stated objections, Responding  Party responds that the following communications are known at this time: On May 25, 2020, Bartlett texted Nick asking about minimum percentage tiers. On June 5, 2020, Nick emailed Bartlett and Lewis regarding tiers for subscription pricing and chat management. On August 7, 2020, Bartlett texted Nick questions surrounding compliance form 2257. In

September of 2020, Bartlett reached out to Nick numerous times asking questions surrounding how McCandless Group handled certain aspects of their business for clients. September 28, 2020, Bartlett texted Nick asking how McCandless Group handled payouts to clients. On October 1, 2020, Bartlett texted Nick asking how McCandless Group calculates payouts to clients. On October 9, 2020, Bartlett texted Nick asking how McCandless Group calculated payments to clients.

**INTERROGATORY NO. 3:**

IDENTIFY ALL COMMUNICATIONS from YOU to LEWIS containing ANY trade secret YOU contend was misappropriated in YOUR COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 3:**

Responding  Party objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Responding  Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. Responding  Party further objects to this request as it seeks information that is not proportional to the needs and expediency of the case.

Notwithstanding the above stated objections, Responding  Party responds that the following communications are known at this time: On May 16, 2020, Nick, Lewis, and Hankins had a phone call discussing use of high-risk payment processors. On May 23, 2020, Nick emailed Lewis a detailed overview of McCandless Group's "technology stack." On May 24, 2020, Nick emailed Lewis sample legal agreements. On May 26, 2020, Lewis texted Nick asking about 2257 compliance forms. On May 27, 2020, Lewis and Nick had a text message exchange discussing the accounting methods McCandless Group utilizes. On May 29, 2020, Lewis texted Nick regarding sample agreements, contract terms, charge back percentages, and McCandless Group's legal structure. On June 5, 2020, Lewis texted Nick asking about chargeback percentages, industry averages, and how McCandless Group handles chargebacks. On June 5, 2020, Nick emailed Bartlett and Lewis tiers for subscription pricing and chat management. On June 15, 2020, Lewis texted Nick asking about chargebacks. On

MCCANDLESS GROUP LLC'S RESPONSE TO INTERROGATORIES FROM COUNTER-PLAINTIFF THE COY COLLECTIVE, INC., SET ONE

June 16, 2020, Lewis texted Nick about sales tax.  On June 23, 2020, Lewis texted Nick regarding McCandless Group accounting.

**INTERROGATORY NO. 4:**

IDENTIFY ALL COMMUNICATIONS from YOU to HANKINS containing ANY trade secret YOU contend was misappropriated in YOUR COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 4:**

Responding  Party objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Responding  Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. Responding  Party further objects to this request as it seeks information that is not proportional to the needs and expediency of the case.

Not withstanding the previously stated objections, Responding  Party responds that the following communications are known at this time: On May 16, 2020, Nick, Lewis, and Hankins had a phone call discussing use of high-risk payment processors.

**INTERROGATORY NO. 5:**

IDENTIFY ALL COMMUNICATIONS from YOU to DREW containing ANY trade secret YOU contend was misappropriated in YOUR COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 5:**

Responding  Party objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Responding  Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. Responding  Party further objects to this request as it seeks information that is not proportional to the needs and expediency of the case.

Not withstanding the previously stated objections, Responding  Party responds that the following communications are known at this time: On May 19, 2020, Nick had an email exchange with Drew relating to costs associated with the websites. On

May 21, 2020, Nick and Drew exchanged emails regarding the building of websites. On May 27, 2020, Nick and Drew exchanged emails regarding the structure of websites. On May 28, 2020, Drew texted Nick regarding the building of websites. On July 9, 2020, Drew emailed Nick regarding security technology on websites. On July 29, 2020, Nick sent Drew an email regarding terms of the partnership. On August 13, 2020, Nick and Drew exchanged emails regarding payouts.

**INTERROGATORY NO. 6:**

IDENTIFY ALL COMMUNICATIONS from YOU to COY containing ANY trade secret YOU contend was misappropriated in YOUR COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 6:**

Responding  Party objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Responding  Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. Responding  Party further objects to this request as it seeks information that is not proportional to the needs and expediency of the case.

