COLIN H. ROLFS (State Bar No. 280654)
crolfs@millerbarondess.com
MILLER BARONDESS, LLP
2121 Avenue of the Stars, 26th Floor
Los Angeles, California 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400

Attorneys for Defendants and Counterclaimants
THE COY COLLECTIVE, INC, JESSICA BARTLETT, COREY LEWIS, ROBERT HANKINS, and THOMAS DREW

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MCCANDLESS GROUP, LLC,

Plaintiff,

v.

THE COY COLLECTIVE, et al.,

Defendants.

THE COY COLLECTIVE, et al.,

Counterclaimants,

v.

MCCANDLESS GROUP, LLC and NICHOLAS MCCANDLESS,

Counterdefendants.

**CASE NO. 2:21-cv-02069-DOC-KES**

**DECLARATION OF COREY LEWIS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Date: Mondav October 2. 2023
Time: 8:30 a.m.
Place: Courtroom 10A

The Hon. David O. Carter
and Magistrate Judge Karen E. Scott

Complaint Filed: March 8, 2021
Discovery Cut-Off: August 28, 2023
Motion Cut-Off: October 2, 2023
Trial: November 7, 2023

**[UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL]**

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**DECLARATION OF COREY LEWIS**

I, Corey Lewis, declare as follows:

1.     I am a party in the above-entitled action.  I have personal knowledge of the facts set forth herein.  If called as a witness, I could and would competently testify to the matters stated herein. I make this declaration in support of Defendants' and Counterclaimants' Motion for Summary Judgment.

**Founding COY**

2.     In 2020, I co-founded The COY Collective, Inc. ("COY") with Jessica Bartlett ("Bartlett") and Thomas Drew ("Drew").

3.     COY was a technology company that helps creator clients to offer subscription-based, exclusive content to their followers.

4.     Bartlett, Drew, and I conceptualized COY to be a more "selective" OnyFans—we would hand-pick influencers and offer them additional services like photo-shoots.

5.     COY vetted different options for building COY's subscription platform, including hiring McCandless Group, LLC ("MG") as a developer, hiring a company called Sedgwick, LLC ("Sedgwick") as a developer, or using a platform called Uscreen.

**COY Considers Hiring MG To Develop Websites**

6.     Bartlett and I discussed with McCandless about hiring MG as COY's developer.

7.     On May 16, 2023, I had an over 2-hour call with Nicholas McCandless ("McCandless").  Attached hereto as **Exhibit A** is a screen shot I took of my phone during this call, showing how long the call had been going.

8.     On May 19, 2020, McCandless sent me estimated upkeep costs for hosting and email services.  Attached hereto as **Exhibit B** is a true and correct copy of an email McCandless sent me on May 19, 2020.

9.     On May 20, 2020, McCandless sent a non-disclosure agreement to me

via DocuSign.

10. I signed the non-disclosure agreement on May 21, 2020. Attached hereto as **Exhibit C** is a true and correct copy of an email I sent to McCandless via DocuSign on May 21 containing a link to a non-disclosure agreement I executed via DocuSign. Attached hereto as **Exhibit D** is a true and correct copy of the non-disclosure agreement I signed via DocuSign.

11. After I signed a non-disclosure agreement in May, 2020, McCandless sent me a document entitled "McCandless Group Model Platform Technology Stack." Attached hereto as **Exhibit E** is a true and correct copy of an email McCandless sent me on May 23, 2020 and the attachment to the email.

12. I do not recall ever receiving, or having access to, MG's source code for the websites it built.

13. On May 27, 2020, I forwarded the tech stack document from McCandless to Drew and Andy Geller ("Geller"). Attached hereto as **Exhibit F** is a true and correct copy of an email I sent to Andy Geller and Thomas Drew on May 27, 2020 and the attachment to the email.

14. Geller was the manager of COY's principal investor and was advising COY on its business, including whether or not COY should choose to hire MG as its developer. Geller understood that his work with us was to be kept confidential.

15. Ultimately, COY hired MG to develop COY's subscription platform.

16. In June and July 2020, Bartlett, Drew, and I continued to negotiate pricing and terms with MG for it to serve as COY's developer. Attached hereto as **Exhibit G** is a true and correct copy of an email thread with McCandless from July 17, 2020 to July 29, 2020.

17. I was excited to work with MG when COY selected MG as its developer. COY did not select MG as COY's developer so that COY could "steal" MG's technology. MG was COY's developer, and we were excited about the arrangement.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

**<u>COY Considers Replacing MG With A Different Developer</u>**

18. In October 2020, COY considered switching developers and reached out to Dionna McPhatter ("McPhatter") about building new sites for COY. I do not recall ever sending a copy of MG's "tech stack" to McPhatter. COY ultimately decided not to replace MG with McPhatter.

