COLIN H. ROLFS (State Bar No. 280654)
crolfs@millerbarondess.com
MILLER BARONDESS, LLP
2121 Avenue of the Stars, 26th Floor
Los Angeles, California 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400

Attorneys for Defendants and
Counterclaimants
THE COY COLLECTIVE, INC,
JESSICA BARTLETT, COREY LEWIS,
ROBERT HANKINS, and THOMAS
DREW

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MCCANDLESS GROUP, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE COY COLLECTIVE, et al.,<br><br>Defendants. | **CASE NO. 2:21-cv-02069-DOC-KES**<br><br>**DECLARATION OF JESSICA BARTLETT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:    Monday  October 2. 2023<br>Time:    8:30 a.m.<br>Place:   Courtroom 10A<br><br>The Hon. David O. Carter<br>and Magistrate Judge Karen E. Scott |
| THE COY COLLECTIVE, et al.,<br><br>Counterclaimants,<br><br>v.<br><br>MCCANDLESS GROUP, LLC and<br>NICHOLAS MCCANDLESS,<br><br>Counterdefendants. | Complaint Filed:     March 8, 2021<br>Discovery Cut-Off:   August 28, 2023<br>Motion Cut-Off:      October 2, 2023<br>Trial:               November 7, 2023 |

**[UNREDACTED VERSION OF DOCUMENT PROPOSED
TO BE FILED UNDER SEAL]**

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

## DECLARATION OF JESSICA BARTLETT

I, Jessica Bartlett, declare as follows:

1.     I am a party in the above-entitled action.  I have personal knowledge of the facts set forth herein.  If called as a witness, I could and would competently testify to the matters stated herein.  I make this declaration in support of Defendants' and Counterclaimants' Motion for Summary Judgment.

### The Creator Economy And Subscription Content Sites

2.     The "creator economy" refers to the economy of independent content creators—influencers, models, bloggers, podcasters, streamers, and others—who use the internet to distribute and monetize content.

3.     OnlyFans and Patreon are two of the largest companies in the creator economy space.  OnlyFans is a service launched in 2016 that allows creators to sell subscription content.  A creator can set up an OnlyFans page to sell content to subscribers, receive "tips," chat with subscribers, and view reporting on the financial performance of the page.

### Inception of Business Relationship With McCandless Group, LLC

4.     I am a social media personality and model.  I have built a substantial social media presence around my image and personal brand.  I have also more recently started a model management company.

5.     In 2019, Nicholas McCandless ("McCandless") introduced himself to me and offered to develop a subscription website for me.

6.     MG's sites have similar functionality as OnlyFans—*i.e.*, subscription content behind a paywall, chat, and financial reporting.  Unlike OnlyFans, MG's websites have unique domains—*i.e.*, "www.creatorname.com" rather than "www.onlyfans.com/creatorname."

7.     On October 27, 2019, I entered a Web Development Agreement (the "Bartlett WDA") with McCandless' company, McCandless Group, LLC ("MG"), for the development of my subscription website.  Attached hereto as **Exhibit U** is a

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  true and correct copy of the Bartlett WDA I executed on October 27, 2019.

2       8.     Because of my large social media following, MG used me to market

3  MG, using my name as a reference and encouraging potential MG clients to reach

4  out to me.

5       **Founding The COY Collective, Inc.**

6       9.     In 2020, I co-founded The COY Collective, Inc. ("COY") with Corey

7  Lewis ("Lewis") and Thomas Drew ("Drew").

8       10.    COY was a technology company that helps creator clients to offer

9  subscription-based, exclusive content to their followers.

10      11.    Lewis, Drew, and I conceptualized COY to be a more "selective"

11 OnlyFans—we would hand-pick influencers and offer them additional services such

12 as photo-shoots.

13      12.    COY vetted different options for building COY's subscription

14 platform, including hiring MG as a developer, hiring Sedgwick, LLC ("Sedgwick")

15 as a developer, or using a platform called Uscreen.

16      **COY Considers Hiring MG To Develop Websites**

17      13.    On May 6, 2020, I reached out to McCandless to gauge his interest in

18 working as COY's developer.  Attached hereto as **Exhibit A** is a true and correct

19 copy of text messages I exchanged with McCandless on May 6, 2020.

20      14.    On May 9, 2020, I set up a call with McCandless and Lewis to discuss

21 the project.  Attached hereto as **Exhibit B** is a true and correct copy of text

22 messages I exchanged with McCandless on May 9, 2020.

23      15.    On May 10, 2020, I asked McCandless to provide Lewis a login to my

24 site, so Lewis could see the experience.  McCandless offered to provide either a

25 client or subscriber login, and I selected a subscriber login.  Attached hereto as

26 **Exhibit C** is a true and correct copy of text messages I exchanged with McCandless

27 on May 10, 2020.

28      16.    McCandless provided the login the next day, May 11, 2020.  Attached

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

hereto as **Exhibit D** is a true and correct copy of text messages I exchanged with McCandless on May 11, 2020.

17.     On May 12, 2020, McCandless proposed some terms for MG to serve as COY's developer.  Attached hereto as **Exhibit E** is a true and correct copy of an email McCandless sent to Lewis and me on May 12, 2020.

18.     I told McCandless that I would be discussing what he sent Lewis and me with investors.  Attached hereto as **Exhibit F** is a true and correct copy of text messages I exchanged with McCandless on May 13, 2020.

19.     On May 14, I set up another call with McCandless and Lewis to discuss McCandless' proposal.  Attached hereto as **Exhibit G** is a true and correct copy of text messages I exchanged with McCandless on May 14, 2020.

20.     On May 20, 2020, McCandless sent me a link to a non-disclosure agreement via DocuSign.  Attached hereto as **Exhibit H** is a true and correct copy of an email McCandless sent to me via DocuSign on May 20, 2020 containing a link to a non-disclosure agreement.

21.     On May 21, 2020, I signed via DocuSign the non-disclosure agreement McCandless sent me.  Attached hereto as **Exhibit I** is a true and correct copy of an email I sent to McCandless via DocuSign on May 21 containing a link to a non-disclosure agreement I executed via DocuSign.  Attached hereto as **Exhibit J** is a true and correct copy of the non-disclosure agreement I signed via DocuSign.

22.     Ultimately, COY hired MG to develop COY's subscription platform.

23.     I was excited to work with MG when COY selected MG as its developer.

### COY Works With MG As Its Web Developer

24.     In June and July 2020, Lewis, Drew, and I continued to negotiate pricing and terms with MG for it to serve as COY's developer.  Attached hereto as **Exhibit K** is a true and correct copy of an email thread between McCandless and me between June 5, 2020 and June 28, 2020.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    25.    On August 6, 2023, COY's designer, Maria Deligiorgio, provided

2    designs for the COY websites.  Attached hereto as **Exhibit L** is a true and correct

3    copy of an email thread between Maria Deligiorgi and McCandless from August 3,

4    2020 to August 6, on which Lewis, Drew, and I were copied.

5    26.    MG never obtained COY's permission to use COY's designs for its

6    own websites.

7    27.    Also on August 6, I executed, on behalf of COY, a Web Development

8    Agreement (the "COY WDA") with MG.  Attached hereto as **Exhibit M** is a true

9    and correct copy of a Website Development Agreement with McCandless Group,

10   LLC that I executed on behalf of COY Collective, Inc. on August 6, 2020.  When I

11   signed the COY WDA, I intended for COY to abide by its terms.  The reason I

12   signed the COY WDA was because we wanted to work with MG as our developer.

13   I did not sign the COY WDA so that COY could "steal" MG's technology.  MG was

14   COY's developer, and we were excited about the arrangement.  COY has never

15   claimed ownership over any of MG's intellectual property covered by the COY

16   WDA.

17   28.    I do not recall ever receiving, or having access to, MG's source code

18   for the websites it built for COY.

19   **MG Transfers Two Websites To COY, Terminates The Bartlett WDA**

20   29.    In August 2020, MG and I agreed that my and one other model's sites

21   would transfer to COY, except that COY would pay MG a minimum amount for

22   these two specific sites.  Attached hereto as **Exhibit N** is a true and correct copy of

23   emails McCandless and I exchanged between August 8, 2020 and August 9, 2020.

24   30.    On September 7, 2020, McCandless sent me an email, confirming that

25   the Bartlett WDA had terminated.  Attached hereto as **Exhibit O** is a true and

26   correct copy of emails McCandless and I exchanged on September 7, 2020.

27   **Friction Emerges Between MG And COY**

28   31.    COY successfully recruited thirteen models and asked MG to build

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

websites for them.

32.     By October 2020, however, friction had emerged between COY and MG.   MG had difficulty launching a number of sites on time, which was frustrating for us.   Our models got upset with us when their sites would not launch on time.

33.     For his part, McCandless began to view COY as competing with MG in recruiting models.   Attached hereto as **Exhibit P** is a true and correct copy of text messages McCandless and I exchanged on October 7, 2020, where he expressed this to me.

34.     On October 19, 2020, McCandless texted me, stating that MG would refuse to build a website for a model, Mikayla Daimeter ("Daimeter"), because MG "had active conversations with" her.   Attached hereto as **Exhibit Q** is a true and correct copy of text messages McCandless and I exchanged on October 19, 2020.

**COY Considers Replacing MG With A Different Developer**

35.     In October 2020, COY considered switching developers and reached out to Dionna McPhatter ("McPhatter") about building new sites for COY.   I do not recall ever receiving a copy of MG's "tech stack" or providing such a document to McPhatter.

36.     COY ultimately decided not to replace MG with McPhatter.

**MG Terminate the COY WDA**

37.     On November 2, 2020, Jason Moskowitz ("Moskowitz") sent a letter to me demanding significant changes to the terms of the COY WDA as a condition of continuing, stating MG would otherwise shut down all COY sites on December 31, 2020.   Attached hereto as **Exhibit R** is a true and correct copy of the letter that Moskowitz sent me.

38.     On November 3, 2020, I notified Moskowitz that COY was not interested in the changed terms so "would be taking the option in which sites are terminated on Dec. 31st."   Attached hereto as **Exhibit S** is a true and correct copy of a text message I sent to Moskowitz on November 3, 2020 in response to his letter

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   dated November 2, 2020.

2       39.     On November 9, 2020, Moskowitz sent another letter to me.  Attached

3   hereto as **Exhibit T** is a true and correct copy of a letter that Moskowitz sent to me

4   in response to my text message dated November 3, 2020.

5       **MG Refuses To Turn Over Subscriber Information**

6       40.     The payment processing account for COY's websites was a critical part

7   of COY's business, because it stored subscriber information and allowed for

8   recurring subscription charges.  However, we learned that McCandless had set up

9   the account for payment processing for COY's websites with CCBill in MG's name,

10  and he refused to turn over the account to COY or transfer any of the subscribers to

11  COY after MG notified us of the termination.  MG also withheld the domains of

12  many of COY's clients, refusing to transfer them to COY.

13      41.     MG's withholding of internet domains and subscriber information was

14  disastrous for COY.  Without domains or access to this account, COY could not

15  relaunch its websites using the same domains or maintain the existing subscribers to

16  its creators' websites.

17      **COY Tries To Rebuild After MG Terminated The COY WDA**

18      42.     After MG terminated the COY WDA, COY was forced to hire a new

19  developer to rebuild its creators' websites—Sedgwick.  I do not recall ever receiving

20  a copy of MG's "tech stack" or providing such a document to Sedgwick.

21      43.     For payment processing, COY set up a new account with CCBill—the

22  same company that OnlyFans uses.

23      44.     COY hired two third parties—first Slashed Content and then Be Safe

24  Management—to provide DMCA take down services.  These companies specialized

25  in this service, and I never asked them to provide anything other than their standard

26  services.

27      **Bartlett Separates From COY**

28      45.     I left COY around early 2021.  Prior to leaving, COY did not sign up

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  any new models who were MG clients.  During this time, COY was focused on
2  trying to service the models it already had under contract.  To my memory, COY
3  only recruited one new model after the December 31, 2020 termination of the COY
4  WDA.  That model was not a current MG client, and we were not competing with
5  MG in signing up that model.  She was also not a potential MG client, which I know
6  because she went to OnlyFans not MG after COY later shut down its subscription
7  websites.

8        46.    I never received a salary or any profit distributions from COY.  The
9  only money I received was from my own subscription website.

       I declare under penalty of perjury that the foregoing is true and correct.

11  Executed on this 31st day of August 2023, at ___8:18 PM EST___.

Jessica Bartlett
Jessica Bartlett

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

# INDEX OF EXHIBITS TO THE DECLARATION OF JESSICA BARTLETT

| Exhibit No. | Description | Pg. No. |
|---|---|---|
| A. | Text messages exchanged with McCandless on May 6, 2020 | 11-18 |
| B. | Text messages exchanged with McCandless on May 9, 2020 | 19-22 |
| C. | Text messages exchanged with McCandless on May 10, 2020 | 23-27 |
| D. | Text messages exchanged with McCandless on May 11, 2020 | 28-30 |
| E. | Text messages exchanged with McCandless on May 12, 2020 | 31-33 |
| F. | Text messages exchanged with McCandless on May 13, 2020 | 34-35 |
| G. | Text messages exchanged with McCandless on May 14, 2020 | 36-37 |
| H. | Email from McCandless via DocuSign on May 20, 2020 containing a link to a non-disclosure agreement | 38-40 |
| I. | Email sent to McCandless via DocuSign on May 21 containing a link to a non-disclosure agreement executed via DocuSign | 41-43 |
| J. | Non-disclosure agreement [NDA] signed via DocuSign | 44-50 |
| K. | Email thread between McCandless and Bartlett between June 5, 2020 and June 28, 2020 | 51-53 |
| L. | Email thread between Maria Deligiorgi and McCandless from August 3, 2020 to August 6, 2020 with Bartlett, Lewis, and Drew copied | 54-57 |
| M. | Website Development Agreement with McCandless Group, LLC executed on behalf of COY Collective, Inc. on August 6. 2020 | 58-68 |
| N. | Email exchange between Bartlett and McCandless August 8. 2020 and August 9. 2020 | 69-71 |
| O. | Email exchange between Bartlett and McCandless on September 7. 2020 | 72-73 |
| P. | Text message exchange between McCandless and Bartlett on October 7, 2020 | 74-76 |
| Q. | Text message exchange between McCandless and Bartlett on October 19. 2020 | 77-82 |
| R. | November 2. 2020. Jason Moskowitz to Bartletvt | 83-86 |
| S. | Text message Bartlett sent to Moskowitz on November 3, 2020 | 87-88 |
| T. | Jason Moskowitz letter dated November 9, 2020, to Bartlett | 89-92 |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

| Exhibit No. | Description | Pg. No. |
|---|---|---|
| U. | Bartlett Web Development Agreement executed on October 27. 2019 | 93-106 |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL. (310) 552-4400   FAX (310) 552-8400

Exhibit A

| Number of participants | 2 |
|---|---|
| Participants | +18058358052 Jessica Bartlett (owner) +19197916441 Nick McCandless |
| Number of messages | 28 |
| First message sent date/time | May 06, 2020 17:10:25 |
| Last message sent date/time | May 06, 2020 23:51:16 |

**+18058358052 Jessica Bartlett**          May 06, 2020 17:10:25

Hey Nick! Working on a subscription based project with a couple investors and pitching you as our developer. They're not too keen on giving away percentages, do you have a flat rate number you'd be willing to do the same services as you do on my site for a similar slightly larger scale project?

