**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| MCCANDLESS GROUP, LLC,<br>    Plaintiff,<br><br>    v.<br><br>THE COY COLLECTIVE, INC. et al.,<br>    Defendants.<br>_____<br>THE COY COLLECTIVE, et al.,<br>    Counterclaimants,<br><br>    v.<br><br>MCCANDLESS GROUP LLC and<br>NICHOLAS MCCANDLESS,<br>    Counter-Defendants. | **Case No.  LA CV 21-02069-DOC-KES**<br><br><br><br>**GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [180]** |

Before the Court is Defendants' Motion for Summary Judgment ("MSJ") (Dkt. 180). The Court heard oral arguments on October 23, 2023. For the reasons explained below, the Court GRANTS IN PART and DENIES IN PART the Motion for Summary Judgment.

## I.   BACKGROUND

### A. Facts[1]

The "creator economy" consists of independent content creators—e.g., influencers, models, podcasters, and streamers—who distribute and monetize content on the internet. Defendants' Response to Statement of Genuinely Disputed Facts ("DRSGDF") (Dkt. 209-2) ¶ 1. OnlyFans and Patreon are two of the largest companies in the creator economy space. *Id.* ¶ 2. OnlyFans is a service launched in 2016 that allows creators to sell subscription content. *Id.* ¶ 3. A creator can set up an OnlyFans page to sell content to subscribers, receive "tips," chat with subscribers, and view reporting on the financial performance of the page. *Id.* ¶ 4.

McCandless Group, LLC ("MG") is a company started by Nicholas McCandless ("McCandless"). *Id.* ¶ 5. MG sites share multiple similarities to OnlyFans—subscription content, tipping, chat, and financial reporting. *Id.* ¶ 6. MG claims in its initial pitch to potential clients, "You also own your subscribers, data and all of your content" and "You have complete access to your subscriber information including name, email, and revenue received." *Id.* ¶¶ 7-8.

Jessica Bartlett ("Bartlett") is a social media personality and model. *Id.* ¶ 10. Around 2019, McCandless convinced Bartlett to hire MG to develop a subscription website for her. *Id.* ¶ 11. On October 27, 2019, Bartlett and MG executed a Web Development Agreement (the "Bartlett WDA"). *Id.* ¶ 12. Because of Bartlett's popularity, McCandless used her, among other creators, to market his services. *Id.* ¶ 13. In February of 2020, McCandless provided a content manager- or creator- level login to Bartlett's site to someone helping her manage the site. *Id.* ¶ 14. Creator-level access to an MG website has the ability to post content, manage chat, and see the financial earnings report, while content manager-level access to an MG website can post

---

[1] Unless indicated otherwise, to the extent any of these facts are disputed, the Court concludes they are not material to the disposition of the Motion. Further, to the extent the Court relies on evidence to which the parties have objected, the Court has considered and overruled those objections. As to any remaining objections, the Court finds it unnecessary to rule on them because the Court does not rely on the disputed evidence.

content and manage chat, but does not have access to earnings reporting. *Id.* ¶¶ 15-16.
McCandless did not require the person helping Bartlett manage her site to sign a separate non-disclosure agreement before providing the login. *Id.* ¶ 17. The parties dispute whether that person was covered under the terms of Bartlett's WDA. *Id.*

In 2020, Bartlett, Corey Lewis ("Lewis"), and Thomas Drew ("Drew") co-founded COY—a company aimed at allowing its creator clients to offer subscription content to their followers. *Id.* ¶ 18. Bartlett, Drew, and Lewis conceptualized COY as a more "selective" OnlyFans that would differentiate itself from that site—they would handpick influencers and offer them additional in-person services like photo-shoots and other hands-on tasks. *Id.* ¶ 19. Bartlett, Drew, and Lewis vetted different options for building COY's subscription platform, including hiring MG as a developer, hiring Segwik as a developer, or using a platform called Uscreen. *Id.* ¶ 20. COY ultimately hired MG to develop COY's subscription platform. *Id.* ¶ 21. When COY selected MG as its developer, everyone at COY was excited to work with MG. *Id.* ¶ 22. The suggestion to use Uscreen came from Robert Hankins ("Hankins"), a photographer and friend of Drew and Lewis. *Id.* ¶ 23. Hankins proposed joining COY to manage COY's Uscreen relationship. *Id.* ¶ 24. Hankins was only involved with COY in the summer of 2020, because shortly after COY decided not to use Uscreen, Hankins had no further involvement with COY. *Id.* ¶ 25.

On May 6, 2020, Bartlett texted McCandless to ask if he would be interested in being COY's developer: "Hey Nick! Working on a subscription based project with a couple investors and pitching you as our developer." *Id.* ¶ 26. On May 9, 2020, Bartlett set up a call with McCandless and Lewis to discuss the subscription based project. *Id.* ¶ 27. Bartlett's May 9, 2020 message to McCandless notified him that she and Lewis were collecting information for an investor pitch: "Preparing an investor pitch for the company I was telling you a little about. Do you have time today for a call with me and my main business guy?" *Id.* ¶ 28. On May 10, 2020, Bartlett asked McCandless to provide Lewis with a login to her site, so Lewis could see the user experience. *Id.* ¶ 29. McCandless offered to provide either a content manager or subscriber login for Lewis, and Bartlett asked for a subscriber login. *Id.* ¶ 30. McCandless

provided the subscriber login the next day, May 11, 2020. *Id.* ¶ 31. On May 12, 2020, McCandless proposed some terms for MG to serve as COY's developer. *Id.* ¶ 32.