Notwithstanding the above stated objections, Responding  Party responds that the following communications are known at this time: On May 16, 2020, Nick and Lewis had a phone call discussing use of high-risk payment processors. On May 23, 2020, Nick emailed Lewis a detailed over view of McCandless Group's "technology stack." On May 24, 2020, Nick emailed Lewis sample legal agreements. On May 26, 2020, Lewis texted Nick asking about 2257 compliance forms. On May 27, 2020, Lewis and Nick had a text message exchange discussing the accounting methods McCandless Group utilizes. On May 29, 2020, Lewis texted Nick regarding sample agreements, contract terms, charge back percentages, and McCandless Group's legal structure. On June 5, 2020, Lewis texted Nick asking about chargeback percentages, industry averages, and how McCandless Group handles chargebacks. On June 5, 2020, Nick emailed Bartlett and Lewis tiers for subscription pricing and chat management. On June 15, Lewis texted Nick asking about chargebacks. On June 16,

2020, Lewis texted Nick about sales tax.  On June 23, 2020, Lewis texted Nick regarding McCandless Group accounting. On May 25, 2020, Bartlett texted Nick asking about minimum percentage tiers. On June 5, 2020, Nick emailed Bartlett and Lewis regarding tiers for subscription pricing and chat management. On August 7, 2020, Bartlett texted Nick questions surrounding compliance form 2257. In September of 2020, Bartlett reached out to Nick numerous times asking questions surrounding how McCandless Group handled certain aspects of their business for clients. September 28, 2020, Bartlett texted Nick asking how McCandless Group handled payouts to clients. On October 1, 2020, Bartlett texted Nick asking how McCandless Group calculates payouts to clients. On October 9, 2020, Bartlett texted Nick asking how McCandless Group calculated payments to clients.

**INTERROGATORY NO. 7:**

State ALL of YOUR efforts to maintain the secrecy or confidentiality of ANY of YOUR trade secrets that YOU contend were misappropriated in YOUR COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 7:**

**CONFIDENTIAL**

Responding  Party objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Responding  Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. Responding  Party further objects to this request as it seeks information that is not proportional to the needs and expediency of the case.

Notwithstanding the previously stated objections, Responding  Party responds as follows: All parties who gain access to this information are subject to Non-Disclosure Agreements and the confidentiality provisions. Source code is managed and maintained using Bitbucket using Git as a version control system. All repositories are private. Websites are hosted with SSL so the transport layer is secured, and Bitbucket is utilized for source code management. All websites are hosted securely through AWS. Hosted servers have restricted SSH access with IP addresses. All

databases are hosted on MongoDB Atlas on AWS and are only accessible via specific IP addresses. All media fields are hosted on AWS S3, each bucket of the S3 utilizing separate credentials. Media is delivered with AWS CloudFront with signed urls with expiration times of six hours. Only limited team members have access to MFA code for Amazon Web Services. All AWS activity is logged via AWS trail. Database is secured using MongoDB database with Atlas via MongoDB.com utilizing one root account with two-factor authentication. All databases are protected using username and password and are only allowed access via specific IP addresses via website servers with static IP addresses.

**INTERROGATORY NO. 8:**

IDENTIFY ALL PERSONS with knowledge of ANY of YOUR trade secrets that YOU contend were misappropriated in YOUR COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 8:**

Responding  Party objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Responding  Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. Responding  Party further objects to this request as it seeks information that is not proportional to the needs and expediency of the case.

Notwithstanding the previously stated objections, Responding  Party responds that, other than the defendants, the following individuals are known at this time: Jason Moskowitz, McCandless Group, LLC, 990 Paseo La Cresta, Palos Verdes Estates, CA 90274. Scot Robinson, McCandless Group, LLC, 4548 Marloma Dr., Rolling Hills Estates, CA 90274. Yogesh Prajapati, Rayo Innovations Private Limited, 803, Landmark Building, Opp. Seema Hall, Anandnagar Road, Ahmedabad, India, 380015. Krushna Joshi, Rayo Innovations Private Limited, 803, Landmark Building, Opp. Seema Hall, Anandnagar Road, Ahmedabad, India, 380015. Himanshu Makwana, Rayo Innovations Private Limited, 803, Landmark Building, Opp. Seema

Hall, Anandnangar Road, Ahmedabad, India, 380015. Bhavesh Panchal, Rayo Innovations Private Limited, 803, Landmark Building, Opp. Seema Hall, Anandnangar Road, Ahmedabad, India, 380015. Bhavesh Gohil, Rayo Innovations Private Limited, 803, Landmark Building, Opp. Seema Hall, Anandnangar Road, Ahmedabad, India, 380015. Siddharth Sukhadia, Rayo Innovations Private Limited, 803, Landmark Building, Opp. Seema Hall, Anandnangar Road, Ahmedabad, India, 380015. Krunal Joshi, Rayo Innovations Private Limited, 803, Landmark Building, Opp. Seema Hall, Anandnangar Road, Ahmedabad, India, 380015. Harsh Thakkar, Rayo Innovations Private Limited, 803, Landmark Building, Opp. Seema Hall, Anandnangar Road, Ahmedabad, India, 380015. Prashnat Paun, Rayo Innovations Private Limited, 803, Landmark Building, Opp. Seema Hall, Anandnangar Road, Ahmedabad, India, 380015. Ritesh Patel, Rayo Innovations Private Limited, 803, Landmark Building, Opp. Seema Hall, Anandnangar Road, Ahmedabad, India, 380015. Karan Raja, Rayo Innovations Private Limited, 803, Landmark Building, Opp. Seema Hall, Anandnangar Road, Ahmedabad, India, 380015. Himalay Parmar, Rayo Innovations Private Limited, 803, Landmark Building, Opp. Seema Hall, Anandnangar Road, Ahmedabad, India, 380015.