**<u>COY Shuts Down</u>**

19. After MG terminated its agreement with COY, COY was forced to hire a new developer to rebuild its creators' websites—Sedgwick. During this time, COY was focused to trying to service the models it already had under contract. To my knowledge, COY did not sign up any new models who were MG clients or attempt to compete with MG to sign up any new models. COY was not successful and shut down all of its subscription websites before the end of 2021.

20. I never received a salary or any profit distributions from COY.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 31st day of August 2023, at New York, NY.

Corey Lewis

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

# INDEX OF EXHIBITS TO THE DECLARATION OF COREY LEWIS

| Exhibit No. | Description | Pg. No. |
|---|---|---|
| A. | May 16, 2023 screen shot of Lewis' phone during call to show length of time | 6-10 |
| B. | May 19, 2020, McCandless email with estimated upkeep costs for hosting and email services | 11-12 |
| C. | Email Lewis sent to McCandless via DocuSign on May 21, 2020 containing a link to a non-disclosure agreement | 13-15 |
| D. | Non-disclosure agreement (NDA) Lewis signed via DocuSign. | 16-22 |
| E. | McCandless email McCandless sent Lewis on May 23, 2020 with attachment | 23-27 |
| F. | Email Lewis sent to Andy Geller and Thomas Drew on May 27, 2020 with attachment | 28-33 |
| G. | Email thread between Lewis and McCandless from July 17, 2020 to July 29, 2020 | 34-40 |

Exhibit A

| Number of part c pants | 2 |
|---|---|
| Part c pants | +18058358052 Jess ca Bart ett (owner)<br>+19176936384 Corey Lew s |
| Number of messages | 16 |
| F rst message sent date/t me | May 16, 2020 20:21:57 |
| Last message sent date/t me | May 16, 2020 23:58:56 |



**+19176936384 Corey Lewis** **May 16, 2020 23:14:36**

Lo

+18058358052 Jessica Bartlett
May 16, 2020 23:17:33
Hahaha I ove t
11:17
LTE
Messages
Search
Nick McCandless
11:16 PM
Just spoke with Corey on the phone for over 2 hours, MUCH more confident now, this is...
Corey Lewis
11:14 PM
Lol
Emilia Trejo
5:13 PM
Okay that's kinda what I am thinking
Kiki Passo
5:13 PM
omg id be honored to meet this mush
Stephanie Guarino
4:48 PM
Okay no worries !
Mom
4:00 PM
I bought myself a couple of bottles of Chopin but I'm going to need to bring one to Ranell...
Emilia Trejo, Lauren Betten...
2:07 PM
Yay!
Lauren Dascalo
12:17 PM
Damnnn
Jack Flaherty
1:29 AM
Nice talking to you as well! Night, sleep well!

+19176936384 Corey Lewis
May 16, 2020 23:18:38
Lo yeah I s tuated t
+19176936384 Corey Lewis
May 16, 2020 23:18:48
St got to ta k about that $1.80

CONFIDENTIAL COY003772

Lewis Declaration - Page No. 8

**+19176936384 Corey Lewis** **May 16, 2020 23:18:52**

But a   good otherw se

**+18058358052 Jessica Bartlett** **May 16, 2020 23:45:42**

Emphas zed “St   got to ta k about that $1.80”

**+18058358052 Jessica Bartlett** **May 16, 2020 23:45:44**

Loved “But a   good otherw se ”

**+18058358052 Jessica Bartlett** **May 16, 2020 23:46:31**

Are we gonna go w th n cks p atform?

**+19176936384 Corey Lewis** **May 16, 2020 23:47:19**

Yes

**+19176936384 Corey Lewis** **May 16, 2020 23:47:44**

He says he's custom zab e, so we w   just have be more  n tune w th that

**+18058358052 Jessica Bartlett** **May 16, 2020 23:47:49**

Loved “He says he's custom zab e, so we w   just have be more  n tune w th that ”

**+18058358052 Jessica Bartlett** **May 16, 2020 23:47:55**

Dope!

**+19176936384 Corey Lewis** **May 16, 2020 23:52:57**

Yes how's the party?