**+19197916441 Nick McCandless**          May 06, 2020 17:27:00

Hey Jessica! That would depend on the project scope and services needed. Not something I would do with the model sites I am currently doing, but if this is for a different project, I am open to the idea, yes, just would need more info 👍

**+18058358052 Jessica Bartlett**          May 06, 2020 22:39:19

Sorry I thought I responded to this!! ;Just reread my message and should've been more specific, to clarify I meant a monthly flat rate number for a model site. No worries if you're not interested in that tho 😊

**+19197916441 Nick McCandless**          May 06, 2020 22:43:50

It's hard to put a flat monthly rate on it because the costs of running a model site varies on traffic, bandwidth, automated emails, etc. Also if payments go directly to a separate entity, there are things that need to be done on the payment processing side of things as there are various requirements in order to transact on what's considered "high risk" payment processing. Not opposed to it, just would need more info on it, but certainly open it 👍

**+18058358052 Jessica Bartlett**                                    **May 06, 2020 22:47:09**

I see! We'd want pretty much the same features as my site but would expect much higher traffic with a group of girls over a million followers on one site. I'll let the investors know all of that and keep you updated on what they say! 🙏

**+19197916441 Nick McCandless**                                    **May 06, 2020 22:52:03**

Sure thing, let me know. Committing to a flat rate would be difficult just because as more traffic and people use the site, the costs would continue to go up so if I commit to just a flat rate, the costs would eventually exceed what I was charging which wouldn't make sense. I'm open to structuring something they are comfortable with on the revenue share side of things, would just need to work those numbers out so that everyone is happy

**+18058358052 Jessica Bartlett**                                    **May 06, 2020 22:52:29**

Loved "Sure thing, let me know. Committing to a flat rate would be difficult just because as more traffic and people use the site, the costs would continue to go up so if I commit to just a flat rate, the costs would eventually exceed what I was charging which wouldn't make sense. I'm open to structuring something they are comfortable with on the revenue share side of things, would just need to work those numbers out so that everyone is happy "

**+18058358052 Jessica Bartlett**                                    **May 06, 2020 22:52:35**

That totally makes sense!

**+19197916441 Nick McCandless**                                    **May 06, 2020 22:55:24**

I now work with over 150 models, many of which have millions of followers so as you know, what we have is tested and proven and it's not something that's anywhere near as simple as it looks, so them having a share taken out with a tested and proven company who's been doing this for a while now and constantly adding new features would make them substantially more than taking the risk of building from the ground up that's not been tested with hundreds of millions of users

**+19197916441 Nick McCandless**                      May 06, 2020 22:55:38

But would love to make it work, sounds exciting and would love to be involved 👍

**+18058358052 Jessica Bartlett**                      May 06, 2020 22:57:27

I agree 100%! I'll make sure to tell them all that and we can hopefully make a structure that works IE they cover all hosting fees/ bandwidth costs or whatever associated costs and give you a monthly flat rate. I'm confident we'll work something fair out :)

**+19197916441 Nick McCandless**                      May 06, 2020 22:57:40

Also, hoping to have that Ibradome page taken down by tomorrow, had my company attorney submit everything yesterday and if by morning it's still live, we will be going directly to their hosting provider and ordering removal from their servers

**+18058358052 Jessica Bartlett**                      May 06, 2020 22:57:55

Loved "Also, hoping to have that Ibradome page taken down by tomorrow, had my company attorney submit everything yesterday and if by morning it's still live, we will be going directly to their hosting provider and ordering removal from their servers"

**+18058358052 Jessica Bartlett**                      May 06, 2020 22:58:00

You're amazing thank you!!

**+19197916441 Nick McCandless**                      May 06, 2020 22:58:35

Sure thing! Keep me updated on that, I'm sure we can work something out, I'm pretty flexible as long as it makes sense 👍

CONFIDENTIAL                                                                      COY003276

**+19197916441 Nick McCandless**                    May 06, 2020 22:59:24

Also, still working on Lauren, hope to have that locked down soon, so will keep you updated there

**+19197916441 Nick McCandless**                    May 06, 2020 22:59:43

And haven't heard anything from your friend, but once I do, I'll let you know 👍

**+18058358052 Jessica Bartlett**                    May 06, 2020 22:59:54

Loved "Sure thing! Keep me updated on that, I'm sure we can work something out, I'm pretty flexible as long as it makes sense 👍 "

**+18058358052 Jessica Bartlett**                    May 06, 2020 22:59:56

Loved "Also, still working on Lauren, hope to have that locked down soon, so will keep you updated there "

**+18058358052 Jessica Bartlett**                    May 06, 2020 22:59:58

Disliked "And haven't heard anything from your friend, but once I do, I'll let you know 👍 "

**+18058358052 Jessica Bartlett**                    May 06, 2020 23:00:15

Dang it! Hopefully he reaches out soon! And I'll keep working on Lauren as well 🙏

**CONFIDENTIAL**                                                    COY003277

**+19197916441 Nick McCandless**                    May 06, 2020 23:02:02

Once the deal with Lauren is done, my team is going to be busy 😬 Her stuff is EVERYWHERE last time my team checked but we will get that under control 👍

**+18058358052 Jessica Bartlett**                    May 06, 2020 23:02:30

I checked too and was shocked she didn't immediately switch over

**+19197916441 Nick McCandless**                    May 06, 2020 23:05:06

Yea I tried telling her 😬 The moment anyone with a sizeable audience goes live on OnlyFans, their stuff is leaked out everywhere. ;Also the beginning of OnlyFans screwing models over big time is only starting. Everyone who referred people to OnlyFans are having all of their referral payouts shut down completely and it's only the beginning. Been telling people this for well over a year now and it's slowly but surely happening

**+19197916441 Nick McCandless**                    May 06, 2020 23:06:17

https://www.vice.com/en_us/article/xg8qqq/onlyfans-cutting-creator-referral-program-bonuses-payout



**+18058358052 Jessica Bartlett** May 06, 2020 23:06:47

Oh wow 🫣

CONFIDENTIAL

COY003279

**+19197916441 Nick McCandless**                    May 06, 2020 23:09:00

Yep, and it's only going to get worse. Just wait until they raise their cut even more and some other stuff that I have been hearing from insiders I know, it's going to be scary for those depending on OnlyFans. This is why having your own site with a locked in deal that can't be changed or used to screw anyone over is critical. Not to mention the shadowbanning occurring with those promoting OnlyFans. It will get nasty

**+18058358052 Jessica Bartlett**                    May 06, 2020 23:51:16

Emphasized "Yep, and it's only going to get worse. Just wait until they raise their cut even more and some other stuff that I have been hearing from insiders I know, it's going to be scary for those depending on OnlyFans. This is why having your own site with a locked in deal that can't be changed or used to screw anyone over is critical. Not to mention the shadowbanning occurring with those promoting OnlyFans. It will get nasty "

Exhibit B

| Number of participants | 2 |
|---|---|
| Participants | +18058358052 Jessica Bartlett (owner) |
| | +19197916441 Nick McCandless |
| Number of messages | 14 |
| First message sent date/time | May 09, 2020 11:00:13 |
| Last message sent date/time | May 09, 2020 18:01:25 |



**+18058358052 Jessica Bartlett**　　　　　　　**May 09, 2020 11:00:13**

Do you mind fixing this typo?

**+19197916441 Nick McCandless**　　　　　　**May 09, 2020 11:01:18**

Fixed! Let me know if you want to add or edit anything else there

CONFIDENTIAL

COY003281

Bartlett Declaration - Page No. 20

**+18058358052 Jessica Bartlett**  May 09, 2020 11:01:45

Thank you!!

**+18058358052 Jessica Bartlett**  May 09, 2020 15:13:46

Preparing an investor pitch for the company I was telling you a little about. Do you have time today for a call with me and my main business guy?

**+19197916441 Nick McCandless**  May 09, 2020 15:19:49

Sure! What time are you thinking?

**+18058358052 Jessica Bartlett**  May 09, 2020 16:59:04

Can we actually do tomorrow?

**+18058358052 Jessica Bartlett**  May 09, 2020 16:59:10

Whenever works for you

**+19197916441 Nick McCandless**  May 09, 2020 17:00:26

Yep! How does 12pm PST sound?

**+18058358052 Jessica Bartlett**  May 09, 2020 17:03:34

Perfect!

CONFIDENTIAL

**+19197916441 Nick McCandless**　　　May 09, 2020 17:03:52

Awesome! Have it on the calendar. Phone? Zoom?

**+18058358052 Jessica Bartlett**　　　May 09, 2020 17:10:54

Just a phone call!

**+19197916441 Nick McCandless**　　　May 09, 2020 17:19:11

Sounds good! Should I call you or wait for a call then?

**+18058358052 Jessica Bartlett**　　　May 09, 2020 18:01:15

I'll call you then! Looking forward to it!

**+19197916441 Nick McCandless**　　　May 09, 2020 18:01:25

Great! 👍

CONFIDENTIAL　　　COY003283

Exhibit C

| Number of participants | 2 |
|---|---|
| Participants | +18058358052 Jessica Bartlett (owner) |
| | +19197916441 Nick McCandless |
| Number of messages | 21 |
| First message sent date/time | May 10, 2020 16:20:45 |
| Last message sent date/time | May 10, 2020 20:18:47 |

**+18058358052 Jessica Bartlett**　　　　　　　　**May 10, 2020 16:20:45**

When you get a chance, could you make a login for Corey to check out my site?

**+19197916441 Nick McCandless**　　　　　　　**May 10, 2020 16:31:54**

Same as a content manager account?

**+18058358052 Jessica Bartlett**　　　　　　　　**May 10, 2020 16:56:42**

No just a regular user

**+19197916441 Nick McCandless**　　　　　　　**May 10, 2020 17:02:46**

Ahhh so just a normal subscriber?

**+18058358052 Jessica Bartlett**　　　　　　　　**May 10, 2020 17:07:13**

Yeah I just want to show him what a subscriber would see

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　COY003284

Bartlett Declaration - Page No. 24

**+19197916441 Nick McCandless**                    May 10, 2020 17:07:30

Got it! Will have that to you by tonight 👍

**+18058358052 Jessica Bartlett**                   May 10, 2020 17:08:34

Thank you!

**+19197916441 Nick McCandless**                    May 10, 2020 17:08:42

👍

**+18058358052 Jessica Bartlett**                   May 10, 2020 19:59:04

Is it still the case that if I delete one photo which was a mass message that it deletes all of them?

**+18058358052 Jessica Bartlett**                   May 10, 2020 19:59:46

IE if I delete a pic that hasn't been unlocked for one guy so I can resend it, will it delete for every one?

**+19197916441 Nick McCandless**                    May 10, 2020 20:15:43

Yes we are wrapping up that functionality. Who was it for? We can manually do it in our backend for now

**+18058358052 Jessica Bartlett**                   May 10, 2020 20:16:12

Oh shoot Kayla's been doing that a ton 😂🧏‍♀️♀️☐

**+18058358052 Jessica Bartlett**                                May 10, 2020 20:16:22

It's okay I'll just have her stop for now

**+19197916441 Nick McCandless**                          May 10, 2020 20:17:34

Wait so just so i understand it fully, so she sends out a mass message, she then goes into individual conversations and she deletes it to resend at what I am assuming is a higher price for spenders?

**+19197916441 Nick McCandless**                          May 10, 2020 20:17:39

Just so I understand correctly

**+18058358052 Jessica Bartlett**                                May 10, 2020 20:18:01

If someone didn't buy a picture from months ago she'll delete it and resend

**+19197916441 Nick McCandless**                          May 10, 2020 20:18:11

Ohhhhhhhhh

**+19197916441 Nick McCandless**                          May 10, 2020 20:18:22

Ok let me confirm that and get you an answer by tonight

**+18058358052 Jessica Bartlett**                                May 10, 2020 20:18:31

So she's probably deletes a good chunk of the old mass messages 😂

**+18058358052 Jessica Bartlett**                    **May 10, 2020 20:18:44**

Deleted*

**+19197916441 Nick McCandless**                    **May 10, 2020 20:18:47**

I know we don't delete it from those who purchased the content but let me check this and get back to you

CONFIDENTIAL                                                   COY003287

Exhibit D

| | |
|---|---|
| Number of participants | 2 |
| Participants | +18058358052 Jessica Bartlett (owner) |
| | +19197916441 Nick McCandless |
| Number of messages | 12 |
| First message sent date/time | May 11, 2020 11:45:17 |
| Last message sent date/time | May 11, 2020 12:33:10 |

**+19197916441 Nick McCandless**                              May 11, 2020 11:45:17

Here is subscriber account for Corey;testsub@gmail.com;Test@123!Sub

**+19197916441 Nick McCandless**                              May 11, 2020 11:50:39

Confirming functionality of the delete on the messages as well. I am going to have that expedited so this is no longer anything to worry about either

**+18058358052 Jessica Bartlett**                              May 11, 2020 12:15:40

Thank you!!

**+19197916441 Nick McCandless**                              May 11, 2020 12:17:16

👍

**+18058358052 Jessica Bartlett**                              May 11, 2020 12:21:15

The account looks great thanks!



EXHIBIT
13
McCandless

**+18058358052 Jessica Bartlett** — May 11, 2020 12:21:44

Question tho, for messages, has it always been blurred there as well?

**+19197916441 Nick McCandless** — May 11, 2020 12:25:12

Yes

**+19197916441 Nick McCandless** — May 11, 2020 12:25:59

We are adding the option to send mass messages so they aren't blurred and just fully covered and we can also increase the level of blur so it's less transparent if you'd like

**+18058358052 Jessica Bartlett** — May 11, 2020 12:31:47

Sounds food!

**+18058358052 Jessica Bartlett** — May 11, 2020 12:31:57

I think a more intense blur would be good for messages

**+19197916441 Nick McCandless** — May 11, 2020 12:33:03

Got it! Will update this and reprocess the blurred images so that they are all more intense and less transparent

**+18058358052 Jessica Bartlett** — May 11, 2020 12:33:10

Loved "Got it! Will update this and reprocess the blurred images so that they are all more intense and less transparent"

Exhibit E

| | |
|---|---|
| **From:** | Nick McCandless |
| **Sent:** | Tuesday, May 12, 2020 10:20 PM PDT |
| **To:** | Jessica Bartlett; corey@1and1life.com |
| **Subject:** | Exclusive Content Platform Proposal |

Hey Jessica and Corey,

It was great speaking with the both of you this weekend about the vision you guys have and I appreciate Jessica connecting us all to begin the conversations of working together. After analyzing and running some numbers internally, here is what I believe would be a lucrative arrangement for us all and incentivize us to work together to grow this into a successful venture.