The initial terms proposed by McCandless included that "McCandless Group would be marketed as the Technology Partner powering your technology" and that MG would retain "the code/technology" while COY would "own all of the content and the relationships with the models." *Id.* ¶ 33. On May 13, 2020, Bartlett messaged McCandless: "Got it! Thank you! I'll talk this over with Corey and the other investors in the morning." *Id.* ¶ 34. On May 14, 2020, Bartlett set up a call with McCandless and Lewis to discuss the proposal. *Id.* ¶ 35. On May 16, 2023, McCandless had an over 2-hour call with Lewis, prior to signing any NDA. *Id.* ¶¶ 36-37. The parties dispute whether trade secrets were discussed on this call, but McCandless testified he believed he disclosed trade secrets on that call. *Id.* ¶ 37. On May 19, 2020, McCandless sent Lewis estimated upkeep costs for hosting and email services. *Id.* ¶ 38. On May 19, 2020, Drew sent McCandless a detailed list of requirements for the COY sites. *Id.* ¶ 39.

On May 20, 2020, McCandless sent non-disclosure agreements ("NDAs") to Bartlett, Lewis, and Drew, which they signed the next day. *Id.* ¶¶ 40-41. Hankins also signed an NDA on May 22, 2020. *Id.* ¶ 42. These NDAs are governed by California law. *Id.* ¶ 43. On May 23, 2020, after the NDAs were signed, McCandless sent Lewis a document entitled, "McCandless Group Model Platform Technology Stack." *Id.* ¶ 44. The documents listed the names of the technologies used by MG for its websites and do not disclose source code. *Id.* ¶¶ 45-46. The parties dispute whether COY ever had access to portions MG's source code through their Content Creator or Content Manager accounts. *Id.* ¶ 47.

On May 27, 2020, Lewis sent the technology stack document provided by McCandless to the manager of COY's principal investor, Andrew Geller ("Geller"). *Id.* ¶ 48. While his identity was not disclosed to MG, Geller was the manager of COY's principal investor and was advising COY on its business, including whether to retain MG as COY's developer. *Id.* ¶ 49. Earlier in May of 2020 Bartlett had informed McCandless that COY was collecting information to share with investors for purposes of deciding whether to retain MG. *Id.* ¶ 50. The parties dispute whether these investors were limited to Drew and Lewis, or whether Bartlett meant

other investors including Geller. *Id.* Section 4 of Lewis' NDA permits disclosure of Confidential Information to "Representatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction or who otherwise need to know such Confidential Information for the purpose of the Proposed Transaction and, in the case of its Representatives, each of whom the Receiving Party will cause to observe the terms of this Agreement as if he or she had been a party hereto…" *Id.* ¶ 51.  Section 3 of Lewis' NDA defines "Representative" to include "advisors." *Id.* ¶ 52. Drew never sent the document to anyone else. *Id.* ¶ 54.

COY and MG continued to negotiate pricing and terms for MG to serve as COY's developer in June and July 2020. *Id.* ¶ 55. On August 6, 2020, COY's designer, Maria Deligiorgio, provided designs for the COY landing pages to MG. *Id.* ¶ 56. MG subsequently reproduced these designs, which were publicly viewable on COY's website, but changed aspects of it. *Id.* ¶ 57. On August 6, COY and MG entered into a Web Development Agreement (the "COY WDA"). *Id.* ¶ 58.

The COY WDA states that MG would serve as the developer for COY's subscription websites. *Id.* ¶ 60. The COY WDA provides that COY "wishes to utilize the services of Developer in connection with the development of software identified as the Coy Collective, INC Websites." *Id.* ¶ 61. The COY WDA provides, "[t]he Websites will be for Customer's brand that allows the Customer to provide exclusive content to the Customer's audience through the Websites," and "[t]he Developer will provide the Customer with Websites that provide support for exclusive content of the Customer including both photos and videos that are made exclusive to those subscribed by paying for a subscription. Subscribers will also have the ability to chat with the Customer through the Websites." *Id.* ¶ 62. In a May 12, 2020 email proposing the arrangement McCandless wrote, "these features and enhancements would continue to grow the technological capabilities that you can offer the models that you work with." *Id.*

Section 4 of the COY WDA provides, in part, "[t]he Developer is and shall remain an independent contractor of the Customer and nothing contained in this Agreement shall be

deemed to create an employer/employee, principal/agent, partnership or joint venture relationship between the parties." *Id.* ¶ 63.

Section 6.1 of the COY WDA provides: "Except as may be otherwise granted herein, title to and ownership of all intellectual property rights including, without limitation, any patent, trademark, copyright or intellectual or industrial property right (the "Developer Intellectual Property") relating to the Software shall at all times remain with Developer." *Id.* ¶ 67. The COY WDA does not include a standalone definition for the term "Software." *Id.* ¶ 68. The parties dispute whether COY has claimed ownership of any of the intellectual property covered by the WDA. *Id.* ¶ 69. The COY WDA defines "Confidential Information" in part as information "designated or described by the disclosing party as 'Confidential,' 'Proprietary' or some similar designation, or which should reasonably be understood by the receiving party, because of the circumstances of disclosure or the nature of the information itself to be confidential or proprietary to the disclosing party." *Id.* ¶ 70. The COY WDA specifically excludes from the definition of "Confidential Information":

> "[A]ny information which (i) is publicly known through no action or inaction of the receiving party; (ii) was already in the possession of the receiving party at the time of disclosure without an obligation of confidentiality, direct or indirect, to the disclosing party; (iii) is obtained by the receiving party from an independent third party without a breach of such third party's obligations of confidentiality; or (iv) is independently developed by the receiving party without use of or reference to materials provided by the disclosing party."