**INTERROGATORY NO. 9:**

Describe ANY use of YOUR trade secrets that YOU contend has been carried out by COY.

**RESPONSE TO INTERROGATORY NO. 9:**

**CONFIDENTIAL**

Responding Party objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Responding Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. Responding Party further objects to this request as it seeks information that is not proportional to the needs and expediency of the case.

Notwithstanding the previously stated objections, Responding Party responds

as follows: COY utilized McCandless Group's "technology stack" to build their own websites independent of McCandless Group, COY utilized McCandless Group's cost, accounting structure, and revenue model to build a competing business, and COY utilized McCandless Group's connections within the industry to set up the infrastructure for Coy Collective. Coy further utilized McCandless Group's trade secrets to compete directly with McCandless Group, targeting clients already in discussion with McCandless Group and attempting to undersell McCandless Group by divulging confidential information to the potential clients.

**INTERROGATORY NO. 10:**

IDENTIFY ALL COMMUNICATIONS from COY that YOU contend contained a false or misleading statement as alleged by YOUR COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 10:**

Responding  Party objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Responding  Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. Responding  Party further objects to this request as it seeks information that is not proportional to the needs and expediency of the case.

Not withstanding the previously stated objections, Responding  Party responds that the following communications are known at this time: On May 6, 2020, Bartlett texted Nick about an idea for a subscription based project she wanted to partner with McCandless on. On May 9, 2020, Bartlett and Lewis called Nick to discuss her business proposal they wanted to partner with McCandless on. On May 16, 2020, Nick, Lewis, Hankins, and Bartlett had a telephone call in which the Defendants indicated that they wanted to partner with McCandless Group, that the two could mutually work together to form a lucrative, non-competitive partnership. On May 19, 2020, Lewis texted Nick stating, "trust when I say I have the people who will be willing to make that happen once we excite on our partnership properly." On May 22, 2020, Lewis texted Nick introducing him to a potential client as his technology

partner. On May 23, 2020, Lewis texted Nick informing Nick that he refers to Nick as his technology partner and uses the terms we when speaking to third parties. On June 16, 2020, Drew texted Nick a message in which referred to their relationship as a friendship and as business partners. On July 8, 2020, Lewis texted Nick and Drew asking how Nick wanted to go about finalizing the partnership agreement between the Coy Collective and McCandless Group. On July 29, 2020, Lewis texted Nick regarding the paperwork pertaining to the partnership, stating "it's a partnership that is meant to be a winning situation for everyone…." On October 7, 2020, Bartlett texted Nick stating that she only ever told prospective clients good things about McCandless Group, that they were not competing, and that it might be helpful to inform Coy of who McCandless was pursuing so that there would be no overlap. On or about October 15, 2020, Bartlett told Nick that she viewed the relationship between Coy and McCandless Group as mutually beneficial and wished to maintain a healthy partnership. On October 19, 2020, Bartlett texted Nick stating, "[i]n my eyes, this is a mutually beneficial partnership without competition…." On October 19, 2020, Bartlett texted Nick stating, "[m]y main concern is keeping a healthy partnership…." On October 30, 2020, Bartlett texted Nick regarding whether or not communications regarding the partnership between The Coy Collective and McCandless Group should be directed towards Nick or Jason Moskowitz.

**INTERROGATORY NO. 11:**

IDENTIFY ALL COMMUNICATIONS from BARTLETT that YOU contend contained a false or misleading statement as alleged by YOUR COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 11:**

Responding Party objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Responding Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. Responding Party further objects to this request as it seeks information that is not proportional to the needs and expediency of the case.