**+18058358052 Jessica Bartlett** **May 16, 2020 23:58:56**

It was good! Back home now

CONFIDENTIAL COY003774

Lewis Declaration - Page No. 10

# Exhibit B

Lewis Declaration - Page No. 11

**From:** Nick McCandless
**Sent:** Tuesday, May 19, 2020 9:08 AM PDT
**To:** corey@1and1life.com
**Subject:** Estimated Upkeep Costs for Exclusive Content Platform Sites

Below are estimated upkeep costs based on the averages we find from the sites we currently manage:

AWS Hosting/Server Costs - $50 - $100 a month each site depending on traffic/bandwidth/etc.

Email Services - Starts at about $0.0009 per email and will drop as volume increases so depends upon the level of email automation involved, but very affordable

All of the other costs involved we cover as part of our structured deal.

**Nick McCandless**
Owner/Founder
McCandless Group

919-791-6441
nick@nickmccandless.com
www.nickmccandless.com

Exhibit C

Lewis Declaration - Page No. 13

**From:** Nicholas McCandless via DocuSign
**Sent:** Thursday, May 21, 2020 8:55 AM PDT
**To:** Corey Lewis
**Subject:** Completed: Corey Lewis NDA
**Attachments:** Corey Lewis NDA.pdf

**Nicholas McCandless**
nick@nickmccandless.com

All parties have completed Corey Lewis NDA.

Powered by DocuSign

**Do Not Share This Email**
This email contains a secure link to DocuSign. Please do not share this email, link, or access code with others.

**Alternate Signing Method**
Visit DocuSign.com, click 'Access Documents', and enter the security code:
1494A2CC42294F149637E42ECD9647083

**About DocuSign**
Sign documents electronically in just minutes. It's safe, secure, and legally binding. Whether you're in an office, at home, on-the-go -- or even across the globe -- DocuSign provides a professional trusted solution for Digital Transaction Management™.

**Questions about the Document?**

If you need to modify the document or have questions about the details in the document, please reach out to the sender by emailing them directly.

**Stop receiving this email**
Report this email or read more about Declining to sign and Managing notifications.

If you are having trouble signing the document, please visit the Help with Signing page on our Support Center.

Download the DocuSign App

This message was sent to you by Nicholas McCandless who is using the DocuSign Electronic Signature Service. If you would rather not receive email from this sender you may contact the sender with your request.

Exhibit D

DocuSign

## MUTUAL CONFIDENTIALITY AGREEMENT

**THIS MUTUAL CONFIDENTIALITY AGREEMENT** (this "Agreement") is entered into as of the date on the signature page (the "Effective Date") by and between McCandless Group, LLC, with its principal place of business located at 127 Bowery, Irvine, CA 92612 (the "Developer") and Corey Lewis with a principal place of business located at 40 Harrison St Apt 36 L, New York, NY 10013 (the "Partner" or "you" or "your") each individually a "Party" and collectively the "Parties."

WHEREAS, the Parties are contemplating business transactions or a collaboration (the "Proposed Transaction") that will require each to disclose information to the other that is confidential, proprietary and competitively sensitive, for example, regarding software, technology, data, customers, products, processes, and business objectives (each as either a "Disclosing Party" or "Receiving Party");

WHEREAS, the Parties are willing to disclose said confidential and proprietary information to each other according to the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. For purposes of this Agreement, the term "Confidential Information" shall mean information, directly or indirectly relating to the Disclosing Party or its affiliates, shareholders, officers, directors or employees and obtained by the Receiving Party in connection with its evaluation of the Proposed Transaction prior to or after the date of this Agreement, (including information conceived or originated, discovered or developed by the Receiving Party by reference to such information or containing such information), and whether orally, in documents, through and by observation or otherwise, together with all summaries, compilations, analyses, and reports created by the Receiving Party from such information or that contains such information. Without limiting the intended generality of the foregoing, Confidential Information shall include the Disclosing Party's existing or contemplated business, processes and services, techniques, components, sales, markets, costs, profits, research, development, inventions, purchasing, staff, employees, compensation, contractors, suppliers, customers, prospects, marketing, pricing policies, financial information, engineering and all other data. Confidential Information also includes, but is not limited to, all proposals and all information and data furnished by or on behalf of the Disclosing Party or any of its Representatives (as defined below).

2. The term "documents" includes, but is not limited to, writings, drawings, graphs, charts, photographs, tape recordings, computer application files, disc drives, tapes, compact discs, e-mail, electronic data, and other media, and data compilations in whatever form recorded or stored from which information can be obtained and/or translated if necessary, through detection devices, into reasonably usable form and any reproductions thereof.