We would provide the technology, technical support, copyright protection services/content monitoring, and continued development and advancement of the technology under the following arrangement:

Cost Per Website: $3,000 one time setup

Monthly Service for Each Website: $1.80 per subscriber per month

Upkeep Expenses: AWS Hosting/Server Costs, Email Services, etc. will be billed directly to your company

Under our arrangement, any and all advancements that we make to our technology would automatically be provided to your sites at no additional cost, so as we grow and expand our platform, these features and enhancements would continue to grow the technological capabilities that you can offer the models that you work with. We will also commit to a set amount of development hours each month allocated for requests directly from your company to ensure that we help your company stand out and continue to  offer clients an experience they cannot get anywhere else.

McCandles Group would be marketed as the Technology Partner powering your technology, but we would require that the terms of our agreement to be kept confidential. We retain ownership of the code/technology and your company will own all of the content and the relationships with the models. We would just need the right to act as a Copyright Agent for each model in order to have the legal right to pull Copyright Protected content down for your clients.

I look forward to hearing your thoughts and discussing how we can begin the process of getting the ball moving. Timing is of the essence and we have the ability to have sites up and running within just two weeks of notice and with the current environment of this industry, you guys are in the right spot at the right time and would love to help you guys succeed in this venture.

CONFIDENTIAL

COY000001



**Nick McCandless**

Owner/Founder

McCandless Group



919-791-6441

nick@nickmccandless.com

www.nickmccandless.com

CONFIDENTIAL

COY000002

Exhibit F

| Number of participants | 2 |
|---|---|
| Participants | +18058358052 Jessica Bartlett (owner) |
| | +19197916441 Nick McCandless |
| Number of messages | 4 |
| First message sent date/time | May 13, 2020 00:18:50 |
| Last message sent date/time | May 13, 2020 10:29:37 |

**+18058358052 Jessica Bartlett**                    May 13, 2020 00:18:50

Got it! Thank you! I'll talk this over with Corey and the other investors in the morning 😊

**+19197916441 Nick McCandless**                    May 13, 2020 00:19:18

Sure thing! Look forward to discussing further 👍

**+19197916441 Nick McCandless**                    May 13, 2020 09:33:55

Jamie texted me, will keep you updated 👍

**+18058358052 Jessica Bartlett**                    May 13, 2020 10:29:37

Loved "Jamie texted me, will keep you updated 👍 "

Exhibit G

| | |
|---|---|
| Number of participants | 2 |
| Participants | +18058358052 Jessica Bartlett (owner) |
| | +19197916441 Nick McCandless |
| Number of messages | 4 |
| First message sent date/time | May 14, 2020 18:15:43 |
| Last message sent date/time | May 14, 2020 18:22:26 |

**+18058358052 Jessica Bartlett**                    May 14, 2020 18:15:43

Hey! Do you have time for another phone call with me and Corey tomorrow to go over your proposal?

**+19197916441 Nick McCandless**                    May 14, 2020 18:16:40

As long as it's in the evening, yep 👍 How does 6pm PST sound?

**+18058358052 Jessica Bartlett**                    May 14, 2020 18:22:12

That works great! I'll send a google calendar invite

**+19197916441 Nick McCandless**                    May 14, 2020 18:22:26

Awesome thanks! Looking forward to it 👍

CONFIDENTIAL                                                    COY003296

Exhibit H

| | |
|---|---|
| **From:** | Nicholas McCandless via DocuSign |
| **Sent:** | Wednesday, May 20, 2020 11:33 PM PDT |
| **To:** | Jessica Bartlett |
| **Subject:** | Jessica Bartlett NDA |





Nicholas McCandless sent you a document to review and sign.

**REVIEW DOCUMENT**

**Nicholas McCandless**

nick@nickmccandless.com

Jessica Bartlett,

Please DocuSign Jessica Bartlett NDA.pdf

Thank You, Nicholas McCandless

Powered by                                    **DocuSign**

**Do Not Share This Email**

This email contains a secure link to DocuSign. Please do not share this email, link, or access code with others.

**Alternate Signing Method**

Visit DocuSign.com, click 'Access Documents', and enter the security code:

26DEB820118A4773814577B7CCC7A3263

**About DocuSign**

Sign documents electronically in just minutes. It's safe, secure, and legally binding. Whether you're in an office, at home, on-the-go -- or even across the globe -- DocuSign provides a professional trusted solution for Digital Transaction

**CONFIDENTIAL**                                                                                                    **COY007203**

Management™.

**Questions about the Document?**

If you need to modify the document or have questions about the details in the document, please reach out to the sender by emailing them directly.

**Stop receiving this email**

Report this email or read more about Declining to sign and Managing notifications.

If you are having trouble signing the document, please visit the Help with Signing page on our Support Center.

Download the DocuSign App

This message was sent to you by Nicholas McCandless who is using the DocuSign Electronic Signature Service. If you would rather not receive email from this sender you may contact the sender with your request.

CONFIDENTIAL

COY007204

Exhibit I

| | |
|---|---|
| **From:** | Nicholas McCandless via DocuSign |
| **Sent:** | Thursday, May 21, 2020 8:54 AM PDT |
| **To:** | Jessica Bartlett |
| **Subject:** | Completed: Jessica Bartlett NDA |
| **Attachments:** | Jessica Bartlett NDA.pdf |





Your document has been completed

**VIEW COMPLETED DOCUMENT**

**Nicholas McCandless**

nick@nickmccandless.com

All parties have completed Jessica Bartlett NDA.

Powered by                                        **DocuSign**

**Do Not Share This Email**
This email contains a secure link to DocuSign. Please do not share this email, link, or access code with others.

**Alternate Signing Method**
Visit DocuSign.com, click 'Access Documents', and enter the security code:
36D4D12AD51C4929AD91D4BD87D7722B3

**About DocuSign**
Sign documents electronically in just minutes. It's safe, secure, and legally binding. Whether you're in an office, at home, on-the-go -- or even across the globe -- DocuSign provides a professional trusted solution for Digital Transaction Management™.

**Questions about the Document?**

**CONFIDENTIAL**

COY007196

Bartlett Declaration - Page No. 42

If you need to modify the document or have questions about the details in the document, please reach out to the sender by emailing them directly.

**Stop receiving this email**
Report this email or read more about Declining to sign and Managing notifications.

If you are having trouble signing the document, please visit the Help with Signing page on our Support Center.

Download the DocuSign App

This message was sent to you by Nicholas McCandless who is using the DocuSign Electronic Signature Service. If you would rather not receive email from this sender you may contact the sender with your request.

CONFIDENTIAL

COY007197

Exhibit J

DocuSigr



**MUTUAL CONFIDENTIALITY AGREEMENT**

  **THIS MUTUAL CONFIDENTIALITY AGREEMENT** (this "Agreement") is entered into as of the date on the signature page (the "Effective Date") by and between McCandless Group, LLC, with its principal place of business located at 127 Bowery, Irvine, CA 92612 (the "Developer") and Jessica Bartlett with a principal place of business located at 404 Cool Valley Dr, Paso Robles, CA 93446 (the "Partner" or "you" or "your") each individually a "Party" and collectively the "Parties."

  WHEREAS, the Parties are contemplating business transactions or a collaboration (the "Proposed Transaction") that will require each to disclose information to the other that is confidential, proprietary and competitively sensitive, for example, regarding software, technology, data, customers, products, processes, and business objectives (each as either a "Disclosing Party" or "Receiving Party");

  WHEREAS, the Parties are willing to disclose said confidential and proprietary information to each other according to the terms and conditions contained herein.

  NOW, THEREFORE, in consideration of the foregoing, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. For purposes of this Agreement, the term "Confidential Information" shall mean information, directly or indirectly relating to the Disclosing Party or its affiliates, shareholders, officers, directors or employees and obtained by the Receiving Party in connection with its evaluation of the Proposed Transaction prior to or after the date of this Agreement, (including information conceived or originated, discovered or developed by the Receiving Party by reference to such information or containing such information), and whether orally, in documents, through and by observation or otherwise, together with all summaries, compilations, analyses, and reports created by the Receiving Party from such information or that contains such information.  Without limiting the intended generality of the foregoing, Confidential Information shall include the Disclosing Party's existing or contemplated business, processes and services, techniques, components, sales, markets, costs, profits, research, development, inventions, purchasing, staff, employees, compensation, contractors, suppliers, customers, prospects, marketing, pricing policies, financial information, engineering and all other data.  Confidential Information also includes, but is not limited to, all proposals and all information and data furnished by or on behalf of the Disclosing Party or any of its Representatives (as defined below).

2. The term "documents" includes, but is not limited to, writings, drawings, graphs, charts, photographs, tape recordings, computer application files, disc drives, tapes, compact discs, e-mail, electronic data, and other media, and data compilations in whatever form recorded or stored from which information can be obtained and/or translated if necessary, through detection devices, into reasonably usable form and any reproductions thereof.

1

DocuSign

3.      As used in this Agreement, the term "Representative" means, as to any person, such person's wholly owned affiliates and their directors, officers, employees, agents and advisers (including, without limitation, investment bankers, accountants and legal counsel).  As used in this Agreement, "wholly owned affiliate" shall mean, with respect to any person which (a) controls such person either directly or indirectly; or (b) is controlled directly or indirectly by such person; or (c) is directly or indirectly controlled by a person which directly or indirectly controls such person.  "Control" means, for purposes of this definition of "wholly owned affiliate", the right to exercise a majority of the voting rights (with the exception of voting rights attaching to de minimis shareholdings required by applicable laws to be held by other person(s)) in the appointment of the directors or similar representatives on the governing body of such person or, if there are no such voting rights, the power to appoint the management or otherwise direct the business or determine the policy of such person.  As used in this Agreement, the term "person" shall be broadly interpreted to include, without limitation, any organ, ministry, agency or instrumentality of any country or any other governmental, quasi-governmental or political subdivision thereof; any corporation, company, partnership or joint venture; or any other entity or individual.  In connection with the evaluation of the Proposed Transaction, the Parties are willing, in accordance with the terms and conditions of this Agreement, to disclose to the each other certain proprietary confidential information relating to the Proposed Transaction and the Area.

4.      Subject to the immediately succeeding paragraph, unless otherwise agreed to in writing by the Disclosing Party, the Receiving Party agrees: (a) to keep all Confidential Information confidential and not to directly or indirectly disclose, disseminate, or reveal, and to use its best efforts to prevent the use, dissemination, disclosure, or revelation of, any Confidential Information to any person other than those of its Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and to cause those persons to observe the terms of this Agreement; (b) not to directly or indirectly use Confidential Information for any purpose other than in connection with the evaluation and negotiation of the Proposed Transaction; and (c) not to disclose to any person (other than those of its Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and, in the case of its Representatives, each of whom the Receiving Party will cause to observe the terms of this Agreement as if he or she had been a party hereto) any information about the Proposed Transaction, or the terms or conditions thereof or any facts or circumstances relating thereto or the status thereof, including, without limitation, the fact that Confidential Information has been or will be made available to the Receiving Party or its Representatives or that discussions are taking place with respect to the Proposed Transaction.  The Receiving Party will be responsible for any breach of the terms of this Agreement by it or its Representatives.

5.      Neither Party will disclose to any person (other than those of its Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and, in the case of its Representatives, each of whom the Party will cause to observe the terms of this Agreement as if he or she had been a party hereto) any information about the Proposed Transaction, or the terms or

2

DocuSign

conditions thereof or any facts or circumstances relating thereto or the status thereof, including, without limitation, the fact that Confidential Information has been or will be made available to the Parties or their Representatives or that discussions are taking place with respect to the Proposed Transaction.

6.   Confidential Information does not include, however, information that (a) is or becomes generally available to the public other than as a result of a disclosure, act or omission by the Receiving Party or its Representatives without the Disclosing Party's consent, (b) is or becomes available to the Receiving Party on a non-confidential basis from a person other than the Disclosing Party or its Representatives and other than as a result of a breach of an obligation of confidentiality to the Disclosing Party or its Representatives or a breach of any other obligation of such person not to transmit the information to the Receiving Party or any of its Representatives or (c) was known or developed independently by the Receiving Party without reference to any Confidential Information, or was available to the Receiving Party prior to its disclosure by the Disclosing Party. The onus of establishing that any of the above exceptions applies shall in each case be on the Receiving Party.

7.   In the event that the Receiving Party is requested pursuant to, or required by, applicable law, regulation, rule or order of a duly empowered court, tribunal or governmental entity having jurisdiction over it or its Representatives, to disclose any Confidential Information, the Receiving Party shall, to the extent permitted by such applicable law, regulation, rule or order, provide the Disclosing Party with prompt notice of such request or requirement in order to enable the Disclosing Party to seek an appropriate protective order or other remedy, to consult with the Receiving Party with respect to the Disclosing Party's taking steps to resist or narrow the scope of such request or requirement, or to waive compliance, in whole or in part, with the terms of this Agreement.  The Receiving Party will furnish only the portion of the Confidential Information that is legally required and will, at the Disclosing Party's sole expense, use its reasonable best efforts to ensure that all Confidential Information and other information that is so disclosed will be accorded confidential treatment by the Receiving Party thereof.

8.   This Agreement does not obligate the Disclosing Party to produce any Confidential Information whatsoever.  In the event that the Disclosing Party chooses to produce Confidential Information, this Agreement does not create a continuing obligation to produce any other information or to update any information that has been previously produced.

9.   All documents containing, and all other tangible and intangible forms of, Confidential Information, including copies thereof, shall belong to and remain the sole property of the Disclosing Party. The Receiving Party shall acquire no proprietary interest in or right to any of the Confidential Information absent written agreement by the Disclosing Party.

10.   The Receiving Party shall not take or make copies of the Confidential Information or any of it, or authorize any other person to do so, other than for the purpose of supplying the Confidential Information to any of its Representatives to whom disclosure of such information is permitted under the terms of this Agreement.  If at any time the Disclosing Party, in its sole discretion, so requests in writing, then the Receiving Party will promptly deliver to the Disclosing Party all original Confidential Information with respect to the relevant Proposed Transaction and promptly deliver to the Disclosing Party or destroy all copies, reproductions, summaries, compilations, analyses and extracts thereof or

3

DocuSign

based thereon in the possession of the Receiving Party or its Representatives, whether maintained in written form or in any electronic or computerized format, and certify to the Disclosing Party that all such originals have been delivered to the Disclosing Party and that such destruction has occurred.