*Id.* ¶ 71.

Section 13a. of the COY WDA provides, in part,

> "This Agreement sets forth the entire agreement and understanding of the parties hereto concerning the subject matter hereof, and, except as otherwise specifically provided below, supersedes all prior and contemporaneous correspondence, agreements, arrangements and understandings, both oral and written, between the parties hereto concerning the subject matter hereof."

*Id.* ¶ 72.

COY's website described COY as "a full service technology company." *Id.* 73. On August 31, 2020, Bartlett sent McCandless an email that included the language COY wanted on its website, including that COY was "a full service technology company," which McCandless never asked Bartlett to explain *Id.* ¶¶ 74-75.

In August 2020, Bartlett and MG communicated about transferring her and other model's site from MG to COY, which included an email correspondence from McCandless

stating "any and all financial responsibilities that [MG] committed to in [the Bartlett WDA] are no longer the responsibility of [MG] and all communications and obligations related to payment affiliated with JesscaMBartlett.com are now handled exclusively between yourself and COY" and that "you are waiving any and all distribution obligations from [MG]." *Id.* ¶¶ 76-77.

COY successfully recruited thirteen models and asked MG to build their websites. *Id.* ¶ 78. By no later than October 2020, friction had emerged between COY and MG. *Id.* ¶ 79. A number of sites MG was creating for COY were not launched on time for design-related reasons, frustrating COY. *Id.* ¶ 80. McCandless began to view COY as competing with MG and interrupting their attempts to recruit models. *Id.* ¶ 81. On October 19, 2020, McCandless texted Bartlett to tell her MG would refuse to build a website for a model, Mikayla Demaiter ("Demaiter"), because MG "had active conversations with" her. *Id.* ¶ 82. McCandless had been pitching Demaiter up until July 30, 2020, including sending her a contract, after which she stopped responding to him. *Id.* ¶ 83.

In October 2020, COY reached out to Dionna McPhatter ("McPhatter") about building new sites for COY's clients. *Id.* ¶ 84. McPhatter was not provided with MG's tech stack document, but may have been familiar with features of the website. *Id.* ¶ 89. COY ultimately decided not to replace MG with McPhatter. *Id.* ¶ 90.

Jason Moskowitz ("Moskowitz") is McCandless' business partner. *Id.* ¶ 91. On November 2, 2020, Moskowitz sent a letter to COY demanding significant changes to the terms of the COY WDA as a condition of continuing, stating MG would otherwise shut down all COY sites on December 31, 2020. *Id.* ¶ 92. The letter concluded, "[i]f the result is that you can't accept this and need to move in another direction— perhaps even becoming our competitor— we are fully aware of that and will be helpful during this transition." *Id.* ¶ 93. On November 3, 2020, Bartlett notified Moskowitz that COY was not interested in the changed terms so "would be taking the option in which sites are terminated on Dec. 31st." *Id.* ¶ 94. On November 9, 2020 Moskowitz sent COY another letter notifying COY that MG would not transfer the domains of most of COY's clients to COY. *Id.* ¶¶ 95-96. Before Moskowitz sent the letter, McCandless explained to him the reasons for withholding the domains: "Yep, I have

done many things like this to lock people in without them even knowing it so can definitely use this as leverage since I own and control all of their domains except for a couple that the models already owned." *Id.* ¶ 97.

The payment processing account for COY's websites stored subscriber information and allowed for recurring subscription charges. *Id.* ¶ 99. Section 8.2 of the COY WDA states, "Customer will establish an account for payment processing with the payment processor assigned to Customer by Developer." *Id.* ¶ 100. McCandless had set up an account with the payment processing company— CCBill—in MG's name, at Lewis' request so that COY would pay a lower rate. *Id.* ¶ 101. McCandless did not turn over the account to COY or transfer any of the subscribers. *Id.* ¶ 102. The parties dispute whether CCBill was able to transfer customers and whether McCandless intended to withhold the information from COY or whether it solely belonged to MG. *Id.* ¶¶ 102-104. Without access to these internet names and subscriber information, COY could not relaunch its websites using the same domains or maintain the existing subscribers to its creators' websites. *Id.* ¶ 105.

MG kept Bartlett's site running after the COY WDA was terminated until approximately February 2021. *Id.* ¶ 106. McCandless testified that after February 2021, McCandless Group was not required by any contract to operate a website for Jessica Bartlett. *Id.* ¶ 107. COY hired a new developer to rebuild its creators' websites—Segwik. *Id.* ¶ 108. In late 2020, COY retained Segwik to build websites for its clients to sell subscription content. *Id.* ¶ 109. COY instructed Segwik to build sites with the basic functionality of OnlyFans, also comparing the site to MG's site. *Id.* ¶ 110.