Not withstanding the previously stated objections, Responding Party responds that the following communications are known at this time: On May 6, 2020, Bartlett texted Nick about an idea for a subscription based project she wanted to partner with McCandless on. On May 9, 2020, Bartlett and Lewis called Nick to discuss her business proposal they wanted to partner with McCandless on. On May 16, 2020, Nick, Lewis, Hankins, and Bartlett had a telephone call in which the Defendants indicated that they wanted to partner with McCandless Group, that the two could mutually work together to form a lucrative, non-competitive partnership. On October 7, 2020, Bartlett texted Nick stating that she only ever told prospective clients good things about McCandless Group, that they were not competing, and that it might be helpful to inform Coy of who McCandless was pursuing so that there would be no overlap. On or about October 15, 2020, Bartlett told Nick that she viewed the relationship between Coy and McCandless Group as mutually beneficial and wished to maintain a healthy partnership. On October 19, 2020, Bartlett texted Nick stating, "[i]n my eyes, this is a mutually beneficial partnership without competition…." On October 19, 2020, Bartlett texted Nick stating, "[m]y main concern is keeping a healthy partnership…." On October 30, 2020, Bartlett texted Nick regarding whether or not communications regarding the partnership between The Coy Collective and McCandless Group should be directed towards Nick or Jason Moskowitz.

**INTERROGATORY NO. 12:**

IDENTIFY ALL COMMUNICATIONS from LEWIS that YOU contend contained a false or misleading statement as alleged by YOUR COMPLIANT.

**RESPONSE TO INTERROGATORY NO. 12:**

Responding Party objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Responding Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. Responding Party further objects to this request as it seeks information that is not proportional to the needs and expediency of the case.

Not withstanding the previously stated objections, Responding Party responds that the following communications are known at this time: On May 9, 2020, Bartlett and Lewis called Nick to discuss her business proposal they wanted to partner with McCandless on. On May 16, 2020, Nick, Lewis, Hankins, and Bartlett had a telephone call in which the Defendants indicated that they wanted to partner with McCandless Group, that the two could mutually work together to form a lucrative, non-competitive partnership. On May 19, 2020, Lewis texted Nick stating, "trust when I say I have the people who will be willing to make that happen once we excite on our partnership properly." On May 22, 2020, Lewis texted Nick introducing him to a potential client as his technology partner. On May 23, 2020, Lewis texted Nick informing Nick that he refers to Nick as his technology partner and uses the terms we when speaking to third parties. On July 8, 2020, Lewis texted Nick and Drew asking how Nick wanted to go about finalizing the partnership agreement between the Coy Collective and McCandless Group. On July 29, 2020, Lewis texted Nick regarding the paperwork pertaining to the partnership, stating "it's a partnership that is meant to be a winning situation for everyone…."

**INTERROGATORY NO. 13:**

IDENTIFY ALL COMMUNICATIONS from HANKINS that YOU contend contained a false or misleading statement as alleged by YOUR COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 13:**

Responding Party objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Responding Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. Responding Party further objects to this request as it seeks information that is not proportional to the needs and expediency of the case.

Not withstanding the previously stated objections, Responding Party responds that the following communications are known at this time: On May 16, 2020, Nick, Lewis, Hankins, and Bartlett had a telephone call in which the Defendants indicated

that they wanted to partner with McCandless Group, that the two could mutually work together to form a lucrative, non-competitive partnership.

**INTERROGATORY NO. 14:**

IDENTIFY ALL COMMUNICATIONS from DREW that YOU contend contained a false or misleading statement as alleged by YOUR COMPLAINT.

**RESPONSE TO INTERROGATORY NO.14:**

Responding Party objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Responding Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. Responding Party further objects to this request as it seeks information that is not proportional to the needs and expediency of the case.

Not withstanding the previously stated objections, Responding Party responds that the following communications are known at this time: On July 8, 2020, Lewis texted Nick and Drew asking how Nick wanted to go about finalizing the partnership agreement between the Coy Collective and McCandless Group. On July 29, 2020, Nick emailed Drew regarding the terms of the partnership.

**INTERROGATORY NO. 15:**

IDENTIFY ALL advertisements, solicitations, or COMMUNICATIONS with ANY past, current, or potential customer referring in ANY way to BARTLETT, INCLUDING by using ANY image of BARTLETT.

**RESPONSE TO INTERROGATORY NO. 15:**

Responding Party objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Responding Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. Responding Party further objects to this request as it seeks information that

is not proportional to the needs and expediency of the case.

Notwithstanding the previously stated objections, Responding  Party responds as follows: The requested material is stored within Instagram and is not readily available. As a result, a request has been made of Instagram to download the requested data so that it may be searched. Once this information is available, Responding  Party agrees to supplement this response providing any relevant, non-privileged information within the purview of this request.

**INTERROGATORY NO. 16:**

Identify ALL servers YOU have used to store ANY image or video of BARTLETT.