DocuSign

3. As used in this Agreement, the term "Representative" means, as to any person, such person's wholly owned affiliates and their directors, officers, employees, agents and advisers (including, without limitation, investment bankers, accountants and legal counsel). As used in this Agreement, "wholly owned affiliate" shall mean, with respect to any person which (a) controls such person either directly or indirectly; or (b) is controlled directly or indirectly by such person; or (c) is directly or indirectly controlled by a person which directly or indirectly controls such person. "Control" means, for purposes of this definition of "wholly owned affiliate", the right to exercise a majority of the voting rights (with the exception of voting rights attaching to de minimis shareholdings required by applicable laws to be held by other person(s)) in the appointment of the directors or similar representatives on the governing body of such person or, if there are no such voting rights, the power to appoint the management or otherwise direct the business or determine the policy of such person. As used in this Agreement, the term "person" shall be broadly interpreted to include, without limitation, any organ, ministry, agency or instrumentality of any country or any other governmental, quasi-governmental or political subdivision thereof; any corporation, company, partnership or joint venture; or any other entity or individual. In connection with the evaluation of the Proposed Transaction, the Parties are willing, in accordance with the terms and conditions of this Agreement, to disclose to the each other certain proprietary confidential information relating to the Proposed Transaction and the Area.

4. Subject to the immediately succeeding paragraph, unless otherwise agreed to in writing by the Disclosing Party, the Receiving Party agrees: (a) to keep all Confidential Information confidential and not to directly or indirectly disclose, disseminate, or reveal, and to use its best efforts to prevent the use, dissemination, disclosure, or revelation of, any Confidential Information to any person other than those of its Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and to cause those persons to observe the terms of this Agreement; (b) not to directly or indirectly use Confidential Information for any purpose other than in connection with the evaluation and negotiation of the Proposed Transaction; and (c) not to disclose to any person (other than those of its Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and, in the case of its Representatives, each of whom the Receiving Party will cause to observe the terms of this Agreement as if he or she had been a party hereto) any information about the Proposed Transaction, or the terms or conditions thereof or any facts or circumstances relating thereto or the status thereof, including, without limitation, the fact that Confidential Information has been or will be made available to the Receiving Party or its Representatives or that discussions are taking place with respect to the Proposed Transaction. The Receiving Party will be responsible for any breach of the terms of this Agreement by it or its Representatives.

5. Neither Party will disclose to any person (other than those of its Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and, in the case of its Representatives, each of whom the Party will cause to observe the terms of this Agreement as if he or she had been a party hereto) any information about the Proposed Transaction, or the terms or

DocuSign

conditions thereof or any facts or circumstances relating thereto or the status thereof, including, without limitation, the fact that Confidential Information has been or will be made available to the Parties or their Representatives or that discussions are taking place with respect to the Proposed Transaction.

6. Confidential Information does not include, however, information that (a) is or becomes generally available to the public other than as a result of a disclosure, act or omission by the Receiving Party or its Representatives without the Disclosing Party's consent, (b) is or becomes available to the Receiving Party on a non-confidential basis from a person other than the Disclosing Party or its Representatives and other than as a result of a breach of an obligation of confidentiality to the Disclosing Party or its Representatives or a breach of any other obligation of such person not to transmit the information to the Receiving Party or any of its Representatives or (c) was known or developed independently by the Receiving Party without reference to any Confidential Information, or was available to the Receiving Party prior to its disclosure by the Disclosing Party. The onus of establishing that any of the above exceptions applies shall in each case be on the Receiving Party.

7. In the event that the Receiving Party is requested pursuant to, or required by, applicable law, regulation, rule or order of a duly empowered court, tribunal or governmental entity having jurisdiction over it or its Representatives, to disclose any Confidential Information, the Receiving Party shall, to the extent permitted by such applicable law, regulation, rule or order, provide the Disclosing Party with prompt notice of such request or requirement in order to enable the Disclosing Party to seek an appropriate protective order or other remedy, to consult with the Receiving Party with respect to the Disclosing Party's taking steps to resist or narrow the scope of such request or requirement, or to waive compliance, in whole or in part, with the terms of this Agreement. The Receiving Party will furnish only the portion of the Confidential Information that is legally required and will, at the Disclosing Party's sole expense, use its reasonable best efforts to ensure that all Confidential Information and other information that is so disclosed will be accorded confidential treatment by the Receiving Party thereof.

8. This Agreement does not obligate the Disclosing Party to produce any Confidential Information whatsoever. In the event that the Disclosing Party chooses to produce Confidential Information, this Agreement does not create a continuing obligation to produce any other information or to update any information that has been previously produced.