11.     The Receiving Party acknowledges that neither the Disclosing Party nor any of its Representatives makes any express or implied representation or warranty as to the accuracy or completeness of any Confidential Information, and the Receiving Party agrees that none

of such persons shall have any liability to the Receiving Party or any of its Representatives relating to or arising from its or their use of any Confidential Information or for any errors therein or omissions therefrom.  The Receiving Party also agrees that it is not entitled to rely on the accuracy or completeness of any Confidential Information.  The Receiving Party acknowledges and agrees that the Confidential Information is being provided solely for the purpose of assisting its independent evaluation and analysis of the Disclosing Party and its assets.

12.     NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT OR LAW TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF PROFITS DUE TO BUSINESS INTERRUPTIONS OR OTHERWISE, IN CONNECTION WITH THIS AGREEMENT.

13.     In the event of litigation relating to this Agreement, the non-prevailing Party as finally determined by a court of competent jurisdiction shall be liable and pay to the other Party all reasonable costs incurred by such other Party in connection therewith, including, but not limited to, reasonable attorneys' fees incurred by such other Party in connection with such litigation, including any appeal therefrom.

14.     It is further understood and agreed that no failure or delay by the Disclosing Party in exercising or pursuing any right, power, privilege or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise or pursuit thereof preclude any other or further exercise or pursuit thereof or the exercise or pursuit of any other right, power, privilege or remedy hereunder.

15.     This Agreement shall be effective as of the date on the signature page (the "Effective Date") and expire on the fifth anniversary thereof. This Agreement may not be amended, modified, superseded or cancelled, nor may any of the terms, covenants, representations, warranties or conditions hereof be waived, except by a written instrument executed by the parties.

16.     If any provision of this Agreement becomes or is found to be illegal or unenforceable for any reason, such clause or provision must first be modified to the extent necessary to make this Agreement legal and enforceable and then if necessary, second, severed from the remainder of the Agreement to allow the remainder of the Agreement to remain in full force and effect.

17.     This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

4

DocuSign                                                AF

IN WITNESS WHEREOF, the Parties have executed this Agreement effective the date stated above.

| DEVELOPER: | PARTNER: |
|---|---|
| Business Name: McCandless Group, LLC | Business Name: Jessica Bartlett |
| Address: 127 Bowery, Irvine, CA 92612 | Address: 404 Cool Valley Dr, Paso Robles, CA 93446 |
| Telephone Number: 919-791-6441 | Telephone Number: 805-835-8052 |
| Email Address: nick@nickmccandless.com | Email Address: jessicambartlett1@gmail.com |
| *Nicholas McCandless*<br>DocuSigned by:<br>CC0CECA0BA5C475...<br>By: _____<br>Signature | *Jessica Bartlett*<br>DocuSigned by:<br>15862633FAD24C0...<br>By: _____<br>Signature |
| Full Name: Nicholas McCandless<br>Title: CEO/Owner/Founder | Full Name: Jessica Bartlett |
| Date: _____5/21/2020_____ | Date: _____5/21/2020_____ |

5

Exhibit K

| | |
|---|---|
| **From:** | Nick McCandless |
| **Sent:** | Sunday, June 28, 2020 7:46 PM PDT |
| **To:** | Jessica Bartlett |
| **Subject:** | Re: Tiers for Subscription Pricing and Chat Management |

Hey Jessica,

I appreciate that! It's been a very rough time, but I am grateful that I am in the position I am to where I have plenty of work to keep my brain working and moving forward.

Regarding getting down to the $1 per subscriber rate, sure we can offer that on 200,000+ subscribers.

Let's make it happen!



**Nick McCandless**

Owner/Founder

McCandless Group



919-791-6441

nick@nickmccandless.com

www.nickmccandless.com

On Jun 28, 2020, at 10:04 PM, Jessica Bartlett <jbartlett@berkeley.edu> wrote:

Hi Nick!

I hope you're hanging in there during this tough time. You and your family are in my thoughts and prayers!

Thanks for getting these numbers to us, that all sounds fair. We would really like to get to $1.00 per subscriber rate as our final locked in rate as we continue to scale. Can we get you to agree to drop the per subscriber cost to $1.00 for all subscribers over 200,000? If we can make that happen, we'll get some legal docs drafted up ASAP so we can get started on this!

Let me know your thoughts!

Best,

Jessica

On Fri, Jun 5, 2020 at 12:10 AM Nick McCandless <nick@nickmccandless.com> wrote:
  Hey Jessica and Corey,

CONFIDENTIAL

COY006917

Sorry for the delays on this, the move to Miami has been hectic but starting to get it under control. I crunched the numbers to see what we can do on pricing based on the number of subscribers and then is what I came up with on the best I can do to ensure the numbers make sense.

0 - 20,000 Subscribers - $1.80 per subscriber
20,0001 - 50,0000 Subscribers - $1.65 per subscriber
50,0001 - 90,000 Subscribers - $1.50 per subscriber
90,0001 - 150,0000 Subscribers - $1.35 per subscriber
150,001+ Subscribers - $120 per subscriber

In terms of the flat rate for management and running of the chat for each site, offering flat monthly rates for this just doesn't make sense with how we are structured on the management side as my trained team is incentivized to drive up revenue through performance based compensation. Offering a flat rate for these services just wouldn't fit with how we operate this service after reviewing internally.

Let me know if you have any questions!



**Nick McCandless**
Owner/Founder
McCandless Group



919-791-6441
nick@nickmccandless.com
www.nickmccandless.com

CONFIDENTIAL

Exhibit L

| | |
|---|---|
| **From:** | Maria Deligiorgi |
| **Sent:** | Thursday, August 6, 2020 2:45 AM PDT |
| **To:** | Nick McCandless |
| **CC:** | Jessica Bartlett; Corey Lewis; Thomas Drew |
| **Subject:** | Re: COY Co Model Website design |

Hello again Nick,
I hope all is well!

I didn't hear from you so I hope the PSD was good to use.
I'm also sending the PSDs for the rest of the pages, along with example JPGs with random content, an Actions Style Guide & the brief Brand Manual.
You can download everything from here:
https://www.dropbox.com/sh/lxbdis7abnxgugx/AACrIory3H6P_APfqWt4bNcva?dl=0

I'm at your disposal if you need something or you'd like to discuss.

As mentioned before, this is the main concept. If you have any suggestions on better UX/ UI feel free to offer your insight.
Also, if small adjustments of sizes are needed (for example text size), please do what you think will look best.

Looking forward to your feedback!

Best,
Maria

---

**From:** Nick McCandless <nick@nickmccandless.com>
**Date:** Tuesday, 4 August 2020 at 16:57
**To:** Maria Deligiorgi <maria@1and1life.com>
**Cc:** Jessica Bartlett <jessica@thecoyco.com>
**Subject:** Re: COY Co Model Website design

Hey Maria,

Yes this looks great! Please send me the PSD



**Nick McCandless**
Owner/Founder
McCandless Group

☐ 919-791-6441
☐ nick@nickmccandless.com
☐ www.nickmccandless.com

**CONFIDENTIAL**

COY000171

Bartlett Declaration - Page No. 55

On Aug 4, 2020, at 11:56 AM, Maria Deligiorgi <maria@1and1life.com> wrote:

Hello Nick,
can you please confirm whether you received the email below?

If yes, can you please let me know if everything looks correct and usable so I can send you the rest of the pages?

Thank you in advance,
Maria

---

**From:** Maria Deligiorgi <maria@1and1life.com>
**Date:** Monday, 3 August 2020 at 16:54
**To:** "nick@nickmccandless.com" <nick@nickmccandless.com>
**Cc:** Thomas Drew <tdrew@1and1life.com>, Corey Lewis <corey@1and1life.com>, Jessica Bartlett <jessica@thecoyco.com>
**Subject:** COY Co Model Website design

Hello Nick and nice to meet you!

Maria here, I've been working with Jessica, TDrew and Corey on the design of the new Coy Co website.
I've designed the look of all Models' pages, but I've only translated the Landing Page to PSD so far, so I can check with you first.
Please confirm to me that the files work for you and you can use them to develop the site.
I'm also including a JPG of the design, using images from a real model, so you can see the final look I had in mind.

Please confirm to me that everything looks good and I'll send you the PSDs for the rest of the pages, too, ASAP.
I'll also send you a video of how I think interactions would work well and a Style Guide for text, buttons, links etc.

Please note; this is the main concept and what I think works well. If you have any suggestions on better UX/ UI feel free to offer your insight.
Also, if small adjustments of sizes are needed (for example text size), please do what you think will look best.

Looking forward to your feedback!

Best,
Maria
<COY-Co_Models_Feed.psd><COY-Co-Landing-Page.jpg>

CONFIDENTIAL

COY000172

CONFIDENTIAL

COY000173

Exhibit M

**Exhibit C
Page 228**

DocuSign Envelope ID: AAB0130D-BCCF-4856-AF3B-BCB47851C61A



## WEBSITE DEVELOPMENT AGREEMENT

THIS AGREEMENT ("Agreement") is entered into as of the date on the signature page (the "Effective Date") by and between McCandless Group, LLC, with its principal place of business located at 88 SW 7th St #2203, Miami, FL 33130 (the ("Developer") and Coy Collective, INC with a principal place of business located at 40 Harrison St Apt 36 L, New York, NY 10013 (the "Customer" or "you" or "your") each individually a "Party" and collectively the "Parties."

**WHEREAS,** Developer is engaged in the business of website and software development.

**WHEREAS**, Customer wishes to utilize the services of Developer in connection with the development of software identified as the Coy Collective, INC Websites (each individually a "Website" and collectively the "Websites").

**NOWTHEREFORE,** in consideration of the promises and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties agree as follows:

**1.** __Services.__   Subject to the terms and conditions of this Agreement, the Customer hereby retains Developer to perform the services set out below ("Services" or "Work").

1.1     General.

a.     Developer will perform the services of website development and support of the Websites according to specifications set forth therein.

b.     The Websites will be for Customer's brand that allows the Customer to provide exclusive content to the Customer's audience through the Websites.

c.     Customer will cooperate with Developer's reasonable requests for information, content, and data necessary for the completion of the Websites.

d.     Customer will cover any and all costs affiliated with the Websites including, but not limited to servers/hosting services, email services, upkeep expenses, and any other fees required to build and operate the Websites.

1.2     Services to be provided:

a.     The Developer will provide the Customer with Websites that provide support for exclusive content of the Customer including both photos and videos that are made exclusive to those subscribed by paying for a subscription. Subscribers will also have the ability to chat with the Customer through the Websites.

1

**Exhibit C**
**Page 229**

DocuSign Envelope ID: AAB0130D-BCCF-4856-AF3B-BCB47851C61A

b.      The design and interface of the Websites will follow the template assigned to it by the Developer.

c.      The Customer guarantees that the Developer will be supplied with the Work to be completed.

d.      The Websites shall contain a statement substantially similar to "Powered by McCandless Group" and such copyright and trademark notices as the Developer reasonably believes are appropriate.

e.      The Developer will be providing the Product "AS-IS" and no custom development will be included under this Agreement excepting that included in the functionalities above. Any maintenance, repair, modification, upgrade or enhancement of the Websites shall be pursuant to a separate mutually acceptable written agreement between the Customer and the Developer.

f.      It is understood and agreed that the Customer will use the Websites and its content to promote their exclusive content with the purpose of monetizing the Customer's fans and shall not be used for any other purposes without written permission from the Developer.

## 2.      Compensation.

2.1     In consideration of the Services to be provided by Developer to the Customer hereunder, the Customer shall pay to Developer the following compensation ("Compensation"):

a.      Upon execution of this Agreement or another date as mutually agreed to by the Parties, which shall be prior to Developer working on the Customer's Website, the Customer shall pay to Developer Three Thousand Dollars ($3,000) for each Website assigned to Developer.

b.      Upon launch of a Customer's Website, the Customer shall pay to Developer service fees (collectively the "Monthly Service Fees") for each Website assigned to Developer. Monthly Service Fees shall be paid no later than on the end of the first (1st) day of each calendar month for the amount owed as a result of the prior months' activity.

2.2     "Monthly Service Fees" shall consist of:

a.      Fees based upon the number of users who have access to the content (each individually a "Subscriber" and collectively the "Subscribers") on each Website based on the following tiers:

0 - 20,000 subscribers = $1.80 per Subscriber per month
20,001 - 50,000 subscribers = $1.65 per Subscriber per month
50,001 - 90,000 subscribers = $1.50 per Subscriber per month

2

Exhibit C
Page 230

DocuSign Envelope ID: AAB0130D-BCCF-4856-AF3B-BCB47851C61A

90,001 - 150,000 subscribers = $1.35 per Subscriber per month
150,001 subscribers - 200,000 subscribers = $1.20 per Subscriber per month
200,001 subscribers and up = $1 per Subscriber per month

b.      One Dollar ($1) for each photo and/or video purchased (each individually a "Content Unlock" and collectively the "Content Unlocks") on each Website.

**3.      Term and Termination.**

3.1     Developer or Customer may terminate this Agreement at any time without cause by providing written notice to the other Party no less than thirty (30) days before termination. Upon termination, Developer will retain all ownership in any and all software and services provided to Customer and Developer will terminate the existence of any and all Websites affiliated with the Customer.

3.2     If Customer terminates Agreement, the Customer must pay to Developer all Monthly Service Fees owed up to the termination date.

**4.      Relationship of the Parties.**  The Developer is and shall remain an independent contractor of the Customer and nothing contained in this Agreement shall be deemed to create an employer/employee, principal/agent, partnership or joint venture relationship between the parties. The Customer shall not provide the Developer with any benefits that the Customer may provide to its employees and shall not be required to withhold income taxes on, or to pay payroll taxes with respect to, the sums to be paid to the Developer hereunder. The Developer agrees that he shall be solely responsible for all excise, self-employment and other taxes relating to the receipt of payments hereunder. As an independent contractor, it is expressly agreed that the Developer operates at his/her own expense and risk. The Developer is not authorized to execute any agreements, make any changes in any agreements, incur or assume any obligations, liabilities or responsibilities, or perform any other act in the name of or on behalf of the Customer. Each party shall have the obligation to supervise, manage, contract, direct, procure, pay, perform or cause to be performed all work and other obligations to be performed by such party pursuant to the terms of this Agreement and shall be liable for the acts or omissions of its or his/her employees and agents in performing its or his/her respective obligations or exercising its or his/her respective rights hereunder.