Segwik was never provided with a document describing the technology stack for the websites built by MG, but may have otherwise had access to elements of MG's site. *Id.* ¶ 111. Segwik obtained at least COY's client data from the prior MG websites was COY's clients' data—i.e., identities and emails of the clients' subscribers, clients' chat history, and clients' photos and videos. *Id.* ¶ 114. The parties dispute what other data Segwik had access to. *Id.* ¶¶ 111-14. McCandless communicated that MG would own the code and technology, but COY

would own the content on these sites, while the final WDAs refer to "their [Coy's] exclusive content." *Id.* ¶¶ 115-16.

Segwik had an existing technology platform which it had developed before being retained by COY; it uses this platform for multiple clients, and it used this platform to build sites for COY's clients, for which it only had to build a few new elements. *Id.* ¶¶ 117-18. Segwik's build used Angular for front end architecture and RDS for database architecture; MG's website uses React and MongoDB, respectively, along with other specific technical elements. *Id.* ¶ 119. For payment processing, COY set up a new account with CCBill. *Id.* 120. COY hired third parties—first Slashed Content and then Be Safe Management—to provide DMCA take down services, their standard services. *Id.* ¶¶ 121-22.

COY ultimately did not succeed in relaunching its websites, shutting them all down before the end of 2021. *Id.* ¶ 123. After MG terminated the COY WDA, COY never made a profit from its subscription website business, losing over $300,000 in 2021. *Id.* ¶ 124. After 2021, COY's subscription website business had been shut down, and COY had no revenue. *Id.* ¶ 125. After MG terminated the relationship with COY, COY did not compete with MG to sign any new models to the COY platform. *Id.* ¶ 126. After the termination, COY was focused on servicing its existing clients under contract and signed up only one new model, who was never a potential MG client. *Id.* ¶¶ 127-28. COY never distributed any profits or paid any salary to Lewis, Drew, or Bartlett. *Id.* ¶ 129. MG's net profits increased the year after it terminated the COY WDA. *Id.* ¶ 130.

MG contends that its "technology stack," among other information, is a trade secret, describing it in discovery:

"The 'technology stack' consists of utilizing servers node.js with express and MongoDB Database, react with redux, FFmpeg to transcode and process videos, TinyPNG to compress images, S3 for storing data, CloudFront to serve private content securely, Nginx to reverse proxy and static server react builds, Socket io for chat, CCBill for payment processing, hosting services through Amazon AWS EC2 instances, S3 to store media files, Amazon Route 53, and AWS CloudWatch to monitor server resource utilization.

Further, the technology allows users to handle and manage data. Website settings are stored on MongoDB which decides theme and other options. Users can register and then subscribe to view exclusive content. Active subscribers can also engage in chat with the models. Subscribers can update profile settings and manage their subscription access. Subscribers can tip and purchase locked content on the model's exclusive content feed and in private chat. The technology stack includes security and

-9-

> privacy protection, meaning that only users with a specific role can access the data with the correct JWT token. API routes are also protected based on user roles. Uploaded content is stored on S3 with a unique id and the content is served with a signed url with CloudFront.
>
> Sites are built for scalability. Specifically, sites are hosted across infinitely scalable AWS server instances to allow for no limitations of traffic, bandwidth, and activity. Databases are hosted across MongoDB databases that are built for infinite scalability. Dedicated server instances for video transcoding and processing services that websites leverage for videos. Image processing is carried out by the same node.js instance which is responsible for the API. This scalability gives the capacity to launch over 200 websites a week."

*Id.* ¶ 132.

The core of this stack is a common "MERN" stack—MongoDB, Express, React, Node, a type of stack which is described on MongoDB's website. *Id.* ¶¶ 133-34. Constituent parts of MG's website, as described in the remainder of the Tech Stack, are public. *Id.* ¶ 135. The parties dispute whether MG also offers unique features, and whether the combination of publicly available components with allegedly unique features create a Trade Secret. *Id.* ¶¶ 135-36. MG had at least one pitch desk that described some general features of MG's website included in the Tech Stack. *Id.* ¶ 137. McCandless does not recall ever asking anyone to sign a non-disclosure agreement before seeing MG's pitch deck. *Id.* ¶ 138.

MG's technology stack was built, under MG/McCandless' direction, by a third-party developer in India— Rayo Infotech ("Rayo"). *Id.* 139. The parties dispute whether MG and Rayo had an NDA covering this stack. *Id.* ¶¶ 140-41.

An additional component of MG's tech stack is CCBill, a payment processor which OnlyFans also uses. *Id.* ¶¶ 142-43. It is publicly available on MG's website that they used CCBill. *Id.* ¶ 144. Anyone who visited an MG site could determine the features offered by the website to subscribers, but not those available to those with more extensive access (i.e. Content Creators). *Id.* ¶ 145.

MG contends that its trade secrets also include a "dynamic watermarking feature" and "DMCA practices." *Id.* ¶ 148. The concept of watermarking is common knowledge. *Id.* ¶ 149. MG never disclosed to COY any code for its watermarking, but disclosed other information about how it watermarks. *Id.* ¶ 150. MG's pitch deck states, regarding watermarking, that "[a] unique identifier in the content is tied to each subscriber." *Id.* ¶ 151. MG discloses that it offers DMCA services in its pitch deck. *Id.* ¶ 153.