**RESPONSE TO INTERROGATORY NO. 16:**

CONFIDENTIAL

Responding  Party objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Responding  Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. Responding  Party further objects to this request as it seeks information that is not proportional to the needs and expediency of the case.

Notwithstanding the previously stated objections, Responding  Party responds as follows: Photos and videos of Bartlett on JessicaMBartlett.com were stored in a S3 bucket and the media urls were served securely with an API hosted on a AWS server with the following information: EC2 Instance ID i-0aee80fbff98f7d7f Public IP 13.56.192.150 EC2 region N. California S3 region us-west-1."

**INTERROGATORY NO. 17:**

Identify ALL servers YOU have used to store ANY image or video of ANY COY CREATORS.

**RESPONSE TO INTERROGATORY NO. 17:**

CONFIDENTIAL

Responding  Party objects to this Interrogatory on the grounds that it is vague,

overbroad, and unduly burdensome. Responding  Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. Responding  Party further objects to this request as it seeks information that is not proportional to the needs and expediency of the case.

Notwithstanding the previously stated objections, Responding  Party responds as follows: Phots and Videos of Coy Creators were stored on the following:

| Website | EC2 Instance Id | Public IP | Instance Type | EC2 Region | S3 Region |
|---|---|---|---|---|---|
| JessicaMBartlett.com | i-0aee80fbff98f7d7f | 13.56.192.150 | t3.2xlarge | N. California | us-west-1 |
| KikiPasso.com | i-0aee80fbff98f7d7f | 13.56.192.150 | t3.2xlarge | N. California | us-west-1 |
| NataGata.com | i-0aee80fbff98f7d7f | 13.56.192.150 | t3.2xlarge | N. California | us-west-1 |
| TheAlexaCollins.com | i-0aee80fbff98f7d7f | 13.56.192.150 | t3.2xlarge | N. California | us-west-1 |
| TheAlexisClark.com | i-0aee80fbff98f7d7f | 13.56.192.150 | t3.2xlarge | N. California | us-west-1 |
| SincerelyJuju.com | i-0aee80fbff98f7d7f | 13.56.192.150 | t3.2xlarge | N. California | us-west-1 |

| | | | | | |
|---|---|---|---|---|---|
| Sabina Kontor.com | i-0aee80fbff98f7d7f | 13.56.192.150 | t3.2xlarge | N. California | us-west-1 |
| VanessaChristineX.com | i-0bfe5b97eecfd6a35 | 54.241.198.178 | t3.xlarge | N. California | us-west-1 |
| AshayEHale.com | i-0bfe5b97eecfd6a35 | 54.241.198.178 | t3.xlarge | N. California | us-west-1 |
| MikaylaDemaiter.com | i-0bfe5b97eecfd6a35 | 54.241.198.178 | t3.xlarge | N. California | us-west-1 |
| Dasha-Mart.com | i-0bfe5b97eecfd6a35 | 54.241.198.178 | t3.xlarge | N. California | us-west-1 |
| MeghanMariie.com | i-0bfe5b97eecfd6a35 | 54.241.198.178 | t3.xlarge | N. California | us-west-1 |
| MacyMariano.com | i-0bfe5b97eecfd6a35 | 54.241.198.178 | t3.xlarge | N. California | us-west-1 |

## INTERROGATORY NO. 18:

STATE all terms of the "partnership" alleged by YOUR COMPLAINT.

## RESPONSE TO INTERROGATORY NO. 18:

Responding Party objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Responding Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible

evidence. Responding Party further objects to this request as it seeks information that is not proportional to the needs and expediency of the case.

Notwithstanding the previously stated objections, Responding Party responds as follows: McCandless Group and The Coy Collective, operated by Defendants Bartlett, Drew, Hankins, and Lewis were to work hand in hand in operating the Coy Collective. Coy was going to be a subscription based service for models and influencers to receive benefits and services not currently offered in the marketplace, such as management, setting up professional photoshoots, social media, content creation, and marketing. In addition, Coy wanted McCandless Group to be the technology partner, building Coy clients subscription based websites similar to the one McCandless built for Bartlett.

McCandless Group and Coy entered into a Website Development Agreement ("WDA") after the defendants had all executed NDA's. The WDA set forth the terms for developing the websites, the compensation in the form of a monthly service fee depending on the amount of traffic the websites would get, further confidentiality provisions prohibiting the parties from revealing any confidential or proprietary information to a third party, ownership of the intellectual property, which was to remain with the McCandless Group, and further provisions. The WDA also set forth the compensation between the partners, which was a revenue sharing agreement between the parties. Bartlett executed the WDA on behalf of Coy Collective.

During this period of partnership/joint venture, Defendants agreed that they would not be competing with the McCandless Group for clients, and that their targeted clients came from a different demographic and that they were operating a different business than that of McCandless Group. This was a key component of the partnership.