9. All documents containing, and all other tangible and intangible forms of, Confidential Information, including copies thereof, shall belong to and remain the sole property of the Disclosing Party. The Receiving Party shall acquire no proprietary interest in or right to any of the Confidential Information absent written agreement by the Disclosing Party.

10. The Receiving Party shall not take or make copies of the Confidential Information or any of it, or authorize any other person to do so, other than for the purpose of supplying the Confidential Information to any of its Representatives to whom disclosure of such information is permitted under the terms of this Agreement. If at any time the Disclosing Party, in its sole discretion, so requests in writing, then the Receiving Party will promptly deliver to the Disclosing Party all original Confidential Information with respect to the relevant Proposed Transaction and promptly deliver to the Disclosing Party or destroy all copies, reproductions, summaries, compilations, analyses and extracts thereof or

DocuSign

based thereon in the possession of the Receiving Party or its Representatives, whether maintained in written form or in any electronic or computerized format, and certify to the Disclosing Party that all such originals have been delivered to the Disclosing Party and that such destruction has occurred.

11. The Receiving Party acknowledges that neither the Disclosing Party nor any of its Representatives makes any express or implied representation or warranty as to the accuracy or completeness of any Confidential Information, and the Receiving Party agrees that none

of such persons shall have any liability to the Receiving Party or any of its Representatives relating to or arising from its or their use of any Confidential Information or for any errors therein or omissions therefrom. The Receiving Party also agrees that it is not entitled to rely on the accuracy or completeness of any Confidential Information. The Receiving Party acknowledges and agrees that the Confidential Information is being provided solely for the purpose of assisting its independent evaluation and analysis of the Disclosing Party and its assets.

12. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT OR LAW TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF PROFITS DUE TO BUSINESS INTERRUPTIONS OR OTHERWISE, IN CONNECTION WITH THIS AGREEMENT.

13. In the event of litigation relating to this Agreement, the non-prevailing Party as finally determined by a court of competent jurisdiction shall be liable and pay to the other Party all reasonable costs incurred by such other Party in connection therewith, including, but not limited to, reasonable attorneys' fees incurred by such other Party in connection with such litigation, including any appeal therefrom.

14. It is further understood and agreed that no failure or delay by the Disclosing Party in exercising or pursuing any right, power, privilege or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise or pursuit thereof preclude any other or further exercise or pursuit thereof or the exercise or pursuit of any other right, power, privilege or remedy hereunder.

15. This Agreement shall be effective as of the date on the signature page (the "Effective Date") and expire on the fifth anniversary thereof. This Agreement may not be amended, modified, superseded or cancelled, nor may any of the terms, covenants, representations, warranties or conditions hereof be waived, except by a written instrument executed by the parties.

16. If any provision of this Agreement becomes or is found to be illegal or unenforceable for any reason, such clause or provision must first be modified to the extent necessary to make this Agreement legal and enforceable and then if necessary, second, severed from the remainder of the Agreement to allow the remainder of the Agreement to remain in full force and effect.

17. This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

DocuSign

IN WITNESS WHEREOF, the Parties have executed this Agreement effective the date stated above.

| **DEVELOPER:**<br>Business Name: McCandless Group, LLC<br><br>Address: 127 Bowery, Irvine, CA 92612<br><br>Telephone Number: 919-791-6441<br><br>Email Address: nick@nickmccandless.com<br><br>DocuSigned by:<br>Nicholas McCandless<br>CC0CECA0BA5C475...<br>By: ___________<br>Signature<br><br>Full Name: Nicholas McCandless<br>Title: CEO/Owner/Founder<br><br>5/21/2020<br>Date: ___________________________ | **PARTNER:**<br>Business Name: Corey Lewis<br><br>Address: 40 Harrison St Apt 36 L, New York, NY 10013<br><br>Telephone Number: 917-693-6384<br><br>Email Address: Corey@1and1life.com<br><br>DocuSigned by:<br>F2FE8E81199B4A5...<br>By: ___________<br>Signature<br><br>Full Name: Corey Lewis<br><br>5/21/2020<br>Date: ___________________________ |
| --- | --- |

Exhibit E

**From:** Nick McCandless
**Sent:** Saturday, May 23, 2020 7:01 PM PDT
**To:** Corey Lewis
**Subject:** McCandless Group Model Platform Technology Stack
**Attachments:** McCandless Group Model Platform Technology Stack.pdf, .htm

Attached is the overview of our technology stack. Let me know of any questions.