**5.      Confidential Information.**

5.1     Definition of Confidential Information. For the purposes of this Agreement, "Confidential Information" means any information disclosed by either party to the other party, either directly or indirectly, in writing, orally or by inspection of tangible objects which is designated or described by the disclosing party as "Confidential," "Proprietary" or some similar designation, or which should reasonably be understood by the receiving party, because of the circumstances of disclosure or the nature of the information itself to be confidential or proprietary to the disclosing party. Confidential Information shall include, but not be limited to, the pricing and payment terms

3

Exhibit C
Page 231

Bartlett Declaration - Page No. 62

DocuSign Envelope ID: AAB0130D-BCCF-4856-AF3B-BCB47851C61A

contained in this Agreement. Confidential Information may also include information disclosed to a receiving party by third parties on behalf of the disclosing party. Confidential Information shall not include any information which (i) is publicly known through no action or inaction of the receiving party; (ii) was already in the possession of the receiving party at the time of disclosure without an obligation of confidentiality, direct or indirect, to the disclosing party; (iii) is obtained by the receiving party from an independent third party without a breach of such third party's obligations of confidentiality; or (iv) is independently developed by the receiving party without use of or reference to materials provided by the disclosing party.

5.2     Non-use and Nondisclosure. Each party agrees that it will not use any Confidential Information of the other party for any purpose except for the purpose of this Agreement. Each party agrees that it will not disclose any of the other party's Confidential Information to anyone except for such party's own directors, officers, employees, and attorneys who are required to have the information in connection with the purpose of this Agreement ("Representatives"). In the event that a receiving party is required by law to disclose Confidential Information obtained from the disclosing party, the receiving party shall give the disclosing party prompt written notice of such requirement as soon as possible prior to such disclosure and shall provide the disclosing party with assistance in obtaining an order protecting the information from disclosure.

5.3     Each party agrees that it shall take reasonable measures to protect the secrecy of and avoid the disclosure and the unauthorized use of the other party's Confidential Information. Without limiting the foregoing, each party shall take at least those measures that it takes to protect its own most highly confidential information and shall ensure that each of its Representatives who have access to the other party's Confidential Information has signed a non-use and nondisclosure agreement in content similar to the provisions hereof, prior to any disclosure of Confidential Information to such Representative. Neither party shall make any copies of the other party's Confidential Information without the disclosing party's prior written consent.

5.4     Term of Confidentiality. The term of this Confidentiality Section shall remain in effect until terminated by either party with written notice to the other party, but such termination shall have no effect on either party's obligations hereunder with respect to Confidential Information already disclosed. The obligations of each receiving party hereunder as to any Confidential Information shall continue in perpetuity from the date such Confidential Information is disclosed or if applicable until such information is no longer a trade secret of the disclosing party, whichever occurs last, and shall survive termination of this Agreement.

**6.      Ownership of Intellectual Property.**

6.1     Except as may be otherwise granted herein, title to and ownership of all intellectual property rights including, without limitation, any patent, trademark, copyright or intellectual or industrial property right (the "Developer Intellectual Property") relating to the Software shall at all times remain with Developer. Customer expressly acknowledges that it does not have and shall not, by virtue of this

4

Exhibit C
Page 232

Bartlett Declaration - Page No. 63

DocuSign Envelope ID: AAB0130D-BCCF-4856-AF3B-BCB47851C61A

Agreement, acquire any title or proprietary rights whatsoever of any kind in or over the Software or any improvements, updates, adaptation, modification, research, development, derivation, addition, extension, changes, or other Developer Intellectual Property related to the Software.

6.2    Developer hereby grants to Customer a non-exclusive, non-transferable, royalty-free, worldwide right to use the Software for those purposes intended by this Agreement.

6.3    Customer reserves all its respective rights, title, and ownership in its respective intellectual property owned or developed independently of this Agreement, including images, videos, written content and other personal content ("Customer Intellectual Property").

6.4    Developer may use, reproduce and copy Customer Intellectual Property for the purposes of planning, operating, managing, optimizing, implementing and maintaining the Website, subject to the maintenance of confidentiality in accordance with Section 5 herein.

## 7.    **Customer Content.**

7.1    All Content on the Website is the sole responsibility of the person who originated such content. All Content transmitted by Customer is at Customer's own risk and Customer is solely responsible and liable for any damage or loss to resulting therefrom. Developer reserves the right to remove any objectionable Content in their sole discretion.

7.2    Customer understands that by providing Content in connection with the Service Customer hereby grants Developer a non-exclusive, worldwide, royalty free, perpetual, irrevocable, sublicensable and transferable right to fully exploit such Content (including all related intellectual property rights) in connection with the Website.

## 8.    **Customer Representations.**

8.1    Customer will use the Websites and its content to promote their exclusive content with the purpose of monetizing the Customer's followers and shall not be used for any other purposes without written permission from the Developer.

8.2    Customer will establish an account for payment processing with the payment processor assigned to Customer by Developer.

8.3    Customer will cover any and all costs affiliated with the Websites including, but not limited to servers/hosting services, email services, upkeep expenses, and any other fees required to build and operate the Websites.

8.4    Customer will provide Developer with an ADULT MODEL RELEASE: 2257 COMPLIANT FORM along with a copy of valid photo identification for each model involved in any capacity of each Website.

8.5    Customer warrants and represents that all information as contained in the ADULT MODEL RELEASE: 2257 COMPLIANT FORMS are true and accurate.

5

**Exhibit C
Page 233**

Bartlett Declaration - Page No. 64

DocuSign Envelope ID: AAB0130D-BCCF-4856-AF3B-BCB47851C61A

**9.** __Indemnity.__   At all times, Customer shall protect, indemnify, defend and hold the Developer, including its affiliates and subsidiaries, officers, directors, shareholders, members, employees, agents, representatives, successors and assigns harmless from and against any and all penalties, claims, losses, liabilities, damages, charges, costs and/or expenses (including, without limitation, attorneys' fees and court costs) rising out of or resulted from or in any way or in any manner connected with or related to any acts or omissions or breach of this Agreement, of Customer.

**10.**   __Warranty, Disclaimer and Limitation of Liability.__

10.1   Customer's use of the Service is at their sole risk. The Service and the associated materials and content are provided on an "as is" and "as available" basis. Except as otherwise expressly provided in this Agreement, Developer, its parent, subsidiary and other affiliated companies, and their respective officers, directors, employees, agents and other representatives (collectively, the "Developer Parties"), expressly disclaim all warranties of any kind, whether express or implied, including, but not limited to the implied warranties of merchantability, fitness for a purpose and non-infringement. Without limiting the generality of the foregoing, the Developer Parties make no warranty that: (i) the Service will meet your requirements; (ii) the Service will be uninterrupted, timely, secure, or error-free; and/or (iii) any errors in the Service will be corrected.

10.2   The Developer Parties shall not under any circumstances be liable for any damages of any kind arising out of, in connection with or relating to the use of or inability to use the Service, including any liability: (i) as a publisher of information; (ii) for any incorrect or inaccurate information or any 'bug' of the Service; (iii) for any unauthorized access to or disclosure of your transmissions or data; (iv) for statements or conduct of any third party on or via the Service; (v) for any disputes between users of the Service or between a User of the Service and you; (vi) for lost data; (vii) cost of procurement of substitute products or services; (viii) for any technical malfunction that may arise from problems with computer systems, software code, servers, computer equipment, mobile phones, software, infrastructure connections or any combination thereof. or (ix) for any other matter relating to the Service or any third party. This is a comprehensive limitation of liability that applies to all damages of any kind, including any direct, indirect, special, incidental or consequential damages, whether based on breach of contract, breach of warranty, tort (including negligence), product liability or otherwise, even if an individual advises the Developer Parties of the possibility of such damages. The limitations of liability set forth herein are fundamental elements of the basis of the bargain between the Developer and you. The products, information and services offered on and through the Service would not be provided to you without such limitations.

10.3   Notwithstanding the foregoing, the sole and entire maximum liability of the Developer Parties for any reason, and your sole and exclusive remedy for any cause or claim whatsoever, shall be limited to any amounts paid by you to Developer during the three (3) months prior to the date any cause of action may have occurred.

10.4   You agree that regardless of any statute or law to the contrary, any claim you may bring must be filed within three (3) months after the cause of action accrues or it will be permanently barred.

6

**Exhibit C
Page 234**

DocuSign Envelope ID: AAB0130D-BCCF-4856-AF3B-BCB47851C61A

10.5    Some jurisdictions do not allow the disclaimer of certain warranties or the limitation or exclusion of liability for certain types of damages. accordingly, some of the above disclaimers and limitations may not apply to you.

10.6    If you are a California resident, you shall and hereby do waive California Civil Code Section 1542, which says: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which, if known by him must have materially affected his settlement with the debtor."

**11.**    **Force Majeure.**  A party will be not be considered in breach or in default because of and will not be liable to the other party for, any delay or failure to perform its obligations under this agreement by reason of fire, earthquake, flood, explosion, strike, riot, war, terrorism, or similar event beyond that party's reasonable control (each a "Force Majeure Event"). However, if a Force Majeure Event occurs, the affected party shall, as soon as practicable:

        a.    Notify the other party of the Force Majeure Event and its impact on performance under this agreement; and

        b.    Use reasonable efforts to resolve any issues resulting from the Force Majeure Event and perform its obligations under this agreement.

**12.**    **Governing Law, Jurisdiction.**  If any dispute arises under the terms of this Agreement, the parties agree to select a mutually agreeable neutral third party to help them mediate such. If mediation is unsuccessful, the Parties agree that any dispute shall be in all respects construed in accordance with and governed by the laws of the State of Florida without regard to conflict of law principles. Costs and fees (including attorneys' fees) associated with the mediation or arbitration shall be responsibility of each individual party.

**13.**    **Miscellaneous.**

        a.    Entire Agreement; Modification. This Agreement sets forth the entire agreement and understanding of the parties hereto concerning the subject matter hereof, and, except as otherwise specifically provided below, supersedes all prior and contemporaneous correspondence, agreements, arrangements and understandings, both oral and written, between the parties hereto concerning the subject matter hereof. No modification hereof shall be binding upon the parties hereto except by written instrument duly executed by such parties or their duly authorized representatives.

        b.    Invalidity of Particular Provisions. If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the other terms of this Agreement, or the application of such terms or provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

7

**Exhibit C**
**Page 235**

DocuSign Envelope ID: AAB0130D-BCCF-4856-AF3B-BCB47851C61A

  c. Counterparts. This Agreement may be executed in any number of counterparts, including electronically, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

  d. This Agreement may be delivered by email, and email copies of executed signature pages shall be binding as originals.

  e. Interpretation. The paragraph headings of this Agreement are inserted for convenience only and shall not constitute a part of this Agreement in construing or interpreting any provision hereof. Whenever the context requires, words used in the singular shall be construed to include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine or neuter gender.

  f. Notices. All notices given under this Agreement must be in writing. A notice is effective upon receipt and shall be sent via one of the following methods: delivery in person, overnight courier service, certified or registered mail, postage prepaid, return receipt requested, or by any other means agreed to by the Parties, such as email.

  g. This agreement will become effective when all parties have signed it. The date this agreement is signed by the last party to sign it (as indicated by the date associated with that party's signature) will be deemed the Execution Date of this agreement.

  h. Each party shall use all reasonable efforts to take, or cause to be taken, all actions necessary or desirable to consummate and make effective the transactions this agreement contemplates or to evidence or carry out the intent and purposes of this agreement.

*[Rest of Page Intentionally Left Blank; Signature Page to Follow]*

8

**Exhibit C
Page 236**

DocuSign Envelope ID: AAB0130D-BCCF-4856-AF3B-BCB47851C61A

IN WITNESS WHEREOF, the parties have executed this Agreement effective the date stated above.

| DEVELOPER: | CUSTOMER: |
|---|---|
| Business Name: McCandless Group, LLC | Business Name: Coy Collective, INC |
| Address: 88 SW 7th St #2203, Miami, FL 33130 | Address: 40 Harrison St Apt 36 L, New York, NY 10013 |
| Telephone Number: 919-791-6441 | Telephone Number: 805-835-8052 |
| Email Address: nick@nickmccandless.com | Email Address: jessica@thecoyco.com |
| By: _____ *Nicholas McCandless* <br> CC0CECA0BA5C475... <br> Signature | By: _____ *Jessica Marie Bartlett* <br> F31117673199472... <br> Signature |
| Full Name: Nicholas McCandless <br> Title: CEO/Owner/Founder | Full Name: Jessica Marie Bartlett <br> Title: CEO, President |
| Date: _____ 8/6/2020 | Date: _____ 8/6/2020 |

9

Exhibit C
Page 237

Exhibit N

| | |
|---|---|
| **From:** | Jessica Bartlett |
| **Sent:** | Sunday, August 9, 2020 4:07 PM PDT |
| **To:** | Nick McCandless |
| **Subject:** | Re: Jessica Bartlett and Kiki Passo Website Arrangement with Coy Collective, Inc. |

Hi there,

As discussed over text, COY Co agrees to all of your terms and conditions, given that Kiki Passo's guarantee per month is brought down to $3,563.59 to factor in the dip in revenue for the months of July and August. Other than that, we're good to go starting September 1st for both sites. Thank you Nick!

Best,

Jessica Bartlett

On Sat, Aug 8, 2020 at 3:51 PM Nick McCandless <nick@nickmccandless.com> wrote:
 Hello Jessica,

As discussed over the phone, McCandless Group currently has active contracts for both yourself, Jessica Bartlett and Cristina D Dospassos, known as Kiki Passo. Upon your request, you asked for Coy Collective, Inc. to have the ability to take part in the business of both the Jessica Bartlett site and Kiki Passo site. Our agreement was that for the length of the term in which the Jessica Bartlett and Kiki Passo site exist, McCandless Group would be entitled to a minimum payment each month in the range of the average collection based upon the current and active agreements with Jessica Bartlett and Kiki Passo. With this agreement in place, we would operate under the agreement signed earlier regarding the model sites, but at a minimum Coy Collective, Inc. will be responsible for paying McCandless Group the following amounts each month as a minimum. If the amounts below are not reached under the agreement agreed to earlier, the difference must be paid by Coy Collective, Inc. In the case that the amount exceeds the amounts below, Coy Collective, Inc. will only be responsible for paying the amount owed under our agreement as long as that amount exceeds the minimums stated below:

Jessica Bartlett: $3,761.84 per month

Cristina D Dospassos (Kiki Passo): $4,382.89 per month

If you agree, please reply to the email stating that you agree to this arrangement and we will move forwarded in good faith with this arrangement as of September 1, 2020.



**Nick McCandless**

Owner/Founder

McCandless Group



919-791-6441

nick@nickmccandless.com

www.nickmccandless.com

CONFIDENTIAL

COY007160

Bartlett Declaration - Page No. 70



**CONFIDENTIAL**

**COY007161**

Exhibit O

| | |
|---|---|
| **From:** | Jessica Bartlett |
| **Sent:** | Monday, September 7, 2020 10:38 AM PDT |
| **To:** | Nick McCandless |
| **Subject:** | Re: Acknowledgement of Payment Responsibility Transfer |

Hi Nick!

Yes, I confirm that this information is accurate and I'm waiving all distribution obligations from McCandless Group! Thank you!