MG contends that its trade secrets include "pricing for potential clients." *Id.* ¶ 154. McCandless's process for deciding pricing for potential clients consists of reviewing how popular a potential client is on social media and then making a "judgement call" about what revenue split to offer, in connection with the CCBill rate. *Id.* ¶ 155. McCandless discloses his revenue split offers to potential clients without requiring a non-disclosure agreement, but not explain the accounting reasons for it or profit margins. *Id.* ¶ 156. MG also contends various accounting procedures, which explain how the profit margins of MG are determined, are "trade secrets." *Id.* ¶ 157. MG also contends he has developed a system to "clearly lay[] out the amount of money owed to each client" and then pay those clients via PayPal. *Id.* ¶ 158. McCandless never provided COY any code for the portion of its website that allows clients to see their revenue. *Id.* ¶ 159. On May 27, 2020, McCandless provided a subscriber login to a potential customer without requiring a non-disclosure agreement. *Id.* ¶ 160. MG disclosed a partially redacted version of the layout of its financial reporting pages and chat feature without requiring any non-disclosure agreement. *Id.* ¶ 161. MG contends that it has "created a system for managing chargebacks," which occur when subscribers ask their credit card company to reverse charges, resulting in a loss of payment. *Id.* ¶ 163. It is common industry knowledge that it is important to have a low chargeback ratio, but the parties dispute whether the precise chargeback percentage is widely known. *Id.* ¶ 164. MG contends its trade secrets also consist of various discounts offered to subscribers, content pricing, and "marketing" through "social media" and on MG's websites. *Id.* ¶ 165.

## B. Procedural History

The Court includes here only the relevant procedural history to the present motions in the interest of clarity. On March 16, 2022, Plaintiff filed its Third Amended Complaint against Defendants ("TAC") (Dkt. 89). Plaintiff brought nine causes of action including claims for misappropriation of trade secrets under the Defend Trade Secrets Act (DTSA), 18 U.S.C. §§ 1832, 1836 et eq., breach of contract, fraud, and breach of fiduciary duty. *See generally* TAC.

On September 1, 2023, Defendants filed a Motion for Summary Judgment as to Plaintiff's Claims ("MSJ") (Dkt. 180) and filed a statement of undisputed facts (Dkt. 180-1).[2] On September 11, Plaintiff opposed ("Opp'n") (Dkt. 195) and filed a separate statement of undisputed facts (Dkt. 195-4). On September 18, 2023, Defendants replied ("Reply") (Dkt. 207).

The Court heard oral arguments on October 23, 2023.

## II. LEGAL STANDARD

### B. Summary Judgment

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248–49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter*

---

[2] Counterclaimants did not seek summary judgment as to their counterclaims.

*Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible, evidence identifying the basis for the dispute. *See id.* The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

## III.   DISCUSSION

Defendants moves for summary judgment pursuant to Fed. R. Civ. P. 56 and Local Rule 56 on all of Plaintiff's claims: (1) misappropriation of trade secrets under the Defend Trade Secrets Act (DTSA); (2) breach of contract (breach of the NDAs; (3) breach of contract (breach of the Bartlett WDA); (4) breach of contract (breach of the Coy WDA); (5) fraud (by Bartlett); (6) fraud (by Hankins, Lewis, and Drew); (7) fraud (by Coy); (8 & 9) breach of fiduciary duty. MSJ at 11-23.

Defendant Robert Hankins argues he is entitled to summary judgment on all claims and should be dismissed, as his relationship with Coy was limited. Further, the remaining Defendants argue they are entitled to summary judgment on the grounds that (1) Plaintiff cannot prove that they had or protected a trade secret, that Defendants misappropriated their alleged trade secret, or that they are entitled to a remedy under the DTSA; (2) the NDAs are limited to the DTSA and there was no material breach of them; (3) the Bartlett WDA terminated and so there was no breach; (4) there was no breach of the confidentiality provision of the Coy WDA; (5) the fraud claim against Bartlett fails because she disclosed the intent to have Coy be a similar platform to MG's website and did not set out to steal MG's technology; (6) the fraud claims against Hankins, Lewis, and Drew fail because they did not set out to steal MG's technology; (7) the fraud claim against Coy fails because they did intend to perform under the WDA; (8 & 9) the

breach of fiduciary duty claims fail because no partnership was formed. *Id.* The Court addresses each argument in turn.

### A. Defendant Hankins

In 2020, before COY selected MG over Uscreen, Hankins hoped to join COY to manage its relationship with Uscreen. DRSGDF ¶ 24-25. Hankins' involvement with COY ended after summer of 2020. *Id.*

Plaintiffs argue that because Drew called Hankins a "business partner" in COY "in the beginning … for a small period of time," Opp'n at 6, Hankins is liable under California Corporations Code § 16306(a) for the actions of the other Defendants, after his limited involvement with COY ceased. MG argues the scope of Hankins' liability should be decided by the trier of fact, but points to no evidence that Hankins' acts could satisfy the elements of the four claims against him, providing only deposition testimony that indicates his involvement was brief and limited. *Id.* The Court finds no genuine dispute of fact over Hankins' liability and no "evidence on which the jury could reasonably find" Hankins to be liable. *Liberty Lobby*, 477 U.S. at 252.

Accordingly, the Court GRANTS summary judgment as to Defendant Hankins on all claims.

### B. Misappropriation of Trade Secrets under the DTSA

To succeed on a claim under the DTSA, a plaintiff must prove: "(1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657-58 (9th Cir. 2020).