**INTERROGATORY NO. 19:**

STATE all terms of the "joint venture" alleged by YOUR COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 19:**

Responding Party objects to this Interrogatory on the grounds that it is vague,

overbroad, and unduly burdensome. Responding Party further objects to this request on the grounds that it seeks information that is not relevant to the parties' respective claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. Responding Party further objects to this request as it seeks information that is not proportional to the needs and expediency of the case.

Notwithstanding the previously stated objections, Responding Party responds as follows: McCandless Group and The Coy Collective, operated by Defendants Bartlett, Drew, Hankins, and Lewis were to work hand in hand in operating the Coy Collective. Coy was going to be a subscription based service for models and influencers to receive benefits and services not currently offered in the marketplace, such as management, setting up professional photoshoots, social media, content creation, and marketing. In addition, Coy wanted McCandless Group to be the technology partner, building Coy clients subscription based websites similar to the one McCandless built for Bartlett.

McCandless Group and Coy entered into a Website Development Agreement ("WDA") after the defendants had all executed NDA's. The WDA set forth the terms for developing the websites, the compensation in the form of a monthly service fee depending on the amount of traffic the websites would get, further confidentiality provisions prohibiting the parties from revealing any confidential or proprietary information to a third party, ownership of the intellectual property, which was to remain with the McCandless Group, and further provisions. The WDA also set forth the compensation between the partners, which was a revenue sharing agreement between the parties. Bartlett executed the WDA on behalf of Coy Collective.

During this period of partnership/joint venture, Defendants agreed that they would not be competing with the McCandless Group for clients, and that their targeted clients came from a different demographic and that they were operating a different business than that of McCandless Group. This was a key component of the partnership.

Dated:  April 11, 2023                    GERARD FOX LAW, P.C.


                                          By: _____
                                              Gerard P. Fox
                                              Attorneys for Counter-defendant
                                              MCCANDLESS GROUP, LLC

## PROOF OF SERVICE

I Lue Wahjudi, I am employed in the County of Los Angeles, in the State of California.  I am over the age of 18 and not a Party to the above referenced matter.  My business address is:  GERARD FOX LAW P.C., 1880 Century Park East, Suite 1410, Los Angeles, CA 90067.

On April 11, 2023, I served the following documents, described as: **MCCANDLESS GROUP LLC'S RESPONSE TO INTERROGATORIES FROM COUNTER-PLAINTIFF THE COY COLLECTIVE, INC., SET ONE**, on the person(s) listed in the attached Service List.  The documents were served by the following means:

| | |
|---|---|
| ☐ | **By Personal Service**.  I personally delivered the documents to the persons at the addresses listed in the attached Service List.  For a Party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office, between the hours of 9 a.m. and 5 p.m.  For a Party, delivery was made to the Party or by leaving the documents at the Party's residence with some person not younger than 18 years of age. |
| ☐ | **By United States Mail**.  I enclosed the documents in a sealed envelope or package addressed to the persons listed in the attached Service List and placed the envelope for collection and mailing following our ordinary business practices.  I am readily familiar with this business's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. |
| ☐ | **By Overnight Delivery**.  I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses listed in the attached Service List.  I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier. |
| ☐ | **By Messenger Service**.  I served the documents by placing them in an envelope or packing addressed to the persons at the addresses listed in the attached Service List and providing them to a professional messenger service for delivery. |
| ☐ | **By Electronic Mail:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list. |
| ☒ | **By Electronic Service**:  Based on a court order or an agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the persons at the electronic notification addresses listed in the attached Services List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful. |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:   April 11, 2023

/s/Lue Wahjudi_____
Lue Wahjudi

MCCANDLESS GROUP LLC AND NICHOLAS MCCANDLESS' RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS FROM DEFENDANT THE COY COLLECTIVE, INC., SET ONE

1

**Service List**

2

| | |
|---|---|
| COLIN H. ROLFS (State Bar No. 280654)<br>**MILLER BARONDESS, LLP**<br>1999 Avenue of the Stars, Suite 1000<br>Los Angeles, California 90067<br>Telephone: (310) 552-4400<br>Facsimile: 310) 552-8400<br>Email: crolfs@millerbarondess.com | *Attorney for Defendants and Counterclaimants*<br><br>The Coy Collective, Inc., Jessica Bartlett, Cristina Dospassos, Corey Lewis, Robert Hankins, and Thomas Drew |
| | |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I, Nicholas McCandless, have read and reviewed the foregoing document titled **MCCANDLESS GROUP LLC.'S RESPONSE TO JESSICA BARTLETT'S INTERROGATORIES (SET ONE), MCCANDLESS GROUP LLC.'S SUPPLEMENTAL RESPONSES TO JESSICA BARTLETT'S INTERROGATORIES (SET ONE), AND MCCANDLESS GROUP LLC.'S SUPPLEMENTAL RESPONSES TO THE COY COLLECTIVE'S INTERROGATORIES, (SET ONE)** and know its contents.