## Architecture of Technology

### Server:

1. Node.js server with express
2. MongoDB Database

### Client:

1. React with Redux

### Other Services:

1. FFmpeg to transcode and process videos
2. TinyPNG to compress images
3. S3 for storing data
4. CloudFront to serve private content securely
5. Nginx to reverse proxy and static server react builds
6. Socket io for chat
7. CCBill for payment processing

### Hosting:

1. Amazon AWS EC2 instances
2. S3 to store media files
3. Amazon Route 53
4. AWS CloudWatch to monitor server resource utilization

## Handling and Management of Data

### User Roles

1. User
    a. Guest user (visitor not yet registered)
    b. Registered user
    c. Active Paying subscriber
2. Content Manager
3. Model
4. Super Admin

- Website settings are stored on MongoDB which decides theme and other options.
- Users can register and then subscribe to view exclusive content.
- Active subscribers can also engage in chat with the model.
- Subscribers can update profile settings and manage their subscription access.
- Subscribers can tip and purchase locked content on the model's exclusive content feed and in private chat.

## Security and Privacy of Content and Customer Data

1. Only users with a specific role can access the data with the correct JWT token.
2. API routes are protected based on user roles.
3. Uploaded content is stored on s3 with a unique id and the content is served with a signed url with CloudFront.

## Scalability

1. Sites are hosted across infinitely scalable AWS server instances to allow for no limitations of traffic, bandwidth, and activity.
2. Databases are hosted across MongoDB databases that are built for infinite scalability.
3. Dedicated server instances for video transcoding and processing services that websites leverage for videos.
4. Image processing is carried out by the same node,js instance which is responsible for the API.
5. Currently launching over 30 websites a week with the capacity to launch over 200 websites a week.

Video Processing instance
S3
DB instance
Website instance
Cloudfront
Browser

Exhibit F

**From:** Corey Lewis
**Sent:** Wednesday, May 27, 2020 12:32 PM PDT
**To:** Andy Geller
**CC:** Thomas Drew
**Subject:** Coy Club Cost
**Attachments:** McCandless Group Model Platform Technology Stack.pdf

Hey Andy,

Sorry for the delay in sending this over, as I was meant to get this out to you this morning prior to our call here in 45 minutes, but I had a little mishap while making breakfast this morning, and cut my hand pretty nicely. This led to a long unexpected trip to the hospital where I had to get a couple stitches lol.

Anyhow, I wanted to share the Architecture and Technology Stack (attached) that our Tech partner provides for us with our agreement. After looking at everything, and talking in depth with him, a lot of the ongoing costs are baked into our agreement with him.

Here are some of the other costs that fall outside of the scope of that agreement, and aren't detailed in the deck that we will be taking care of on an ongoing basis for each website we get up and running:

AWS Hosting/Server Costs - $50 - $100 a month each site depending on traffic/bandwidth/etc.

Email Services - Starts at about $0.0009 per email and will drop as volume increases so depends upon the level of email automation involved, but very affordable.

Cyber Security Insurance - Still waiting for a couple firms to get back to me with a quote based on the questions that I had to answer, but seems as though this will be $2k -$3k for the year (paid monthly or annually).

Legal Fees - Outside of the initial fees for getting everything situated to launch with Paul and the team, there may be instances where there will be back and forth negotiation. In those instances, I'm sure it will be good to lean on Paul and the team.

Accounting Fees - Ongoing Bookkeeping, Tax filing (accounted for in the deck)

Content Creation - Photographer, Location, Local Travel Fees, Hair and Make up, etc. (Accounted for in our initial budget)

Paid media - Marketing efforts to acquire more subscribers and customers for each site (accounted for in the initial budget)

Automation - In the event a model wants us to handle everything, including posting for them, messaging for them, etc. we will look to hire a minion that will take on this role. (accounted for in the deck)

Looking forward to chatting soon AG!

Best,

CL

--
**Corey Lewis**
**CEO/Co-Founder**
*Team 1and1*
*1and1 Life INC.*
corey@1and1life.com

*This message contains information that is confidential and/or may be privileged. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copy of this message or its attachments is strictly prohibited. In addition, emails sent from and to this 1and1life.com domain are monitored, archived, and subject to disclosure, including in connection with regulatory or other legal processes. If you have received this message in error, please advise the sender immediately by reply email and delete this message.*



# Architecture of Technology

## Server:

1. Node.js server with express
2. MongoDB Database

## Client:

1. React with Redux

## Other Services:

1. FFmpeg to transcode and process videos
2. TinyPNG to compress images
3. S3 for storing data
4. CloudFront to serve private content securely
5. Nginx to reverse proxy and static server react builds
6. Socket io for chat
7. CCBill for payment processing

## Hosting:

1. Amazon AWS EC2 instances
2. S3 to store media files
3. Amazon Route 53
4. AWS CloudWatch to monitor server resource utilization

# Handling and Management of Data

## User Roles

1. User
    a. Guest user (visitor not yet registered)
    b. Registered user
    c. Active Paying subscriber
2. Content Manager
3. Model
4. Super Admin

- Website settings are stored on MongoDB which decides theme and other options.
- Users can register and then subscribe to view exclusive content.
- Active subscribers can also engage in chat with the model.
- Subscribers can update profile settings and manage their subscription access.
- Subscribers can tip and purchase locked content on the model’s exclusive content feed and in private chat.