Best,

Jessica Bartlett

On Mon, Sep 7, 2020 at 10:36 AM Nick McCandless <nick@nickmccandless.com> wrote:
  Hello Jessica Marie Bartlett,

  The purpose of this email is to confirm and receive acknowledgment from you that as of September 1, 2020 any and all financial responsibilities that McCandless Group, LLC committed to in our Website Development Agreement are no longer the responsibility of McCandless Group, LLC and all communication and obligations related to payments affiliated with JessicaMBartlett.com are now handled exclusively between yourself and Coy Collective INC. Please confirm that the following information in this email notification is accurate and acknowledge that you are waiving any and all distribution obligations from McCandless Group, LLC.





**Nick McCandless**

Owner/Founder

McCandless Group

919-791-6441

nick@nickmccandless.com

www.nickmccandless.com

CONFIDENTIAL

COY006956

Exhibit P

| Number of participants | 2 |
|---|---|
| Participants | +18058358052 Jessica Bartlett (owner) |
| | +19197916441 Nick McCandless |
| Number of messages | 9 |
| First message sent date/time | October 07, 2020 09:13:26 |
| Last message sent date/time | October 07, 2020 13:37:32 |

**+19197916441 Nick McCandless**                    **October 07, 2020 09:13:26**

Good morning Jessica, I have had a couple people from my team mention to me that they have spoken with talent that brought up my company to you and there was a feeling of competition (not cooperation) with McCandless Group as a way of pushing them towards Coy Co. As I made very clear from the beginning, I'm not going to compete against my own company, so if we feel it's becoming competitive, it's going to be a conflict of interest for us. Just wanting to mention this now rather than later.

**+18058358052 Jessica Bartlett**                    **October 07, 2020 09:23:32**

Good morning. I understand your concerns and this is definitely not my intention. However, I've now asked numerous that your recruiters stop using my name as it has now three times landed me on a phone call with a potential client who doesn't mention your name until after I've explained everything. I assume it's because it is unclear and they believe we all work together as it says McCandless on our sites and you are using my name in recruiting efforts after all. Every single time I've explained that we are separate but you handle our tech and then gave the highest compliments and encouraged them to work with you. ;The only person this could be is Moon, who insisted your team was "sketchy," "abrasive," and she "didn't like how they were coercive or how they operate." I told her I've never spoken to your team so I couldn't speak to that but have nothing but good things to say about you. I answered some more of her questions about both companies and ultimately told her she should contact you directly instead of your team and work with you.

**+18058358052 Jessica Bartlett**                    **October 07, 2020 09:24:48**

Ultimately, if your team stops using my name, we won't run into these predicaments in the first place

CONFIDENTIAL

COY003657

**+18058358052 Jessica Bartlett**                    October 07, 2020 09:26:42

But I stand by the fact that every time someone has brought you up I say that you handle our tech and I have nothing but great things to say about you

**+19197916441 Nick McCandless**                    October 07, 2020 09:31:44

Appreciate it, just wanted to make sure we are on the same page. Your name and Kiki's have been pulled from any and all outreach awhile ago so that should no longer be the case but we both know that we handle far more than the tech for you guys. Just wanting to avoid a bigger issue in the future 👍

**+18058358052 Jessica Bartlett**                    October 07, 2020 09:55:56

Liked "Appreciate it, just wanted to make sure we are on the same page. Your name and Kiki's have been pulled from any and all outreach awhile ago so that should no longer be the case but we both know that we handle far more than the tech for you guys. Just wanting to avoid a bigger issue in the future 👍 "

**+19197916441 Nick McCandless**                    October 07, 2020 13:09:37

Can you please send ID and 2257 form for Sabina? Doesn't seem we have received those yet

**+18058358052 Jessica Bartlett**                    October 07, 2020 13:35:51

Sorry about that! She's in Poland and usually responds early morning so I'll get that to you as soon as she sends

**+19197916441 Nick McCandless**                    October 07, 2020 13:37:32

Thanks 🙏

CONFIDENTIAL                                                                 COY003658

Bartlett Declaration - Page No. 76

# Exhibit Q

| Number of participants | 2 |
|---|---|
| Participants | +18058358052 Jessica Bartlett (owner) |
| | +19197916441 Nick McCandless |
| Number of messages | 24 |
| First message sent date/time | October 19, 2020 08:32:06 |
| Last message sent date/time | October 19, 2020 19:06:50 |

**+19197916441 Nick McCandless**                    **October 19, 2020 08:32:06**

Hey Jessica, so with Mikayla we aren't going to build and support a site for a model that we had active conversations with, was a referral, and had a contract in their hands from us. We just aren't going to compete with ourselves and provide services for another option that was presented to them which is still reliant on my company under the deal we currently have. The best thing I can do is offer to do her site with my company getting 15% which is still lower than if I did the deal with her myself. Doesn't make sense otherwise.

**+18058358052 Jessica Bartlett**                    **October 19, 2020 18:02:47**

There's only so many models on Instagram and in general, so there's inevitably going to be some overlap. Are you saying that anyone you have ever had a conversation with is off limits? I completely understand if we were attempting to poach someone, which we would never do, but not sure how me closing a deal and ensuring that you benefit from someone at all vs them not signing isn't ideal for you. If a girl is in current talks with you, then that would be a completely different story and I would completely understand.;I would think you would be happy to get a cut from Mikayla at all if what she's telling me is true and she had no intention of signing with you guys and hasn't responded to a message in months. By no means am I attempting to "compete" with your company, I would think that you would be happy to get a piece of a deal you wouldn't have closed otherwise. Not competing but collaborating, we all are benefitting in our structure with your company, and no one is trying to undermine anyone.

**+19197916441 Nick McCandless**                    **October 19, 2020 18:07:37**

The reality is that my company is making very little with the sites you guys bring on, it's evident by the numbers and we all know that. The reality is that if she didn't want to be on OnlyFans and wanted to monetize her following with exclusive content, McCandless Group has the best solution out there by a long shot. She had a contract with her and she was referred to me by a model who has brought me a lot of talent and spoke with her for months. Not saying if I just spoke with someone, but this was ongoing and multiple people were involved

CONFIDENTIAL                                                                          COY003682

**+18058358052 Jessica Bartlett**  October 19, 2020 18:07:52

Happy to hop on a call and discuss further. In my eyes, this is a mutually beneficial partnership without competition. We all win when one of us wins. But I'm not getting the sense that you feel the same way so I'd love to get on a call to make sure we're all on the same page

**+18058358052 Jessica Bartlett**  October 19, 2020 18:11:40

We paid you what, 40k last month? Can't see how that could be considered very little

**+18058358052 Jessica Bartlett**  October 19, 2020 18:12:57

We negotiated for months to ensure that our deal structure was both fair and beneficial to everyone

**+18058358052 Jessica Bartlett**  October 19, 2020 18:14:10

It's truly not even about Mikayla, I just feel a hostility and resentment towards me that I want to smooth over. No one is trying to compete with you, no one is trying to poach your girls

**+19197916441 Nick McCandless**  October 19, 2020 18:14:44

Sure, I'm happy to get on a call, and I agree with talent that I haven't had continued conversations with. The reality is we both know the numbers, my company is getting very little for what we offer and bring to the table. I'm happy to offer this on people we haven't sent a contract to or been in deep conversations with, but this case is clearly not in the best interest of my company.;The one time $3k payments for sites aren't what I look at, those are one time. Take those away, and for servicing the sites we do, we got about 13k for 6 sites. Having competition to make anywhere near this amount is not smart for my company

CONFIDENTIAL

COY003683

Bartlett Declaration - Page No. 79

**+18058358052 Jessica Bartlett**                                    October 19, 2020 18:16:13

Well I hope you know, I had no idea about Mikayla having talked to you until well into our talks when she mentioned it offhandedly

**+19197916441 Nick McCandless**                                    October 19, 2020 18:16:20

No hostility or resentment at all, but the reality is Coy Co provides another option that could result in cases like Mikayla, and for those scenarios to be possible for a little money each month doesn't make sense. I'm content with the deal we have, but I stressed from the very beginning that if there is competition or concerns of that, it would need addressed

**+18058358052 Jessica Bartlett**                                    October 19, 2020 18:16:49

Completely understand that, but you're acting as if I knew or was trying to compete

**+19197916441 Nick McCandless**                                    October 19, 2020 18:16:55

Of course, I don't think you did anything malicious by any means. If I truly thought you were trying to do something like that, this would be a different conversation

**+18058358052 Jessica Bartlett**                                    October 19, 2020 18:17:05

Maybe you can give me a list of people you're in talks with to avoid this?

**+18058358052 Jessica Bartlett**                                    October 19, 2020 18:17:33

Loved "Of course, I don't think you did anything malicious by any means. If I truly thought you were trying to do something like that, this would be a different conversation "

CONFIDENTIAL                                                                    COY003684

Bartlett Declaration - Page No. 80

**+19197916441 Nick McCandless**                          October 19, 2020 18:19:17

We talk to hundreds of people a week, it wouldn't be possible to do that and honestly wouldn't even be fair to you, all I am saying is that if I have a contract in someone's hands or if I have had conversations with someone for months, I feel it's fair that we agree on different terms. We all know I cut Coy an incredible deal for what we bring to the table. I'm happy to do that, but at the same time, I can't have it impact our growth negatively. Not trying to come across as hostile or upset, that's not the case at all, I would just prefer to work it out earlier rather than later

**+18058358052 Jessica Bartlett**                          October 19, 2020 18:19:19

Happy to do whatever to prevent this from happening and I'm truly sorry about the Mikayla situation, I would've never continued to talk with her had I known you had nurtured that relationship for so long

**+19197916441 Nick McCandless**                          October 19, 2020 18:20:01

I know you didn't, again I never once thought this was intentional by any means

**+19197916441 Nick McCandless**                          October 19, 2020 18:20:41

If I thought it was intentional, our conversation would be a lot different. We just need to understand both sides and ensure both sides are happy so that we can grow together, that's all I am wanting

**+19197916441 Nick McCandless**                          October 19, 2020 18:23:10

No apologizes needed either, not your fault at all, you have done business with me since February, you know I'm a reasonable and upfront guy, I just hope you can see my point of view and why I have to ensure this stays healthy for both parties

CONFIDENTIAL                                                     COY003685

Bartlett Declaration - Page No. 81

**+18058358052 Jessica Bartlett**                    October 19, 2020 18:25:28

That's all I'm wanting as well! I understand where you're coming from and am happy to have a different deal in this case. My main concern is keeping a healthy partnership, so I'm glad to hear we feel the same way!

**+19197916441 Nick McCandless**                    October 19, 2020 18:38:55

We are on the same page, that's why I am bringing it up now rather than later. I apologize if I came across as if I resented you by any means, I can assure you that's not the case. I don't do business with people I resent. I just prefer to address things early and be direct so that it can be handled and continue focusing on what really matters which is growing

**+18058358052 Jessica Bartlett**                    October 19, 2020 18:57:33

Loved "We are on the same page, that's why I am bringing it up now rather than later. I apologize if I came across as if I resented you by any means, I can assure you that's not the case. I don't do business with people I resent. I just prefer to address things early and be direct so that it can be handled and continue focusing on what really matters which is growing "

**+18058358052 Jessica Bartlett**                    October 19, 2020 19:01:11

I appreciate and am glad to hear it! In other news, we have two to three more sites that need building so I will send that up front money tomorrow! Excited to keep growing 🙏

**+19197916441 Nick McCandless**                    October 19, 2020 19:06:50

🙌

CONFIDENTIAL                                                                                    COY003686

Bartlett Declaration - Page No. 82

# Exhibit R

**Exhibit D**
**Page 238**

11/02/2020

Jessica:

Thank you for the time this week with you and your team, discussing yours and Coy Collective business relationship with McCandless Group ("MG").

As we discussed, we want to be clear that it is the evolving business model of MG and the opportunities to grow before us, that are requiring this review.  We are reviewing all of our strategic relationships.  The goal is to satisfy and implement the due diligence requirements from our legal and business teams.  It is very much NOT personal, we think only the best of you and all of our relationships. This is purely a function of where our business must be, with no exceptions, in order to move forward with the plans for growth and expansion we have ready to go.

Here is what we can discuss with you and Coy Collective in order to move forward with our business relationship.  Please note that nothing is agreed to until a written, fully executed and mutually agreed upon final agreement exists.

    1.    Coy Collective-MG Deal Terms

        a.    Effective immediately, all current Coy Collective clients on the MG platform, must execute individual Agreements directly between MG and each client, for the service that MG provides for these clients to continue on the MG platform.  Details of those agreements below in Section 3.

            i.    If you choose not to facilitate this, MG will honor your Agreements with these clients until December 31, 2020, at which time they will be removed from the MG platform.

            ii.    If the option above is chosen, payment processing for your sites will discontinue on November 30, 2020, so as not to cause any customer to pay for a subscription or content that is not entirely fulfilled (the 30-day cycle).

            iii.    If you choose to have your client's sites removed from the MG platform sooner, MG will cooperate but with the caveat that to ensure no customer lawsuits from this change, all customer subscriptions (max 30 days) must run out prior to the site being brought down, this means that effective immediately all sites would have their payment processing discontinued, and the sites taken down in up to 30 days.

        b.    All future Coy Collective clients that desire to be on the MG platform, must execute individual Agreements directly between MG and said client, for the service that MG provides for these clients.`

    2.    Individual Client Deal Terms:

        a.    Agreement with Coy Collective and MG (which will be specified in each client's individual Agreements) for the revenue generated from these clients will be as follows:

**Exhibit D
Page 239**

      i.       20% paid first to MG from that client's gross revenue after credit card fees are deducted.

      ii.      The client's revenue percentage, that Coy Collective has negotiated and included in the Agreement, is then paid directly from MG to the client

      iii.     The remaining revenue is then paid to Coy Collective.

3.    <u>Additional deal points:</u>

    a.     All Coy Collective prospects must be approved in advance prior to the first contact with said prospect.  There will be no conflicts after the fact.  Approval must be prior to first discussions with the prospect of any kind about the MG platform, even if said prospect has "signed" with your agency for other non-MG services.

    b.     MG reserves the right to disapprove any prospect for any reason at any time, up until a fully executed and mutually agreed upon Agreement with client exists between MG and client.

      i.       Failure to gain approval as per the above will in every case result in disapproval, no exceptions.

      ii.      If approval for a prospect is granted, 45 days after initial approval, if that prospect has not executed an Agreement with MG, that approval expires and that prospect is back in the greater pool.

    c.     Non-compete, plus 2 years after the Coy Collective-MG agreement is terminated by either party for any reason.  All principles of the Coy Collective now and in the future, must agree to the non-compete.

4.    <u>Technical details:</u>

    a.     These are the major deal points and there will be other details for this agreement.  For instance, that MG will pay up to the date any site is taken down; the disposition of the URL's of sites taken down, and the honoring of the original terms of the Jessica Barlett and Kiki Passo MG deals.