The DTSA broadly defines the types of information that may be considered a trade secret, including "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically,

electronically, graphically, photographically, or in writing[.]" 18 U.S.C. § 1839(3). To bring this information under the statute's coverage, the claimant must also: (a) take reasonable measures to keep the information secret, and (b) derive actual or potential independent economic value from the information not generally being known to, or readily ascertainably by, another person who can obtain economic value by disclosing or using the information. *See Alta Devices, Inc. v. LG Elecs., Inc.* (N.D. Cal. 2018), 343 F.Supp.3d 868, 877; 18 U.S.C. § 1839(3).

MG groups its alleged trade secrets into three categories: (1) the design and structure of the individual websites and technology and overall infrastructure of MG's technology platform (such as the document explaining the architecture of the website; the chat features; levels of access); (2) the accounting, cost structure, and "know-how" (including the profit margins, costs, profit splitting margins depending on the model, and chargeback percentages); and (3) "negative know-how" (such as payment processors to avoid doing business with). *See* "PLAINTIFF'S TRADE SECRET DISCLOSURES") (Dkt. 118).

Looking at the first category, the Court finds a genuine dispute of fact over whether Plaintiff possessed a trade secret, the first element of a DTSA claim. It is undisputed that much of the "Tech Stack" was composed of publicly available, third-party information and that other alleged trade secrets like the payment processor it could be ascertained by anyone accessing MG's website. DRSGDF ¶¶ 135; 144. Numerous courts have found, however, that trade secrets can be composed of a specific combination of public domain elements, the combination which then leads to a competitive advantage. *See United States v. Nosal* (9th Cir. 2016), 844 F.3d 1024, 1043-44 (source lists, "derive[d] from an amalgam of public and proprietary source data," were protectable akin to customer lead sheets compiled and coded from a computer program); *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.* (N.D. Cal. 2006), 420 F.Supp.2d 1070, 1089-90 ("[c]ombinations of public information from a variety of different sources when combined a novel way can be a trade secret."), *aff'd,* 221 Fed. Appx. 996 (Fed. Cir. 2007). Whether MG's specific combination of elements qualifies as a trade secret is a genuine dispute of material fact.

The Court also finds a genuine dispute of fact as to the second element of a DTSA claim as it relates to the first category of trade secrets, whether the Defendants misappropriated

Plaintiff's trade secrets. Misappropriation under the DTSA "means either (1) the '[a]cquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means;' or (2) the '[d]isclosure or use of a trade secret of another without express or implied consent.'" *Alta Devices*, 343 F.Supp.3d. at 877; 18 U.S.C. § 1839(5). It is undisputed that MG took steps to protect the components its technology platform, including having Defendants sign NDAs. DRSGDF ¶¶ 40-41. Disclosure of a trade secret inconsistent with these NDAs, then would indicate Defendants acted without Plaintiff's consent in violation of the DTSA. Whether the undisputed disclosure to Geller, *id.* ¶ 48, was a violation of the NDA is a question of material fact regarding whether he qualified as a Representative under the agreement. The record does not establish whether or not he met that definition, making this question inappropriate for resolution at the summary judgment stage. Additionally, the issue of whether COY misappropriated elements of MG's website such as its chat feature, or whether those features merely align with common industry practices, is similarly disputed in the record presented. *See, e.g.*, *id.* ¶ 69.

As such, the Court DENIES summary judgment as to Plaintiff's claim under the DTSA related to its technology platform.

As to the second and third category, the Court does not find a genuine dispute of fact regarding whether Plaintiff's know-how or negative know-how were trade secrets. Plaintiff defines these categories as follows:

> "The "knowhow" includes how to negotiate with clients that are specific to this industry; how to grow their client's websites; how to identify good Content Creators; marketing strategies; how to use components of the website technology to generate revenue; accounting methods; revenue models; the revenue-splitting ratio; pricing of content; which vendor to use; vendor relationships; and similar or related knowledge (collectively "know-how"). …

> The "negative knowhow" includes knowledge of what not to do, because doing them could be fatal for the business. … This includes what type of payment processors to avoid; which specific payment vendor to not use (specifically Stripe); the reasons for this; which countries to avoid doing business with; avoiding a chargeback ratio of greater than 1%, the reasoning for keeping the chargeback ratio below 1%; and other similar or related knowledge."

Opp'n at 2.

Plaintiff has not adequately explained how these general business practices are distinct from existing practices in the creator economy, or that many of this information is not publicly

known. It is undisputed, for example, that it is common industry knowledge that it is important to have a low chargeback ratio, that MG uses the same payment process as OnlyFans, the best-known industry competitor, and that the payment processor it uses it is listed publicly on MG's website. *Id.* ¶¶ 142-43; 164. On these facts, the Court cannot find that MG has created a genuine dispute over whether this information qualifies as a trade secret. *See Alphonso Inc. v. Tremor Video, Inc.*, 2022 WL 17968081, at *4 (N.D. Cal. Oct. 31, 2022) (trade secret disclosure insufficient because "it does not adequately explain how its alleged trade secrets are distinct from existing technology"); *Workplace Techs. Rsch., Inc. v. Project Mgmt. Inst., Inc.*, 2023 WL 3152157, at *9 (S.D. Cal. Mar. 28, 2023) ("[Defendant's] articulation of its trade secret was simply too vague to convey an understanding of its parameters or to separate it from matters of general knowledge."); *Race Winning Brands, Inc. v. Gearhart*, 2023 WL 4681539, at *5 (C.D. Cal. Apr. 21, 2023) (list of general areas not a substitute for "particularized and concrete" trade secrets). Accordingly, the Court GRANTS summary judgment for Defendants on Plaintiff's claims under the DTSA related to know-how and negative know-how.