I am an authorized representative of McCandless Group LLC., a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. Based on my knowledge, the matters stated in the foregoing document are true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 2nd day of August 2023, in Los Angeles County, California.

*Nicholas McCandless*
Nicholas McCandless (Aug 2, 2023 17:28 EDT)
NICOLAS MCCANDLESS
MCCANDLESS GROUP, LLC

2

PLAINTIFF AND COUNTER-DEFENDANT'S NOTICE OF DEPOSITION TO THOMAS DREW

# McCandless v. Coy - Verifications

Final Audit Report                                                                           2023-08-02

| | |
|---|---|
| Created: | 2023-08-02 |
| By: | Cecilia Quiroz (cquiroz@gerardfoxlaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAQzgxo28-8xUG4aP1LUZ5pHIk9uLUi9LI |

## "McCandless v. Coy - Verifications" History

📄 Document created by Cecilia Quiroz (cquiroz@gerardfoxlaw.com)
   2023-08-02 - 4:18:55 PM GMT

↪ Document emailed to nick@nickmccandless.com for signature
   2023-08-02 - 4:19:12 PM GMT

📄 Email viewed by nick@nickmccandless.com
   2023-08-02 - 4:39:28 PM GMT

🔏 Signer nick@nickmccandless.com entered name at signing as Nicholas McCandless
   2023-08-02 - 9:28:38 PM GMT

🔏 Document e-signed by Nicholas McCandless (nick@nickmccandless.com)
   Signature Date: 2023-08-02 - 9:28:40 PM GMT - Time Source: server

✅ Agreement completed.
   2023-08-02 - 9:28:40 PM GMT

📄 Adobe Acrobat Sign

# EXHIBIT D

| From: | Nicholas McCandless via DocuSign |
| Sent: | Wednesday, May 20, 2020 11:27 PM PDT |
| To: | Corey Lewis |
| Subject: | Corey Lewis NDA |


**MCCANDLESS GROUP**



Nicholas McCandless sent you a document to review and sign.

REVIEW DOCUMENT

**Nicholas McCandless**
nick@nickmccandless.com

Corey Lewis,

Please DocuSign Corey Lewis NDA.pdf

Thank You, Nicholas McCandless

Powered by                                    **DocuSign**

**Do Not Share This Email**
This email contains a secure link to DocuSign. Please do not share this email, link, or access code with others.

**Alternate Signing Method**
Visit DocuSign.com, click 'Access Documents', and enter the security code:
DF29C3131F5345CEA61A7552147C53093

**About DocuSign**
Sign documents electronically in just minutes. It's safe, secure, and legally binding. Whether you're in an office, at home,
on-the-go -- or even across the globe -- DocuSign provides a professional trusted solution for Digital Transaction

EXHIBIT

McCandless

CONFIDENTIAL

COY000020

**Page 146**

Management™.

**Questions about the Document?**
If you need to modify the document or have questions about the details in the document, please reach out to the sender by emailing them directly.

**Stop receiving this email**
Report this email or read more about Declining to sign and Managing notifications.

If you are having trouble signing the document, please visit the Help with Signing page on our Support Center.

Download the DocuSign App

This message was sent to you by Nicholas McCandless who is using the DocuSign Electronic Signature Service. If you would rather not receive email from this sender you may contact the sender with your request.

CONFIDENTIAL

COY000021

# EXHIBIT E

| Number of participants | 2 |
|---|---|
| Participants | 8:mark.lenteken<br>8:nick212004ps3 |
| Number of messages | 29 |
| First message sent date/time | February 18, 2021 17:31:01 |
| Last message sent date/time | February 18, 2021 17:56:35 |

**8:nick212004ps3**  February 18, 2021 17:31:01

Hey Mark, are you there?

**8:mark.lenteken**  February 18, 2021 17:35:36

Hi Nick

**8:nick212004ps3**  February 18, 2021 17:35:49

Are you able to do a quick design for me today?

**8:mark.lenteken**  February 18, 2021 17:36:04

what kind of design?