## Security and Privacy of Content and Customer Data

1. Only users with a specific role can access the data with the correct JWT token.
2. API routes are protected based on user roles.
3. Uploaded content is stored on s3 with a unique id and the content is served with a signed url with CloudFront.

## Scalability

1. Sites are hosted across infinitely scalable AWS server instances to allow for no limitations of traffic, bandwidth, and activity.
2. Databases are hosted across MongoDB databases that are built for infinite scalability.
3. Dedicated server instances for video transcoding and processing services that websites leverage for videos.
4. Image processing is carried out by the same node,js instance which is responsible for the API.
5. Currently launching over 30 websites a week with the capacity to launch over 200 websites a week.

Video
Processing
instance
S3
DB
instance
Website
instance
Cloudfront
Browser

Exhibit G

**From:** Nick McCandless
**Sent:** Wednesday, July 29, 2020 11:24 AM PDT
**To:** Corey Lewis
**CC:** Jessica Bartlett; Thomas Drew
**Subject:** Re: Work For Hire Terms and Agreement with developer/technology partner

Hey Corey,

Thanks for sending this over. Before we work on those other numbers, there are a lot of issues with this agreement in the sense that its more of a Work for Hire agreement as opposed to a licensing agreement. I will outline the major concerns below that need to be addressed before having our legal counsel review:

3.7a: We cannot promise that all advancements of our tech can be supplied at no additional cost. While this will be the case for most advancements, we have things in the works that will not be for the purposes of our business.

4.1: As discussed prior, we own the code completely and are offering it on a licensing basis. We will not be sharing the code of any of our work in any capacity.

Overall: We will not be liable nor be subject to "all other remedies" for very open ended scenarios which opens up immense liability

5.3: It was made clear at the beginning that our technology must have a "Powered by McCandless Group" statement as our technology

6.3a: Fees and expenses being paid 45 days after an invoice is not reasonable

6.3b: We cannot accept "Developer shall continue performing the Services in accordance with this Agreement notwithstanding any such dispute." If there is a dispute, we cannot be responsible for continuing to offer services while a dispute drags out

6.3c: All payments must be made via wire transfer, not check

6.5: Not applicable as there won't be any scenarios where we have a balance we must pay to Coy

Sections 7 and 8: All technology will remain owned by McCandless Group, we are not building out a product that's ownership is transferred to Coy so both of these sections need completely redone based on a licensing structure, not Work for Hire

9.2a: McCandless Group must have the same right to terminate upon the same terms and retain ownership of all McCandless Group property

Section 11: Completely unreasonable. This puts an immense level of liability on McCandless Group that will not be taken on

15.8: Completely unreasonable

15.12a: Must be by the laws of the State of Florida

15.12b: Location of arbitration must be within the state of Florida

Schedule A: Design Deliverables must be approved before a signed agreement and must explicitly state so in the Scope of Work

Schedule A: Design Services again must state "Powered by McCandless Group"

Schedule A: F-J need defined

All of Schedule B needs defined, but again this is a licensing agreement, not Work for Hire so this should be omitted

Schedule C: There are no definitions of the costs related to content and chat unlocks as we discussed

**Nick McCandless**
Owner/Founder
McCandless Group
919-791-6441
nick@nickmccandless.com
www.nickmccandless.com

On Jul 28, 2020, at 6:09 PM, Corey Lewis <Corey@1and1life.com> wrote:

Hey Nick,

Attatched is the work for hire terms and agreement for Coy Co and McCandless group.

In sections 3.7 and 4.3, there's a couple of numbers that we can quickly agree upon putting in place on a quick call, and then should be good to go.

We can hop on a quick call tonight to discuss those numbers real quick for those sections.

Pumped to get everything going my man!