Jessica, again with the sincere utmost respect and appreciation for everything accomplished to date, our hands are most definitely tied on this, we are not at all flexible.  If the result is that you can't accept this and need to move in another direction - perhaps even becoming our competitor- we are fully aware of that and will be helpful during this transition.

Please feel free to text or email me at <u>jason@jasland.com</u>  I am travelling a bit, so I'll be as responsive as possible.

Jason Moskowitz

Partner, Strategic Relations

**Exhibit D**
**Page 240**

Exhibit S

| Number of participants | 2 |
|---|---|
| Participants | +18058358052 Jessica Bartlett (owner) |
| | +14246342013 Jason Moskowitz |
| Number of messages | 1 |
| First message sent date/time | November 03, 2020 17:07:04 |
| Last message sent date/time | November 03, 2020 17:07:04 |

**+18058358052 Jessica Bartlett**                    **November 03, 2020 17:07:04**

Hi Jason! Thank you very much for the information! While we definitely didn't want it to come to this, and were excited to grow in tandem with McCandless group with our original agreement, we understand that things have changed and that Nick and McCandless group are scaling quickly, and this is the best course of action for him and his company to take right now. ;It was a pleasure working with Nick, and we appreciated the short lived partnership and opportunity to work with him on this. We are excited to watch him take McCandless to the next level and continue to crush it! ;After discussions, so as to no longer step on any toes or get in the way of where McCandless group is going, we will be taking the option in which sites are terminated on Dec. 31st. ;As your document stated, we very much appreciate that you will be cooperative in the transition process. I'm assuming the technicalities of the transition will be facilitated through Nick? ;If so, I'll set up a call between our new CTO and him ASAP to ensure this is done smoothly and efficiently, so we can get out of his hair sooner rather than later! ;I appreciate all of the valuable insight you've given us, and it's been a pleasure to get the opportunity to connect with someone with such an impressive track record as yourself. Thanks Jason!

Bartlett Declaration - Page No. 88

Exhibit T

Dear Jessica:

Thank you for your kind text on 11/3/20 in response to our McCandless Group ("MG") text plus letter sent two days earlier on 11/1/20.

As you mentioned in your text, your response to our letter is that you are "taking the option in which sites are terminated on Dec. 31st."

This letter is to follow up on your decision by detailing out the transition process while noting some decisions to be made, ramifications of obligations and the future. If you believe anything, I have detailed below is inaccurate, please reply with comments and I will further review and respond.  I am genuinely trying to stay factual and transparent as I understand everything.

*I must point out here clearly, this letter at this time is not an offer, a promise or a guarantee to do anything, and we reserve the right to change our minds about any item below. This entire letter at this time is for discussion purposes only and not a guarantee of anything of any kind. We will, however, be sending a final letter at some point in the future or perhaps in its place, some new agreement.*

Our thinking as to transition and the future is as follows and considers previously mutually agreed upon and fully executed agreements.

1) <u>Coy Collective client's websites that have URL's that are owned by MG:</u>
   a) Payment processing on these websites will be changed to OFF on November 30, 2020.
   b) These websites will remain available for customer use through December 31, 2020 on which date they will be taken down.
       a. This is done to fulfill all customer's 30-day billing cycles who have unfulfilled paid subscriptions on November 30, 2020.
   c) As usual, the disposition of all chargebacks/refunds/voids on the site will be accounted for.
   d) List of the sites that have URL's that are owned by MG
               (i) Juju - http://SincerelyJuju.com
               (ii) Sabina Kontor - http://SabinaKontor.com
               (iii) Alexa Collins - http://TheAlexaCollins.com
               (iv) Vanessa Christine - http://VanessaChristineX.com
               (v) Alissa Hale - http://AshayEHale.com
               (vi) Macy Mariano - http://MacyMariano.com
               (vii) Dasha Mart – http://Dasha-Mart.com
   e) MG intends to retain ownership of these URLs, preserve MG's rights and fully realize the value that MG has created, but is open to the idea of negotiating an alternate disposition of these valuable assets.

2) <u>Coy Collective client's websites that have URL's that are owned by the clients themselves:</u>
   a) Payment processing on these websites will be changed to OFF on November 30, 2020.

CONFIDENTIAL                                                                     COY006896

Bartlett Declaration - Page No. 90

b) These websites will remain available for customer use through December 31, 2020 on which date they will be taken down.
  a. This is done to fulfill all customer's 30-day billing cycles who have unfulfilled paid subscriptions on November 30, 2020.
c) As usual, the disposition of all chargebacks/refunds/voids on the site will be accounted for.
d) List of the sites that have URL's that are owned by the clients themselves:
  (i) Alexis Clark - http://TheAlexisClark.com
  (ii) Natalia Garibotto - http://NataGata.com

3) <u>Coy Collective client's websites that have not yet been launched and will not be launched, with URL's are owned by MG:</u>
  (i) Mikayla Demaiter - https://mikaylademaiter.com
  (ii) Meghan Mariie - https://IoMeghanMariie.com
  a) MG intends to retain ownership of these URLs, preserve MG's rights and fully realize the value that MG has created, but is open to the idea of negotiating an alternate disposition of these valuable assets.

4) <u>MG client's websites that have URL's that are owned by MG:</u>
  a) The following sites have agreements in place with MG and the URLs are owned by MG.  The expiration dates are noted below.  MG has heavily invested into these agreements and will continue to honor these agreements and all of its terms, until they terminate.
    i. Jessica Bartlett - http://JessicaMBartlett.com (expires 10/26/2021)
    ii. Kiki Passo (aka "Cristina D Dospassos") - http://KikiPasso.com (expires 12/25/2021)
  b) As a courtesy and with good reason, MG suggests reviewing those agreements and the obligations that are immortalized there; especially Sections 3.2, Sections 3.3, Section 5, Section 8 and the 2257 Compliant Form.
  c) MG intends to retain ownership of these URLs, preserve MG's rights and fully realize the value that MG has created, but is open to the idea of negotiating an alternate disposition of these valuable assets.

5) <u>Mutual Confidentiality Agreements and Confidentiality Agreements</u>
  a) MG has in its possession individual mutually agreed upon and fully executed Mutual Confidentiality Agreements (aka NDAs) with Jessica Bartlett, Corey Lewis, Joshua Cherry, Robert Hankins, and Thomas Drew; as well a Confidentiality Agreements (Section 5 of the Website Development Agreement) with Coy Collective, Jessica Bartlett and Kiki Passo; and encourages their immediate review.
  b) It is important to note that it is MG's right to enforce these agreements in the past, now and in the future, and it is reasonable to assume that MG has every intention to do so should it come to our attention that any part of these agreements has been violated or breached.  It is especially advisable to have your legal counsel review these agreements as you have noted your intention to possibly position yourself as a

CONFIDENTIAL

COY006897

competitor to MG and use your confidential knowledge of MG's business and business practices as a foundation for your business.  Further, it would be advisable to seek legal advice before using any of our confidential information in your business plans. Breaches of these agreements will be taken very seriously as they can be highly damaging to MG, and one intent of these mutually agreed upon and fully executed agreements was clearly to protect MG's business from his type of breach and activity.

6) <u>Customer Privacy</u>
   a)  In your text dated 11/5/20, you mentioned "…to begin coordinating transferring ccBill information of our clients and their subscribers.."  MG cannot give anyone customer names or customer data.  All customers signed up to become MG customers as disclosed in the Terms of Service, Privacy Policy, etc. They did not agree to become customers of another third party so we can't transfer confidential customer information outside of MG and we are bound to each customer to protect their privacy. In addition, all customer credit card information is exclusively retained by credit card company.
   b)  Additionally, in your text dated 11/5/20, you introduce a concept "so as to transfer liability."  MG is uncertain as to what this means, and we are skeptical that this is legally possible as it relates to our legal, professional, moral and ethical obligations to protect our customer's privacy.

7) <u>Commissions on Referrals</u>
   a)  At this time, MG will continue to offer you 5% commission on referrals for clients who fully execute pre-approved MG Website Development Agreements.


Jessica, again MG would like to stress that this is very much NOT personal, we think only the best of you as we do all of our relationships. MG has created a highly valuable business and as would be expected, intends to do everything possible to enforce our rights, uphold our agreement's obligations, realize value it creates and prevent the unauthorized use of our trade practices, confidential information and so on.

I am available to walk through this point-by-point.  Let's schedule something if you like to do that.


Kindly yours,

Jason Moskowitz
Partner – McCandless Group

Cc: Nick McCandless/McCandless Group

CONFIDENTIAL

COY006898

Exhibit U

DocuSign Enve



**WEBSITE DEVELOPMENT AGREEMENT**

THIS AGREEMENT ("Agreement") is entered into as of the date on the signature page (the "Effective Date") by and between McCandless Group, LLC, with its principal place of business located at 3141 Michelson Drive #1307, Irvine, CA 92612 (the ("Developer") and Jessica Marie Bartlett with a principal place of business located at 550 North Figueroa Street #5027, Los Angeles, CA 90012 (the "Customer" or "you" or "your") each individually a "Party" and collectively the "Parties."

**WHEREAS,** Developer is engaged in the business of website and software development.

**WHEREAS**, Customer wishes to utilize the services of Developer in connection with the development of software identified as the Jessica Marie Bartlett Website (the "Website").

**NOWTHEREFORE,** in consideration of the promises and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties agree as follows:

**1.** **Services.** Subject to the terms and conditions of this Agreement, the Customer hereby retains Developer to perform the services set out below ("Services" or "Work").

1.1 General.

a. Developer will perform the services of website development and support of the Website according to specifications set forth therein (the "Website").

b. The Website will be for Customer's brand that allows the Customer to provide exclusive content to the Customer's audience through the Website.

c. Customer will cooperate with Developer's reasonable requests for information, content, and data necessary for the completion of the Website.

1.2 Services to be provided:

a. The Developer will provide the Customer with a Website that provides support for exclusive content of the Customer including both photos and videos that are made exclusive to those subscribed by paying for a subscription. Subscribers will also have the ability to chat with the Customer through the website.

b. The design and interface of the Website will follow the template assigned to it by the Developer.

1

DocuSign Enve

c.      The Customer guarantees that the Developer will be supplied with the Work to be completed.

d.      The Website shall contain a statement substantially similar to "Powered by McCandless Group" and such copyright and trademark notices as the Developer reasonably believes are appropriate.

e.      The Developer will be providing the Product "AS-IS" and no custom development will be included under this Agreement excepting that included in the functionalities above. Any maintenance, repair, modification, upgrade or enhancement of the Website shall be pursuant to a separate mutually acceptable written agreement between the Customer and the Developer.

f.      It is understood and agreed that the Customer will use the Website and its content to promote their exclusive content with the purpose of monetizing the Customer's fans and shall not be used for any other purposes without written permission from the Developer.

## 2.      **Compensation.**

2.1     In consideration of the Services to be provided by Developer to the Customer hereunder, the Customer shall pay to Developer the following compensation ("Compensation"):

a.      Fifteen percent (15%) of the Gross Revenue collected from the Website in perpetuity.

(i)      Developer shall be responsible for collecting sales charges generated from the Website and shall remit Customer's eighty-five percent (85%) of the Gross Revenue (a "Distribution").

(ii)     Distributions shall be made no later than on the end of the first (1st) week of each month for the amount owed as a result of the prior months' sales.

(iii)    Developer shall provide Customer with access to the reporting software used to track revenue.

2.2     "Gross Revenue" shall mean:

a.      All sales collected by Developer from the Website of any kind.

b.      All sales generated from social media and other sites which Customer uses to market products and services offered on the Website.

## 3.      **Term and Termination.**

3.1     This Agreement shall commence on the Effective Date and shall continue for a period of twelve (12) months (the "Initial Term") and shall renew for successive twelve

2

DocuSign Env

(12) month periods (each a "Renewal Term") unless terminated by either party by providing written notice to the other Party no less than ninety (90) days prior to Renewal Period of its intent to not renew the Agreement.

3.2     Customer may not terminate this Agreement at any time, for any reason, during the Initial Term. Any such termination shall be a material breach of this Agreement for which Developer may collect damages including those liquidated damages as stated below.

3.3     Customer grants exclusivity to the Developer by the Customer and shall not provide for any subscription services using any other means rather than the Website to be developed for the period of twelve (12) months after the Website's launch date and for any Renewal Period.

**4.     Relationship of the Parties.**  The Developer is and shall remain an independent contractor of the Customer and nothing contained in this Agreement shall be deemed to create an employer/employee, principal/agent, partnership or joint venture relationship between the parties. The Customer shall not provide the Developer with any benefits that the Customer may provide to its employees and shall not be required to withhold income taxes on, or to pay payroll taxes with respect to, the sums to be paid to the Developer hereunder. The Developer agrees that he shall be solely responsible for all excise, self-employment and other taxes relating to the receipt of payments hereunder. As an independent contractor, it is expressly agreed that the Developer operates at his/her own expense and risk. The Developer is not authorized to execute any agreements, make any changes in any agreements, incur or assume any obligations, liabilities or responsibilities, or perform any other act in the name of or on behalf of the Customer. Each party shall have the obligation to supervise, manage, contract, direct, procure, pay, perform or cause to be performed all work and other obligations to be performed by such party pursuant to the terms of this Agreement and shall be liable for the acts or omissions of its or his/her employees and agents in performing its or his/her respective obligations or exercising its or his/her respective rights hereunder.

**5.     Confidential Information.**

5.1     Definition of Confidential Information. For the purposes of this Agreement, "Confidential Information" means any information disclosed by either party to the other party, either directly or indirectly, in writing, orally or by inspection of tangible objects which is designated or described by the disclosing party as "Confidential," "Proprietary" or some similar designation, or which should reasonably be understood by the receiving party, because of the circumstances of disclosure or the nature of the information itself to be confidential or proprietary to the disclosing party. Confidential Information shall include, but not be limited to, the pricing and payment terms contained in this Agreement. In the event Developer is included in any image, video or content posted by Customer in Customer's Content, Customer shall maintain identification of Developer confidential and may not under any circumstances disclose Developer's identity. Confidential Information may also include information disclosed to

3

DocuSign Env

a receiving party by third parties on behalf of the disclosing party. Confidential Information shall not include any information which (i) is publicly known through no action or inaction of the receiving party; (ii) was already in the possession of the receiving party at the time of disclosure without an obligation of confidentiality, direct or indirect, to the disclosing party; (iii) is obtained by the receiving party from an independent third party without a breach of such third party's obligations of confidentiality; or (iv) is independently developed by the receiving party without use of or reference to materials provided by the disclosing party.

5.2     Non-use and Nondisclosure. Each party agrees that it will not use any Confidential Information of the other party for any purpose except for the purpose of this Agreement. Each party agrees that it will not disclose any of the other party's Confidential Information to anyone except for such party's own directors, officers, employees, and attorneys who are required to have the information in connection with the purpose of this Agreement ("Representatives"). In the event that a receiving party is required by law to disclose Confidential Information obtained from the disclosing party, the receiving party shall give the disclosing party prompt written notice of such requirement as soon as possible prior to such disclosure and shall provide the disclosing party with assistance in obtaining an order protecting the information from disclosure.