In sum, the Court DENIES IN PART and GRANTS IN PART Defendants' Motion for Summary Judgment as to Plaintiff's DTSA claim.

### C. Breach of Contract (Breach of the NDAs)

"A claim for breach of a non-disclosure agreement is essentially a breach of contract claim." *Viasat, Inc. v. Space Sys./Loral, Inc.*, No. 312CV00260HWVG, 2014 WL 11889467, at *4 (S.D. Cal. Feb. 4, 2014). In California, "[t]o prevail on a cause of action for breach of contract, the plaintiff must prove (1) the contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff." *Richman v. Hartley*, 224 Cal.App.4th 1182, 1186 (2014).

Interpretation of contract language is a matter of law. *Irwin v. Carpenters Health & Welfare Trust Fund*, 745 F.2d 553, 555 (9th Cir. 1984). In a contract dispute, "[s]ummary judgment is appropriate when the contract terms are clear and unambiguous, even if the parties

disagree as to the meaning." *United States v. King Features Entertainment, Inc.*, 843 F.2d 394, 398 (9th Cir. 1988).

Under California law, a contract is to be interpreted so as "to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal. Civ. Code § 1636. Intent should be ascertained "solely from the written contract if possible." *Windsor Pacific LLC v. Samwood Co.*, 152 Cal. Rptr. 3d 518, 527 (2013). California law instructs that a court is to conduct "at least a preliminary consideration of all credible evidence offered to prove the intention of the parties." *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 39-40 (1968). Then, after considering the language of the contract in light of this extrinsic evidence, the court determines whether the contract is reasonably susceptible to more than one of the interpretations that the parties advance. *Id.* at 40. If it is not, then the court may resolve the question as a matter of law, but if it is, then the meaning of the document in light of the extrinsic evidence is a question for the finder of fact. *Id.*; *see also First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust*, 162 Cal. App. 4th 1107, 1126-27.

The court finds no genuine dispute as to the first two elements of the cause of action—Defendants do not dispute that they signed the NDAs or contend that Plaintiff did not perform under the contract. *See* DRSGDF ¶¶ 40-41.

The Court finds a genuine dispute about whether Lewis breached the contract. First, as discussed above, there is a genuine dispute about whether the Tech Stack constitutes confidential information under the NDA, such that sharing it would constitute a breach, or merely a collection of common industry practices. Upon examining the Tech Stack, (Dkt. 187-5, 189-7 (Redacted)), the Court finds the question of whether it is confidential information under the NDA cannot be resolved as a matter of law and presents a triable issue of material fact. Second, there is a genuine dispute over whether Lewis was permitted to disclose the Tech Stack to Geller under the terms of the NDA. It is undisputed that Lewis sent the Tech Stack to Geller and that Geller did not have an NDA with MG. *Id.* ¶ 48. The record shows, however, that Lewis' NDA specifically allowed for disclosure to "[r]epresentatives who are actively and directly participating in the evaluation and negotiation of the Proposed Transaction." *Id.* ¶ 51. Plaintiff

does not dispute that Geller falls within the definition of a representative. The issue of whether Geller falls within the carve-out, and whether sharing the (purportedly confidential) Tech Stack with him violated the NDA, therefore depends on whether he was actively and directly participating in the evaluation and negotiation of the Proposed Transaction. Additionally, the Court finds that a genuine dispute exists as to whether Defendants breached the NDA in any way by sharing information covered under the agreement with Segwik. *See* Opp'n at 20. The Court also finds these triable issues of material fact that cannot be resolved as matters of law.

As the Court finds genuine issues of material fact exist as to Defendants' breach of the NDAs, the Court DENIES summary judgment on this claim.

### D. Breach of Contract (Breach of the Bartlett WDA)

The Court assesses Bartlett's alleged for breach of the WDA under the same breach of contract standard as above. That a contract exists is not in dispute.

The Court finds there is no genuine dispute over whether Bartlett breached her WDA with MG by not paying for MG's services after contract purportedly automatically renewed in October 2020. It is undisputed that in a September 7, 2020 email, McCandless told Bartlett: "[A]s of September 1, 2020 any and all financial responsibilities that McCandless Group, LLC committed to in our Website Development Agreement are no longer the responsibility of McCandless Group, LLC." DRSGDF ¶ 77. The Court finds MG's contention that all of its financial obligations under the Bartlett WDA terminated while Bartlett's continued implausible and in violation of the basic principles of contract law. The Court finds Bartlett's website transferred to COY as of September 1, 2020, terminating the Bartlett WDA. That MG kept Bartlett's site running until February 2021, *id.* ¶ 106, when MG took the site down, does not mean the WDA was valid during that time.

The Court finds a genuine dispute of material fact, however, as to whether Defendants breached the Bartlett WDA when Lewis told Segwik, "literally just want to replicate what nick has for the most part and then expand. Don't want to reinvent the wheel any further." *Id.* ¶ 110. Whether Segwik copied elements of MG's site in violation of the confidentiality provisions of the WDA is therefore inappropriate for resolution here.