**8:nick212004ps3**  February 18, 2021 17:37:41

Let me share

**8:nick212004ps3**  February 18, 2021 17:37:43

One second

EXHIBIT
22
McCandless
PENGAD 800-631-6989

CONFIDENTIAL

MCCANDLESS014751

**Page 149**

**8:nick212004ps3**                     **February 18, 2021 17:39:54**



**8:nick212004ps3**                     **February 18, 2021 17:41:32**

So you will see this design and elements. We already built this but we want to change the design without changing the elements. So we will still have these 4 photos and the options for the text. That will stay the same, but we need it to look different enough to where someone wouldn't think its the same design

**8:nick212004ps3**                     **February 18, 2021 17:41:42**

It"s just a landing page

CONFIDENTIAL

MCCANDLESS014752

**8:mark.lenteken** February 18, 2021 17:43:41

okay I understand but I can't finish it today. I can send it tomorrow

**8:nick212004ps3** February 18, 2021 17:46:14

**8:nick212004ps3** February 18, 2021 17:46:14



CONFIDENTIAL

MCCANDLESS014753

**8:nick212004ps3**                                    **February 18, 2021 17:46:14**



**8:nick212004ps3**                                    **February 18, 2021 17:46:14**



**8:nick212004ps3**                                    **February 18, 2021 17:46:14**

<MediaAlbum albumId="8ff36af2-2d8b-4629-993d-bf9e44646169"></MediaAlbum>

CONFIDENTIAL



**8:nick212004ps3**                    February 18, 2021 17:46:14

**8:nick212004ps3**                    February 18, 2021 17:47:03

**8:mark.lenteken**                    February 18, 2021 17:48:02

okay got it. how much is your budget?

**8:nick212004ps3**                    February 18, 2021 17:48:14

Tomorrow is fine. Here are a few notes:1) For the name please have it say ALEXA DELLANOS2) For the four images, use these3) Make sure we dont have those blue lines at all as those were specific to another brand. Like the lines next to TITLE1 H1 and TITLE2 H1

**8:nick212004ps3**                    February 18, 2021 17:48:19

**8:nick212004ps3**                    February 18, 2021 17:48:51

How long will it take you? Should be a quick simple thing

CONFIDENTIAL

**8:mark.lenteken**                          February 18, 2021 17:49:43

no, it's not quick simple thing. I need to design new style/brand for it.

**8:nick212004ps3**                          February 18, 2021 17:50:09

Ok what cost is fair to you?

**8:mark.lenteken**                          February 18, 2021 17:50:25

$180

**8:nick212004ps3**                          February 18, 2021 17:52:00

Ok that works if you can have it to me by tomorrow

**8:mark.lenteken**                          February 18, 2021 17:55:36

Here is the invoice for the downpayment

**8:mark.lenteken**                          February 18, 2021 17:55:37

<a href="https://www.paypal.com/invoice/p/#A3AACH8ZN2PFAHVE">https://www.paypal.com/invoice/p/#A3AACH8ZN2PFAHVE</a>

**8:nick212004ps3**                          February 18, 2021 17:56:19

Paid

**8:mark.lenteken**                          February 18, 2021 17:56:35

Thank you

CONFIDENTIAL

MCCANDLESS014756

CONFIDENTIAL

MCCANDLESS014757

# EXHIBIT F

| Number of participants | 2 |
|---|---|
| Participants | 8:nick212004ps3<br>8:live:ritag_57 |
| Number of messages | 8 |
| First message sent date/time | October 16, 2020 16:07:59 |
| Last message sent date/time | October 16, 2020 16:20:54 |

**8:nick212004ps3**  October 16, 2020 16:07:59

Hey Rita, have a question when you have a secon

**8:nick212004ps3**  October 16, 2020 16:08:02

second*

**8:live:ritag_57**  October 16, 2020 16:10:23

Good Morning, Nick <ss type="smile">:)</ss>

**8:nick212004ps3**  October 16, 2020 16:17:24

Hey Rita, I hope all is well

**8:nick212004ps3**  October 16, 2020 16:19:18

I just wanted to confirm something. I am assuming that in terms of customer data, relationships, terms, etc. all of that remains exclusively with me and my company even though Coy Co receives the earnings on their sites correct? I am just wanting to confirm that in the event where I decide to no longer work with them that they would have to get their own account resulting in higher fe es, no account history like I have, no transfer of customer data/info, etc. since its all ran under m e, correct?



EXHIBIT
24
McCandless

CONFIDENTIAL

MCCANDLESS014508

**8:live:ritag_57**                          October 16, 2020 16:20:33

That is all correct.

**8:nick212004ps3**                          October 16, 2020 16:20:47

Perfect! Thanks for confirming that for me

**8:live:ritag_57**                          October 16, 2020 16:20:54

Anytime <ss type="smile">:)</ss>

CONFIDENTIAL

MCCANDLESS014509