Best,

Corey

---------- Forwarded message ---------
From: <alex@baileyduquette.com>
Date: Tue, Jul 28, 2020 at 2:41 PM
Subject: RE: Work For Hire Terms and Agreement with developer/technology partner
To: Corey Lewis <corey@1and1life.com>
CC: Thomas Drew <tdrew@1and1life.com>, Jessica Bartlett <jessicambartlett1@gmail.com>

Hi Corey:

Please find attached a slightly revised versions of the Website Development Agreement per our call earlier this afternoon.

Let me know if you have any additional questions/comments.

Thanks,

Alex

Alexandre Sauveplane

BAILEY DUQUETTE P.C. | 104 Charlton St., Suite 1W | New York, NY 10014

D: (917) 679-4657 | O: (212) 658-1946 ext 207 | F: (866) 233-5869 | E: alex@baileyduquette.com

www.baileyduquette.com

-----Original Message-----
From: alex@baileyduquette.com <alex@baileyduquette.com>
Sent: Monday, July 27, 2020 6:41 PM
To: 'Jessica Bartlett' <jessicambartlett1@gmail.com>
Cc: 'Thomas Drew' <tdrew@1and1life.com>; 'Corey Lewis' <corey@1and1life.com>
Subject: RE: Work For Hire Terms and Agreement with developer/technology partner

Hi Team:

Attached is a draft Website Development Agreement to be used with your technology partner, the McCandless Group. Please review and let me know if you have any questions/comments. I left a few comments where we had comments as well as a few items in brackets/highlighted where we need your input.

I'm generally around this week if you'd like to discuss.

Thanks,

Alex

Alexandre Sauveplane

BAILEY DUQUETTE P.C. | 104 Charlton St., Suite 1W | New York, NY 10014

D: (917) 679-4657 | O: (212) 658-1946 ext 207 | F: (866) 233-5869 | E: alex@baileyduquette.com www.baileyduquette.com

-----Original Message-----

From: Corey Lewis <corey@1and1life.com>

Sent: Friday, July 17, 2020 2:01 AM

To: Alexandre Sauveplane <alex@baileyduquette.com>

Cc: Jessica Bartlett <jessicambartlett1@gmail.com>; Thomas Drew <tdrew@1and1life.com>

Subject: Work For Hire Terms and Agreement with developer/technology partner

Hey Alex,

As promised, here are the terms that we agreed on with our developer (McCandless Group) in order to have them build out our clients/creators sites, as well as get access to their technology, technical support, copyright protection services/content monitoring (biggest

factor), and continued development and advancement of the technology under the following arrangement:

Cost Per Website: $3,000 one time setup

Monthly Services for Each Website (price per subscriber drops at certain thresholds):

0 - 20,000 subscribers - $1.80 per subscriber per month

20,001 - 50,000 subscribers - $1.65 per subscriber

50,001 - 90,000 subscribers - $1.50 per subscriber

90,001 - 150,000 subscribers - $1.35 per subscriber

150,001 subscribers - 200,000 subscribers - $1.20 per subscriber

200,001 subscribers and up - $1 per subscriber

Upkeep Expenses: AWS Hosting/Server Costs, Email Services, etc. will be billed directly to CoyCo

Under this arrangement, any and all advancements that McCandles group makes to their technology would automatically be provided to all of Coy's sites at no additional cost, so as they grow and expand their platform, these features and enhancements would continue to grow the technological capabilities that we will be able to offer the clients/creators that we work with. They will also commit to a set amount of development hours each month that are

allocated for requests directly from Coy to ensure that they help us stand out and continue to offer clients an experience they cannot get anywhere else.

McCandles Group would be positioned as the Technology Partner powering your technology, but they wanr that the terms of our agreement to be kept confidential (which we obviously want too). They retain ownership of their code/technology IP that we will be licensing/white labeling and Coy will of course own all of the content that we create and the relationships with all of our clients. They would also just need the right to act as a Copyright Agent for each client/creator in order to have the legal right to pull Copyright Protected content down for all of our clients.

TDrew and/or Jess, let me know if I'm missing anything, but I believe this covers everything that goes in to our agreement with McCandles group. Alex, let me know if there's anymore info that you need us to get in order to finalize this work for hire contract.

Best,

CL

--
**Corey Lewis**
**CEO/Co-Founder**
*Team 1and1*
*1and1 Life INC.*
corey@1and1life.com

*This message contains information that is confidential and/or may be privileged. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copy of this message or its attachments is strictly prohibited. In addition, emails sent from and to this 1and1life.com domain are monitored, archived, and subject to disclosure, including in connection with regulatory or other legal processes. If you have received this message in error, please advise the sender immediately by reply email and delete this message.*
<COY - McCandless - Website Development Agreement - BD Draft 7.28.20.docx>