5.3     Each party agrees that it shall take reasonable measures to protect the secrecy of and avoid the disclosure and the unauthorized use of the other party's Confidential Information. Without limiting the foregoing, each party shall take at least those measures that it takes to protect its own most highly confidential information and shall ensure that each of its Representatives who have access to the other party's Confidential Information has signed a non-use and nondisclosure agreement in content similar to the provisions hereof, prior to any disclosure of Confidential Information to such Representative. Neither party shall make any copies of the other party's Confidential Information without the disclosing party's prior written consent.

5.4     Term of Confidentiality. The term of this Confidentiality Section shall remain in effect until terminated by either party with written notice to the other party, but such termination shall have no effect on either party's obligations hereunder with respect to Confidential Information already disclosed. The obligations of each receiving party hereunder as to any Confidential Information shall continue in perpetuity from the date such Confidential Information is disclosed or if applicable until such information is no longer a trade secret of the disclosing party, whichever occurs last, and shall survive termination of this Agreement.

**6.     Ownership of Intellectual Property.**

6.1     Except as may be otherwise granted herein, title to and ownership of all intellectual property rights including, without limitation, any patent, trademark, copyright or intellectual or industrial property right (the "Developer Intellectual Property") relating to the Software shall at all times remain with Developer. Customer expressly acknowledges that it does not have and shall not, by virtue of this Agreement, acquire any title or proprietary rights whatsoever of any kind in or over the

4

DocuSign Env

Software or any improvements, updates, adaptation, modification, research, development, derivation, addition, extension, changes, or other Developer Intellectual Property related to the Software.

6.2     Developer hereby grants to Customer a perpetual, non-exclusive, non-transferable, royalty-free, worldwide right to use the Software for those purposes intended by this Agreement.

6.3     Customer reserves all its respective rights, title, and ownership in its respective intellectual property owned or developed independently of this Agreement, including images, videos, written content and other personal content ("Customer Intellectual Property"). Developer expressly acknowledges that it does not have and shall not, by virtue of this Agreement, acquire any title or proprietary rights whatsoever of any kind in or over Customer Intellectual Property.

6.4     Developer may use, reproduce and copy Customer Intellectual Property for the purposes of planning, operating, managing, optimizing, implementing and maintaining the Website, subject to the maintenance of confidentiality in accordance with Section 5 herein.

**7.**     **Customer Content.**

7.1     All Content on the Website is the sole responsibility of the person who originated such content. All Content transmitted by Customer is at Customer's own risk and Customer is solely responsible and liable for any damage or loss to resulting therefrom. Developer reserves the right to remove any objectionable Content in their sole discretion.

7.2     Customer understands that by providing Content in connection with the Service Customer hereby grants Developer a non-exclusive, worldwide, royalty free, perpetual, irrevocable, sublicensable and transferable right to fully exploit such Content (including all related intellectual property rights) in connection with Developer's business.

**8.**     **Customer Representations.**

8.1     Customer will use the Website and its content to promote their exclusive content with the purpose of monetizing the Customer's followers and shall not be used for any other purposes without written permission from the Developer.

8.2     Customer shall post unique content on the Website at least one (1) time daily, five (5) days a week, for the subscribers for the life of the term.

8.3     Customer commits themselves to promote the Website and its content at least one (1) time weekly on social media for the life of the term.

8.4     Customer will include the url to the Website in the bio of their social media accounts for the life of the term. Customer has the right to include other links in the bio in the case of a brand deal with such requirement.

8.5     Customer will be using the following social media channel for all of the social media promotions mentioned above:

5

DocuSign Enve

a.    Instagram: @jessicambartlett

b.    Should the name of the Customer's account be changed, this name will be deemed to have been recognized and valid within this agreement along with the new account name.

8.6    In the event Customer fails to deliver any of the requirements as contained in Sections 8.1 – 8.5, Customer shall pay to Developer the amount of Seven Thousand Five Hundred Dollars ($7,500) in liquidated damages upon notice from Developer of such failure without the curing of such within five (5) days. This right to cure shall be available to Customer one (1) time and thereafter no right to cure shall exist following a second (2nd) failure to adhere to the above obligations.

8.7    Customer warrants and represents that all information as contained in the attached ADULT MODEL RELEASE: 2257 COMPLIANT FORM is true and accurate.

**9.    Indemnity.**    At all times, Customer shall protect, indemnify, defend and hold the Developer, including its affiliates and subsidiaries, officers, directors, shareholders, members, employees, agents, representatives, successors and assigns harmless from and against any and all penalties, claims, losses, liabilities, damages, charges, costs and/or expenses (including, without limitation, attorneys' fees and court costs) rising out of or resulted from or in any way or in any manner connected with or related to any acts or omissions or breach of this Agreement, of Customer, including but not limited to subsection 8.7 herein.

**10.    Warranty, Disclaimer and Limitation of Liability.**

10.1    Your use of the Service is at your sole risk. The Service and the associated materials and content are provided on an "as is" and "as available" basis. Except as otherwise expressly provided in this Agreement, Developer, its parent, subsidiary and other affiliated companies, and their respective officers, directors, employees, agents and other representatives (collectively, the "Developer Parties"), expressly disclaim all warranties of any kind, whether express or implied, including, but not limited to the implied warranties of merchantability, fitness for a purpose and non- infringement. Without limiting the generality of the foregoing, the Developer Parties make no warranty that: (i) the Service will meet your requirements; (ii) the Service will be uninterrupted, timely, secure, or error-free; and/or (iii) any errors in the Service will be corrected.

10.2    The Developer Parties shall not under any circumstances be liable for any damages of any kind arising out of, in connection with or relating to the use of or inability to use the Service, including any liability: (i) as a publisher of information; (ii) for any incorrect or inaccurate information or any 'bug' of the Service; (iii) for any unauthorized access to or disclosure of your transmissions or data; (iv) for statements or conduct of any third party on or via the Service; (v) for any disputes between users of the Service or between a User of the Service and you; (vi) for lost data; (vii) cost of procurement of substitute products or services; (viii) for any technical malfunction that may arise from problems with computer systems, software code, servers, computer equipment, mobile phones, software, infrastructure connections or any combination

6

DocuSign Env

thereof. or (ix) for any other matter relating to the Service or any third party. This is a comprehensive limitation of liability that applies to all damages of any kind, including any direct, indirect, special, incidental or consequential damages, whether based on breach of contract, breach of warranty, tort (including negligence), product liability or otherwise, even if an individual advises the Developer Parties of the possibility of such damages. The limitations of liability set forth herein are fundamental elements of the basis of the bargain between the Developer and you. The products, information and services offered on and through the Service would not be provided to you without such limitations.

10.3   Notwithstanding the foregoing, the sole and entire maximum liability of the Developer Parties for any reason, and your sole and exclusive remedy for any cause or claim whatsoever, shall be limited to any amounts paid by you to Developer during the three (3) months prior to the date any cause of action may have occurred.

10.4   You agree that regardless of any statute or law to the contrary, any claim you may bring must be filed within one (1) year after the cause of action accrues or it will be permanently barred.

10.5   Some jurisdictions do not allow the disclaimer of certain warranties or the limitation or exclusion of liability for certain types of damages. accordingly, some of the above disclaimers and limitations may not apply to you.

10.6   If you are a California resident, you shall and hereby do waive California Civil Code Section 1542, which says: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which, if known by him must have materially affected his settlement with the debtor."

**11.**   **Force Majeure.**   A party will be not be considered in breach or in default because of and will not be liable to the other party for, any delay or failure to perform its obligations under this agreement by reason of fire, earthquake, flood, explosion, strike, riot, war, terrorism, or similar event beyond that party's reasonable control (each a "Force Majeure Event"). However, if a Force Majeure Event occurs, the affected party shall, as soon as practicable:

a.   Notify the other party of the Force Majeure Event and its impact on performance under this agreement; and

b.   Use reasonable efforts to resolve any issues resulting from the Force Majeure Event and perform its obligations under this agreement.

**12.**   **Governing Law, Jurisdiction**.   If any dispute arises under the terms of this Agreement, the parties agree to select a mutually agreeable neutral third party to help them mediate such. If mediation is unsuccessful, the Parties agree that any dispute shall be in all respects construed in accordance with and governed by the laws of the State of California without regard to conflict of law principles. Costs and fees (including attorneys' fees) associated with the mediation or arbitration shall be responsibility of each individual party.

7

DocuSign Env

**13.**   **Miscellaneous.**

a.      Entire Agreement; Modification. This Agreement sets forth the entire agreement and understanding of the parties hereto concerning the subject matter hereof, and, except as otherwise specifically provided below, supersedes all prior and contemporaneous correspondence, agreements, arrangements and understandings, both oral and written, between the parties hereto concerning the subject matter hereof. No modification hereof shall be binding upon the parties hereto except by written instrument duly executed by such parties or their duly authorized representatives.

b.      Invalidity of Particular Provisions. If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the other terms of this Agreement, or the application of such terms or provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

c.      Counterparts. This Agreement may be executed in any number of counterparts, including electronically, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

d.      This Agreement may be delivered by email, and email copies of executed signature pages shall be binding as originals.

e.      Interpretation. The paragraph headings of this Agreement are inserted for convenience only and shall not constitute a part of this Agreement in construing or interpreting any provision hereof. Whenever the context requires, words used in the singular shall be construed to include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine or neuter gender.

f.      Notices. All notices given under this Agreement must be in writing. A notice is effective upon receipt and shall be sent via one of the following methods: delivery in person, overnight courier service, certified or registered mail, postage prepaid, return receipt requested, or by any other means agreed to by the Parties, such as email.

g.      This agreement will become effective when all parties have signed it. The date this agreement is signed by the last party to sign it (as indicated by the date associated with that party's signature) will be deemed the Execution Date of this agreement.

h.      Each party shall use all reasonable efforts to take, or cause to be taken, all actions necessary or desirable to consummate and make effective the transactions this agreement contemplates or to evidence or carry out the intent and purposes of this agreement.

8

DocuSign En

IN WITNESS WHEREOF, the parties have executed this Agreement effective the date stated above.

| DEVELOPER: | CUSTOMER: |
|---|---|
| Business Name: McCandless Group, LLC | Business Name: Jessica Marie Bartlett |
| Address: 3141 Michelson Drive, Unit 1307, Irvine, CA 92612 | Address: 550 North Figueroa Street #5027, Los Angeles, CA 90012 |
| Telephone Number: 919-791-6441 | Telephone Number: 805-835-8052 |
| Email Address: nick@nickmccandless.com | Email Address: jbartlett@berkeley.edu |
| By: _____ *Nicholas McCandless* _____<br>CC0CECA0BA5C475...<br>Signature | By: _____ *Jessica Bartlett* _____<br>F1B789CDC1A4452...<br>Signature |
| Full Name: Nicholas McCandless<br>Title: CEO/Owner/Founder | Full Name: Jessica Marie Bartlett |
| Date: _____ 10/27/2019 _____ | Date: _____ 10/27/2019 _____ |

9

Bartlett Declaration - Page No. 103

DocuSign Env

**EXHIBIT A**

**ADULT MODEL RELEASE: 2257 COMPLIANT FORM**

## ADULT MODEL RELEASE: 2257 COMPLIANT FORM:

## Model Name:

| | |
|---|---|
| MODEL'S LEGAL NAME: | **Jessica Marie Bartlett** |
| STAGE NAME [IF ANY]: | Jessica Bartlett |
| ALIAS [IF ANY]: | Jessica Bartlett |
| MAIDEN NAME: | |
| PROFESSIONAL NAME: | |
| ALSO KNOWN AS: | |
| ALSO KNOWN AS: | |
| If model has additional names, must include: | |

## Identification Produced:   First form of identification produced

| | |
|---|---|
| Driver's License Number: | California – F4389157 |
| Passport Number: | |
| State Identification Card Number: | |
| School I.D. Number: | |
| Selective Service Card Number: | |
| Work Identification Card Number: | |
| Date of Birth of Model: | 06/10/1996 |
| Address of Model: | 550 North Figueroa Street #5027 |
| City: | Los Angeles |
| State: | California |

## TERMS AND CONDITIONS:

I, the undersigned model (hereafter model) do hereby voluntarily authorize and give permission to Company/Producer below (hereafter Producer) to the exclusive use of: photographs, video, electronic and digital reproductions in any form of my person or personal property

From the date of execution of this General Release and Authorization, the undersigned hereto does hereby grant, release and assign to Producer any and all claims of right whatsoever in and to all photographs or printed materials of the undersigned or by the undersigned and delivered to

10

Bartlett Declaration - Page No. 104

DocuSign En

Producer for any purpose chosen by Producer.

From execution hereto and for value received and acknowledged below by model Producer shall exclusively and irrevocably own in perpetuity all right, title and interest, including copyright, in and to the digitized photographs, reproductions, video and any digitized printed material of the undersigned with no rights expressly reserved by the model.

Model also grants Producer and its designees the right to use her name, likeness, image voice, appearance, and performance as embodied in the Product whether recorded on or transferred to videotape, film, slides, photographs, audio tapes, or other media, now known or later developed. This grant includes without limitation the right to edit, mix or duplicate and to use or re-use the Product in whole or part as Producer may elect. Producer or its designee shall have complete ownership of the Product in which model appears, including copyright interests, and model acknowledges that she has no interest or ownership in the Product or its copyright.

Model also confirms that she/he has the right to enter into this Agreement, that she/he is not restricted by any commitments to any parties, and that Producer has no financial commitment or obligations to me as a result of this Agreement besides the consideration already paid.

I hereby give all clearances, © 2019 McCandless Group, LLC bodied in the Product. I expressly release and indemnify Producer and its officers, employees, agents and designees from any and all claims known and unknown arising out of or in any way connected with the above granted uses and representations. The rights granted Producer herein are perpetual and worldwide survive my death and any other occurrence.

In consideration of all the above, I hereby acknowledge receipt of reasonable and fair consideration from the Producer received and paid.

## AS TO MODEL:

| MODEL'S SIGNATURE: | | DocuSigned by: *Jessica Bartlett*  F1B789CDC1A4452... |
| --- | --- | --- |
| Dated on: | | |

I the above-signed model do hereby certify and swear under unsworn declaration of perjury that the following is true and correct by my above signature and that I agree with such terms.

I swear that I am above 18 years of age

I swear that I have disclosed my correct legal name

I swear that I have disclosed all other names that I have been known by to producer

I swear that I have produced a legal identification card

I swear that I have not provided any false or misleading information to producer

## AS TO PRODUCER:

| Producer's Name: | Nicholas McCandless |
| --- | --- |
| Company Name: | McCandless Group, LLC |

11

DocuSign En

| Dated on: | October 27, 2019 |

12