Accordingly, the Court DENIES summary judgment as to breach of the Bartlett WDA.

### E. Breach of Contract (Breach of the COY WDA)

The Court assesses COY's alleged breach of the WDA under the same breach of contract standard as above. Again, the first two elements of a breach of contract claim are undisputed. Turning to the third element, the Court finds a genuine dispute of material fact as to whether COY breached the WDA in creating its chat feature. It is undisputed that MG and COY's chat features shared similar design elements, such as the display of how much each subscriber had paid next to their name. *See* PSUF (Dkt. 226-1) ¶¶ 14-15. Other industry competitors, however, such as OnlyFans, have similar chat features with that same design element. DRSGDF ¶ 6. "[T]rade secrets plaintiffs must show "more than speculation" of misappropriation; simply pointing out that products are 'the same or conceptually similar' is insufficient to survive summary judgment." *Wisk Aero LLC v. Archer Aviation Inc.,* 2023 WL 3919469, at *14 (N.D. Cal. June 9, 2023). Similarly, it is insufficient to affirmatively obtain summary judgment on a claim. *See also M.A. Mobile Ltd. v. Indian Inst. of Tech. Kharagpur*, 400 F. Supp. 3d 867, 893 (N.D. Cal. 2019) **(**"The fact that [two companies] developed similar technology does not raise [plaintiff's] theories above the speculative level"). Whether the chat programs are so similar that MG can establish COY copied MG's chat feature, whether the chat feature was confidential information protected under the WDA, and whether Segwik, the developer COY hired after the relationship with MG ended, had access to the Tech Stack in developing COY's chat feature are all genuinely disputed issues of fact.

Accordingly, the Court DENIES summary judgment on the claim for breach of the Coy WDA.

### F. Fraud

The elements of fraud are "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Superior Ct.*, 12 Cal. 4th 631,

638 (1996).

The Court finds no genuine dispute of fact as to the first element, specifically whether Defendants falsely represented their intention to create a technology company that would potentially become a competitor of MG. McCandless acknowledged that COY would be a technology company as early as May 12, 2020, when he proposed that MG would "be marketed as the Technology Partner powering your technology." DRSGDF ¶¶ 32-33. Additionally, the COY WDA provided COY "wishes to utilize the services of Developer in connection with the development of software identified as the Coy Collective, INC Websites." *Id.* ¶ 61 (emphasis added).) Moreover, it is undisputed that COY's public website, *built by McCandless*, described COY as "a full service technology company." *Id.* ¶ 73. It is further undisputed that on August 31, 2020, Bartlett emailed this description directly to McCandless and that he never asked why COY would describe itself that way. *Id.* ¶ 74. Thus, the record does not demonstrate any genuine dispute over whether McCandless was aware from the outset that COY intended to become a technology company operating in the creator economy space that Plaintiff also operated in.

The Court also finds no genuine dispute of fact as to the first element of fraud as it relates ti Plaintiff's allegations that Defendants intended to steal MG's technology and partnered with MG as a pretense to gain access to their technology. Indeed, it is undisputed that when COY selected MG as its developer, Bartlett and everyone at COY was excited to work with MG, *id.* 22, and the text messages and emails in the record confirm that. Plaintiff's mere allegations that Defendants conspired to steal MG's technology, in the absence of any additional evidence supporting such a conspiracy, are insufficient to survive a motion for summary judgment.

Accordingly, the Court GRANTS summary judgment for Defendants as to Plaintiff's fraud claims.

### G. Breach Of Fiduciary Duty

The premise of MG's eighth and ninth causes of action for breach of fiduciary duty is that COY, Bartlett, Lewis, and Drew entered into a partnership with MG. *See* TAC 187-195. On Defendants' motion to dismiss, the Court let this claim proceed only as to a partnership

"between May 6, 2020, until August 6, 2020." *See* Order Granting in Part Defendants' Motion to Dismiss (Dkt. 86) ("MTD Order") at 14. Plaintiffs' claim for breach of fiduciary duty, however, is essentially identical to Plaintiff's fraud claims. Plaintiffs allege "[Defendants] each breached their fiduciary duties, including care, loyalty, and good faith owed to MG by concealing their true motives and goals, leveraging the trust engendered by the partnership and/or joint venture with MG in order to obtain knowledge and skills and by ultimately creating a business expressly designed to compete directly against their partner/joint venturer, MG." TAC 192. As the Court finds Defendants are entitled to summary judgment on Plaintiff's fraud claims, the Court similarly finds they are entitled to summary judgment on the breach of fiduciary duty claims. Accordingly, the Court GRANTS summary judgment for Defendants as to Plaintiff's breach of fiduciary duty claims.

## IV.   DISPOSITION

For the foregoing reasons, the Court GRANTS IN PART Defendants' Motion for Summary Judgment as to (1) all claims against Defendants Hankins; (2) Plaintiff's DTSA claims regarding know-how and negative know-how; (3) Plaintiff's fraud claims; and (4) Plaintiff's breach of fiduciary duty claims; and DENIES IN PART Defendants' Motion for Summary Judgment as to (1) Plaintiff's DTSA claim related to its technology platform; (2) breach of the NDAs; and (3) breach of the Bartlett and Coy WDAs.

DATED: October 23, 2023

*David O. Carter*

DAVID O. CARTER

UNITED STATES DISTRICT JUDGE